1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE WESTERN DISTRICT OF MICHIGAN

3                            SOUTHERN DIVISION

4        PERRIGO COMPANY,

5              Plaintiff,                  No.  1:17cv737

6        vs.                              Volume VIII

7        UNITED STATES OF AMERICA,

8              Defendant.

9

      Before:

10
                          THE HONORABLE ROBERT J. JONKER
11                           U.S. District Judge
                             Grand Rapids, Michigan
12                           Friday, June 4, 2021
                             Bench Trial Proceedings
13
      APPEARANCES:
14
                     Morgan Lewis & Bockius LLP
15                   MR. JOHN BENJAMIN MAGEE
                     MR. DOUGLAS NORTON
16                   MR. DREW ALEXANDER CUMMINGS
                     MR. HANS GERLING
17                   1111 Pennsylvania Avenue, NW
                     Washington, DC 20004
18                   (202) 373-6229

19                   Morgan Lewis & Bockius LLP
                     MR. THOMAS V. LINGUANTI
20                   77 West Wacker Drive, Suite 500
                     Chicago, IL 60601-5803
21                   (312) 324-1486

22

23

24

25

```
 1                         Warner Norcross & Judd LLP
                          MR. EDWARD J. BARDELLI
 2                        1500 Warner Building
                          150 Ottawa Avenue, NW
 3                        Grand Rapids, MI 49503
                          (616) 752-2000
 4
                                  On behalf of the Plaintiff;
 5
                          U.S. Department of Justice, Tax Division
 6                        MR. JAMES EDWARD WEAVER
                          MR. ARIE M. RUBENSTEIN
 7                        555 4th Street, NW
                          P.O. Box 55
 8                        Washington, DC 20044
                          (202) 305-4929
 9
                          IRS Office of Chief Counsel
10                        MR. MATTHEW AVON
                          33 Maiden Lane, 12th Floor
11                        New York, NY 10038
                          (646) 259-8012
12
                          U.S. Department of Justice, Tax Division
13                        MR. RICHARD JEREMY HAGERMAN
                          Ben Franklin Station
14                        P.O. Box 227
                          Washington, DC 20044
15                        (202) 616-9832

16                                On behalf of the Defendant.

17        REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

18

19

20

21

22

23

24

25
```

1      06/04/2021

2      (Resume Proceeding, 8:30 a.m.)

3      LAW CLERK:  United States District Court for the

4   Western District of Michigan is now in session, the Honorable

5   Robert J. Jonker, Chief Judge, presiding.

6      THE COURT:  All right.  Good morning, everybody.  Good

7   to see you.  We have Dr. Manning on the stand, and we are in

8   cross, and we'll get back to that whenever you are ready to

9   pick up, Mr. Linguanti.

10      MR. LINGUANTI:  Thank you, Your Honor, and good

11   morning.

12      CROSS EXAMINATION (Continuing)

13   BY MR. LINGUANTI:

14   Q    Good morning, Dr. Manning.

15   A    Good morning.

16   Q    Dr. Manning, I'd like to pick up sort of where we left off

17   yesterday and clean up a couple of loose ends.  And what would

18   be a morning cross-examination without talking about the

19   compare to statement?

20      If we can pull up Dr. Manning's report, Exhibit 5393,

21   figures 8 and 9, which I think is PDF 65.  And I believe,

22   Dr. Manning, if you want your hard copy of your report it's

23   still there in front you.  You were discussing with counsel

24   yesterday the label, the back label.

25      And, actually, if we can pull up figure 8?  That's

1    perfect.  Thank you.  We'll do both of these.  The labels on

2    the boxes of the Prilosec OTC and the Dexcel OTC.  You recall

3    that testimony?

4    A    I do.

5    Q    All right.  And I think if I recall your testimony

6    correctly, you were discussing that, well, a consumer can look

7    at -- figure 8, please -- the Prilosec OTC label, which says --

8    sorry -- equivalent to -- thank you -- equivalent to the

9    20 milligram omeprazole, and then they could go to figure 9,

10   please, and then see in the Dexcel product, well, it's

11   omeprazole, and sort of make the connection.  Is that

12   essentially your point?

13   A    I had made the point that there is information on the box

14   that would allow a consumer to make a comparison between the

15   two; that the FDA authorized label for Prilosec OTC identifies

16   it as equivalent to 20 milligrams omeprazole, and that the box

17   on -- the back of the box on the OTC, sorry, the store brand

18   OTC product, the Dexcel product identifies it as 20 milligrams

19   omeprazole and that a consumer had information available to him

20   or her, and that, yes, that's what I said.

21   Q    Okay.  So -- and, again, it's the Prilosec OTC box that has

22   the equivalent to language, not the Dexcel box, right?

23   A    Yes.

24   Q    All right.  Now, again, from your perspective, a consumer

25   has that information, which is certainly true and can make a

1    decision.  So you really don't need the compare to statement

2    because this allows a consumer to compare, right?

3    A    I did not say that.

4    Q    Okay.  All right.  So the compare to statement is still

5    important, you agree?

6    A    Well, I believe I have never said that it wasn't important.

7    I said it was relatively less important than other things and

8    that there were ways to respond to that risk.

9    Q    And communicate to consumers equivalent information?

10   A    Maybe not precisely equivalent but similar and helpful

11   information.

12   Q    All right.  And, really, the term itself is still used in

13   your view because of sort of some inertia.  It became

14   established by somebody early in the process, is that right?

15   A    Well, I have said that, and I believe that the -- and my

16   recollection was that early on, although I didn't verify this,

17   but my recollection is that early on in the over-the-counter

18   drug time, you know, so when I was in graduate school, for

19   example, I remember going to a store and seeing that -- and I

20   was studying economics, studying industrial organizations,

21   studying the marketing and materials, and I just noticed

22   that -- my recollection is that there was a box that said,

23   compare to active ingredient, in some other product on a store

24   brand label, and I thought, well, that's interesting.

25            So they were trying to convey information to people

1    with this language.  I do not know what the regulatory origin

2    of the physical -- of the specific term compare to is.  I would

3    surmise that it came into use and became generally accepted,

4    and, therefore, the FDA -- it's possible that the FDA dictated

5    that compare to are the words you have to use.  I don't know

6    the regulatory history of that, so I would want to ask a

7    regulatory expert about that.

8    Q    Well, there is a couple different things Dr. Manning.

9    First, it is regulatory accepted language.  That you

10   understand?

11   A    I understand that the FDA blesses it in some manner, yes.

12   Q    And as you fairly acknowledge, you are not a regulatory

13   expert, right?

14   A    Yes.

15   Q    And you are also not a marketing expert, right?

16   A    Well, I am not a practitioner of marketing, but, as I've

17   said, industrial organization encompasses marketing and the

18   study of marketing.  And as I mentioned, you know, when I was

19   in graduate school, the reason this caught my attention is

20   because we were -- you know, I was -- we were studying how

21   companies sell their products, how companies communicate to

22   people, how -- what the value of information is to a consumer

23   in making consumer choices.  And so I noticed and it stuck in

24   my mind that this is a way that companies are doing this.

25   Q    When were you in grad school?

1    A    1982 to middle '80s.

2    Q    Okay.  So 40 years ago?

3    A    Coming on that, yeah.

4    Q    Okay.  Well done.  All right.  So grad student.  Made the

5    observation.  That's your view.

6    A    That's my memory.  Yeah.

7    Q    Now, you have been in academia for a while.  So in your

8    programs do you have professors of marketing?

9    A    So I am not in academics anymore.  There are professors of

10   marketing in business schools at economics departments, yes.

11   Q    You are not a professor of marketing?

12   A    I am not.

13   Q    All right.  And I believe, as we talked about yesterday, as

14   part of that analysis of the compare to statement, you didn't

15   do an independent study of consumer preferences in the 2008

16   period, for example?

17   A    I did not.

18   Q    All right.  And correct me if I'm wrong, you don't have any

19   documents from Perrigo that says, we are just going to rely on

20   the back of the box in this information and just drop the whole

21   compare to thing?

22   A    I don't have anything that says they are going to drop the

23   compare to statement, but in the Move Over Prilosec

24   presentation, I believe that's what I recall.  There is a

25   section where they talk about -- you know, they draw attention

1    to this very fact that the equivalent to language is on the

2    Prilosec OTC box.  So they were aware of it.  They were

3    thinking about it.  They had managed it.

4    Q    Now, since the Dexcel product, how many OTC products has

5    Perrigo sold without the compare to label, do you know?

6    A    I have understood that they've said none.

7    Q    All right.  Let's shift gears a little bit.  Thank you,

8    Doctor.  Thank you.  And I want to talk a little bit about

9    Perrigo's previous efforts at developing omeprazole, okay?  So

10    if you just correct me if this is inconsistent with your

11    recollection.  So before its partnership with Dexcel, Perrigo

12    did seek to develop its own omeprazole in a number of different

13    ways, right?

14    A    I have heard that testified to, yes.

15    Q    And actually at some point it continued to do so even after

16    the partnership with Dexcel?

17    A    For a time, and then it was put into moth balls.

18    Q    And then it was picked up again?

19    A    I understand that to be true, yes.

20    Q    All right.  So may we go to Exhibit 5207?

21          MR. LINGUANTI:  And Your Honor, if I may, we have

22    documents in folders this morning.  So if we may approach, and

23    then we will throughout the morning as you wish?  Is that okay?

24          THE COURT:  Okay.

25          MR. LINGUANTI:  Thank you.

BY MR. LINGUANTI:

Q    So, Dr. Manning, I've handed you Exhibit 5207.  Do you have
that in front of you, sir?

A    I do.

Q    Since it's a hard copy I am going to make references to PDF
pages, so it may not equate with yours.  So bear with me, if
you will.  This is a long document, which we will not go
through.  As Mr. Weaver often says, long document.  Lots of
pieces.  We are not going through the whole thing, I promise.

        But let's go to PDF page 9.  So it should be
approximately page 9 in your -- actually, thank you.  It's
Bates ending 705, and it's up on the screen.  I just want to --
this is to acclimate ourselves.  Do you have that in front of
you, sir?

A    Yes, I do.

Q    Okay.  As you see this is a June 8th, 2004, board of
directors meeting held in New York of Perrigo.  And if we can
go a couple pages later, it's PDF page 11.  Thank you.  And
this will be Bates No. 707.

A    Um-hum.

Q    You can see that, sir?

A    I do.

Q    Great.  Now, as you can see from this table, it's fiscal
year '05, which for a company like Perrigo ends June 30th,
2005.  16 years ago.  Key OTC and ANDA investment.  Do you see

1    that?

2    A    I do.

3    Q    And you see on the left-hand column, A priority, B

4    priority, C priority.  See that?

5    A    Yes.

6    Q    And under the A priority column, we go down to the second

7    bullet point, we see the omeprazole capsule/Schwarz.  You see

8    that?

9    A    I do.

10   Q    And Schwarz was one of the partnerships, if you recall the

11   testimony, that was explored with -- Perrigo explored.

12   A    Yes, I do.

13   Q    Now, you see the next column over to the right, potential

14   launch timing fiscal year '07, and then you can see in the next

15   column, potential incremental year one sales 20 million, and

16   then the far right column '05 spending of, it looks like,

17   $700,000 for 0.7 million.  You see that?

18   A    I do.

19   Q    So as of fiscal year '05, at least at this time what was

20   being reported to the board of directors is that by hopefully

21   fiscal year '07 they would have the omeprazole capsule from

22   Schwarz, is that right?

23   A    It would be consistent with that.  I don't know what their

24   intent was.

25   Q    Fair enough.  And if you can go to the fourth bullet to the

1    omeprazole tablet, do you have that, sir?

2    A    I see it.

3    Q    Great.  Thank you.  And we'll go over to the -- continue to

4    the right column and the omeprazole tablet.  This was -- this

5    was Perrigo's own product at the time.  That's why you don't

6    see a Schwarz, for example, and you recall they had their own

7    development program as well, right?

8    A    I do.

9    Q    All right.  And we see that the potential launch timing

10    here is fiscal year '08.  So as of fiscal year '05, they

11    thought by fiscal year '08 they would have their launch, a

12    potential launch, as of the year ending June 30th, '08.  You

13    see that?

14    A    I see that it says that, yes.

15    Q    And then the next column over to the right, again,

16    potential incremental year one sales of about $20 million, you

17    see that?

18    A    Yes.

19    Q    And again by this time the '05 spending was about $1.7

20    million.  You see that in the last column?

21    A    I do see that.

22    Q    Now, as you know, the Schwarz product did not come to

23    market, right?

24    A    I understand that, yes.

25    Q    And the omeprazole tablet market -- or product, excuse me,

1     that did not come to market either, is that right?

2     A    As far as I am aware it did not, yes.

3     Q    Okay.  All right.  Thank you.  You can take that -- you can

4     set that document aside.  So let's turn to a next topic, and to

5     some degree this is where the meat of the discussion hopefully

6     will be.

7          Let's turn to your views of risk shifting in the LLC.

8     I want to make sure that we are clear about the focus of your

9     work, and then we'll talk a little about that.  All right.  So

10    as I understand it, the primary focus of your analysis was to

11    assess the degree to which the various risks faced by Perrigo

12    US were mitigated when Perrigo US transferred the SDA or the

13    sales and distribution agreement it had with Dexcel to the LLC,

14    right?

15    A    I would be a little careful about the language.  I may have

16    said that exact -- I would worry about when.  I mean, the

17    assignment was broader than evaluating the risk when that

18    happened.  The assignment, and what I understood to be my

19    assignment, was to evaluate the risks over the time period

20    rather than on a specific date or point in time.

21    Q    Okay.  Well, let me ask -- fair enough.  I'll ask you the

22    next question, and if we need to pull up your report, we

23    certainly will.  And you analyzed the ability of LLC to

24    mitigate any remaining risks after the transfer of the Dexcel

25    agreement, is that right?

1    A    Again, I would refer back to my timeline that showed that I

2    was considering the entire period reflected on that timeline

3    and reflecting that LLC didn't exist prior to its formation, so

4    it couldn't have managed any risk prior to its formation.  So

5    yeah.

6    Q    Okay.  So I get that.  Let's pull up Exhibit 5393, your

7    report.  I just want to ground ourselves in some basic

8    foundational stuff, Dr. Manning.

9    A    Sure.

10    Q    PDF page 7, paragraph 11.  You see that in front of you.

11    Let's go to the second sentence, please.  The primary focus of

12    my analysis --

13    A    I'm sorry.

14    Q    I'm sorry, Dr. Manning.  My fault.

15    A    What paragraph again?

16    Q    Paragraph 11, sir.

17    A    All right.

18    Q    Do you have that in front of you?

19    A    I do.

20    Q    All right.  So second sentence, paragraph 11, 5393, the

21    primary focus of my analysis is to assess the degree to which

22    the various sides faced -- sorry, which the various risks faced

23    by Perrigo US were mitigated when Perrigo US transferred the

24    SDA it had with Dexcel to LLC.  Additionally, I analyzed the

25    ability of LLC to mitigate any remaining risks after the

1    transfer of the Dexcel agreement.

2           You see that there?

3    A    I do.

4    Q    All right.  So when it comes to mitigating risks between

5    the parties, your view is that being an external party is

6    different than being an internal party?

7    A    From a firm wide or company perspective, yes, I do believe

8    that's true.

9    Q    Your view is that if a third party were able and willing to

10   bear uncertainty at a lower cost than, say, the one holding the

11   risk, then that is a way to manage -- that is a way to manage

12   or to provide a useful service to the company?

13   A    That is true.  Yeah.

14   Q    All right.  So let's hypothesize for a second that Perrigo

15   LLC, which is the Israel company in our example as part of the

16   PITLP partnership, actually had agreed to pay $37.4 million to

17   Perrigo US for the Dexcel contract instead of the 877,000 that

18   was at least recorded originally.  All right.  Now, in

19   determining whether that would have changed your risk analysis

20   of Perrigo LLC, the key question from your perspective is

21   whether that money, that $37.4 million, comes from an internal

22   source or an external source, is that right?

23   A    It is important that in order to manage risk, there needs

24   to be an ability to do something within the organization that

25   is given that assignment that can't be accomplished elsewhere

1    in the organization.  There needs to be some productive

2    purpose, some productive capacity.  That's what I believe.

3    Q    Sure.  We are talking about the ability to pay $37.4

4    million, and again, the key question from your perspective is

5    whether that money comes from an internal source or an external

6    source, right?

7    A    Right.  I don't have a view on whether that amount of money

8    is an amount of money that means anything.  My view is whether

9    the money purportedly comes from a source that is more able to

10   bear risk than the parent company would be.

11   Q    An external source?

12   A    Yes.

13   Q    All right.  And the 37.4 million is hypothetical in this

14   situation.  I am not holding you to any of those facts there.

15   A    Okay.

16   Q    All right.  So if you have an obligation to an internal

17   party that you fund by a transfer within the company, all

18   right, you just don't see how that changes the risk of the

19   company because the money is held within the companies still,

20   right?

21   A    You know, I understand there are legal obligations in

22   determining internal obligations within a company.  I am not an

23   attorney, and I don't have an opinion about those.  But from an

24   economic perspective I don't understand whether it matters if I

25   hold my money in my left pocket or my right pocket.

1    Q    All right.  So right pocket meaning if the parent held the

2    funds and transferred it to the left pocket of the subsidiary,

3    from your perspective you don't understand why that would

4    matter?

5    A    Correct.

6    Q    And just because we've talked about it, you heard

7    Mr. Kennelly's testimony concerning UK Finco and

8    Mr. Broadhurst, as well?

9    A    I've heard that.

10    Q    So if UK Finco had had the financial wherewithal to manage

11    the obligations of its subsidiaries like PITLP or LLC, again,

12    it would not make a difference to your analysis because it's

13    ultimately within the organization?

14    A    Well, you are getting into questions regarding the legal

15    organization that I did not analyze that others were called on

16    to analyze, but I would continue to opine that, you know, there

17    has to be a productive function for an organization that's

18    assigned a risk.  If they are really going to manage and

19    address that risk, they have to be able to do something that

20    can't be done otherwise.

21    Q    All right.  Okay.  So in giving your knowledge of

22    industrial organizations, which is obviously an area of

23    specialty for you, you do understand the concept of risk

24    shifting -- I'm sorry, risk shifting at arm's length between

25    parties, right?

1    A    Sure.

2    Q    And so, for example, in the pharma industry, one, I am

3    using arm's length to be sort of unrelated.

4    A    Great.

5    Q    In the pharma industry, one party may do the manufacturing

6    and the other party may do the R&D, and then the parties have

7    shifted the risks between them from your perspective?

8    A    In that kind of setting hypothetically, of course, I can

9    imagine a world in where, you know, one part of the

10    organization is better organized to do the R&D than another

11    part, and so it would be assigned the right and responsibility

12    to do that R&D.  And so yes, I can understand how that would

13    happen.

14    Q    And to be clear, I'm talking about arm's-length parties

15    here.

16    A    So if I am a Pfizer and I have a contract with a Company A,

17    B, C to develop a new drug, sure, that happens all the time.

18    Q    And that's risk shifting?

19    A    It is sometimes risk shifting.  It is sometimes just profit

20    maximization.  It depends on the nature of the risks that are

21    in play.  What's the knowledge of the two parties?  What's

22    their interest in, you know, bearing or sharing risk?  It can

23    be risk sharing.  It can be other financial goals, as well.

24    Q    Well, I think you put your finger on it, right?  In our

25    world of economics it's all about profit maximization, right?

1    A    Profit or value maximization.  There are some things

2    that -- some goals that companies have that are recognized as

3    legitimate that aren't strictly profit maximizing.

4    Q    Putting aside the laudable goals of non-profit

5    organizations and the like, we're talking a for-profit

6    pharmaceutical organization in my hypothetical.  One is doing

7    manufacturing; another organization is doing pharmaceutical

8    R&D; and they have shifted the risks of profit maximization

9    between them.  Just trying to set this up, is that right?  Is

10   that fair?

11   A    I can understand the potential structure that would involve

12   an arrangement like that.  Yes.

13   Q    Okay.  So let's just continue just so we can break down

14   each of the risks of the parties for a moment.  Again, I'm just

15   asking these conceptual points, and you can help me through

16   this.  If one party is taking on -- again, two arm's-length

17   parties.  One has got the R&D and manufacturing obligations.

18   One unrelated party, arm's-length party, has the selling

19   activities; this distribution.  All right.  So they have

20   shifted the risks between them.  I've got the R&D manufacturing

21   risks.  Party two has the selling risks, agreed?

22   A    If that's your hypothetical, I accept that.

23   Q    Great.  So let's take it just one last step further, and

24   let's assume we've got a three-way arrangement.  You've got one

25   party doing the R&D and manufacturing all unrelated in my

1    hypothetical.  One party doing the selling, and one party has

2    the capital.  That's the third party, and their job is to fund

3    these exercises.  Now, in that case -- you with me so far?

4    A    Yes.

5    Q    Great.  So in that case, each of the three parties,

6    unrelated parties in my hypothetical, has shared or shifted the

7    risks between them, right?

8    A    Again, I would want to be a little careful about focusing

9    only on risk.  I mean, you could certainly describe that as a

10   risk sharing arrangement, but you could also describe it as a

11   profit maximizing arrangement or a value maximizing

12   arrangement.  But, yeah, there are such structures that exist

13   where an investor will provide funds for the companies to

14   pursue their goal.  Yes.

15   Q    So let's now take a look at how the parties -- again, we'll

16   stay with parties at arm's length and how they work through

17   their risks and how they take these risks, and I think you've

18   touched on a couple of things, so we should move through this

19   fairly quickly.  The most significant uncertainty associated

20   with Perrigo's omeprazole business -- we'll talk more

21   specifically for a moment.  The most significant uncertainty

22   associated with Perrigo's omeprazole business in the United

23   States rested in the upside profit potential that it could

24   realize by selling the product rather than the risk that it

25   would incur significant financial losses or fail to recover its

1    relatively modest investment in the product, right?

2    A    That is correct.  That's what I said.

3    Q    Now, this was true -- so we'll be specific again for a

4    moment.  Not talking hypothetical.  So that statement was true

5    when Perrigo, the U.S. company, entered into the Dexcel

6    arrangement in 2005, right?

7    A    I'm sorry, say that again.

8    Q    Sure.  What I just described, what you just described -- in

9    fact, can we put it up on the board?  It's a long sentence.

10    This is your report 5393.  Paragraph 15, PDF page 8.  Okay.

11    And I am looking at the sentence that begins, the most

12    significant uncertainty, about five, six lines down.  After

13    Perrigo US, the most significant uncertainty, all the way

14    through modest investment in the product -- and keep that on

15    the board for a moment, please.  Okay.  So this observation was

16    true when Perrigo US entered into the Dexcel agreement in 2005,

17    right?

18    A    After -- after having agreed -- as I discussed yesterday,

19    after having agreed, reached -- negotiated an agreement with

20    Dexcel that severely limited Perrigo's downside risks, the most

21    remaining -- the remaining largest uncertainty was how large is

22    the upside?  How big is the opportunity?  Yes.

23    Q    Sure.  Because at the time of the sales and distribution

24    agreement with Dexcel, I mean, there was really only a $600,000

25    commitment, right?  There was the $100,000 upfront payment?

1   A    Yes.

2   Q    And a $500,000 commitment at the time for litigation fees.

3   So it was really only $600,000 and then a $500,000 bonus if

4   they got FDA approval, is that right?

5   A    Just to be precise, I understand that the litigation costs

6   were a shared costs up to a cap of $500,000 at the time.  So it

7   might have even been lower, but it turns out not so.

8   Q    Absolutely right.  Thank you.  And, in fact, if you recall

9   the testimony, the parties later agreed to increase that to

10   750,000, I believe?

11   A    Something like that, yes.

12   Q    So in August 2005, at the time it entered its agreement

13   with Dexcel, the potential upside, though, at that time was

14   actually about an $80 million sales opportunity, right?

15   A    I don't really know what the size of the opportunity was at

16   that point.

17   Q    Okay.  I believe -- well, I got to do a couple things to

18   get there, I think.  Let's go to your report.  Still PDF 39.

19   And just going to show this to you.  You see what we're talking

20   about.  Footnote 110.  So we can go back to the main text in a

21   moment.  This is one of the documents you relied on, right.

22   And we can go up to the main text for a moment just to ground

23   everybody in it or grind everybody down and see how this

24   morning goes.

25        Footnote 110, which I think is probably paragraph 95.

1    Sorry, I want to give you the benefit of the main text.  There

2    we go.  So footnote 110 comes off of paragraph 98.  All right.

3    And the -- that document you reference talks about first year

4    sales of 80 million.  Does that sound familiar?

5    A    Yes.

6    Q    All right.  So again, at the time -- thank you everybody.

7    At the time of the entering into the agreement August 2005,

8    Perrigo has got a commitment of $1.1 million with all the

9    discussion we've had about how you get to that 1.1 with the

10   potential upside opportunity of 80 million dollars in sales,

11   right?

12   A    Well, you know, that footnote and that discussion wasn't

13   precise to the question of how big the opportunity really is.

14   It was -- you know, I -- and you'll recall that we have seen

15   several numbers flash up on the screen of how big the

16   opportunity was perceived to be at different points in time.

17   So I took that to suggest that, yeah, this product was worth

18   that kind of investment.  So the question was, is it going to

19   be 80?  Is it going to be 200 million?  Who knows.  I did not

20   evaluate the value -- I did not evaluate the value that Perrigo

21   assigned to the contract specifically at that point in time.

22   Q    Sure.  All fair.  All fair.  Because we all know from our

23   discussions over the last two weeks those projections changed

24   over time.

25   A    Right.

1    Q    And reality shows different results and all those sorts of

2    things.  I need to get us late into August 2005.  So August

3    2005 contract with Dexcel, at most a $1.1 million investment to

4    be adjusted with a potential upside of $80 million in sales at

5    that moment in time, fair?

6    A    According to a projection that I had seen, that is what it

7    said.

8    Q    Okay.  Now, that's -- that analysis, an economic analysis

9    of risk and reward, that's true of every investment, isn't it?

10   A    I'm sorry, the last few words I didn't quite hear.

11   Q    Sure.  That economic analysis of risk and reward, it's true

12   of every investment, right?

13   A    If you are curious about the return on your investment,

14   yes.

15   Q    You make an investment, and you say, well, what's the risk

16   of losing my money?  That's part of your analysis.

17   A    That would be a reasonable thing to ask, yes.

18   Q    That we can agree on.  All right.  And what you hope for is

19   you are hoping for the upside profit potential?

20   A    Yes.

21   Q    All right.

22   A    Well, if you want to -- if you want to maximize your income

23   from the investment or balance the risk in the return, that's

24   close.

25   Q    Now, an investor doesn't need an office to make an

1    investment decision.  You can make an investment decision if

2    you got your app, right?

3    A    Yes.

4    Q    Don't need a factory if you are an investor to make an

5    investment decision like that, right?

6    A    You don't need a factory.

7    Q    Don't need a team of really smart investment analysts to

8    make a decision like that.  May be better for you, but you

9    don't need one to make an investment decision like that, right?

10   A    You don't need one.  No.

11   Q    All right.  What you need, though, I think we can agree on,

12   is money and resources, right?  To -- if you are going to

13   invest and look at your upside profit potential, that's the one

14   piece of the puzzle that has to be there, right?

15   A    If the question is can you know -- in abstraction, can a

16   person -- can an individual make an investment decision

17   without, you know, physical assets at his or her disposal?

18   Yes, a person can make a decision without any knowledge if one

19   wants to.

20   Q    All right.  So -- and sometimes people don't have the cash.

21   They may borrow and get the resources that way to make their

22   investment, right?

23   A    A person can borrow to make an investment, yes.

24   Q    Companies can borrow to make an investment, too, right?

25   A    They can.  Yes.

Q    And do?

A    They do.

Q    Efficient allocation of scarce resources.

A    Those are your words, but they would also be said by most
economists.

Q    Thank you.  So most financial analysts will say that a
house is an individual's most significant investment, and
that's usually paid with some cash and a mortgage, right?

A    Yes.

Q    All right.  In some ways -- well, what we just described,
again, putting ourselves on the facts for a moment, that was
true of Perrigo US at the time they entered into the Dexcel
contract.  I am going to invest up to 1.1 million, and my hope
is I have this significant upside profit potential.  Fair?

A    I think it's fair to say they invested the 1.1 million with
the hope of making a return.  Yes.

Q    Now, if Perrigo US had not assigned the contract, if we
were here for other reasons but not this assignment, all right,
and we were just looking at the situation of Perrigo US and
Dexcel as of August of 2005, that's -- that's what Perrigo
U.S.'s risk profile would look like, right?

A    I'm sorry, you said that's what it would look like?

Q    Its risk profile, $1.1 million investment with a hope for a
potential upside?

A    I would want to make sure that I was focused on -- you are

1    just talking about the investment risk as opposed to this

2    particular investment not corporate wide?

3    Q    Right.

4    A    They have a lot of other things going on.

5    Q    Just that one.

6    A    Yes.  Well, ask your question again just so I'm clear.

7    Q    That's okay.  We can take it to the facts for a second

8    then.  So let's talk about the assignment.  So at the time --

9    so those were the risks and rewards Perrigo US had as we

10   discussed in August 2005.  And if the parties weren't

11   disagreeing about the effect of the assignment, if that

12   assignment was assumed given to Perrigo LLC --

13   A    So -- I'm sorry.  I shouldn't interrupt.  Go ahead.

14   Q    That's all right.

15   A    When you say the parties?

16   Q    Meaning the esteemed United States of America and the

17   esteemed Perrigo Corporation.  If we were not arguing about the

18   effect of this assignment, if it was a matter of accepted fact

19   that the assignment was appropriate, okay, from Perrigo US to

20   Perrigo LLC, then Perrigo LLC would step in the shoes of

21   Perrigo US and have the risk of a $1.1 million, or whatever --

22   we'll talk about that in a moment -- $1.1 million investment

23   with a potential upside profit potential.  We could agree on

24   that?

25   A    Not necessarily, no.

1    Q    They've got -- all they've -- so the day after the Dexcel

2    contract Perrigo LLC has now legitimately in my hypothetical

3    taken on that assignment obligation.  And that's -- and we are

4    not -- there is no question about the legitimacy of the

5    organization.  It's an appropriate organization.  It has the

6    funds or some amount of money in resources, $1.1 million

7    investment.  Now Perrigo LLC has the potential upside

8    potential, fair?

9    A    You know, I think there is some legal issues there that I

10   don't have an opinion about, but -- and there is some transfer

11   pricing questions that I'm sure Dr. DeRamus will have something

12   to say about, but the notion that giving -- if -- you know,

13   accepting, as you suggest, that giving -- if we were here for

14   some other reason and giving the risk, assigning the risk to an

15   entity from an economic perspective, I have to ask, well, can

16   that party do that?  You know, so if I put my paycheck in a

17   shoebox, does my shoebox manage that risk in any way?

18         From an economic perspective I can't see that.  Now --

19   and so if all we have is a glorified shoebox, I guess I would

20   wonder what is the economic consequence of that assignment

21   regardless of its legal, you know, justification whether -- of

22   which I really don't have an opinion.

23   Q    All right.  So let's break this down.  All right.  So,

24   again, you have dealt with assignments of contracts before in

25   your career?

1     A     Not in the legal perspective, no.

2     Q     Never -- in your work at Pfizer you never dealt with the

3     parties assigning the rights under one contract to another?

4     A     Not in the legal sense.  No.

5     Q     How else does one assign a contract?  A contract is a legal

6     writing.

7     A     Well, maybe I don't know what you mean by assign.  That

8     sounds like a legal practice, and I am not a lawyer.

9     Q     Fair enough.  All right.  That's fair enough.  So let's

10    talk -- let me go back to a hypothetical.  We seem to be on

11    safer ground there.

12    A     All right.

13    Q     Let's assume we are not talking about Perrigo LLC, right?

14    We are back to my third party at arm's length.  And this time

15    my party is Dr. Reddy.  Not the company but Dr. Reddy, and

16    Dr. Reddy -- excuse me, and she is looking -- she sees that

17    Perrigo has this contract with Dexcel, this sales and

18    distribution agreement from August of 2005.  Okay so far?

19    A     Okay.

20    Q     We are in November of 2006.  All right.  So that's

21    before -- in the facts of our case before the approvable letter

22    has been issued, all right.  So far so good?

23    A     Yes.

24    Q     And she, Dr. Reddy, comes to Perrigo US and says, you know,

25    I am interested in this arrangement you have with Dexcel.  We

1    heard Ron Schutt, and you were here for Mr. Schutt's testimony,

2    you recall?

3    A    I was.

4    Q    And we heard Ron Schutt say at some point, I think, to

5    government counsel that even an individual with rights to a

6    good product can figure out a way to get to market.  So that's

7    my Dr. Reddy.  Okay?

8    A    Okay.

9    Q    And here is the deal, Perrigo, Dr. Reddy, she says, you can

10   be the exclusive distributor of the product, and -- but I am

11   really interested in this opportunity you have with Dexcel.  So

12   now it's a matter of price economically, isn't it?

13   A    If it were between independent arm's-length parties.  Yes.

14   Q    Sure.  And again, Dr. Reddy's got thoughtful valuation

15   experts, and she says -- and the parties do, and she says, I am

16   willing to pay $37 million for this contract in November 2006.

17   And I am willing to risk this $37 million because I see

18   significant upside profit potential.  That's a rational thought

19   process economically for Dr. Reddy to have, agreed?

20   A    In your hypothetical it's not irrational for a third party

21   like that to approach someone and say, I'd like to make you an

22   offer.

23   Q    Perrigo agrees because Perrigo is making the same economic

24   analysis, and they say, well, I'd rather take the $37 million

25   upfront rather than wait to see what happens with the Dexcel

1    product.  Now, economically that's a rational decision for

2    Perrigo to make if they choose to?

3    A    It is a potential thing they could have done, but they

4    didn't.  They could have done that with Dexcel.  They could

5    have said, hey, here is -- let's do this deal, and we'll share

6    the risks differently than we agreed to.

7    Q    Well, we know with Dexcel they negotiated a couple of

8    different options, right?

9    A    Yes.

10   Q    You heard us talk about option one, which is one certain

11   deal, right, full access to information?  You remember that

12   discussion?

13   A    I do.

14   Q    And then option two, no access to information or little

15   access to information for a slightly less amount.  You recall

16   that?

17   A    I do.

18   Q    All right.  So back to my hypothetical.

19   A    Okay.

20   Q    Both of those sides of my relationship, Dr. Reddy, Perrigo,

21   again, they are at least asking fair economic questions of one

22   another, right?

23   A    In your hypothetical it sounds like it.

24   Q    So let's assume they agree, they reach an agreement, and

25   now at that point Dr. Reddy has -- in my hypothetical has the

1    funds and resources.  She is just a doctor.  She is what me and

2    Chris Rock would say a wealthy person, not a rich person, but a

3    wealthy person.  She actually has the money to buy into this

4    the contract.  She's got $37 million.  Now she has the

5    contract.  At that point now she has the upside profit

6    potential, right?

7    A    Yes.

8    Q    All right.  Now, let's assume that -- although a sometimes

9    difficult and often frustrating process, and if you recall --

10   and we -- I don't think we need to pull up the exhibit, but

11   Joe Papa was talking about that letter, Exhibit 331, when

12   Dan Oren said, hey, I'm pleased to let you know that this has

13   been approved.  It has been a sometimes difficult and often

14   frustrating process.  You recall Joe Papa talking about that

15   yesterday?

16   A    I don't remember those exact words, but I'll accept it.

17   Q    Okay.  So after this long, although sometimes and difficult

18   and often frustrating process, if Dexcel is successful in my

19   hypothetical with Ms. -- er, Dr. Reddy, excuse me, and they --

20   they are successful in their litigation on the IP, so they are

21   successful on the AstraZeneca litigation.  They get FDA

22   approval.  They manage their scaleup risks, commercial risks.

23   At that point Dr. Reddy, having risked the $37 million, gets

24   the payoff, right?

25   A    I'm sorry, hits the payoff?

1    Q    Gets the payoff.

2    A    Hits the payoff?

3    Q    Or gets the payoff?

4    A    If -- again, your hypothetical, if a company like, or a

5    person like Dr. Reddy had purchased that upside and had

6    succeeded, then Dr. Reddy would get the upside, yes.

7    Q    And I started the hypothetical with this point, and we just

8    haven't talked about it, but again, part of the deal with

9    Perrigo in my hypothetical is that we'll pay the $37 million

10   upfront and you get exclusive distribution rights because

11   Perrigo says, well, I really want to be on the market with this

12   product, and that's part of the deal, too.  Put that into the

13   facts in my hypothetical for a second.

14         So at that point Dr. Reddy has got the upside.

15   Perrigo, as part of the deal in the $37 million contract, gets

16   the distribution rights.  Now, if Dexcel is not successful,

17   things happen that as we agree things can happen, right?

18   A    Things can happen.

19   Q    Then Dr. Reddy is out her $37 million, right?

20   A    Yes.

21   Q    Perrigo is out any opportunity to distribute this product,

22   of course?

23   A    Yes.

24   Q    And now -- but they did get the $37 million in this case,

25   Perrigo in my hypothetical?

1    A    Okay.

2    Q    You'd agree with that?

3    A    I agreed that if Dr. Reddy as an individual gave Perrigo

4    $37 million, they would have it.

5    Q    Okay.  And after -- even after the Dexcel contract or the

6    Dexcel product fails for all the hypothetical reasons we

7    described, Perrigo still gets the $37 million upfront, correct?

8    A    Yes.

9    Q    All right.  That's -- I guess in some ways Perrigo -- well,

10   Dr. Reddy took a shot on goal as Andy Solomon told it, right?

11   A    I believe those were his words, yes.

12   Q    And that's the risk, right?  Dr. Reddy takes the risk

13   investing the money, losing the money, right?

14   A    In your hypothetical that is a way that someone, this

15   hypothetical, Dr. Reddy person, could buy the risk.  Yes.

16   Q    Right.  That's the risk Perrigo takes in my hypothetical,

17   right?  They -- do I just take it for $37 million, get my

18   upfront money and distribution rights, or do I hang in there?

19   That's the risk profile of Perrigo in my hypothetical, right?

20   A    I have -- Perrigo in that hypothetical, yes, where they've

21   sold the upside to Dr. Reddy, that's true.

22   Q    Okay.  All right.  So one last hypothetical, I think, and

23   hopefully it'll take us -- finish this up this morning.

24        And you can take that down.  Thank you.

25        So again, we heard from Joe Papa yesterday, former CEO

1    of the company, and Joe Papa becomes the focus of my

2    hypothetical.

3    A    Okay.

4    Q    Much to his chagrin, I'm sure, if he were listening here

5    today.  All right.  So pardon me.  In my hypothetical we are

6    now we are in the middle of 2006.  So there is a Dexcel

7    contract.  No approval letters -- approvable letters.  We are

8    in the middle of 2006.  But Mr. Papa has hired you as his

9    consultant because this product is potentially significant to

10   the company.  He wants to bring all the minds to bear he can to

11   really make sure he understands through the process what -- how

12   the Dexcel product is making its way through its development

13   and its success.  Investors want to know.  The board wants to

14   know.  So he has hired you in my hypothetical to be that

15   consultant for him.  So far so good?

16   A    I would like to know what my assignment is, but sure.

17   Q    He wants you to advise him, right, so he can communicate

18   internally and externally to the marketplace what the chances

19   of this product coming to market are through the process.  He

20   is looking for your guidance and advice.  Okay?

21   A    Okay.

22   Q    All right.  And for my hypothetical we'll assume you both

23   made an economically rational decision, and you are going to

24   get compensated accordingly.

25   A    Okay.

1    Q    Remember, again, that Perrigo factually is a public

2    company, publicly traded company, right?

3    A    Yes.

4    Q    As you heard Mr. Papa describe it's governed by the SEC as

5    far as what it's got to communicate to the marketplace, right,

6    just foundationally?

7    A    I understand.

8    Q    All right.  So now we are in November 30th, 2006.  So this

9    is again before the FDA approvable letter has been issued in a

10   real timeline in my hypothetical.

11   A    Okay.

12   Q    And Joe Papa has a public shareholders meeting.  All right.

13   And he asks you, all right, well, what can I say?  What can I

14   say in this public shareholders meeting about where Dexcel's

15   product is in this development?  All right.

16         So can we turn, please, to your report, Dr. Manning,

17   5393, paragraph 43.  I'm sorry, paragraph 116, PDF 43?

18         And what Joe Papa wants to say -- again, this is

19   November 2006, is by the time -- so the first sentence -- I

20   mean, he is looking at the whole paragraph.  He has the benefit

21   of your thoughts and analysis here, but he says, look,

22   Dr. Manning, I want to say that by the time Perrigo signed the

23   agreement with Dexcel in August 31st, 2005, Dexcel had

24   completed the development of the drug for the U.S. market,

25   including successful establishment of bioequivalence.  That's

1    what he wants to say.  Do you advise him to say that?

2    A    It depends on whether he knows it or not in your

3    hypothetical.

4    Q    In my hypothetical I am assuming you know that because you

5    have done your analysis, you have written the report, you've

6    given it to Mr. Papa, and he said, okay, this is what you are

7    telling me, Dr. Manning.  May I say this to the public market?

8    A    Well, that sounds like a piece of legal advice that I

9    wouldn't be qualified to give him.  Can he say it?  Will the

10   SEC have trouble with him saying that?  Those are all legal

11   questions I wouldn't advise him on.

12   Q    Fair enough.  So if your point is, well -- you would tell

13   him, well, my opinion is that you can tell the markets that

14   Dexcel had completed the development of the drug for the U.S.

15   market, including successful establishment of bioequivalence.

16   You got to talk to your lawyers whether you're allowed to say

17   that.

18   A    I am confused between where the hypothetical begins and

19   ends and where the real world begins and ends here.  Are you

20   asking --

21   Q    Sorry, Dr. Manning, I'll clarify.  My hypothetical is

22   Joe Papa, November 2006.  Okay.  So far so good?

23   A    Yes.

24   Q    You have been hired as a consultant to help him understand

25   where Dexcel's product is in its development.  So far so good?

1    A    Is that different from the original assignment --

2    Q    No.

3    A    He's got a shareholder meeting?

4    Q    No.  I am building the blocks here, Dr. Manning.

5    A    Okay.

6    Q    All right.  He has a shareholder meeting, and he has come

7    to you as his consultant and says, I want to be able to go to

8    my shareholders meeting.  A young fiery Joe Papa is a little

9    bit more aggressive than the kinder gentler Joe Papa we saw

10   yesterday.  And he says, I want to go to the shareholder

11   meeting, and I want to say -- because this is -- I've looked at

12   your report, Dr. Manning, and I want to be able to say that

13   Dexcel had completed the development of the drug for the U.S.

14   market, including successful establishment of the

15   bioequivalence.  Dr. Manning, may I say that in my shareholders

16   meeting?  Is that what you are going to tell him to say?

17   A    Again, the question of whether he should say it in a

18   shareholders meeting is a question for an attorney, not for me.

19   Q    Would this be your advice to Dr. -- er, Mr. Papa?

20   A    Would this be my advice?

21   Q    Paragraph 116 of your report, first sentence, would this be

22   your advice to Mr. Papa?  It's a simple question.

23   A    I would -- if he wanted to know whether -- well, I don't

24   know that there is advice in that sentence just to answer your

25   question.

Q    Well, is this statement true?

A    If you look at footnote 121, it will take you to --

Q    I understand footnote 121.

          MR. WEAVER:  Again, can Dr. Manning finish his answer, please?

          MR. LINGUANTI:  If he answers my question.

BY MR. LINGUANTI:

Q    Is it true or not, Dr. Manning?

          MR. WEAVER:  I object.

          THE COURT:  I mean, let the time burn.  I obviously gave Perrigo too much.  You know, this is such a barnacle-laced hypothetical by this time that it's sunk to the bottom of the sea.  So, you know, we can continue with it and get his answer, but it doesn't really mean much.

          Go ahead.

BY MR. LINGUANTI:

Q    Is that statement true or not, paragraph 116 of your report?

A    If you look at the footnote, it tells you that in Dexcel's response to questions from the IRS, Dexcel said that before they had signed the agreement their development of the product for the U.S. market had been completed.

Q    Okay.  So is the statement true?

A    It is consistent with Dexcel's statement that they had completed development of the product.

Q    Okay.  And that's what -- and then that's what you would tell Mr. Papa?

A    Well, again, the hypothetical and the real world's confused here that I am not sure, you know.  And am I an attorney?  I am not.  I would -- I am not sure what I would say given that confusing hypothetical.

Q    Let me simplify it.  I'll take one more shot at this using my time, as the Court has identified.  Mr. Papa has come to you in November of 2006.  Wants your view.  Okay.  I want to know, Dr. Manning, what -- where Dexcel's product stands in its development.  You say, well, paragraph 116, first sentence.  Is that your statement to Mr. Papa?

A    I wouldn't say exactly that to him in this hypothetical because there is more to the story than that.

Q    Now, you wrote this report in 2018, for example -- in 2019?

A    Yes.

Q    All right.  And we're talking 2006 in my hypothetical.

A    Yes.

Q    All right.  All right.  Well, let's continue.  Let's go to -- now we are in January 2007.  This is after the FDA approvable letter is issued time wise.  Same problem with -- same issue.  Joe Papa comes to you, his consultant.  He's got another public meeting, and again he wants to know, where do we stand with this Dexcel product?

So if we look at your report, paragraph 140, PDF page

52.  And he wants to be able to -- he wants your view, and we go -- really you can look at the whole paragraph, but I want to be able -- this is your advice to Mr. Papa because this is what he wants to tell the markets.  We -- Perrigo -- the very last line, Perrigo does not view the issue to be substantial at that time referring to the MDS issue that's been raised by the approvable letter.  Do you agree with your statement here on 140?

A    I'm sorry, are we in the real world or the hypothetical world?

Q    The first question is, do you agree with the statement here on paragraph 140?

A    I agree with what I said in paragraph 140.  Yes.

Q    Okay.  And my hypothetical is, would you tell Mr. Papa that when he asks you, what can I tell the public in my meeting of the status of the Dexcel product?  Would you tell him that, you can tell them that you do not view this MDS issue to be a substantial risk?  Is that what you tell him?

A    Again, this idea of me advising him on what he should say given the SEC restrictions is just beyond my scope of expertise and training.  I would not advise him on what he should or shouldn't say to a shareholder because that's a legal issue.

Q    Okay.  Would you then, if you -- with that caveat, would you tell him, well, my view is that -- this is now, again, in my concept, January 30th, 2007.  You are looking at the

1    approvable letter.  Do you then tell Mr. Papa, in my view,

2    Mr. Papa, and you are Dr. Manning, is that you should not view

3    the MDS issue to be a substantial risk?

4    A    I may have the timing a little -- I have to go back and

5    review the dates to be precise, but, you know, my understanding

6    is that the MDS issue was fairly easily resolved and that it

7    was not a show stopper and that there was communication between

8    the two parties.

9    Q    All right.  So you would at least tell him that your advice

10   is that we do not view this issue, this MDS issue, to be a

11   substantial risk at that time?

12        MR. WEAVER:  Objection.  Mischaracterized his prior

13   answer.

14        THE COURT:  You know, we can go round and around on

15   it, but the reality is he has not been proffered as an expert

16   or qualified as an expert to talk about what a public company

17   CEO can or can't say safely to shareholders.  That's an issue

18   that involves complicated SEC guidance, especially when we are

19   looking at forward-looking statements and projections, and so I

20   don't really care what his answer is.  It's pointless, but the

21   clock is running.

22        MR. LINGUANTI:  All right.  Okay.

23   BY MR. LINGUANTI:

24   Q    Let's solve for the SEC.

25   A    Sorry.  What do you mean, solve for?

1    Q    He is not talking to you about going to visit the public

2    markets.  So it's just you and Mr. Papa, in addressing the

3    Court's observation and yours, which is you are not an SEC

4    expert.  Okay.  Mr. Papa has come to you, and he simply asked

5    you, should I view the MDS issue to be a substantial risk as

6    of, in this case, January 2007?

7    A    That would depend on, you know, the nature of the question.

8    I mean, is it do I believe as a regulatory expert that the MDS

9    issue is big?  I wouldn't have an opinion about the regulatory

10   impact of the MDS issue.  I would have an opinion about -- I

11   would ask the regulatory people what they thought.  I would

12   say, you know, you should ask them.

13   Q    Right.  But this is -- now we are in the real world,

14   Dr. Manning.  This is your report, is it not?

15   A    Yes.

16   Q    You are not a regulatory expert.

17   A    I am not.

18   Q    Not a legal expert.

19   A    I am not.

20   Q    All right.  But you are an economist as we discussed,

21   correct?

22   A    Yes.

23   Q    With a certain specialty in industrial organization and

24   otherwise?

25   A    Yes.

1    Q    In this report, in paragraph 140, that is your view?

2    A    That is my view in paragraph 140, yes.

3    Q    And if in my hypothetical Mr. Papa had hired you as an

4    economist with your expertise in industrial organization, what

5    your view is of the world as of, in this case, January 2007,

6    this is what you would tell him?

7    A    I would investigate what had been communicated between the

8    parties, and I would say, here is what the record says, so here

9    is what my view is.

10   Q    Okay.  So yes?

11   A    I don't think it's that simple, but I would just restate

12   what I said.

13   Q    In your report?

14   A    Yes.

15   Q    All right.  Well, let me -- let's go to the last one here.

16   All right.  And again, we are not talking about Joe Papa going

17   to the public markets.  We are not talking about Joe Papa going

18   to the SEC rules.  I am asking -- now I've got you are a

19   consultant to the company at the time in your economic

20   capacity.  All right.  Okay.  So far so good?

21   A    Yes.

22   Q    I am not asking for your legal advice, regulatory advice.

23   He is asking for your economic expertise.  Okay?

24   A    Okay.

25   Q    So now we are in June -- we are in June of 2007 after the

1    tentative approval letter has been issued.  Okay?

2    A    Okay.

3    Q    And if we can go to your report, paragraphs 151 and --

4    paragraphs 151 and 152, which is PDF 55.  PDF 55.  Is that

5    correct, PDF 55?

6              MR. WEAVER:  It's 56.

7              MR. LINGUANTI:  56.  My apologies.  Thank you.

8    BY MR. LINGUANTI:

9    Q    And now, again, Mr. Papa has come to you, and he's asked

10   for your advice, Dr. Manning, economist, expert in industrial

11   organization, and he is looking at paragraphs 151 and 152.

12   Just take a moment to refresh yourself on those.  Take a look.

13   And he reads all this, and he says, so, Dr. Manning, is it the

14   case, then, that we will -- that the case will be resolved in

15   Dexcel's favor, and the only substantial uncertainty is whether

16   we will be able to launch Dexcel products sooner than is

17   targeted in November 2008?

18   A    Sorry.  Just a second.  Well, I don't believe I was that

19   declarative in that paragraph because, you know, as we've

20   talked about, lots of things could happen, you know.  Any

21   number of things might happen.  The question if Dr. -- if

22   Mr. Papa were to ask me, you know, what's the main uncertainty,

23   I would give to him what I said here.  The main uncertainty is

24   whether -- will you be able to launch before you -- your -- the

25   end of the 30-month stay, I suppose?

1    Q    And you'd tell him, looking at 152, that really we are in

2    June of 2007 that Perrigo did not confront considerable

3    litigation risk, right?

4    A    I would say that the litigation risk was -- you know, he

5    would have heard from other people about how likely that

6    litigation risk was, and I wouldn't be the best person to tell

7    him about how sizable the litigation risk was because I didn't

8    have the legal opinions about how secure those patents were or

9    not.  I would say that, you know, somebody like Mr. Rush would

10   come and tell you -- would be a better person to advise you on

11   how strong those patents are.  But the main question is,

12   pending the resolution of those patents from -- as an

13   economist, the main question is, are you going to be able to

14   launch before or after the 30-month stay?

15   Q    And you would then tell him that there is not uncertainty

16   about the litigation outcome here in 152?

17   A    Well, there is not never zero uncertainty until things have

18   actually happened, so I wouldn't say there is zero uncertainty.

19   Q    And you would say that -- well, you would say that as of

20   June of 2007 that settlement was a foregone conclusion?  Would

21   you say that?

22   A    No.

23   Q    All right.  And the timing restrictions, again, in the

24   costly terms of possible settlement, they were there, but in

25   your view not substantial, right?

1    A    I'm sorry, the costs -- what did you say?

2    Q    I'm just reading, the timely restrictions and costly terms

3    of possible settlement could be imposed were there, but, as you

4    said, they are not substantial, right?

5    A    Well, I don't agree that there were huge -- well, I

6    suppose, you know, that's a quote from Professor Berndt, and I

7    said I disagreed that, you know, the primary or the most

8    substantial uncertainty at that point was whether they would be

9    able to launch on time.

10    Q    Okay.  And that's -- sorry.  I am actually -- now I have

11    one more topic.  Sorry.  So let's just take this sentence and

12    set this up.  And so I am looking at 152.  The first, really,

13    two sentences.  Now, we are just talking about your report.

14    Hypothetical goes away.  Professor Berndt offers his opinion

15    that until late September 2007, Perrigo still confronted

16    considerable litigation risk, has uncertainty about the

17    litigation outcome, the potential for settlement, uncertainties

18    surrounding the launch date, and the timing restrictions or

19    costly terms a possible settlement could impose were still

20    present.  I disagree.

21        You see that there?

22    A    I do.

23    Q    All right.  So let's talk about how the -- in your report

24    you analyze this question.  Let's go, perhaps -- well, to --

25    actually, it's government's demonstrative Exhibit 5504-D,

1    please.  All right.  Did you prepare this, Dr. Manning, or did

2    the government assist you?  Probably both.

3    A    I prepared it.

4    Q    All right.  Thank you.  And as it says here in -- it

5    doesn't have a D, but as the government has stipulated, this is

6    a demonstrative exhibit.  This is what you laid out as the

7    patent litigation timeline, is that right?

8    A    Yes.

9    Q    So let's start on the far left-hand side.

10               MR. WEAVER:  Your Honor, I am just going to object.

11   We didn't use this.  It's beyond the scope of the direct.  It's

12   one of our demonstratives we chose not to use.

13               THE COURT:  Well, I think he can use the demonstrative

14   because the overall point of the direct was to assess the level

15   of risk, one element of which is the patent litigation.

16               And, I mean, go ahead if you wish.

17               MR. LINGUANTI:  Thank you, Your Honor.

18   BY MR. LINGUANTI:

19   Q    So let's start on the far left-hand side.  April of 2004.

20   You see that, sir?

21   A    I do.

22   Q    And this is the discussion of the PH legal opinion

23   regarding the Cipla sourced to omeprazole API, and that was

24   referenced in Exhibit 5344.  You see that there?

25   A    I do.

1   Q    So may we get Exhibit 5344 so you have it handy, please?

2   And we can pull this up on the screen while we have copies

3   handed out.  Thank you.

4        MR. LINGUANTI:  May we approach, Your Honor?  Is that

5   okay?

6        THE COURT:  Sure.

7        MR. LINGUANTI:  Thank you.

8   BY MR. LINGUANTI:

9   Q    So you should have Exhibit 5344 in front of you as well as

10  up on the screen, is that correct, sir?

11  A    Yes.

12  Q    All right.  So let's go to PDF page 74, please, which is

13  happily page 74 of the document.  And the second --

14  A    I don't have that in my binder, is that correct?  Well, I

15  guess --

16  Q    You don't.  We just handed you a copy.

17  A    You handed me this.  I thought you meant you were handing

18  me the Price Heneveld letter.

19  Q    We were to do so.  Apologies, sir.  Sorry for the

20  interruption.  Apologies, and thank you.

21       Now, Dr. Manning, do you have the opinion letter in

22  front of you?

23  A    I do.

24  Q    Great.  And -- good.  So now we are going to page 74, PDF

25  page 74 and just the first -- I'm sorry, the second full

1    paragraph, Cipla has provided.

2    A    I can't read that Bates number on the bottom.

3    Q    Page number is on the top, I believe.  Page 74.

4    A    Okay.

5    Q    Using good old fashioned page numbers as opposed to the

6    Bates number.

7    A    Okay.

8    Q    All right.  It says the first sentence there in that

9    paragraph, Cipla has provided written representations to Byron

10   Chemical Company, which we have reviewed.  And then it

11   continues.  You see that?

12   A    I do.

13   Q    All right.  Now, if we go to page 97 on the conclusion

14   paragraph, paragraph actually numbered one.  You can start with

15   the, our opinions and analysis.  That's it.  Do you see that,

16   sir?

17   A    I'm sorry, okay.  Yes.  I see it.

18   Q    Sure.  It says, our opinions and analyses were based on the

19   following assumptions.  And then it mentions representations

20   made by Cipla and/or Byron Chemical Company are accurate and

21   can be proven.  You see that?

22   A    I do.

23   Q    Again, this is one of the documents you used as you were

24   analyzing the patent litigation risks, right?

25   A    Yes.

1   Q    All right.  Now, this is an opinion letter.  You understand

2   that to be an opinion letter by counsel to Perrigo, right?

3   A    I do.

4   Q    All right.  By, in this case, Perrigo's lawyers?

5   A    Right.

6   Q    Right.  It was, though, with regard to a different product.

7   It was the Perrigo omeprazole product.  That's your

8   understanding?

9   A    That is.

10  Q    All right.  And, again, this is, as the letter points out,

11  in connection with the Cipla items, which is patent 380.  These

12  are all based on representations made by Cipla.  Is that your

13  understanding?

14  A    That's what it says.

15  Q    And the letter also points out that there is no evidence of

16  any due diligence that the lawyers did at least with regard to

17  this patent, right?

18  A    I take this as advice from their attorneys.  I don't know

19  the level of diligence that --

20  Q    And we know Perrigo -- Andy Solomon testified, if you

21  recall, that he didn't think about this opinion letter for the

22  reasons he described.

23  A    He said something like on that order.  Yeah.

24  Q    All right.  Now, in your -- Cipla in this case would

25  have -- obviously was in their interest to be -- their

1    representations to be true, right?

2    A    I presume so.  Yes.

3    Q    They would be motivated to sort of make these

4    representations because they want an invalid patent or at least

5    one that doesn't infringe, or both, right?

6    A    I haven't thought about what Cipla's motivations were.

7    Q    Fair enough.  So let's go back to 5504-D, which was your --

8    or the Defendant's demonstrative exhibit you assisted with, and

9    we are going to go across the line here for a second to the

10    paragraph IV notice letter, which is April 2006.  Do you see

11    that?

12    A    I do.

13    Q    All right.  And, again, this was the -- this was Dexcel's

14    putting AstraZeneca's lawyers on notice that in their view they

15    either -- these three patents, 230, 505, and 380 either did not

16    infringe or were invalid, right?

17    A    That does reference that letter, but I'd want to see what

18    it said specifically before saying it to know what it said.

19    Q    This Exhibit 5136 is one of the documents, this notice

20    letter that you relied on to come to your view about litigation

21    risks, right?

22    A    Yes.

23    Q    All right.  Now, you understand from the testimony that the

24    way the process works is after the paragraph IV notice letter,

25    then you have potential litigation, right?

1    A    Yes.

2    Q    In this case AstraZeneca did sue Dexcel?

3    A    Yes.

4    Q    They did, right.  Can we maybe have Exhibit 399, please?

5    Now you have that in front of you, sir?

6    A    I do.

7    Q    All right.  This is the complaint that AstraZeneca filed in

8    response to Dexcel's paragraph IV notice.  And if we can go to

9    PDF page 5, which is the claim for relief concerning the 380

10   patent.  So I think it's page 5 of the complaint, too, sir.  Do

11   you have that there?

12   A    I do.

13        MR. WEAVER:  Just kind of make one objection.  I think

14   Mr. Linguanti said this is the complaint and was referring to

15   the commencement of the litigation.  It's clearly an amended

16   complaint.  So I object to that characterization.

17        MR. LINGUANTI:  Absolutely fair.  Apologies,

18   Your Honor.

19        It is the amended complaint, Dr. Manning.

20        Thank you, Counsel.

21        THE WITNESS:  Okay.

22   BY MR. LINGUANTI:

23   Q    Now, if we go to PDF page 7, paragraph 34, and we see

24   AstraZeneca beginning to lay out its view of the Dexcel

25   paragraph IV notice, and it says, there therefore has been and

1    is now an actual justiciable controversy between Dexcel and

2    Cipla on the one hand, and plaintiffs on the other hand.  And

3    it continues.  And just to the end of that sentence it talks

4    about the 380 patents.  Do you see that?

5    A    Yes.

6    Q    All right.  And that's, again, AstraZeneca just sort of

7    letting the folks -- letting the parties and the Court know

8    this is their view of the 380 patent, right, in litigation?

9    A    That's typical, although I am not an attorney so I don't

10    want to venture into offering legal opinions.

11    Q    Fair enough.  Okay.  Okay.  All right.  Let's go back to

12    5504-D.  Now, if we see -- I am going to jump ahead a little

13    bit, and we see that in your chart after litigation is

14    continuing we have a couple things happen.

15        Now, you see the red box where we have May/June

16    assignment to LLC signed.  That sort of thing.  So after the

17    litigation commences through, let's say, June, so I am looking

18    at that period in there, okay?

19    A    Okay.

20    Q    So did you do any investigation of the status of the

21    litigation as you were considering your question?

22    A    Well, what I observed was that Mr. Oren had communicated to

23    Perrigo that in his view it was a sham litigation.  That he

24    thought it would be resolved soon.  So that he thought it would

25    move in a quicker way than a slower way.

1    Q    That's actually -- we'll come back to that.  Apologies,

2    Dr. Manning.  You have on your chart, Dexcel shares memorandum.

3    That's what you are referring to there, Exhibit 5334, right?

4    A    I am referring to an e-mail exchange between Dan Oren, and

5    I'm not sure whether it was to Needham or Papa, but --

6    Q    All right.  And -- I mean, we'll talk about that in a

7    moment, but that was in March, as well, give or take?

8    A    I'd have to be reminded when that communication was

9    exactly.

10   Q    All right.  We will do so.  But other than that, you did no

11   investigation on the status of the litigation between Dexcel

12   and AstraZeneca in this March through, say, June period?

13   A    Well, I reviewed the -- what the parties had been saying to

14   each other, and I did not do a legal analysis.  No.

15   Q    All right.  You say parties.  Do you mean Dexcel and

16   AstraZeneca?

17   A    No.  I mean, Dexcel and Perrigo.

18   Q    Okay.  So again, what investigation did you do of the

19   status of the litigation between Dexcel and AstraZeneca?

20   A    I did not do an independent analysis of that litigation.

21   Q    Okay.  So let's look at, if we may --

22   A    That was a legal issue.

23   Q    It's the patent litigation action, though, right?

24   A    Yes.

25   Q    Right.  And you had an opinion on the patent litigation

1    risks, correct?

2    A    I had an opinion on the resolution -- how those appeared to

3    be evolving over time, and key to that was a statement by

4    Dexcel that they viewed it to be sham litigation, and that it

5    was going to be resolved.

6    Q    Can I have Exhibit 404, please?  All right.  So first let's

7    make sure, do you have that in front of you, sir, Dr. Manning?

8    A    I do have this document in front of me.

9    Q    Okay.  Now, I didn't see it on your docs considered list.

10   Do you recall seeing this?  I'll explain what it is in a

11   moment.

12   A    I don't.

13   Q    Okay.  Can you take the blowup off for a moment.  Thank

14   you.  So for yours and the Court's benefit, Exhibit 404, which

15   is in evidence, is a conference between AstraZeneca and Dexcel

16   held in June of 2007, June 28th, 2007, in Wilmington, Delaware.

17   Okay?

18   A    Okay.

19   Q    If we can go you can see the appearances, just go to the

20   next page, please.  Thank you.  We have counsel for

21   AstraZeneca, which is Milbank, Tweed, and others.  And we have

22   counsel for Dexcel, Leydig Voit and others.  Do you see that,

23   sir?

24   A    I do.

25   Q    And, of course, her honor, Judge Robinson, is there as

1    well, okay?

2    A    Okay.

3    Q    Now, if we turn to the next page.  Sorry.  Bear with me for

4    a moment.  Great.  Okay.  Since you hadn't see this, I want to

5    make sure you have a chance to take a look at some of this so

6    you know what we are talking about.  So if you look through the

7    first colloquy between the parties, down where you've got this

8    is page 3, pardon me, Mr. Taylor from Milbank explained that

9    this is another in our series of conferences updating the Court

10   on discovery issues and status of the case.  Do you see that?

11   A    I do.

12   Q    And I'll represent to you, and counsel can correct me if

13   I'm wrong, that this goes on for a number of pages, but that's

14   the nature of this conference.  Okay?

15   A    Okay.

16   Q    All right.  Now, just -- this is not a settlement

17   conference by indications of this document -- I'll represent

18   there is nothing in here that I see settlement conference.  You

19   didn't understand this to be a settlement conference, for

20   example?

21   A    I don't understand anything about what the conference was.

22   Q    Okay.  Fair enough.  All right.  So let's go to PDF -- PDF

23   page 4, please.  And lawyers like to speak, as His Honor has

24   reminded us, so give me a moment.  I'll point us to something.

25   So PDF page 4, again, this is the parties talking about the

1    status of discovery.  Let's go down to the bottom of the page,

2    line 24 it looks like in the transcript.

3    A    I'm sorry, are -- we are still on Plaintiff's Exhibit 404?

4    Q    We are.  We are.  And actually just because I am taking an

5    excerpt, let's go to PDF page 4.  Page 4 of Exhibit 404,

6    Dr. Manning.  And we'll start actually at line 18 because we'll

7    come back to this, okay, and take that all the way down to the

8    end of that page, please.  Thank you.  Okay.

9        MR. WEAVER:  Your Honor, I would object.  If he is

10   going to take Dr. Manning through excerpts of a document he has

11   never seen before, he ought to have a chance to read it.

12       THE COURT:  Well, he can go through it.  You know,

13   Perrigo's time is running at three hours 52 minutes left, and

14   this is for both sides meaningless time.  You know, all that

15   Dr. Manning did was look at certain documents, maybe not this

16   one, and then made an interpretation.  It's what I talked to

17   the government about yesterday in terms of my views of the

18   limits of the testimony.  It was in response to your objection

19   that all he is doing is a preclosing argument, and in a way

20   that's true.  But that's kind of what you did on direct, too.

21       And I think, you know, you decided to spend 45 minutes

22   on it where we're going on two hours.  And so, I mean, I'll

23   allow him to go forward with it.  I don't think it's very

24   meaningful.  I think the testimony has in both cases on the

25   direct and the cross basically demonstrated that what

1  Dr. Manning did was assess the same documents I am going to

2  have to assess when I rely on credibility judgments about

3  whether I believe what the Perrigo witnesses said they felt was

4  at risk or not.  It's not like we are looking at economic

5  analysis that really, you know, changes that one way or the

6  other, but I don't mind how you use your time.  Like I said,

7  it's going down, and my blood pressure is even.

8           MR. LINGUANTI:  Thank you, Your Honor.

9  BY MR. LINGUANTI:

10  Q   So I'll just complete this one, Dr. Manning, and then we

11  will wrap up before our break.  All right.  So, again, we will

12  look at what I was referring to as, again, the parties were

13  describing at line 18, it says, we'll get back to the Cipla

14  issue a little later.  And we'll talk about that.  And then we

15  see that line 24 they've asked for a 30(b)(6) deposition of

16  Dexcel.  Do you know what a 30(b)(6) deposition is?

17  A   My understanding it's testimony by a fact witness.

18  Q   Okay.

19  A   But --

20  Q   All right.  So all right.  So let's go to the next page,

21  PDF page 5.  All right.  And down approximately line 15 to the

22  end of the page, please.  And, again, the parties are talking

23  about discovery issues.  And you can see Cipla was the company

24  that produced the API, is that right?

25  A   That's my understanding.

1    Q    All right.  And you can see beginning at line 17 the

2    parties are describing seeking communications between the

3    parties, and you can read that yourself, seeking documents.

4    Please take a moment and read that through.

5    A    Right.

6    Q    Again, at this point we've got AstraZeneca seeking

7    information concerning the -- again, the Cipla product from the

8    parties themselves.  You didn't consider this in your analysis?

9    A    As I told you before, I had not seen this document.

10   Q    Okay.  All right.  All right.  You may set that aside.  So

11   since you mentioned it, all right, let's go back to the March

12   e-mail.  So that's Exhibit 388.  I don't believe that's in your

13   binder or the Defendant's binder, so we'll hand you 388 so you

14   have it in front of you.  Do you have that in front of you,

15   sir?

16   A    I do.

17   Q    All right.  Now, was this the Dan Oren e-mail you were

18   referring to?

19   A    Let me look at it for a moment.

20   Q    Sure.  Of course.

21   A    I did look at this document.  My recollection is that there

22   was a more direct communication to Perrigo about his hope

23   that -- you know, that the -- or his expectation that the sham

24   litigation would be settled soon.  This appears to be an e-mail

25   among the Dexcel team only, unless I am not seeing something.

1    Q    Well, Dan Oren is at the top.  You see that there?

2    A    I do.

3    Q    And you see that the two -- if you look through, you'll see

4    cc Jeff Needham, Andy Solomon.

5    A    Okay.  They are on there.  Cc line.  My recollection was

6    that there was also a more direct e-mail, but, you know, I

7    suppose my memory could be incorrect.

8    Q    Okay.  All right.  So -- but if you look at -- that's fair

9    enough.  But you saw this document, though, right?

10    A    I recall seeing this.  Yes.

11    Q    And paragraph 6 -- well, so paragraph 6 you see Mr. Oren

12    make a note that he may meet a senior AZ executive during the

13    last week of March in order to reach a resolution.  And he

14    continues.  You see that?

15    A    I see that.

16    Q    All right.  If you go down to follow the paragraphs,

17    paragraph 7?

18    A    Yes.

19    Q    And paragraph 8 he talks about -- paragraph 7, excuse me,

20    talks about sham litigation.  You see that?

21    A    Yes.

22    Q    Paragraph 8 he talks about AstraZeneca being vulnerable to

23    a Handgards charge.  You see that?

24    A    I do.

25    Q    And then paragraph 10 AstraZeneca particularly vulnerable

1    to a Walker Process charge.  Do you see that?

2    A    I do.

3    Q    Your 5504-D, if we could pull that up.  So you are looking

4    at Exhibit 5334.  Can we see what 5334 is, please?  Just pull

5    it up on the screen and make sure we are looking at the same

6    documents.  Okay.  Okay.  So this is -- this is what you

7    referred to in your chart, right?

8    A    That is an exhibit -- exhibit number is listed on the

9    chart, yes.

10   Q    So is this -- this was what you were referring to for

11   March -- the March 2007 meeting, right?

12   A    It looks to be, yes.

13   Q    Okay.  This was actually -- just to make the

14   representation, this was the attachment to Mr. Oren's e-mail

15   that we were just referring to?

16   A    Um-hum.

17   Q    Do you agree?

18   A    I believe that's correct, yes.

19   Q    All right.  Again, this is what the basis was for your

20   views about the status of the settlement as of March 2007,

21   right?

22   A    Well, I would have to go back and look at my report in

23   detail to make sure, but my impression was that they had good

24   reason to believe that it had been communicated to them that

25   the litigation was progressing successfully and that they

1    anticipated an early termination to that litigation.  Now,

2    whether there are legal interpretations in play, I would

3    suggest that I am not the best expert for those questions.  In

4    fact, I am not an appropriate expert for the legal questions.

5    Q    Okay.  If we can go back to Exhibit 388 momentarily, which

6    is what I just handed to you.  Paragraph 1, talking about the

7    legal issues, the four lawyers had fully agreed with Mr. Oren's

8    strategy.  You see that?

9    A    Yes.

10   Q    In paragraph 2, Mr. Oren states, they are all professionals

11   and have a positive orientation.

12         Here is my last question for you.  As far as you know,

13   you have no evidence of AstraZeneca's view of Dexcel's view, do

14   you?

15   A    I don't know what AstraZeneca was thinking at all.

16   Q    You don't know whether AstraZeneca agreed with Dexcel's

17   confidence in its position, do you?

18   A    I have no information about AstraZeneca other than the fact

19   that they settled.

20   Q    All right.  Well, AstraZeneca continued to litigate in

21   June of '07.  We just saw this status report, right?

22   A    Yes.

23   Q    And they continued to litigate in July of '07?

24   A    Up until they settled.  I think it was Mr. Solomon who

25   said, it's not done until it's signed.

1    Q    That's right.  And they were still litigating in August of

2    2007?

3    A    Until it was signed.

4    Q    You agree?

5    A    Yes.

6    Q    Still litigating in September of '07?

7    A    Sure.

8              MR. LINGUANTI:  All right.  Thank you, Your Honor.

9              Dr. Manning.

10             THE COURT:  All right.

11             Any redirect?

12             MR. WEAVER:  Relatively short redirect, Your Honor,

13   but a few minutes of redirect.

14             THE COURT:  All right.

15                      REDIRECT EXAMINATION

16   BY MR. WEAVER:

17   Q    Dr. Manning, first I just want to make sure the record is

18   very clear.  So could we pull up Exhibit 5504?  This is a

19   timeline that you and your staff prepared, correct?

20   A    Yes.

21   Q    But you certainly got input from the government attorneys,

22   is that right?

23   A    Yes.

24   Q    Okay.  Just to be clear and make sure that's on the record.

25   Okay.  Second, Exhibit 5344, which Mr. Linguanti showed you,

1    that's this long opinion letter from Price Heneveld.  You saw

2    that just a couple of minutes ago, correct?

3    A    Correct.

4    Q    And Mr. Linguanti I think had you agree that the opinion

5    letter was relating to the Cipla -- excuse me, the omeprazole

6    product that was internally being developed by Perrigo as

7    opposed to the Dexcel product.  Do you recall that?

8    A    Yes.  I remember him asking me that.

9    Q    And I know you are not a patent attorney, but if a patent

10   is invalid, it's invalid no matter what the product they are

11   looking at is, is that a fair statement?

12            MR. LINGUANTI:  Well, objection.  As counsel's

13   question suggests, he is not a patent attorney.

14            THE COURT:  He isn't, but you got him to talk about a

15   lot of things that weren't within his expertise either.  So

16   let's go ahead and get the answer.

17   BY MR. WEAVER:

18   Q    If you know the answer.

19   A    My general understanding, and, you know, I have thought a

20   lot about I am in the -- had been in the pharmaceutical

21   industry where patents are at issue.  I would agree that from

22   my non-legal opinion, if a patent is invalid, it is invalid.

23   Q    Finally, Dr. Manning, my last question to you is going to

24   require a little explanation, but since Mr. Linguanti dove

25   deeply with a whole series of hypotheticals about LLC and risk

1    analysis, I would like to refer you to paragraph 86 of your

2    report, your report being Exhibit 5393.  And you have a section

3    on page 35.  Hopefully it's PDF page 35.  PDF page 35 of your

4    report, which again, is Exhibit 5393, and -- that's too high.

5    Take that down.  I want to go to the section called, LLC's role

6    in risk management.  It starts in paragraph 86.  It runs

7    through paragraph 90.  Do you see that?

8    A    I do.

9    Q    Now, you did some economic analysis there.  I think you did

10   some analysis that I would like you to explain to the Court,

11   but before we get to that, you are not a transfer pricing guy,

12   right?

13   A    That's correct.

14   Q    And you mentioned in your testimony with Mr. Linguanti that

15   you were looking at some risks on a firm wide basis, correct?

16   A    I did.

17   Q    Did I recall correctly?  It didn't matter which pocket it

18   was in, the left pocket or the right pocket.  You were looking

19   at whether something was going to affect the firm, correct --

20   A    Correct.

21   Q    -- in these paragraphs?  So could you give your economic

22   analysis, summarize your economic analysis in this set of

23   paragraphs that you are doing regarding LLC's role in risk

24   management, please?

25   A    Yes.  So LLC had the potential to insulate Perrigo from a

1    failure of the product, for example.  So suppose we had, as I

2    recount here in this section of my report, a hypothetical

3    where, you know, there is a 50 percent probability of zero

4    sales and a 50 percent probability of a million dollars in

5    sales.  Suppose that, you know, there was a -- so if Perrigo

6    were to hold the contract on its own, they would get $1 million

7    in a good state and have zero in the bad state.  If they could

8    sell that contract to LLC and LLC could then insulate them from

9    the bad state, then they might be able to avoid that loss.

10   Q    By stiffing the creditors?

11   A    Yes.

12   Q    Okay.

13   A    And -- but that beyond that, any sales level above that

14   $1 million, there was no further ability to insulate them

15   because they would have the same -- they would have enough

16   money to cover that obligation in the good state or the bad

17   state.

18   Q    So what did you conclude in that?

19   A    That the ability of LLC to assess, to handle risk, to

20   insulate the company from risk was extremely limited.

21            MR. WEAVER:  That's all I have, Your Honor.

22            THE COURT:  All right.

23            Any recross?

24            MR. LINGUANTI:  No.  Thank you, Your Honor.

25            THE COURT:  All right.  Thank you, Dr. Manning.

1              (Witness excused, 10:04 a.m.)

2              THE COURT:  We will just take a morning break early

3     because I think your next witness is going to run a while,

4     right?

5              MR. WEAVER:  Yes.

6              THE COURT:  Okay.  We'll do that.

7              LAW CLERK:  Court is in recess.

8              (Recess taken, 10:04 a.m.)

9              (Resume Proceeding, 10:28 a.m.)

10             LAW CLERK:  Court is in session.

11             THE COURT:  All right.  We're back and ready to go

12    with the government's next witness.

13             MR. WEAVER:  Your Honor, Defendant calls Dr. David

14    DeRamus.

15             THE COURT:  Dr. DeRamus, we'll have you sworn in to

16    start.

17             (Witness sworn, 10:28 a.m.)

18             MR. WEAVER:  Can I proceed, Your Honor?

19             THE COURT:  Please.  Please.

20                          RICHARD DERAMUS

21        having been first duly sworn, testified as follows:

22                          DIRECT EXAMINATION

23    BY MR. WEAVER:

24    Q    Good morning, Dr. DeRamus.

25    A    Good morning.

1    Q    I would direct you to Exhibit 5392, please.  And we have it

2    on screen.  Is this the report that you submitted in this case?

3    A    Yes.  It is.

4    Q    Now, I note it's entitled a revised report.  Why did you

5    revise your report?

6    A    I revised it in response to certain corrections or updates

7    that Mr. Broadhurst did to his report.  There were certain

8    corrections that Dr. Frisch made to his report in response to

9    my initial report, and then, finally, I understand the parties

10   have stipulated numbers.  So I wanted to make sure that my

11   final report reflected those stipulated numbers.

12   Q    Okay.  Okay.  So let's go to page 118, PDF page 181, it's

13   Appendix A in your report.  Let's put that up on screen,

14   Appendix A, and with that, are we looking at your CV?

15   A    Yes.  You are.

16   Q    Okay.  And so why don't we start with your educational

17   background, please.

18   A    Certainly.  I received my undergraduate degree from Duke

19   University in 1984.  I received my MA in economics from the

20   University of Massachusetts at Amherst in 1992, I believe, and

21   then I received also my Ph.D. from the University of

22   Massachusetts at Amherst in 1999.

23   Q    Okay.  And let's talk about your relevant work experience.

24   Can you briefly summarize that, please?

25   A    Certainly.  I have been a partner with the economic

1    consulting firm of Bates White since it was founded in 1999.

2    Prior to that I was with the management consulting firm of A.T.

3    Kearney.  And prior to that I was at KPMG or KPMG Peat Marwick

4    for approximately five years, and then prior to that in the

5    early '90s, I was a research associate for the graduate school

6    at -- the graduate business school at Harvard University.

7    Q    Okay.  Now, if we drop down to the bottom of the page, and

8    there is really no reason to follow along precisely with your

9    report, but could you summarize your work experience in the

10   area of transfer pricing for the Court?

11   A    Certainly.  So I've worked on transfer pricing analysis for

12   the better part of 28 years now.  I'm sorry, 28 years?  Am I

13   doing the math right?  Yes, 28 years.  And on a wide variety of

14   types of intercompany transfers, as well as a wide variety of

15   industries.  So it's spanned the gamut of what's often referred

16   to as documentation reports to tax planning to restructuring.

17   I have worked in some disputes, and I've also worked on advance

18   pricing agreements.  And my work has pretty much covered the

19   gamut of intangible transfers as well as tangible goods

20   transfers and services, as well.

21   Q    Now, what's an advance pricing agreement?

22   A    It is an agreement that is negotiated between a taxpayer

23   and the IRS that effectively sets the terms under which the

24   taxpayer is going to set their intercompany prices.  So it's an

25   agreement in advance that obviates the need for a lot of

1    documentation.

2    Q    Now, have you done any court work in the transfer pricing

3    area?

4    A    Yes.  I have -- I worked on a number of litigation -- tax

5    related and transfer pricing related litigation matters on a

6    consulting capacity.  I have testified, or I have submitted

7    expert reports, I should say, in two foreign jurisdictions, in

8    Mexico and Ecuador, but I have never submitted expert testimony

9    before either a U.S. tax court or U.S. federal court in a

10   transfer pricing proceeding in the United States.

11   Q    So this will be your first time?

12   A    Yes, it will.

13   Q    All right.  Now, can you summarize your other relevant

14   experience in other areas like antitrust, commercial, and

15   energy disputes?

16   A    Certainly.  So over the course of my career I've worked

17   across a wide range of different types of matters and different

18   types of litigation or other dispute proceedings.  In the area

19   of antitrust I have testified both on damages issues as well as

20   conduct issues; for example, monopolization cases.

21         In the areas of commercial litigation, I've worked on

22   a number of contract disputes often involving valuations.  Some

23   of those -- or damages.  Some of those disputes also involved

24   investment disputes.  So a breach of reps and warranties, for

25   example, which involved significant amount of work of forecasts

1   that were prepared prior to an investment.  And I've worked on

2   a wide range of energy matters, as well as some intellectual

3   property matters, as well.

4   Q   Now, as of the date of your report, had you previously

5   worked on any engagements relating to the pharmaceutical

6   industry?

7   A   As of the date of my report I had done some, but my --

8   although my experience in the pharmaceutical industry is

9   nowhere near as extensive as my former colleague's,

10  Dr. Manning, I had been retained as an expert on an antitrust

11  matter involving an antitrust -- involving the pharmaceutical

12  industry.  I had worked on a breach of contract case involving

13  a pharmaceutical manufacturer and a distributor.  And I had

14  worked with one of my colleagues on a pharmaceutical transfer

15  pricing case.

16          I had some broader responsibility at Bates White for

17  helping to develop a suite of econometric techniques that were

18  being used for primarily pharmaceutical marketing, but I was

19  not directly involved with the actual implementation of those

20  at the client site, for example.

21  Q   Let's zero in a little bit on what you are doing here.  So

22  are you familiar with the § 482 regulations and what they are?

23  A   Yes, I am.  So the § 482 regulations, as I understand them,

24  are the section of the Internal Revenue Code that govern

25  transfer pricing.  As a transfer price -- as a transfer pricing

1    practitioner, I have referred to those regulations over the

2    course of my entire career beginning back in probably 1993 when

3    I first joined KPMG.  So I refer to them primarily as guidance

4    the same way that I also refer to the OECD guidelines?

5    Q    What are OECD guidelines?

6    A    I'm sorry, the OECD transfer pricing guidelines are

7    published by the Organisation for Economic Co-Operation and

8    Development.  They effectively provide, you know, broad brush

9    guidance to the OECD members, including the United States,

10   regarding basic transfer pricing principles.  Actually, more

11   than basic principles.  Often with a large amount of additional

12   guidance in them, as well.

13   Q    Now, you are not offering legal opinions regarding the

14   regulations, are you?

15   A    No.  I'm not.

16   Q    Okay.  What is transfer pricing?

17   A    So transfer pricing arises in the pricing of any

18   intercompany goods or services.  It's not necessarily only

19   within kind of the corporate framework, but also sometimes

20   within kind of the broader network of related parties.  So you

21   might have transfer prices even when there is not a complete

22   overlap of ownership.  It goes fairly broadly to the

23   determination of effectively administered prices rather than

24   market prices.

25   Q    Now, is transfer pricing limited to tax issues?

1    A    No.  And I think that's why I believe Dr. Manning referred

2    to transfer pricing as a topic that's actually taught in

3    economic departments.  It's not an extensive area of study, but

4    it is one that has some important ramifications for companies'

5    compensation decisions for managers, for example, based on a

6    relative performance of a given division.  It can also have a

7    significant impact on a company's basic make versus buy

8    decision depending on how they set their internal transfer

9    prices.  It can also come up in the context of bankruptcies and

10   not just tax disputes.  How they set up their internal pricing

11   policies.

12   Q    And we need to keep Mr. Brandell in mind when you are going

13   through this.

14   A    Thank you.

15   Q    So have you been qualified to testify on economics in court

16   proceedings before?

17   A    Yes.  I have several times.

18          MR. WEAVER:  Your Honor -- Your Honor, at this point

19   in time I'm offering Dr. DeRamus as an expert in the field of

20   economics in transfer pricing.

21          THE COURT:  Mr. Magee?

22          MR. MAGEE:  I have no objection on the economics,

23   Your Honor.  I have reservations about the extent of his

24   transfer pricing experience, which I am happy to cover on

25   cross-examination.

1      THE COURT:  All right.  Very good.  Then we'll proceed

2   and hear Dr. DeRamus's opinions.

3   BY MR. WEAVER:

4   Q   So Dr. DeRamus, let's start, if we look at page 9 of your

5   report, and I certainly don't want you to read page 9, but you

6   were asked to do a number of things, and could you just

7   basically summarize for the Court the scope of your analysis,

8   what you were asked to do here, please?

9   A   Certainly.  And I probably -- it is -- there is a long list

10  here.  So it's probably easier to think of it in terms of two

11  big buckets.  So I'll call it bucket A is -- I was asked to

12  evaluate the economic opportunities, the commercial

13  opportunities faced by Perrigo US as it contemplated turning

14  into the U.S. omeprazole market in the early 2000s and

15  particularly after it entered into the Dexcel contract.

16      The second issue I was asked to address was whether

17  the assignment of the Dexcel contract to LLC had any economic

18  effects or commercial effects on Perrigo US either considered

19  in isolation or Perrigo as an entire company.

20      Third, I was asked to evaluate whether the $8 77,000

21  assignment price corresponded to the value of the opportunity

22  reflected in the Dexcel contract.

23      And, fourth, I was asked to evaluate similar issues

24  with regard to coated nicotine gum, fexofenadine and

25  desloratadine.

Q    Okay.  So that was bucket A, right?

A    Correct.

Q    Why don't you now describe what you were doing for bucket B.

A    So bucket B is really turning more towards the actual pricing of the transaction.  So the first thing I was asked to do was to provide my opinion as to the arm's-length price of the sale and distribution agreement between LLC and Perrigo US.

The second thing I was asked to do was to provide my opinion of the arm's-length price of the assignment agreement.

The third thing I was asked to do was to review and respond to Dr. Frisch's report and, to a lesser extent, some of the other experts, such as Mr. Kennelly's and Mr. Broadhurst's report.

And the last thing I was asked to do was to perform certain calculations at the request of counsel, which I understand are intended to reflect the requirements of the -- commensurate with income or the CWI provisions --

MR. MAGEE:  Objection, Your Honor.  Objection.  There is no mention of commensurate with income in his entire report.

THE COURT:  Well, he is only telling us what he was asked to do.  If there is no mention of it, he didn't do it.

MR. MAGEE:  He was asked to do some computations, but his report contains no mention of commensurate.

THE COURT:  The only question so far, Mr. Magee, is

1   what he was asked to do.  So he is not actually reporting, and

2   if and when Mr. Weaver gets to those calculations you can renew

3   your objection.

4           MR. MAGEE:  Thank you, Your Honor.

5   BY MR. WEAVER:

6   Q    All right.  Dr. DeRamus, could you finish your answer?

7   A    Yes.  I was asked to perform certain calculations, which I

8   understood to be intended to reflect the requirements of the

9   482 commensurate with income standards.

10  Q    Now -- now just briefly, again, we do not want to go into

11  great detail, but I'll just point out for the record, since

12  your report is a demonstrative, Appendix B on pages 130 to 153

13  list the materials that you have considered, is that correct?

14  A    That's correct.

15  Q    A lot of materials, right?

16  A    That's correct.

17  Q    Okay.  And can you just briefly, briefly summarize the

18  types of information you considered?

19  A    It would have been a broad range of the documents that have

20  been produced in this case, including strategic analyses, board

21  presentations, general overviews of the company, and

22  information regarding the Dexcel contract.  I reviewed a number

23  of deposition transcripts, as well, and a number of forecasts

24  if I didn't already say that.  Those were particularly

25  important for my analysis, and other publicly available

1    information as well.

2    Q    Now, before we get to your conclusions and a summary of

3    your conclusions, let's just start with the analytic framework

4    that you brought to your assignment.  So can you tell us a

5    little bit at a high level about your analytic framework?

6    A    Certainly.  And with transfer pricing analysis in general,

7    the overarching analytical framework is the arm's-length

8    standard.  That's kind of -- I would think of that as almost

9    like the wrapper around which kind of all of your analysis has

10   to come into.  So when you apply the arm's-length standard, I

11   analyzed the functions, assets, risks; that's the core of

12   transfer pricing analysis, along with the contracts and the

13   conduct.  It's a very fact intensive review to then determine

14   how to appropriately price the transactions at issue.

15   Q    Now, why would you be evaluating conduct?  Why not just

16   look at the contracts themselves?

17   A    So, for one, it's consistent with my understanding of the

18   guidance under the 482 regulations that effectively and as an

19   economist I would expect that related parties can put down

20   anything they want -- they can write anything they want in a

21   related party contract.  That's the whole notion of whether

22   it's administered pricing or administered contracts.  They are

23   simply written down by the parties without any kind of

24   negotiation.

25                So in order to actually -- to actually -- to ensure

1    that the prices reflect arm's-length dealings, you need to

2    actually look at the actual conduct of the parties in order to

3    then accurately price those transactions.

4    Q    Is that especially true when you are dealing with

5    intangible property?

6    A    Very much so.  Intangible property generally is the crown

7    jewels of a company.  They often -- by definition the

8    intangible property generates substantial returns far more than

9    tangible property, and there is -- it's an area where there is

10   the greater potential for taxpayer abuse and then the need for

11   greater rigor in understanding exactly the conduct of the

12   parties.

13   Q    Now, we've heard many witnesses, both fact and experts,

14   testify about risk.  You mentioned functions, assets, and

15   risks.  Can you elaborate on the approach, the analytic

16   approach, that you use when you review risk?  Let's talk about

17   risk.

18   A    Certainly.  And I really kind of put it into five buckets

19   of -- er, five issues that I, as an economist, need to analyze

20   when it comes to risk.  The first -- particularly a transfer of

21   risk.  So the first is whether the party that is assertively

22   bearing the risk actually has the financial capability to bear

23   that risk.  The -- so it's a capability of bearing the risk.

24        The second big issue is whether the party has the

25   ability to manage a risk, and that's particularly important in

1    a transfer pricing context.

2         The third issue is whether the price that was

3    assertively paid for the value at risk that was apparently --

4    that was assertively transferred between two parties, whether

5    that price, in any way, corresponds to that value.

6         And fourth is timing.  You know, with time all risks

7    resolve.  So understanding the exact timing of when a transfer

8    occurs is particularly important.

9         The last issue is more of a -- the fifth issue is more

10   of a broader perspective, which is, is this the type of risk

11   that I, as an economist, would expect a commercial enterprise

12   to actually want to transfer?  So, for example, the R&D

13   functions sometimes is the most risky portion of a company's

14   activity, and sometimes a company -- a multinational company

15   may decide to move that R&D function from one country or

16   another to -- or maybe to centralize that in one location, and

17   then so that the resulting IP is exploited efficiently across

18   its international operations.  So that's the broader context to

19   understand is that a commercially reasonable risk in evaluating

20   a transfer?

21   Q    Now, before we get to your conclusions, one more framework

22   question.  What approach did you take in looking at the

23   arm's-length pricing for the sale and distribution agreement

24   and the assignment?

25   A    Certainly.  So the -- so there are certain types of

1  transactions, certain types of products that are sold even in

2  the market that are so inherently interrelated that you need to

3  really evaluate them together, and that's consistent with the

4  guidelines.  The 482 guidelines say that sometimes you have

5  these goods and services transactions that have these inherent

6  interdependence or interrelatedness.

7  So think, for example, of razors and blades or coffee

8  makers and pods.  The manufacturers of those products sometimes

9  design those so that you can only buy their pods with their

10  coffee makers or their razor blades with their razor handles.

11  So you need to evaluate those market prices as a bundle.  So I

12  concluded that here while there is no necessary product or

13  complementary of demand the way there is with the razors and

14  blades example, there is a need to evaluate the supply and

15  distribution agreement and the assignment agreement as

16  inherently interrelated because the assignment agreement is

17  predicated on the sale and distribution agreement simply

18  because LLC had no ability to perform any of the functions

19  under the Dexcel contract that it was assertively taking on

20  from Perrigo US.

21  Q    Okay.  Now, let's move to your conclusions, and let's just

22  go through them.  What did you conclude regarding Perrigo's

23  opportunities and risks associated with the omeprazole business

24  during the time period leading up to the assignment and

25  thereafter?

A    I concluded that they were very large, that the

opportunities were very large, the sales potential was

extremely large, and that the -- and those were growing over

time pretty much on a month-to-month basis that opportunity was

increasing.  And that the risks of those -- of that opportunity

for Perrigo was declining regularly, particularly after it

entered into the contract with Dexcel.

Q    Let's turn to your next conclusion.  What did you re --

conclude regarding the economic or commercial impact of the

assignment of the Dexcel contract on Perrigo?

A    I concluded that the assignment agreement had no economic

or commercial effects on either Perrigo US considered in

isolation or Perrigo as a company considered in its entirety.

     I -- as I believe Dr. Frisch also recognized that

the -- there were no operational consequences to the assignment

agreement.  Perrigo US continued to perform the same functions

it performed before, primarily because LLC had no employees.

It had no tangible assets.  It had nothing other than the piece

of paper, the assignment agreement itself.

     And, furthermore, LLC was not even capitalized prior

to March 2008; in other words, right as the product already was

launching in the United States, and its effectively all risks

were resolved.

     With regard to -- I think the real core area

disagreement with -- between me and Dr. Frisch on this issue is

1    really with regard to whether risks were actually transferred

2    from Perrigo US to LLC as a result of the assignment.  And so

3    back to my five issues that I evaluated.

4          You know, first, I concluded that LLC had no ability

5    to bear the risks that it was assertively taking on.  Probably

6    the primary reason because it wasn't capitalized prior to March

7    1, 2008.

8          Second, LLC had no ability to manage the risks or

9    the -- and by this I mean the broad range of activities that

10   Perrigo US had to do in order to ensure a favorable outcome to

11   its business.

12         Third, I concluded that the $877,000 assignment value

13   or assignment price had no relationship to the actual value of

14   the opportunity even on a risk-adjusted basis as I believe

15   Dr. Frisch also agrees.

16         And then, fourth, on the timing issue that the --

17   effectively the -- as I evaluated the actual timing of the

18   transactions, that by the time -- certainly the time that cash

19   was actually paid to Perrigo US for the $877,000 that was in

20   March of 2008, all risks had been resolved.  So the timing of

21   the payment didn't match up to when the risks were assertively

22   in place.

23         And then with regard to kind of the overall wrapper

24   question of, is this an economically reasonable risk to expect

25   Perrigo to have -- or unrelated parties to have transferred?  I

1    also concluded it was not one of those risks.

2         Ultimately the value of the opportunity and the risks

3    associated with that opportunity were very much tied into

4    Perrigo U.S.'s own intangible assets, and ultimately Perrigo US

5    is a very diversified portfolio of products.  And as I saw the

6    transaction, the conclusions I drew is Perrigo US was

7    effectively taking out four of the largest profit potential

8    products from its portfolio and shifting them to these overseas

9    uncapitalized affiliates, and, therefore, basic portfolio

10   theory tells us that you have increased the risk of Perrigo

11   US's portfolio, not decreased it.

12   Q    And why would you be increasing the risk of Perrigo's

13   portfolio by transferring these things overseas?

14   A    Well, because, as I said, these are the -- from the

15   perspective of the time, these were the crown jewels, the

16   opportunities to provide the greatest upside.  So you have

17   removed the upside potential for -- the very large upside

18   potential from these four products.

19        And so by definition, the remaining portfolio of

20   products you have are going to be more risky because you still

21   incur risks with all of those, as well.  It's just those have a

22   less of an upside opportunity.  And many of them actually have

23   even greater costs associated with getting them to market for

24   Perrigo.

25   Q    Now, were there any elements of the parties' conduct that

1    affected your conclusions about risk transfer?

2    A    Yes.  I would say probably first and foremost is the fact

3    that Perrigo US signed the performance guarantee with Dexcel, a

4    third party, in December of 2007, so fully one year after the

5    date of the November assignment.

6         The second issue would be the fact that Perrigo US

7    continued to actually bear the cost of -- associated with the

8    Dexcel contract, i.e., the paragraph IV litigation costs all

9    the way up to March of 2008.  So it was only reimbursed for

10   those costs by LLC after the fact and after all risks

11   associated with those expenditures had been resolved.

12        A third issue would have been the fact that Perrigo US

13   signed the -- an additional third-party contract; mainly the

14   quality assurance agreement in, I believe, 2009 with Dexcel.

15   That is not what I would have expected in -- if Perrigo US had

16   been released of the risks and obligations of dealing with

17   Dexcel.

18        And the fourth area would be -- or the fourth area of

19   conduct is really kind of a broader bucket of conduct, and it's

20   really all of the ongoing risk management activities I observe

21   Perrigo US continuing to perform as its dealing with everything

22   from the compare to statement, which we've heard a lot about,

23   to packaging, marketing, pricing; you name it.  Kind of that

24   broader bucket of activities.

25        And then maybe last but not least the one curiosity

that I observed is that as we are talking about all these risks

and what risks were transferred, the most risky element of this

whole business is the new product development portion.  And as

we heard from Mr. Papa, the one portion associated with the

U.S. omeprazole business where the risks were not transferred

over to the LLC were these continuing efforts in the United

States to develop another omeprazole product, which ultimately

did receive approval in, I believe, 2015.

Q    Now, let's move to another conclusion.  What did you

conclude about the -- whether the 877,000 and change

consideration amount in the assignment, whether that was

consistent with the value of the Dexcel contract?

A    I concluded it was not.  It was -- and it was not off by a

small amount.  It was off by many orders of magnitude.  It was

based on the wrong method, the cost-plus method, which I

believe Dr. Frisch also agrees with, and it was also based on

the wrong -- even the wrong data inputs.  The costs that were

developed weren't really related to the Dexcel contract, but

they were related to Perrigo's, I believe, their own internal

development efforts and with regard to probably expectations of

costs under a prior contract, namely, the Schwarz contract.

        But more important to me than how they got to the

number is just that the overall value that I concluded, the

actual value of that contract, was $630 million in NPV terms as

of March 1, 2008, given everything I know today about the

1    actual sales experience of the -- and profit experience of that

2    product.  And even though Dr. Frisch disagrees with me in terms

3    of what the overall value is of the Dexcel contract, he also

4    agrees that it was orders of magnitude greater than this

5    $877,000 nominal assignment price.

6    Q    Now, did you come to any conclusions regarding

7    desloratadine, fexofenadine, and coated nicotine gum?

8    A    Yes.  I came to similar conclusions with regard to my

9    opinion that LLC or Perrigo Denmark were effectively empty

10   boxes with regard to those transactions as well.  Like the LLC,

11   Perrigo Denmark also had no employees and performed no

12   functions and prior to the assignment had no financial ability

13   to bear whatever risks there are related to the coated nicotine

14   gum product.

15         I also concluded that the assignment values determined

16   for desloratadine and coated nicotine gum of 872 to 875

17   thousand dollars were also far below the values of those

18   opportunities.  And with fexofenadine there wasn't even any

19   assignment value paid because the LLC simply entered into the

20   contract with a third party in the first instance.

21   Q    I would only note, I am not sure if I heard 872 to 875.

22   You may be a little off on the numbers, but you got them about

23   right, right?

24   A    Yes.  It was in the low 800,000s for one and the high

25   800,000s for the other for coated nicotine gum and

1    desloratadine.   The numbers are in my report if you want me to

2    refer to them.

3    Q    All right.  Well, let's go from bucket A now, and let's go

4    to bucket B.  Did you come to any conclusions regarding the

5    arm's-length pricing of the sale and distribution agreement?

6            And let's start by pulling up Exhibit 5505,

7    Dr. DeRamus.  This is a demonstrative that you prepared, is

8    that correct?

9    A    That's correct.

10   Q    All right.  So with this demonstrative, tell us about your

11   conclusions regarding the arm's-length pricing of the sale and

12   distribution agreement.

13   A    Okay.  So I think the first thing to do is to -- as you

14   look at the exhibit or the demonstrative if you can imagine

15   without LLC in the middle.  So that's the prior to LLC being

16   formed.  Dexcel was on the left, and Perrigo US was on the

17   right.  Perrigo US had had the entirety of the business

18   opportunity associated with the Dexcel contract and the sale of

19   omeprazole in the United States.

20           So in November of 2006, the -- Perrigo then inserted

21   LLC in between them, and again, I have an empty box for LLC

22   because, as I said before, I concluded it had no -- it

23   performed no functions, it had no people, and had no capital.

24           And in doing so, then, there is this -- the red line

25   at the bottom you'll see kind of the Perrigo performance

1    guarantee because ultimately I color coated it red because I

2    think it is intimately connected in with the assignments and

3    the sales and distribution agreements.

4         But when it comes to kind of pricing the sale and

5    distribution agreement and the assignment agreement, as I said

6    before, you need to look at them together, and it does require

7    a little bit of mental gymnastics.  And one reason is because

8    the transaction itself is highly unusual.

9    Q    I'm always wary about mental gymnastics, but let's jump in.

10   A    Okay.  So imagine this had been a sale of the Dexcel

11   contract to a third party.

12        THE COURT:  When you are doing gymnastics, think yoga

13   and slow down.  Okay.  We are not going to be able to go at

14   your current pace and hear it, let alone transcribe it.  Okay?

15        THE WITNESS:  Okay.  Understood.

16        So in a typical arm's-length transaction, if somebody

17   wants to sell their business, then they figure out the price,

18   they turn it over to the buyer, and then you walk away, and the

19   seller goes and does whatever it was going to do anyways.  It

20   pursues other opportunities, whether it's leisure or work or

21   whatever.

22        Here, Perrigo, since LLC is incapable of performing

23   any functions, then Perrigo US can't simply sell the entire

24   opportunity to Dexcel for an arm's-length -- I'm sorry, to LLC

25   for an arm's-length price, but it must enter into this sales

1    and distribution agreement, or, rather, LLC can't simply

2    purchase the assignment and walk away.  It has to stay in the

3    deal with and keep Perrigo US in the deal via the sale and

4    distribution agreement.  That's my understanding of why there

5    would have been a provision in the assignment agreement that

6    actually required it to do so.

7         Now, this is effectively -- think of it as one

8    equation and two unknowns.  So the total value of the

9    opportunity is Perrigo U.S.'s before they enter into the

10   agreement.  That's what Perrigo US has, and that's its outside

11   option, or that's -- its reasonable economically available

12   alternative is simply to continue along as it had been doing

13   prior to the assignment.  Do all the functions it did after the

14   assignment.  Enter in the profits therefrom.

15        So when it enters into this particular agreement, it

16   had the sum total of the compensation under the sales and

17   distribution agreement and the assignment agreement has to add

18   up to the total value that Perrigo US would have expected.

19        And I believe that's generally the framework that

20   Dr. Frisch applies, although I don't think he really draws it

21   to both its logical conclusion, nor does he implement it in the

22   way that I think is most reasonable.  And I think the most

23   reasonable way to apply it is to effectively take the -- so you

24   have to -- with one equation and two unknowns, you need to

25   assume something about one of those unknowns.  You need to fix

1    one of those so that you can solve for the other one, and I

2    think the right unknown to fix is the value of the assignment

3    agreement because that $877,832 is a known number.  That is

4    what was actually paid or asserted to be paid with the demand

5    note in 2006, or whenever it was actually signed.  That is the

6    hard -- the only hard number I have as of 2006.

7          So I take the $832,000 as given and then --

8    BY MR. WEAVER:

9    Q    $877,000?

10   A    I'm sorry, $877,000 assignment price as given, and then I

11   can then value the compensation that Perrigo US should receive

12   under the sale and distribution agreement, and I can do so by

13   looking at the things that economists always look to in

14   transfer pricing analysis; namely, the functions, the assets,

15   the risks of -- and the conduct of both LLC on the one hand and

16   Perrigo US -- and I'm sorry, on Perrigo US on the other.

17   Q    So applying that approach, what did you conclude?

18   A    I concluded that, you know, based on that functions,

19   assets, and risks analysis, that because LLC provides no

20   value-add, it provided no functions, and as I concluded in my

21   analysis it also incurred no risks, that effectively Perrigo US

22   should receive all of the compensation under that contract as

23   effectively all of the value-add is attributable to not only

24   the kind of the routine functions that Perrigo US is doing but

25   also because of these valuable other U.S. intangibles that it's

1    bringing to the business.

2    Q    Now, we are going to go into it a little more detail later,

3    but let's pull up Exhibit 5434.  This is a table from your

4    report, Dr. DeRamus, and can you tell how this relates to your

5    opinion when you are trying to derive an arm's-length price for

6    the sale and distribution agreement?

7    A    Correct.  So the affirmative opinion is in the top row.  It

8    shows zero income for LLC and then all of the remaining income

9    being allocated to Perrigo US for the reasons that I just

10   described.  I also performed four different sensitivity

11   analyses in the event the Court were to disagree with my

12   conclusion that there were no risks associated with the actual

13   investment or cash that -- I hesitate to even characterize it

14   as an investment, but with the cash that was paid by LLC to

15   Perrigo US, if the Court were to apply that framework, then I

16   have these four alternative scenarios.  That's why I consider

17   them sensitivity analyses, and they also confirm the overall

18   reasonableness of my -- of the first line.

19   Q    Let's come back to the details on that --

20   A    Okay.

21   Q    -- and keep going.  So let's go now -- just at a high

22   level, did you come to conclusions regarding the arm's-length

23   value of the assignment agreement?

24   A    Yes, I did.  So going back to that basic valuation

25   framework or transfer pricing framework of the need to consider

1    these two transactions, the sale and distribution and the

2    assignment as an integrated transaction, you can flip the

3    transaction the other way than what I just described here,

4    i.e., you can -- you can assume something about the sale and

5    distribution agreements and then price the assignment

6    agreement.

7          I think that that has some important conceptual flaws

8    associated with it.  Probably most importantly because in doing

9    so the -- because the terms of the sale and distribution

10   agreement that the parties actually put in place, the pricing

11   terms are so low relative to the intangibles.  The other

12   intangibles that Perrigo US continued to contribute to the

13   business that effectively that remaining assignment value

14   sweeps in the value of Perrigo U.S.'s additional intangibles

15   back to the mass customization, the managing the customer

16   relationships.

17         So it becomes -- I think Dr. Frisch called it a Ragu,

18   which I think is actually an apt characterization, which is the

19   result of that assignment that we flip it on its head whereas

20   when I do it the first way, value in the sale and distribution

21   agreement, Perrigo US I think is appropriately compensated for

22   its intangibles on an ongoing basis through the sale and

23   distribution agreement.  And it also focuses on the years at

24   issue, and you don't need to make any assumptions about

25   forecasts.  Here you have to fix not only the assumption under

1   the sale and distribution agreement but also you have to

2   determine the total value of the Dexcel contract.

3   Q    Now, I hesitate to pull up Exhibit 5455.  It's a table out

4   of your report.  It's fairly busy.  But I am pulling it up to

5   ask you the next question.  Did you do the math, a discounted

6   cash flow, even with the reservations you just expressed?

7   A    Yes.  So this is -- this result is based on the actual cash

8   flows earned by Perrigo US during 2008 to 2012, and every time

9   I say the years, note that I am talking about the fiscal years.

10  So I had the actual results for 2008 to 2012.  Dr. Frisch's

11  report had sales from 2013 to 2017.  So the cash flows

12  resulting from those sales are estimates.  The sales are

13  actuals, and then I have an estimate of the terminal value in

14  the out years.  And so the conclusion that I came to is that

15  the actual value of the assignment and, as I said before, the

16  total value of the Dexcel contract is $663 million.  I'm sorry,

17  $632 million.  That's on row 26.  And the value of the

18  assignment to LLC is $474 million, which is on row 27.

19  Q    And then you've converted that into a royalty rate to the

20  rate there of 21-some percent, correct?

21  A    That's correct.

22  Q    All right.  What conclusions did you reach regarding

23  Dr. Frisch's report?

24  A    Well, Dr. Frisch and I agreed that the 877 was not reliable

25  and not an arm's-length price.  We also agree, as I understand

1   from his testimony, that Perrigo US -- I'm sorry, that LLC

2   performed -- had no operational consequences for Perrigo US,

3   and I believe that probably is about it.

4       So Dr. Frisch in his approach, he used a -- he used

5   forecasts to estimate -- to apply the discounted cash flow

6   method to estimate the assignment value in that second way of

7   doing it that I just described.  I think his reliance on

8   forecasts were -- those forecasts were unreliable for valuation

9   purposes.

10  Q    Why would that be?

11  A    They were not prepared with a level of diligence that I

12  would have expected in an arm's-length transaction.  I have

13  been involved in arm's-length transactions, and I know the

14  level of research and diligence that's done for those purposes.

15  They were done for capital budgeting and other planning

16  purposes, but not for purposes of actually negotiating a sale

17  and, therefore, determining an arm's-length price of that

18  contract.

19      But in the grand scheme of things, that's actually a

20  nit.  Even though it's an important nit, but the bigger issue

21  is using any of these forecasts.  These forecasts are very --

22  they are highly variable.  So your valuation will depend quite

23  a lot depending on which one you use.  But because the

24  valuation at the end of the day of all these forecasts is

25  considerably less than Perrigo U.S.'s -- er, I'm sorry,

1    Perrigo's actual profit experience.

2    Q    Why does that matter?

3    A    Because if you try and roll back time and pretend as if

4    Perrigo US -- I'm sorry, pretend as if LLC had actually paid

5    Perrigo US the price implicated by one of these forecasts, then

6    LLC by definition will get the benefit of a bargain it didn't

7    make.  It didn't pay $37 million in 2006.  It didn't pay $43

8    million on -- in Dr. Frisch's other approach.  It paid

9    $877,000.

10   Q    When did it pay that $877,000?

11   A    So I concluded it only paid that $877,000 in March of 2008

12   after all those risks were resolved.  So on that basis from an

13   economic perspective and from an arm's-length standard

14   perspective, giving LLC the benefit of that bargain that it

15   didn't make would effectively give LLC a risk free return of

16   hundreds of millions of dollars evaluated over the past years

17   where we have available data.

18   Q    Now, again, despite your reservations that you just

19   expressed, you have done calculations, correct?

20   A    Yes.  I have.

21   Q    So let's look at Exhibit 5511, please.

22   A    Okay.

23   Q    And can you walk us through your calculations

24   notwithstanding your reservations using a discounted cash flow.

25   A    Okay.  So the analyses are book-ended on the top by the LLC

actual payments.  So there is the $870,000 actual assignment price.  The bottom row, F, is applying the discounted cash flow methodology, the one that I applied to the actual profit experience of Perrigo, and that's where I derive the $474 million assignment valuation, again, taking the 4.31 percent operating margin and 10 percent kicker of the sale and distribution agreement as given.  That's separate compensation off to the side.

    Now, Dr. Frisch's opinion is on row B, $37.4 million, and I am focusing here on --

Q    Slow down, please.  Slow down just --

A    Yes.

Q    Okay.  Good.  So $37.4 million.  Pick it up from there, please.

A    Yes.  I'm sorry.  So the $37.4 million is Dr. Frisch's opinion.  Obviously it's many multiples of the actual payment. I concluded that there was a major conceptual error in how Dr. Frisch implemented his calculation.  I made one change to his -- or one major change to his assumptions with regard to his SG&A assumption in row C, and that one change in SG&A then moves the valuation up to $58.4 million.

    The next change I made was to evaluate based on all of the forecasts I had available to me to evaluate what was the information that was known or knowable, which I believe is the right stand to apply a valuation if you are using forecasts.

1    What was the information that was known or knowable to

2    Perrigo as of November 2006?  And I concluded based on those

3    forecasts that there was a number of assumptions that the

4    analysts could have made.  I know they could have made them

5    because Mr. Schutt implemented a number of them in June of

6    2007.

7    So I took his implementation of many of those

8    assumptions, and I applied that to the June 2006 forecast that

9    Dr. Frisch used, and that gets me to row D, which results in an

10   assignment value of $126 million.

11   So, finally, you know, it's my opinion -- or,

12   actually, I shouldn't say finally.  There is two additional

13   analyses with forecasts that I did.  The one that's on the

14   sheet on this demonstrative here of $175 million is effectively

15   the forecast price or the forecast based price that is based --

16   if the Court were to decide that forecasts are appropriate to

17   use in this instance, I think that is the most reasonable

18   number to use, and, frankly, I think it's a low estimate of the

19   assignment value, and it is -- relies on a March 1, 2008,

20   valuation date, a date that I selected because that's when I

21   concluded that even a scintilla of risk was transferred from

22   LLC to Perrigo US with the actual 800 -- I'm sorry, $877,000

23   assignment price payment.

24   So since that's the date of the valuation, the most

25   recent available information to me is a forecast from December

1    2007, and that gets you the $175 million.

2    Q    And are you referring to the -- the couple of year

3    forecasts that we looked at with Mr. Papa that Chris Epple

4    forecast?

5    A    That's correct.  And I combined that information with

6    some -- some of the additional information that for the out

7    years.  Since that was only a 2008 and 2009 forecast, I had to

8    combine that with 2010 and forward forecasts from earlier

9    forecasts, and I used, again, Mr. Schutt's July 18th, 2007

10   forecast for that purpose.

11         I should also say in my report I also have a

12   valuation, if the Court were to decide that the use of

13   forecasts were reasonable and that rather than March -- using a

14   March valuation date if one were to use a June valuation date

15   consistent with the date on which the assignment agreement

16   appears to have been signed or approximately signed, then

17   the -- using Mr. Schutt's forecast from July 2007 as the

18   appropriate -- would be the appropriate basis, and that

19   produces a NPV, an assignment price, of $127.8 million.  So a

20   little bit more than what's on row D.

21   Q    Now, again, just to wrap up this demonstrative, what is

22   your opinion with respect to the assignment value?

23   A    So again, my assignment -- my conclusion about the

24   assignment value is that it's the best evaluated in conjunction

25   with the sale and distribution agreement and you evaluate that

1    as a single transaction, and for that purpose you take the

2    assignment price as given, and then you value the remainder

3    under the sale and distribution agreement under which LLC gets

4    zero.

5              The alternative if you were to apply this DCF

6    approach, the arm's-length result would be to use an assignment

7    value of $474 million, and -- which converts to an effective

8    royalty rate of 21.57 percent over the expected life of the

9    entire contract or business.

10   Q    Now, you've been in court in the gallery over the course of

11   the trial, is that correct?

12   A    Yes.  I have.

13   Q    Did you hear anything over the course of the trial that

14   changed your views?

15   A    No.  In fact, everything that I heard further confirmed my

16   opinions on this matter.

17   Q    All right.  So now with that overview, Dr. DeRamus, let's

18   go back to your analysis of economic effects.  And while your

19   analysis is fairly extensive in your report, and we have

20   limited time, let me focus a little bit on certain things and

21   especially risk.  In your risk analysis did you review the

22   terms of the Perrigo contract with Dexcel?

23   A    Yes.  I did.

24   Q    And what did you conclude from that review?

25   A    Well, I concluded what -- the same thing that I think just

1    about every witness who has described those has also concluded;

2    namely, that the terms of that contract resulted in

3    exceptionally limited downside risks, i.e., a risk of loss to

4    Perrigo US when it entered into that contract.

5          The $100,000 signing amount is effectively the only

6    thing that was at risk prior to the commencement of the

7    paragraph IV litigation.  The paragraph IV litigation expenses

8    that were initially determined to only be $500,000, again

9    capped, only started to accrue after that litigation commenced.

10          And then the remaining $500,000 commitment wasn't an

11   at-risk payment because that payment was conditional upon the

12   receipt of the final FDA approval, i.e., after all risks

13   associated with the ability to commercialize that product were

14   fully resolved.

15   Q    And I would just note, would you agree that that litigation

16   amount obligation increased in actuality from half a million

17   dollars to $750,000?

18   A    Correct.  And I would say the fact that that was increased

19   and by whom is still a bit of a mystery to me in terms of

20   trying to link it back up with the assignment agreement because

21   based on the accrual of the litigation expenses, the $500,000

22   threshold would have had to have been exceeded after August of

23   2006 -- after -- I'm sorry, after November of 2006.

24   Q    Okay.  Now, did the terms inside the August 2005 Dexcel

25   contract, the one between Perrigo and Dexcel, did the pricing

1    terms in there, in that agreement, inform your view of

2    Perrigo's risks?

3    A    Yes.  That setting aside even these upfront payment amounts

4    or these milestone payments that were -- and very modest

5    milestone payments, the very pricing terms themselves released

6    Perrigo US of a lot of risks that you would normally see in

7    third-party licenses particularly in the pharmaceutical

8    industry.  So you think of your typical pharmaceutical license

9    would often be where a developer develops a molecule, will

10   license it to a company that can market it, and will then

11   require a sales-based royalty.  And that sales-based royalty is

12   obligated to be paid regardless of whether the marketer makes

13   any money or not.

14        So the fact it was done as a profit split alone is a

15   risk reduction for Perrigo US.  The fact that Perrigo US was

16   able to deduct a six percent marketing fee before doing the

17   split is a further risk reduction.  And the last element is

18   that even when it came to paying Dexcel for the actual pills

19   themselves, it was all based on Dexcel's costs, not cost plus

20   some profit element on top of that.

21        So Dexcel didn't get anything out of the deal until

22   Perrigo US also made a dollar of profit.

23   Q    Now, you've heard about optionality and option one and

24   option two over the course of the trial.  Does the fact that

25   Perrigo chose Dexcel's option two have any relevance to your

analysis?

A    Yes.  And I think to pull it into economic terms, it's going to -- what economists also refer to as revealed preference.  When you observe -- when a customer has two different bundles of products that it is faced with and it chooses one, you can obviously infer that it prefers that bundle over the other bundle.  And here I think this also -- the revealed preference is important because it reveals something about -- or to me, as an economist at least, it reveals something about Perrigo U.S.'s risks -- risk preferences and assessment of relative risks.

So when it chose option two, it chose to forego access to a lot of information about the FDA approval process, and the paragraph IV litigation in return for something that was very valuable to Perrigo at the time.  And that was its ability to continue its own internal development process.  So that gives -- it doesn't give me an absolute value of how that trade-off is done.  There was a slight change in the dollar terms of the milestone payments, but it was that swapping of information for the ability to continue to -- this freedom to operate -- this continue to develop its own potentially competing product.  That tells me that the development efforts were much more valuable to Perrigo than the access to information.

Q    Now, how does that optionality analysis that you just went

1    through -- I think the term was revealed preference.  How does

2    that relate to your analysis with respect to the November 2006

3    effective date of the assignment?

4    A    So one of the issues that I wrestled with was, okay, I know

5    that the risks are declining over time, but because there are

6    various milestones -- and by over time I mean they -- the risks

7    to Perrigo US substantially declined the moment it entered the

8    Dexcel contract.  Those risks continued to decline further as

9    good news was coming out of Dexcel about some of the

10    bioavailability studies, but the question is ultimately how can

11    I benchmark -- how can I think about the level of risk that

12    Perrigo US actually faced and perceived as of November 2006 of

13    the asserted assignment date?

14          And so one thing I observed that happens between late

15    2005 after Perrigo comes out with the bioavailability -- I'm

16    sorry, after Dexcel comes out with the favorable results of

17    it's fed study --

18    Q    You mean its fasting study?

19    A    The fasting steady.  The bioavailability study.  After the

20    fall of 2005, then what happens in the spring of 2006?  Two

21    things happen.  Three things really happen.

22          One, they file for the FDA approval.  Two, they --

23    AstraZeneca initiates paragraph IV litigation, a risk that

24    Perrigo US fully expected and actually is a positive signal.

25    It means you've gotten through one more gate in the approval

process.  But, most importantly, Perrigo US decides to cease

its internal development -- product development efforts.  So

this to me is a summary statistic as it were.

Q    What's a summary statistic, and explain how that applies

here?

A    So often times economists are looking for one particular

data point to help resolve one question.  So in statistics you

are often looking at, sort of like a T statistic to look at the

statistical significance of a parameter you are estimating, but

conceptually economists are looking for these kinds of

indicators that allows you to benchmark something, to pin down

something that's being estimated with some significant degree

of uncertainty.  And to me as an economist it's uncertain to me

how Perrigo US perceived the risks because I was not in their

shoes, but what I do observe is they decide to forego the very

thing that they bargained very hard for in option two.

        So when they decided that option two was preferable to

option one, they decided to go it alone -- the option of doing

a go-it-alone strategy was very valuable to them.  They wanted

to maintain that option open.  But as of spring of 2006, they

decided that effectively that wasn't an insurance premium that

was worth paying anymore.

        I don't have a precise number.  I don't know exactly

how much their internal development costs were at that time

period, but I can estimate it based on some of the documents

1    I've seen.  It appears to be in the several hundred thousand

2    dollars a year.  It's not like the level of the multiple

3    millions of dollars that you would expect with a -- in terms of

4    the tens of millions of dollars or more that you would expect

5    for an innovative drug, for example.  It's a very modest

6    insurance policy.

7    Q    Okay.  I'd like to go back through the various risk factors

8    that you discussed earlier in your summary and apply them to

9    your analysis of LLC's capacity to bear risk.

10   A    Okay.

11   Q    So why don't you start with the ability to bear risk.

12   A    So I concluded that LLC had no ability to bear risk.  It

13   was -- as I said before, it was not even capitalized until

14   March 2008.  So when I look at the transaction, the parties

15   could have structured it with a cash payment from LLC to

16   Perrigo US as of March -- I'm sorry, as of November 2006, but

17   instead they did it with the transaction with this unsecured

18   demand note.

19          So it's like if I am entering into an insurance

20   contract with a third party, and I am being asked to pay, call

21   it, a $5,000 premium -- annual premium for a $1 million life

22   insurance policy, I need to ensure that the life insurance

23   company has the ability, the cash resources to pay my estate $1

24   million if I pass away tomorrow.  So --

25   Q    Hopefully not.

A    Hopefully not.  And even over time, if over after five

years I've paid in $25,000 of premiums and I die, then the

insurance company can only pay my estate $25,000, there has

been no risk transfer in that scenario.  So that's what I

concluded was effectively the situation with LLC.  It had no

ability to bear that risk of even the risks associated with the

877,000 nominal assignment price in November of 2006.

Q    Now, let's turn to the second factor, the risk factor that

you were evaluating, the ability to manage risk.  How did that

apply?

A    So in thinking about risk management, you need to think

about it more broadly than maybe as often used in common

parlance with companies.  Often times the risk management

function is thought of as kind of a check-the-box thing that

companies do to make sure some of the people aren't going off

the reservation.  So the risk management function from an

economic perspective particularly in transfer pricing analysis

and particularly in transfer pricing analysis as it applies to

intangible assets goes to the fundamental question of who in

the related party transaction is doing the day-to-day

management of these major risks that are assertedly

transferred.

          So in a typical transfer of an intangible, it involves

technology.  If you set up a centralized organization that --

where it might be even in a tax haven where you are doing R&D

1    and you might even be contracting out to related parties to do

2    R&D for -- on a contract basis for -- effectively the mother

3    ship of R&D, you need to have that ability at the headquarters

4    level, wherever the R&D is concentrated, to actually manage

5    those risks.  So that is a -- has been a particularly important

6    concern for transfer pricing practitioners for many years.

7    Q    Now, I think we heard Dr. Frisch characterize LLC as

8    something like becoming the entrepreneur.  How does that inform

9    -- or would you agree with that analysis?

10   A    I entirely disagree with that.  So the whole -- the word

11   entrepreneur is a bit of a buzz word in the transfer pricing

12   world, and so it'll typically come up in the context of a

13   contract manufacturing type operation where you might have a

14   U.S. company that designs, call it, vehicles and sells them

15   overseas, but it might purchase certain components from an

16   assembly operation in Mexico.  And in that context US is

17   performing the entrepreneurial function in terms of deciding

18   the -- what products to produce, how to price those products;

19   you name it.  The forecasting exercise to try and determine,

20   you know, whether to invest in a big piece of plant and

21   equipment.

22          What Dr. Frisch is referring to is really a pure

23   passive-risk-bearing activity.  The kind of risk bearing that a

24   financial investor would do.  And for a transfer pricing

25   economist there is a big, big difference between the risks that

1    a passive financial investor incurs versus the operating risks

2    that we are evaluating particularly in intangible transfers

3    because, recall, what's the whole point of what we are doing in

4    transfer pricing analysis?  We are trying to determine the

5    appropriate allocation of operating income.  You know,

6    occasionally we get down to look at interest income, if it's a

7    new party loan, but as of here the issue is an operating

8    income.

9         And for a party to have a claim on the operating

10   income that's generated by an enterprise, it needs to be

11   managing those entrepreneurial risks, doing what you think

12   entrepreneurs do every day; the people that actually run the

13   company and not simply a passive investment which would be

14   entitled to a dividend, which is a non-tax consequence or in

15   general non-tax.

16   Q    All right.  Let's turn to the amount of payments element in

17   your risk analysis.  Can you expand on that?

18   A    Sure.  Not to beat a dead horse about the $877,000, but I

19   think, again, it's well established or agreed between me and

20   Dr. Frisch that the $877,000 was by no means an arm's-length

21   price.  And because it's not an arm's-length price and because

22   it was off by many orders of magnitude, there is no way from an

23   economic perspective that I could see it as an arm's-length

24   result for LLC to now get the benefit of a hypothetical payment

25   of 37 to 43 million dollars that it never made.  That, to me --

1    the result would be just a huge windfall to LLC because of the

2    fact that these -- the actuals have come out so much better

3    than the forecasts that Dr. Frisch relies on for his opinion.

4    Q    Now, what about the timing?  That was another thing you

5    were considering; the timing.

6    A    Right.  So imagine, you know, I try to enter into a life

7    insurance policy in 2021 that covers my potential death in

8    2020.  Clearly that's kind of an absurd type of contract.

9    There is no reason I would enter into that contract, and I

10   can't believe any insurance company, even one that would love

11   to take my money, I can't believe any insurance company would

12   also do that.

13        Or think, for example, if you have a desire to take

14   out travel insurance.  You can't take out travel insurance

15   after you have completed the trip, right?  So the timing of the

16   transfer is important and critical, I think, in risk assessment

17   and particularly in valuing risk because you need to figure out

18   exactly when risk was transferred in order to accurately price

19   it.  And here I concluded that the earliest date for that risk

20   transfer, and, again, a scintilla of risk transfer, with the

21   $877,000 payment made out of profits that Perrigo US was

22   already earning at the time, that date is March 1, 2008.

23   Q    Now, do you have anything further to say about what you

24   heard from Mr. Papa about the omeprazole magnesium program that

25   I think, if I recall correctly, he indicated restarted in 2009

1    or 2010 or something like that?

2    A    Correct.  And, again, that goes to my opinion that this is

3    an additional indicator that the type of risk that Perrigo US

4    transferred over with the assignment agreement and retained

5    for -- in its domestic program is inconsistent.  That they

6    effectively left the biggest risk in the United States

7    associated with the ongoing -- their ongoing development or

8    their restarted R&D project.  And -- but they also did so in a

9    way that is inherently interrelated with the profits that they

10   are earning from the sale of the Dexcel tablets.

11   Q    How is that?

12   A    Well, as Mr. Papa or, and Mr. Hendrickson said as well,

13   they were concerned about the compare to statement.  I think

14   this was some of the hedging their bets on the compare to

15   statement.  So developing an internal product helps to provide

16   an insurance policy for those additional -- so for the existing

17   sales in the event that there is another product that comes

18   out, we need to put the new and improved product out there.

19           Probably most importantly, in terms of how it actually

20   played out is I think it actually helped to forestall

21   competition from other producers because Perrigo US, when it

22   obtained its actual FDA approval, it obtained 180-day

23   exclusivity, and it did so even though it didn't launch right

24   away.  It didn't -- and I don't know if it's launched to this

25   date.  But as of -- at least as of 2017, I know it had not

1    launched that despite the fact that it obtained that FDA

2    approval.  And so that effectively helped to ensure -- it

3    helped to enable Perrigo US to earn lots and lots of profits.

4    I'm sorry.  It helped to enable Perrigo LLC earn lots and lots

5    of profits on the sale of the Dexcel omeprazole tablets.

6    Q    I'd like to bring up Exhibit 458, Plaintiff's Exhibit 458.

7    You mentioned Mr. Hendrickson, and I believe hopefully

8    correctly that Mr. Hendrickson addressed a compare to statement

9    in connection with this particular exhibit during his direct

10   testimony.

11   A    Correct.

12   Q    Can you explain your view of this document with respect to

13   compare to issues?

14   A    Certainly.  So one thing that I was -- wanted to understand

15   as an economist is exactly what was the impact on Perrigo

16   U.S.'s business -- I'm sorry, Perrigo's consolidated business,

17   so the entirety of the omeprazole business, upon the

18   introduction of Dr. Reddy's, and also what happens when there

19   is competition in the market and what is the actual -- what was

20   the actual effect of a lack of that compare to statement?  And

21   here I did observe that there were some losses from some

22   competitors by -- some sales losses to Dr. Reddy's after

23   Dr. Reddy's came into the market.

24            But the big surprise is, number one, those sales

25   losses were exceptionally modest relative to the volumes that

1    Perrigo US was selling at the time and certainly modest

2    relative to the projections that Dr. Schutt -- I'm sorry,

3    Mr. Schutt described and that Dr. Frisch relied upon.

4         The other thing that I observed that -- the other

5    surprise is Perrigo US maintained its pricing at a very

6    aggressive level, i.e., it did not drop its prices by the

7    percentages that we observed in the forecasts, but instead it

8    maintained its prices very high, and this e-mail from -- from

9    Walmart, and then we see the internal reaction to it, I read to

10   really reflect the nature of those pricing negotiations where

11   Walmart was demanding a reduction in its prices, as you'll see

12   at the bottom part of the e-mail, back to a level which is

13   consistent with its other over-the-counter products.

14        So, yes, that bottom block that you are highlighting,

15   it talks about the decision based on Perrigo's final pricing,

16   not based on Perrigo's lack of a compare to statement.  And

17   then as you go up in the e-mail chain, I interpret that as

18   Perrigo deciding to -- well, they offer to meet with Walmart

19   and discuss it.  The top line statement is one that I interpret

20   as Perrigo US effectively digging in on its pricing, and so the

21   profit maximizing decision is to continue to hold the line on

22   pricing.  And I shouldn't say hold the line entirely because

23   there were some price reductions during this time period, but,

24   like I said, they were far, far less than what were forecasted.

25   And by not dropping those more significantly, Perrigo US

1    maximized the aggregate profits for Perrigo US and LLC combined

2    and Dexcel.

3    Q    Did you hear any testimony from Mr. Schutt and his

4    projections that influence your view of the compare to concern

5    that has been expressed here over the course of the trial?

6    A    Yes.  So recall when Mr. Schutt was describing the more

7    aggressive pricing assumptions, that he was including in his

8    July 18th, 2007, model.  So he had new information about the --

9    or new information to him at the time about the margin that

10   Prilosec OTC, the national brand product, was earning on

11   Prilosec, and that effectively provided an opportunity for

12   Perrigo to raise its prices and effectively squeeze the margin

13   to the retailer and, therefore, earn higher profits.

14            At the same time that Mr. Schutt, in conversations

15   with management apparently, he also reduced his assumption

16   about that first year pricing discount to customers.  So there

17   is a standard formula that Perrigo US had used for its -- in

18   its pricing models both for the discount offered to customers,

19   and the discount offered to retailers in order to incentivize

20   the retailers to push the product and to incentivize the

21   customers to purchase the product, but with omeprazole, the one

22   product in their history, as I understand it, that did not have

23   the compare to statement, that's the one that they raised the

24   prices, narrowed the margins to the retailers, as we saw with

25   the Walmart e-mail, and also lowered the discount, i.e., raised

the price to end consumers relative to the national branded

product.  That, to me, is entirely inconsistent with the notion

that the compare to -- the lack of a compare to statement was a

major financial risk.

Certainly had they had it, it might have made their

life a little bit easier, and maybe they would have earned more

money, but it was not the type of disaster risk that I

believe -- or based on my review of the data I do not interpret

that by any means as a disaster.  It's another one of these two

data points -- back when I said summary statistic, those are

two summary statistics of the risk of the lack of a compare to

statement.

Q    So the ability to be more aggressive on pricing is what you

are talking about?

A    That's correct.  And to be more aggressive on pricing on

the one product that does not have a compare to statement.

Q    Now, finally, or maybe not finally, how about the timing

issue?

A    So in terms of the timing of the transfer of risk?

Q    Yes.

A    So, again, the fact that the -- the -- that the assignment

agreement apparently was not even signed until some time in the

May/June time period as a lot of the development or the -- the

FDA approval process is kind of winding down as Perrigo US

is -- I'm sorry, as Dexcel is fully responding to the issues

1   raised by the FDA in the approvable letter, that tells me that

2   they are only executing the agreement as these risks of both

3   FDA approval and even paragraph IV litigation are being

4   resolved.  I think that's what we heard in some of the -- or

5   what we saw with some of the e-mails in the late May and then

6   June time period between the various -- between Dexcel and

7   Perrigo US and also in communications with the board about

8   potential early launch.

9   Q    Now, how about the sales and distribution agreement?  Did

10  the pricing terms of the sale and distribution agreement result

11  in any transfer -- significant transfer of risk?

12  A    No.  And I think that's probably the one -- the last area

13  that at least I think it's an asserted risk that I've seen.  I

14  can't remember if it's in Dr. Frisch's report or if it was in

15  the Ernst & Young reports.  But somehow the notion that by LLC

16  guaranteeing Perrigo US a 4.31 percent operating margin, plus

17  that 10 percent kicker, that somehow that relieved Perrigo US

18  of so much of their risks associated with the business that it

19  would have been worth it in an arm's-length transaction for

20  Perrigo US to give up this enormous upside and this enormous

21  commercial opportunity.

22         So, as I said before, go back to the issue of is LLC

23  capable of bearing those risks?  So assume a downside scenario.

24  What would have happened in a downside scenario?  Perrigo US --

25  assume that there were losses on the business.  The LLC did not

1    have the ability to fund those losses to bring Perrigo -- I'm

2    sorry, to bring Perrigo US up to scratch, up to 4.31 percent,

3    but probably more importantly is that that 4.31 percent plus 10

4    percent was set so low it was actually set below the margins

5    that Perrigo US routinely earns even on its monograph products.

6    On its ANDA products it's earning operating margins well in

7    excess of 20 percent, 25, 30, even, given the gross margins of,

8    you know, 35 to 40 percent or more on some products.

9         So they -- by setting that number so low, they

10   effectively are -- there is no risk transfer even if LLC had

11   all the capital in the world to pay Perrigo US in the event of

12   a downside scenario.

13   Q    Dr. DeRamus, at this point I am going to segue to a topic

14   you did address, but I don't want to spend too much time on it,

15   but that is the topic of UK Finco.  Was UK Finco's financial

16   capability relevant to your analysis as to whether the

17   assignment agreement transferred risk from Perrigo US to LLC?

18   A    No.  The obligations that Perrigo -- that LLC undertook

19   with regard to the assignment agreement and with regard to the

20   sale and distribution agreement were LLC's obligations.  So I

21   looked at it as LLC is the appropriate related party to be

22   evaluating in this contract, or LLC and -- because LLC is a

23   disregarded entity for tax purposes, LLC in conjunction with

24   PITLP.

25   Q    And what about the idea that UK Finco is the parent of

PITLP?

A    Well, eventually if you do this in transfer pricing, it's the tail wagging the dog, or it's the dog running around in circles, rather, because if the parent -- you then would go back and what about -- who is the parent of UK Finco?

So there is an obligation that Perrigo -- that LLC incurs with regard to Perrigo US under the assignment agreement or sale and distribution agreement that it can't meet.  It looks to its parent, that parent looks to its parent, and then you go all the way around the circle and you are back to Perrigo US.  And if you go back to Perrigo US, how could you possibly think there was any transfer from Perrigo US to LLC as a result of the assignment?

Q    Putting this aside the question of relevance, have you analyzed, at least in brief, the opinion of Mr. Kennelly and the ability to UK Finco at least in theory to go out and borrow money from a third party to finance some large transaction?

A    Yes, I did do that analysis.

Q    You say you did?

A    I did.  Yes.

Q    Let's go to your report, which is 5392, and let's go to page 62, 62 of the report.  That is -- maybe I've got the wrong number.  5393.  Sorry.  I should not be doing this from memory.

A    That's Richard Manning's report.

Q    Yes, 5393.  Apologize, Your Honor.  5393 page --

1      THE COURT:  I think 5392 is Dr. DeRamus's report.

2      MR. WEAVER:  Then I had it right.

3      THE COURT:  I think you were right the first time.

4  Yeah.

5      MR. WEAVER:  Okay.  My memory has been rehabilitated.

6  BY MR. WEAVER:

7  Q    So if we are on page 62, let's go to table 7, and --

8  A    Yes.

9  Q    Dr. DeRamus, can you explain how this table informed your

10  analysis regarding the theoretical ability of UK Finco to

11  finance a very large purchase?

12  A    So this is the EBITDA that Mr. Kennelly reported for UK

13  Finco in FY 2006.  So the $18.5 million is what he then applies

14  to a multiple to figure out what the debt capacity was of the

15  company in his report at the time.  The paragraph above I

16  described the $69 million number that he primarily used in his

17  report.  I understand from his testimony the other day he said

18  it could have borrowed up to a $110 million, or, I don't know,

19  maybe even more, but I do not think that is -- would have been

20  nearly enough to actually finance the actual arm's-length price

21  of the assignment of the omeprazole contract, which I concluded

22  was -- well, first is $474 million under this, kind of this

23  second approach to doing it, or even if you are using forecasts

24  it's somewhere between 125 and $175 million that I have in my

25  report.

1          The big conceptual error that I think Mr. Kennelly

2     makes is you'll notice the second line under that, in that

3     table is PDKS.  That's Perrigo Denmark.  So Perrigo Denmark in

4     2006 is only -- is only earning that much in EBITDA because it

5     is selling coated nicotine gum, which I concluded was

6     transferred for a non-arm's-length price.

7          So if you are going to look to UK Finco in trying to

8     figure out this, you know, but for world, this hypothetical

9     world in which UK Finco would have or could have stepped into

10    LLC's shoes if LLC had, in fact, established an arm's-length

11    price for the omeprazole contract, you need to sweep in there

12    the arm's-length price of coated nicotine gum, desloratadine

13    and fexofenadine, as well later on in this time period it would

14    have been the three products in 2006:  Coated nicotine gum,

15    desloratadine and omeprazole.  So you would need to --

16    Q    Well, just to be fair to Mr. Kennelly, he was excluding LLC

17    so he would have excluded omeprazole?

18    A    Correct.  But what I meant was you need to first exclude

19    the non-arm's-length transactions from your measure of EBITDA

20    that in this hypothetical world Finco actually had so it would

21    have had not $18.5 million but only $10 million of non -- so of

22    non -- non-arm's-length assigned contracts, so effectively just

23    the EBITDA from Perrigo U.K. or PUKAL in this sheet.  So that

24    would have been the basis for its borrowing capacity, but it

25    would have needed to have borrowed just a huge amount to then

1    finance not just the arm's-length omeprazole contract but also

2    the desloratadine and the coated nicotine gum contract, which

3    was particularly both profitable and low risk even at the time

4    of the assignment.

5    Q    Okay.  So we're close to the end of your bucket A.  Just a

6    couple of more questions.  Did you identify any financial cost

7    savings or cost efficiencies from the assignment?

8    A    No.  Quite to the contrary.  I observed both additional

9    administrative inefficiencies, which I think we heard about

10   over the past couple of days in terms of the accounting,

11   internal accounting that needed to be done, but probably more

12   important for me as a transfer pricing economist is looking at

13   the implications for the arm's-length contract with Dexcel.  So

14   even in renegotiating that amended supply and distribution

15   agreement with Dexcel, the -- as a result of the assignment and

16   then the performance guarantee, that contract imposed

17   additional costs and even risks on Perrigo US -- actually,

18   Perrigo US because of the performance guarantee that it did not

19   otherwise have prior to that date under the original Dexcel

20   contract.

21        And these aren't large amounts.  It's, I believe, tens

22   of thousands of dollars per quarter, maybe $20,000 a quarter,

23   but these are ongoing costs because of -- as a result that --

24   that were incurred as a result of the assignment, which is, in

25   my mind, a very clear inefficiency.

Q    And just to be clear, I think you've already covered this, but regarding economic effects, in less detail you examined desloratadine and the assignment to LLC, and also -- well, let's start there.  Did you find any economic effects there?

A    No.  As I stated earlier, I did not see any economic effects, and I think I reference coated nicotine gum was a particularly problematic data point for me in terms of trying to identify any concept of risk that may have been transferred there because coated nicotine gum was with an established manufacturer that Perrigo US already had a relationship with, Fertin.  And for a coated gum product that -- they had already been selling the uncoated gum product, it still needed to get FDA approval, but the -- they had learned -- Perrigo had learned a substantial amount about the regulatory approval process based on its experience with uncoated gum, and there was no paragraph IV litigation.  And the assignment and the launch of the product occurred in very rapid succession along with the FDA approval.  And so about I think it was in May of 2006 is the assignment date for coated nicotine gum, and then June of 2006 the FDA approval comes out.

        The third-party contract with Fertin is -- acknowledging the assignment happens, then, I believe in July -- actually, it was August of 2006, and then launches later on that fall.  And payment, again, is a nominal 800-some thousand dollar amount that's done first with a note and

1    effectively repaid out of the profits that Perrigo Denmark is

2    then earning from this very valuable non-arm's-length transfer.

3    Q    And lastly, what about fexofenadine?  That was a later

4    thing?

5    A    Correct.  And as I may have mentioned earlier, that was one

6    in which there wasn't even the basics of an assignment.  It was

7    just LLC entering into a contract with a third party even

8    though it had no ability to perform on that party, on that

9    contract.

10   Q    All right.  So I think we've concluded bucket A.

11            Why don't we turn to your bucket B.

12            THE COURT:  So why don't we -- unless you think you

13   are going to be done with bucket B in 20 minutes?

14            MR. WEAVER:  Doubtful.

15            THE COURT:  I didn't think so.  Let's take our break

16   now.  It's a natural stopping point, and then we'll pick up in

17   20 minutes.

18            MR. WEAVER:  Thank you, Your Honor.

19            THE COURT:  Thank you.

20            LAW CLERK:  Court is in recess.

21            (Recess taken, 12:00 p.m.)

22            (Resume Proceeding, 12:22 p.m.)

23            LAW CLERK:  Court is in session.

24            THE COURT:  All right.  Go back to Mr. Weaver --

25            MR. WEAVER:  Yes, Your Honor.

1        THE COURT:  -- and continue the direct.

2        MR. WEAVER:  Okay.

3    BY MR. WEAVER:

4    Q    So I believe when we took our break, Dr. DeRamus, we were

5    just about to switch to talking about your bucket B of

6    conclusions.  So let's go ahead and do that.  And I think

7    you've pretty much already touched on your framework, so let's

8    speed past the framework, and if you could just again, though,

9    briefly tell the Court why -- and let's start with the pricing

10   you did for the sale and distribution agreement, so that

11   scenario first.  And could you briefly tell the Court why you

12   found it more reliable to take the assignment price as a given

13   and then determine the arm's-length price of the sales

14   distribution agreement rather than in the reverse?

15   A    Okay.  So the -- there are maybe two principal advantages.

16   One is that doing it this way does not rely on any forecasts;

17   that you can simply price the sale and distribution agreement

18   based on the functions, assets, and risks that Perrigo US and

19   LLC contributed to the U.S. omeprazole business.  And the other

20   advantage is that it really does focus on the years at issue,

21   the 2009 to 2012 tax years, and what compensation should be due

22   to Perrigo US from that business.

23        And, again, I just encourage you to remember that

24   whenever I talk about the pricing of any -- of either of the

25   sale and distribution agreement or the assignment agreement,

that the arm's-length pricing is really with regard to both

combined.

Q    Okay.  Now, you mentioned functions, assets, or risks.  I

think you've already described the functions and assets of LLC

early today.  But I don't know that we've really touched on

your functional and asset analysis of Perrigo US.  So why don't

we spend a couple of moments.  Could you describe the nature of

Perrigo U.S.'s functions, tangible, and intangible assets?

A    Sure.  And I guess the main takeaway I would encourage you

to have is that Perrigo US is more than a simple distributor.

I have worked on transfer pricing assignments in the past where

my job was to derive an arm's-length distribution return, and

what Perrigo US does, its actual functions, the actual assets

it brings to this business, are far, far more than those of a

simple distributor.

         So I think we've seen demonstratives and heard lots of

testimony about -- and I'm sorry, and exhibits, that reflect

the complexity of Perrigo's business in the United States,

its -- the way in which it takes one product and turns that

into many, many skews, many, many stock-keeping units.  It has

to have different variants for different customers because its

business is a store brand business where you have to have the

CVS package or the Walgreens' package or the Meijer's package

on the product that's going to go on the shelf.

         So the other thing it has is this, I think, a

1    remarkable marketing capability.  It is -- it has, I think, a

2    marketing machine that is able to deal with issues like the

3    lack of a compare to statement that can produce artwork to

4    convince customers that the active ingredient in the Perrigo

5    omeprazole product is -- does the same thing as the national

6    brand product.

7            So this notion of mass customization -- the customer

8    relationships it has, I think, are pretty remarkable.  One

9    thing that -- again, back to a summary statistic, what is it

10   that economists look to in seeing if a company has valuable

11   intangibles is going to be, one, its market share.  As a

12   economist who does a lot of antitrust work, market share is a

13   key indicator of market power and the ability to affect price.

14           And the second thing is the margins that it's able to

15   earn, and Perrigo earns these substantial margins that I

16   referenced earlier on -- particularly on its ANDA products, but

17   even on its monograph products that are higher than those that

18   I would expect a typical distributor to earn.  So those -- it's

19   that broader functions and those -- I just referenced the

20   assets as well these intangible assets it has, and also has

21   productive assets, you know, the factory operations, the

22   warehouses, this -- a distribution network to get the right

23   bottle on the right shelf at the right time.  And, in addition,

24   it has its own product development capabilities and its

25   knowledge of the FDA regulatory process.  And that's kind of a

1    remarkable package of functions and assets that Perrigo US

2    brings to this business.

3    Q    Does Dr. Frisch agree with you -- as you understand what

4    has transpired here and your review of the reports, does

5    Dr. Frisch agree with you that Perrigo US has significant

6    intangible assets?

7    A    He does.  Although his quote-unquote, arm's-length

8    analysis, where he only assigns Perrigo US a 2.6 percent

9    operating margin for its distribution return does not reflect

10   Perrigo US contributing intangible assets by any stretch of the

11   imagination.  That's where that -- he is characterizing that

12   return as a distribution return.

13   Q    Now, is that where the Ragu comes in?

14   A    Well, the Ragu comes in everything that's pushed over into

15   the assignment value.  So, remember, the total value that

16   Perrigo US has before the assignment is what it should earn

17   under the sale and distribution agreement and the assignment

18   agreement, and because of the way that the forecasts work and

19   kind of the difference between the forecasts and the actuals is

20   the more you skinny down this functional return under the sale

21   and distribution agreement, the greater the upside Perrigo --

22   I'm sorry, LLC, will effectively receive through Dr. Frisch's

23   method by giving -- by pricing the assignment based on

24   forecasts.  So the Ragu is what goes into, in Dr. Frisch's

25   approach, is what goes into the assignment bucket, i.e., it

includes these very valuable intangibles that, as I read the assignment agreement, I don't see those as being transferred, nor do I see them as being really transferrable because how do you transfer customer relationships to LLC?  So I have two pieces of that to kind of keep in mind in that analysis.

Q   Now, again, I think you've already said it, so just keep it brief.  What's your conclusion as to the arm's-length price under the sale and distribution agreement?

A   So under the sale and distribution agreement, keeping -- taking the actual price actually paid by LLC of $877,000 as a given, as a data point, the arm's-length contribution to LL -- to Perrigo US is that they should -- Perrigo US should earn all of the returns from that activity, and LLC should return zero -- should earn zero because LLC is not contributing anything to the operations of the U.S. business.

Q   Now, what about the idea that, okay, LLC doesn't have any functions.  It's not operational.  Why can't it just contract back with the U.S.?  How does that figure into your analysis?

A   Well, there are certain transactions when you can have related parties, and we observe third parties rely on outside service providers, or every time a company buys something from the market instead of making it itself it is relying on something from somebody else.  So it is effectively contracting out that particular piece of the product.  Or even with services, a company might decide to contract out certain

1    administrative services, for example, but there is a limit to

2    this, particularly in an operation that every company, and any

3    company that earns any significant amount of money, has to be

4    providing some value-added service.  That's what companies get

5    compensated for doing.

6             If you contract out everything, then there is nothing

7    left but the empty shell of a company.  The only instance in

8    which you would have that scenario would be a pure financial

9    investor, an investor who is simply investing in a company and

10   then getting dividends in return, but then they are not --

11   there is no expectation of a claim of operating profits from

12   the activity of the firm.

13   Q    Okay.  Now, you did some sensitivity analyses to confirm

14   your conclusion regarding the arm's-length price of the sale

15   and distribution agreement, correct?

16   A    Yes.  I did.

17   Q    So why don't we look at a demonstrative that summarizes

18   your sensitivity analysis.  Let's go to Exhibit 5508,

19   demonstrative 5508.  Dr. DeRamus, is this your summary of your

20   sensitivity analysis?

21   A    Yes.  It is.

22   Q    Can you walk us through it, please?

23   A    Sure.  And I'll do this relatively briefly because there

24   are a fair number of computations underlying some of these

25   iterations, but I did four different types of sensitivity

1    analyses.  The first one would be to assume that Perrigo US --

2    I'm sorry, that LLC actually incurred some amount of risks when

3    it made the what I calculate to be a $2.18 million total

4    payment to LL -- to Perrigo US in March of 2008.

5    Q    All right.  Let's stop right there.  Let's take a little

6    detour, and can you explain the $2.18 million number?  For

7    that, let's put up Exhibit 5507, please, and we'll come back to

8    this one this a minute.  So can you tell us why you are using

9    2.18 million in these various sensitivity tests?

10   A    So you'll use -- I would use a different number depending

11   on what the date of the valuation is or the date of the risk

12   transfer is.  So here because the perspective that I'm using is

13   that there was -- for the sensitivity analysis I am going to

14   assume that there was a sliver of risk transfer when LLC

15   actually makes a cash payment to Perrigo US.  I have to figure

16   out, what is that total value?  What is that total payment?

17   And that payment was the 877, the top block there.  There was

18   also interest on it of $63,000, and this was also when there is

19   a share of litigation expenses of the Dexcel -- paragraph IV

20   litigation expenses that Perrigo US had been bearing up until

21   this time period.

22            So this is when 740,000 -- actually, according to

23   Mr. Broadhurst's schedules, maybe a little bit less than

24   $740,000 was actually then reimbursed to LLC -- to Perrigo US,

25   and then this is also the time when there is a payment to

1    Dexcel of the $500,000 final milestone payment.  So the sum of

2    those numbers is the $2.18 million that I use in

3    conceptualizing this as an investment by -- a financial

4    investment by Perrigo US -- I'm sorry, a financial investment

5    by LLC that, in turn, would give -- would then be entitled to

6    some rate of return using this first sensitivity, what the IRS

7    regulations sometimes refer to as the investor model.

8    Q    Let's go back to Exhibit 5508, please, which is where we

9    were before we took this detour.  So just go back to the last

10   demonstrative.  And with that background, why don't you go

11   ahead and resume your discussion of these sensitivity tests

12   that you are doing to price that second component of this

13   combined transaction as you've described it.

14   A    Okay.  So if I treat the $2.18 million that I just derived

15   in that prior demonstrative, if I treat that as an investment,

16   and then I need to simply determine what is a market return on

17   that investment, and here I've used Perrigo's 10 percent cost

18   of capital plus.  It's a little bit more than their cost of

19   capital, but it's a reasonable benchmark for using -- for

20   using -- or for deriving a financial return.  And that is --

21   that then results in an $873,000 payment to LLC in return for

22   the $2.18 million over the FY 2009 to 2012 time period.

23   Q    So to be clear, is that a 10 percent return on that $2.18

24   million investment?

25   A    Correct.

Q    And why choose 10 percent?

A    Because that was consistent with the, as I said, a cost of capital plus a little bit.  I think the -- given the fact that there were no risks, I hesitate to even call the $2.18 million an investment.  It was paid as -- a substantial amount of profits were actually being earned.  There is something like -- this is a few days worth of profits that are being earned contemporaneously with the payment, and over the -- even just over FY 2008 there -- the LLC is earning something like 25 times the amount of that $2.18 million payment.  So I say investment, but I say it with a bit of a lump in my throat. So -- but, yes, I think 10 percent is effectively a generous return to Perrigo LLC in return for a -- given the very limited risks that it incurred with that $2.18 million.

Q    All right.  Why don't we drop down a bullet point.  Tell us about this comparables analysis that you did.  And when you are ready, we'll jump to a slide with the comparables, but go ahead.

A    Sure.  Just conceptually the comparable profits method is a standard approach that's used in transfer pricing analysis. It's well described in the 482 regulations.  And so it's a method in which you go out and you try and identify unrelated parties that are comparable to and hopefully in a lot of ways to the -- to the tested party and in their related party transaction you are evaluating.  And, again, based on the

1    returns that those comparables earn, then you would apply a

2    similar return for the tested party in the related party

3    transaction.

4    Q    Now, let's go to Exhibit 5445.  So here is a list of your

5    comparables, I guess is the way you pronounce it, is that

6    correct?

7    A    Correct.

8    Q    So can you explain why these companies would be comparable

9    to LLC?

10   A    Well, I think, again, this is -- as a sensitivity analysis

11   I believe it is a big stretch to say that there are any

12   companies that are comparable to LLC simply because LLC doesn't

13   perform any value-added functions, but if I am going to take

14   simply the assumption that LLC is doing something in this

15   transaction, what -- how can I best analogize what it's doing

16   versus what independent companies actually do?  And I concluded

17   the closest thing I could come to a comparable would be

18   companies that engage in leasing transactions.

19   Q    Why is that?

20   A    Well, because a leasing company, what does it do?  It

21   purchases equipment and it leases it to other parties who use

22   that equipment in their operations.  So the equipment that they

23   lease is expected to generate a financing rate of return for

24   them.  It's not generating intangible profits.  It's not

25   creating a product that they, themselves, are selling, you

1    know, and companies will often engage in leasing transactions

2    simply because they don't want to carry the capital cost of a

3    fixed asset on their books.

4         Now, these particular companies actually sweep in more

5    functions than just leasing.  They have real people behind

6    them.  It's not simply a paper company just doing leasing

7    transactions.  It is -- they have people that do financing

8    services and other complementary things around the leasing

9    business, but that's why I think this provides a -- you know,

10   an upper bound of the returns that I would expect to observe

11   for LLC if LLC were earning a return on its assets.

12        So based on these returns, this is a return on assets.

13   You see kind of the upper end of this is 9 percent over the

14   years at issue, and some years it's a little bit higher, 11.5

15   percent.  So I concluded it was reasonable and very generous to

16   effectively give LLC a 10 percent return on its asset, and what

17   asset did LLC have at the time?  It's the $2.18 million that

18   its invested.  So that's the book value of the asset it's

19   investing.  Multiply that by the same 10 percent that I used in

20   the sensitivity one, and I am obviously going to get the same

21   answer.

22   Q    All right.  And just for the record, there is a Accord

23   Financial Corp, Black Diamond, CAI International, General

24   Financial Corp, Marlin Business Services, McGrath RentCorp,

25   Ryder Systems, United Rentals, Zedcor Energy.  I mean, you've

1     got returns for each of those companies for four years,

2     correct?

3     A     Correct.  And I provide the lower quartile and the upper

4     quartile, which is the lower 25th percentile and the upper 75

5     percentile simply because that is the standard that is used in

6     transfer pricing analysis to establish the interquartile range.

7     Q     Okay.  Why don't we go back to Exhibit 5508, and you did

8     two additional sensitivities.  If we could briefly discuss

9     those sensitivities that you analyzed in your report?

10    A     Certainly.  So these last two are forms of profit splits.

11    I would say that I consider the sensitivities to be effectively

12    rank order as you see them on the screen in terms of their

13    relative reliability, i.e., the first one of the sensitivities,

14    it's -- it approximates closer to what I think would be an

15    arm's-length result.

16          The second one is a little bit more one step removed.

17    It is based on a well established method, but it's also based

18    on this more tenuous notion of the comparability between the

19    leasing companies and LLC.  And the profit splits, I think, are

20    pretty far removed from anything that I would ever consider a

21    best method in this context.  The profit split approach

22    basically treats both related parties as almost quasi joint

23    venture partners in the operations.

24          So you will typically see a profit split when you have

25    either two companies that both -- two related parties that

1    contribute technology to a given enterprise.  So assets for --

2    I'm sorry, intangible assets that are held by one entity

3    overseas and another -- an intangible asset, intellectual

4    property, owned by the local entity.  And then if those are

5    both contributed to the local operation, there is an allocation

6    of profits that result.

7         Again, I do not think that in any stretch of the

8    imagination applies here, but I said, okay, how would that work

9    out if I were to apply it?  And I have two different ways of

10   approaching it.  One is the standard way you would think of an

11   equity investor investing in an opportunity.  So if Perrigo US

12   came to the table with a -- this very valuable asset called the

13   Dexcel contract, you know, right before the assign -- they

14   brought the assignment agreement in, and LLC brought its $2.18

15   million of cash, what's the relative value of those two things?

16        So obviously the 2.18 million is a tiny fraction of

17   that broader opportunity.  Now I have to sell value.  The

18   broader Dexcel contract for Perrigo US in its entirety, you

19   know, in this t-minus one, the day before the actual

20   assignment, and I have used one of my valuations that -- the

21   one that's based on a 2006 forecast with information that I

22   consider to be known or knowable, and you just divide one by

23   the other and you get the 1.33 percent for LLC.

24        While that might sound a little bit complicated, or

25   there is a sequence of steps, the reasonable profit split

1    entails actually more steps and more assumptions, which is why

2    I think it's even less reliable.  But to get to the punch line,

3    this is the application of a standard method under the 482

4    regulations where you first apply a functional return to each

5    of the parties to a transaction, and then there is a residual

6    profit, and that residual profit is then split among the owners

7    of the intangibles.

8         Here -- so the numerator and the denominator are

9    different in this one, the way I've applied it, because I am

10   using it from the vantage point of November 2006.  Here I just

11   used the 877 as the value of the asserted assignment intangible

12   that LLC would have been contributing, and I have this

13   capitalized cost of the marketing and sales intangibles that

14   I've derived.

15        On the other side of the ledger for Perrigo US, and I

16   calculate the ratio and the net result of that with the

17   functional return to Perrigo US, and the profit split between

18   the parties is then a 1.58 percent split to LLC, and the

19   $4 million total payment over the FY 2009 to FY 2012 time

20   period.

21   Q    Now, I think that's all that we need to do today with

22   respect to your sensitivity analysis.  But just to confirm,

23   these sensitivity analyses are described in more detail on

24   something, like, page 83 to 92 of your report, and that's

25   Exhibit 5392.  Is that correct?

1    A    That's correct.

2    Q    Okay.  Now, Dr. DeRamus, let's go the other way and -- in

3    this two-pronged analysis.  And did you also value the

4    assignment agreement taking the actual prices as were

5    experienced under the sales and distribution agreement in later

6    years as a given?

7    A    Yes.  I did.

8    Q    Okay.  And I think you've gone through some of the

9    methodological questions and your reservations.  Let's just go

10   right to it.  What value do you calculate for the assignment

11   taking the -- given the pricing terms in the sales and

12   distribution agreement?  And for that let's go and pull back up

13   Exhibit 5509 or maybe pull it up.  I am not sure if it's been

14   up before, so can you walk us through your conclusion here?

15   A    Sure.  So I first -- when I say I take the sales and

16   distribution agreement as given, what I mean is I take the

17   4.31 percent and 10 percent kicker as an input into my

18   calculations.  It's important to note that those terms, though,

19   when I say take as given, those were not established until

20   approximately April of 2008.

21        So, you know, typically the pricing terms of a

22   transaction, purely one where there is sort of a transfer of

23   risk, needs to be established before the risk is resolved

24   because the pricing terms of the sale and distribution

25   agreement aren't even established until 2008.  There is -- then

1    all the risks have been resolved by that time, but,

2    nevertheless, I pretend for my analysis that the 4.31 percent

3    and the 10 percent kicker had been established as of 2006.

4          So I am going to take that as kind of a data point,

5    and then I am going to plug that into the cash flows that I

6    have from the taxpayer.  So I have the actuals through 2012.

7    These are the stipulated numbers from Mr. Broadhurst.

8    Q    That's the first column, right?

9    A    Correct.  So the first column, the NPV of those cash flows

10   then gives kind of that consolidated value that's really the

11   total value that Perrigo US had and that the -- that LLC value

12   of 192 million is the amount that Perrigo US gave up to LLC in

13   return for the $877,000 payment, and the $44,000 -- the $44

14   million amount under the last row is what Perrigo US retained

15   under this 4.31 percent, plus 10 percent compensation

16   structure.

17   Q    And then you go across through different time frames?

18   A    Correct.  So then I use the column that says NPV of cash

19   flows FY 2013 to 2017.  This is where I use the sales from

20   Dr. Frisch's report.  The parties did not -- er, Perrigo did

21   not produce the cash flows or profits for that time period, so

22   I estimated them, and so that's an additional $121.5 million of

23   assignment value that LLC received.

24          And then I go to that terminal value calculation in

25   the next to the last column because this is a continuing

1    business at this point, at least as of 2017, and as I

2    understand it as of today.

3         Now, to get to the terminal value, I apply a negative

4    growth rate for those future cash flows.  So from --

5    Q    Do you recall Dr. Frisch criticized you for a negative

6    growth rate if I recall correctly?

7    A    He didn't so much criticize me as he tried to use that to

8    say his assumptions were conservative, which I disagree with,

9    and I think he was incorrect in his statement.  So I only use

10   this negative 1.35 percent growth rate in this valuation based

11   on Perrigo's actual profit experience to date, which in 2017

12   has a much, much higher level of cash flows than in the

13   projections.  And all my calculations in the projections I

14   simply adopt Dr. Frisch's assumption, which I actually thought

15   was a fairly -- a reasonable and a standard growth assumption

16   for the growth rate of the future cash flows.  So he was

17   incorrect in how he characterized my calculations.

18   Q    Okay.

19   A    And I should say, like Dr. Frisch, I also discount all

20   these numbers back using a 10 percent discount rate.  Although

21   the $474 million amount I calculated here is discounted back to

22   March 1, 2008 as the date that I concluded is the earliest that

23   one could conclude a very small amount of risk transfer.  If

24   one were to discount this back to November 2006, you would

25   discount using the same discount rate.  It's an additional,

1    I'll call it, 15 percent less than these amounts.

2    Q    Now, to be clear, why did you use Perrigo's actual results

3    when you are discounting things back to 2008?

4    A    Well, because, one, I think it's the only way to get to an

5    arm's-length result with this method.  It is consistent with

6    the actual price that Perrigo -- I'm sorry, that LLC paid

7    Perrigo US.  It's consistent with the $877,000 that it paid,

8    because to use any forecast in this scenario or in this method

9    would give LLC a risk free rate of return or a risk free return

10    of many hundreds of millions of dollars and reward it for risks

11    that it simply did not occur at the time.

12    Q    Okay.  Let's turn to your review of Dr. Frisch's report and

13    conclusions.  And I believe you said earlier that you didn't

14    agree with the valuation of the assignment, which, if I recall

15    correctly, is somewhere between 37.4 million or 43.1 million,

16    or somewhere in that range, depending on which assumptions he

17    was looking at.  Can you summarize at a high level for the

18    Court your disagreements with Dr. Frisch.

19    A    Sure.  So I would say at the broadest conceptual level it

20    is his reliance on forecasts to then provide LLC this benefit

21    of the bargain, this benefit of this hypothetical bargain.  I

22    disagree as a, just a basic implementation approach.  I don't

23    believe he did sufficient due diligence of the available

24    forecasts, so I don't believe he relied on the right forecasts,

25    nor did he attempt to incorporate all information that was

known or knowable at the time.  And I think I referenced

earlier the fact that he also has this other method that I

haven't really -- I haven't talked that much about, but this

notion of when he does the 2.16 -- I'm sorry, the 2.16 percent

compensation under the sales and distribution agreement, this

is a so-called arm's-length approach, that it produces that

higher -- slightly higher assignment value in his calculations.

        The net effect is to give LLC even more income because

basically the more you skinny down this functional return to

LLC -- to Perrigo US under the sale and distribution agreement,

the more you are going to pump additional monies into LLC

because the -- the actuals are so much greater than the

forecasts, and, of course, LLC is getting the lion's share, the

vastest proportion of any upside.

Q    Now, let's just look at a couple summaries that you

prepared for forecasts that you looked at, and let's start with

Exhibit 5441, please.  So can you just quickly tell us what

forecasts you were looking at with the aid of Exhibit 5441?

A    The top row is the June 2006 forecast.  This is the

forecast that Dr. Frisch relies on in his analysis.  The second

row is the June/July 2007 forecast that Mr. Schutt discussed in

his testimony last week, and you can see the substantial

increase in the sales even in that very short time period

between those two times, between those two dates.  Not because

in my view there was new information that wasn't available

1     before, but simply because there was greater attention to

2     detail in the actual forecast assumptions.

3     Q     And what about that third line?

4     A     So the third line, I encourage you to focus primarily on

5     the FY 2008 and FY 2009 cells first.  Those are the sales

6     amounts that were in that Epple schedule that was produced in

7     December of 2007.  So shortly before launch and then

8     communicated to, I believe, Mr. Papa.  And that was effectively

9     the closest to the March -- closest forecast that I have been

10    able to identify to the March launch date.  And you can see

11    kind of the substantial increase even relative to the June/July

12    forecast, both for FY '09 and FY '08.

13          Now, I'll just say in listening to Mr. Schutt the

14    other day, his -- and it was unclear to me at what point he was

15    starting to model sales in FY 2008.  I know there is a later

16    schedule in August of 2007 that he did that where -- I believe

17    he also brought that up in his testimony, or the schedule was

18    put on the screen.  So I believe by at least August of 2007

19    there were sales numbers in there for FY 2008 potential launch.

20          The numbers in that third row for that December 2007

21    forecast for FY 2010 and beyond, those are simply numbers that

22    I have basically copied down from the June/July 2007 forecast.

23    Q     So they are repeated on purpose?

24    A     Correct.  It's because I don't have another forecast that I

25    can rely on to actually fill in the out years because Perrigo

1    did not -- Mr. Epple or his team did not produce a forecast for

2    the out years at that time.  There was this other forecast that

3    Mr. Schutt did in August of 2007, so just past the June/July

4    2007 forecast that's up here that produced higher numbers.  And

5    had I used those numbers particularly for the out years, it

6    would have increased those even further.

7         But the main take away as you can see, the -- if you

8    look at the total lines, how much those totals change over time

9    depending on which forecast you use and then compare it to that

10   $1.7 billion number in actual sales.  So your valuation that

11   you are going to come up with is going to be hugely dependent

12   on which forecast that you use.

13   Q   And just to back up a minute, to be fair to Mr. Schutt,

14   would you recall that his August forecast had a best case, a

15   business case, and a target case, or something like that, and

16   then a conservative case?

17   A   Correct.  And when I say the numbers would have been higher

18   in my December 2007 forecast if I had used those numbers, I was

19   referring to the numbers from his business case applied to the

20   out years and not even necessarily updating the FY 2008 and FY

21   2009 numbers.

22   Q   Okay.  We'll flash it on screen, but no need to walk

23   through this again.  If you turn to Exhibit 5422, you've also

24   looked at those forecasts not with respect to sales but with

25   respect to operating profit, is that correct?

1    A    That's correct.

2    Q    Same idea, right?

3    A    Yes.

4    Q    Okay.  Now, do you know the context of the company

5    forecasts and what drove those changes in the forecasts over

6    time?

7    A    Yes.  My understanding of the context of those forecasts,

8    based on my review of the board documents, listening to

9    testimony and reviewing e-mails, is that they were primarily

10   being used for budgeting purposes and planning purposes, at

11   least up until the time Mr. Schutt took over responsibilities

12   for those forecasts in July of -- er, June or July of 2007.  So

13   they were -- the parameters that they were using for those

14   forecasts were based on their typical experience as I believe

15   Mr. Schutt described.

16        And, again, it -- those forecasts showed substantial

17   value and substantial sales and substantial profits, but they

18   were not done with nearly the degree of accuracy that I would

19   expect and I have seen in actual third-party transactions

20   involving the sale of a significant intangible.

21   Q    Now, did you also review some of that information as

22   provided in board presentations that we've looked through at

23   various points in the trial?  I believe it was Exhibit 5207.

24   A    Yes.  I did.

25   Q    And how does that impact your view about whether you should

1    be using these forecasts for purposes of doing an arm's-length

2    valuation?

3    A    Well, as an analyst, as somebody who is doing the

4    valuation, I can't simply rely on any company document in a

5    vacuum, but the fact that I have the board documents in

6    conjunction with the forecasts, it does provide me additional

7    insight into how those forecasts were used.  And the one thing

8    that I observed in those board documents is that the numbers

9    that were being reported for omeprazole or for any of the other

10    products, they were not being regularly synchronized up to the

11    forecasts that were being done by the marketing team in this

12    instance.

13         So that led me to conclude that they were -- again,

14    they may have been perfectly fine information for a board to

15    make a decision about a capital investment decision, but those

16    board documents, particularly even the inconsistencies in some

17    of those documents as you march through time, and there was

18    kind of a lowering of the forecasts when all of the data that's

19    coming in from the forecasting people should be showing an

20    increase in those sales values.  So there is that inconsistency

21    that led me to conclude that you can't simply rely on those

22    board documents as a basis for a valuation opinion.

23    Q    If you brought in investment bankers to do an arm's-length

24    transaction regarding the omeprazole line of business, would

25    the investment bankers be satisfied with those forecasts?

A    Not at all.  The amount of due diligence that's done in

actual transactions is actually quite extensive.  That the --

both the investment bankers, the advisors for the parties, but

even the finance people in the companies themselves, these are

the people who are typically charged with developing forecasts

that are used in a transaction.

There is a substantial amount of research and rigor

and cross-checking of the assumptions as part of that process,

and I did not see anything like that in this -- in the

forecasting process here.  The closest I could see to a -- some

amount of rigor is certainly by the time Mr. Epple presents

those 2008 and 2009 forecasts.  Because there is a launch

that's pending and they need to forecast something that's

important to them, they put a fair amount of rigor into making

sure that those are accurate.

Mr. Schutt applies more attention to detail.  Again, I

think there were certain assumptions and, frankly, certain

things that looked like they were -- may have even been errors

in his calculations that I would not have expected, but it was

a step up in the level of detail relative to any of the

forecasts that were done before, particularly in terms of his

use of updated information because that's the one thing that I

have seen throughout my experience in transactions is that the

valuations that are done for a given transaction until that

deal is signed, they are -- the analysts are trying to find the

1    most updated information, anything that's going to affect the

2    value of that deal to know that they are getting kind of the --

3    maximizing the value for a seller or for a buyer that they are

4    not -- making sure that they are not over paying for a

5    particular asset.

6    Q    Now, do you recall, Dr. Frisch, when he testified here, he

7    indicated that he reviewed the board materials, something along

8    the lines of the following, with the objective of making sure

9    that the projections that he found or was given were the ones

10   that the business leaders were actually relying on?  Do you

11   recall him mentioning something like that?

12   A    I do.

13   Q    And as an economist, is it your opinion that Dr. Frisch's

14   review is a supportable means of deriving an arm's-length

15   price?

16   A    No.  Both because the process he went through was not the

17   rigor that I would have expected of an expert in providing an

18   independent valuation opinion.  His reliance on those board

19   documents actually should have led him to the opposite

20   conclusion, to the fact that you didn't have regular updates to

21   those board documents.  You had valuations that were declining

22   as sales of Prilosec were growing extremely fast.  And even the

23   dollars didn't match up to the numbers that he was using in

24   that June 2006 forecast.  And I would say maybe the biggest

25   thing that I heard on the stand that bothered me the most is

1    when he said that he looked at the January 2006 forecast -- I'm

2    sorry, January 2007 forecast.

3          So after the assignment date.  And he said, oh, those

4    numbers in January 2007 are exactly the same as they are in

5    June of 2006.  Well, this is a fast moving market.  The reason

6    those numbers were exactly the same in January 2007 in that

7    spreadsheet is because the input data, the Prilosec OTC sales

8    numbers that are the fundamental basis for this entire exercise

9    were still from February 2006.

10         So not only had they not updated their basic

11    assumptions, they had not -- the analysts, or whomever was

12    responsible for producing that spreadsheet, had not updated the

13    basic data input that any data analyst would need to do in

14    order to have a reliable valuation.

15    Q    Now, I think the concept came up in trial about risk

16    adjustment and how would one view the forecast you are looking

17    at with respect to adjusting for risk.  Maybe it works out.

18    Maybe it doesn't.  But how did those spreadsheets that you are

19    looking at adjust for risk?

20    A    Sure.  And adjusting or incorporating risk in any kind of

21    valuation is an important part of what you do as an economist

22    or as a valuation expert.  The primary way in which a risk is

23    incorporated in a net present value type calculation is through

24    the discount rate.  It's one of the reasons why future cash

25    flows and far off cash flows are discounted relatively heavily

1   in present value terms when you apply particularly this

2   10 percent discount rate.

3   Q    So let's just stop there and make sure that we are very

4   clear about what a discount rate is and how it works into these

5   projections.

6   A    So the projections are all nominal dollars, and then both

7   Dr. Frisch and I bring these back to dollars of the day.  So

8   either dollars as of March 1, 2008, in some of my analyses, and

9   some my analyses are also bringing back to November 29th, 2006.

10  So I need to have a metric that basically discounts those

11  future cash flows for the risks that those -- those cash flows

12  may not occur.  They may be higher.  They may be lower.  They

13  may be zero.  And so the standard way in which financial

14  analysts do this is through a discount rate that captures the

15  risks of those cash flows.

16         Now, Dr. Frisch and I both use the same 10 percent

17  discount rate, which is based on Perrigo's cost of capital,

18  which my review of the documents looks like it's somewhere

19  between seven-and-a-half and eight-and-a-half percent during

20  this time period, but it has also a risk adjustment factor to

21  bring it up to 10 percent, and that's what Perrigo routinely

22  used in its valuation analyses and evaluating potential profit

23  opportunities.

24         So I would say the primary way in which any forecast

25  is -- where risk is incorporated explicitly is through the

1    discount rate.  I would say the other way that they are

2    incorporated is through what I considered some fairly

3    conservative assumptions that were baked into those, which I am

4    happy to go through at some point with you, but, you know, in

5    terms of costs of goods sold, in terms of what the market share

6    assumptions, and even the -- if you look at the spreadsheet

7    itself for these forecasts, there is a tab at the top, and it

8    tells you the perceived risks by Perrigo of those cash flows,

9    and for omeprazole that tab under risk says low.  Other

10   products, desloratadine, said medium.  So that's how I

11   concluded that the 10 percent discount rate was a sufficient

12   way of incorporating risks into a valuation analyses --

13   analysis using those forecasts.

14   Q   Now, before we dive into a few more details, a couple of

15   other broad questions.  First, Dr. Frisch also stated that he

16   was reviewing conduct and thought it important.  And you may

17   recall during the trial there's been mention of a step plan and

18   the fact that the LLC entity was formed in November 2006.  How

19   do you and Dr. Frisch differ with respect to the impact of

20   conduct on your respective valuations?

21   A   Well, I don't think I've ever heard of an economist using

22   tax planning as an example of the kind of conduct that you use

23   to actually derive the arm's-length price for a given

24   transaction.  So when the regs describe conduct as I understand

25   it, as I understand the regs, they are referring to what the

1    parties are actually doing when they are interacting with each

2    other or when they are engaged in the course of business, the

3    operating -- the operating conduct, operational conduct, not

4    some kind of tax planning conduct.  And the formation of a

5    business entity is not conduct.  It is simply another form of

6    inter -- of company contract that a company can create from now

7    until the end of time as many different entities that it likes

8    without necessarily affecting the conduct of the parties.  So I

9    think he is being extremely selective in terms of referencing

10   the kind of conduct that he thinks is relevant in pricing the

11   transactions at issue.

12   Q    Now, also, I would note that I don't think Dr. Frisch did

13   any sort of valuation work for desloratadine.  Could you just

14   describe any -- any comments you would have on applying

15   Dr. Frisch's methodology with respect to desloratadine?

16   A    Sure.  So the whole notion that Dr. Frisch, I think, is

17   providing is that the IRS should respect the fact that Perrigo

18   had this intention to pay an arm's-length price back in 2006,

19   and then the appropriate way to do that is then to calculate it

20   today based on the forecasts and then give LLC the benefit of

21   that hypothetical price that Perrigo intended to pay, and if

22   that's -- so I have many different criticisms for that approach

23   particularly as an economist to try and price something based

24   on intentions.  That's probably the weakest read of anything

25   I've ever heard an expert lean on in coming up with an opinion.

1          But even aside from that, if you just take that at

2     face value, it would imply that Perrigo should be coming to the

3     government today and paying the government an arm's-length

4     price for desloratadine, an arm's-length price for

5     fexofenadine, an arm's-length price for coated nicotine gum

6     simply because his opinion is that the cost -- the cost-plus

7     method used to derive those assignment values are unreliable.

8     So where is the check for those valuations?

9          Now, my view of the available forecasts for those

10    products indicate that the total sum is in the tens of millions

11    of dollars, maybe more than that.  I don't know.  I didn't

12    explicitly independently value those, but what I do know is

13    that there is not a check today for those products, and the net

14    result of his approach is a, you know, heads I win; tails you

15    lose approach.  It provides the taxpayer every incentive to

16    radically underestimate the value of a transferred intangible.

17         And then years after the fact, you know, from the ones

18    that were -- that maybe didn't materialize or that might not be

19    challenged, they don't owe any money on -- they don't owe the

20    arm's-length price on those.  And then for the ones that did

21    come out better than expected, the only thing that they owe is

22    the expected value using forecasts at the time allowing them to

23    recoop this windfall benefit.  That, to me, is just a

24    completely absurd result from a tax -- as a transfer pricing

25    practitioner.

Q    We are not here fighting about desloratadine, are we?

A    No.  But it's still part of the transactions that I did

evaluate, and it sheds light, I think, both not just as

loratadine but coated nicotine gum and fexofenadine on whether

the commercial purpose of the omeprazole assignment was to

transfer risk or to do something else.

Q    All right.  While we are addressing Dr. Frisch, I hesitate

to do this, and we'll try to do it in summary fashion, but

let's pull up that June 2006 forecast you are referring to.

Exhibit 5020, please.  Exhibit 5020.  We are going to pull it

up in spreadsheet form, I guess, and let's try to run through

some of this as quickly as we can.  If we go to cell C-67 on

this first-to-market tab, C-67.

A    Yes.  So cell C-67 is a -- is the assumption that the

analyst used for Perrigo's sales and marketing fee under the

Dexcel contract.  Now, you'll notice that it says five percent.

Under the actual Dexcel contract that number should have been

six percent.  Now, this is from the 2006, the June 2006

forecast that Dr. Frisch relied on.  He also corrected that

particular data input, but I think that should have been a real

red flag that says, these forecasts are not reliable for -- to

value today omeprazole and the value of the assignment.

Q    Let's go to C-81.  C-81, and just highlight that.  What's

going on there in terms of your analysis?

A    So this is the five percent SG&A assumption that's embedded

1    in most of the forecasts that I have reviewed, and I concluded

2    that actually the five percent was a reasonable and maybe even

3    a high estimate of the incremental SG&A associated with this

4    particular product.

5        Dr. Frisch, however, this is the one area where he

6    decides to use ex-post information, i.e., he says, let me look

7    at -- and, I'm sorry, I'm paraphrasing.  He says, let me go to

8    Mr. Broadhurst's report.  Let me look to see what the actual

9    SG&A experience is.  It's nine percent, and so he applies nine

10   percent to the forecast.  That radically lowers the value, his

11   valuation analysis, which I believe is incorrect.

12   Q    All right.  And you may recall the difference between

13   average and marginal, and do you have a view on that?

14   A    Yes.  It's really -- it's really -- the transactions I have

15   been involved in, it's the incremental SG&A that's at issue.

16   It's not the -- the average is going to incorporate a lot of

17   overhead.  It's going to incorporate, you know, salaries of

18   your executives; things that really aren't attributable to that

19   particular project.  In an actual arm's-length transaction.

20   Somebody else typically is going to have their own overhead

21   costs, and it's really just the amount that should be in there

22   is the actual additional SG&A that the company is likely to

23   incur if they are taking on that particular project.

24   Q    Let's go to their tabs at the bottom of this, and we can't

25   quite see it.  It's partly there.  Let's go to the estimated

1    costs of goods sheet tab.

2    A    Yes.

3    Q    And let's go to row 21, please.

4    A    Yes.

5    Q    Row 21.  You can't really see the rows on screen here.

6    A    Yes.  It says, bulk COGS from Schwarz.  And you'll notice

7    there is an eight cent per tablet estimate for the costs of

8    goods sold, and it is derived based on the expected amount from

9    Schwarz.  That's why it says in -- under column E on that same

10   row 21, using COGS provided by Schwarz as proxy, i.e.,

11   placeholder.  So this is long after the Dexcel contract was

12   signed.  The Dexcel contract actually has a defined price for

13   the cost of goods sold.  That price is somewhere between six

14   and-a-half and seven cents depending on the volumes if it's,

15   you know, a 2012 -- I'm sorry, 14-count pack or a 28 or a 42

16   pack.

17   Q    And just to be clear, this is that June 2006 forecast?

18   A    Correct.  This is the June 2006 forecast that -- that

19   Dr. Frisch is relying on.

20   Q    All right.  Let's go to the volume and price tab and go to

21   M-27.  M, as in Michael, 27.

22   A    Yes.  And that's the -- you'll see the words there.  It

23   says, current 52 weeks ending February 19th, 2006.  I think

24   Mr. Schutt may have testified about these, but the long and the

25   short of it, this is a data pull from a third-party commercial

1     data provider called IRI.  And the date of the data pull was

2     February 19th, 2006, which is a fair -- fairly long time period

3     before the November 2006 assignment date.  And between February

4     and November the volumes of Prilosec OTC sales are growing by

5     quite substantial amounts.

6     Q    And, in fact, there is a few months between June 2006 and

7     this data pull, correct?

8     A    Oh, yes.  Correct.  That's right.  So the valuation or this

9     forecast is a June forecast, and, yet, it's still relying on a

10    February 19th, 2006, forecast.  And if -- even if the antitrust

11    was really using it for valuation purposes as of June, I would

12    have expected to see a May 2006 data pull at that time period.

13    This information is readily available on a monthly basis.

14    Q    What about -- let's go back to the first-to-market tab and

15    go to the first-to-market tab.  Let's go to cell E-50.  E as in

16    Edward 50.

17    A    Yes.  So E-50 is the total market units, 64,072 if you

18    scroll --

19    Q    Are we on E-50?

20    A    You were.  Yes.  At the very top of your screen right

21    there.  You'll see total market units on row 50.  E is the

22    projected number of units for that first year for 2009.  Now,

23    the -- again, the thing that the -- as somebody who does

24    forecasting, I see that the part that bothered me considerably

25    is that the input data is that 61,021.  I believe these are

14-count packages.  So 61 million 14-count boxes.  So that's derived based upon a February 2006 data point that we just saw on the prior data sheet.  So they are pulling the February 2006 data point.  They are bringing it over into this spreadsheet. That's where the 61,000 comes from.  And then they are incrementing it by five percent to 2009.

Now, there are, you know, three years between 2006 and 2009, not one.  So, number one, I think the five percent growth assumption is too low based on what we observe in the actual growth experience of Prilosec.  But even if it were the right number, they should have applied it for an additional two years to bring the volumes up to 2009.  So it's another example of, I consider, kind of a basic methodological error that was embedded in these forecasts.

Q    And I don't know if you recall, if not, we'll eventually get to it, but even the year zero unit numbers over there in C, column C, it's 61 million, right?

A    Correct.  That's the data input, the 61,000 where it says unit in years zero, that's where the number -- again, the 64 million number in column E, row 50, that is five percent -- the 64 million dollar -- I'm sorry, the 64 million unit number in column E, is that 61 million unit number in column C multiplied by 1.05 or five percent.

Q    Do you recall -- I don't know.  Maybe this is asking a lot, Dr. DeRamus.  Do you recall that Mr. Schutt pulled unit volume

1    data for his spreadsheet in July of 2007?  He was pulling June

2    data for both June 2007 and year-old data for June 2006.  Do

3    you recall that?

4    A    That's correct.  So --

5    Q    Do you recall if that June 2006 data was higher than what's

6    reflected here?

7    A    Yes.  It was significantly higher.  And you see -- you see

8    kind of the rate of growth in the -- in Mr. Schutt's data pull

9    both compared to the February 6 number and the June 2006 number

10   and then June 2006 all the way to July of -- or June of 2007.

11   And you see a consistently, you know, double digit growth rate

12   in this market.  This is not a five percent growth market.

13   These are -- this is a very fast growing market.

14   Q    Let's go to rows 18, 19, and 20, please.  And just if you

15   can highlight them so we can figure out what they are?  And

16   these are assumptions in that June 2006 forecast that

17   Dr. Frisch is relying on, is that correct?

18   A    That's correct.

19   Q    All right.  Do you have a critique of utilizing these

20   assumptions here?

21   A    Yes.  I think -- and, actually, I would also maybe

22   highlight row 21, as well, because these are all parameters

23   that or input parameters that Mr. Schutt actually revised in --

24   in June and July of 2007.  So, again, Mr. Schutt is -- he is

25   charged with actually paying close attention to the forecast,

1    to preparing a forecast they can rely on as they are getting --

2    where there is a real potential for an earlier launch, and we

3    heard him describe, you know, a couple different changes that

4    he made in these -- in this block, particularly in three of

5    these four blocks that substantially increased his projection

6    of the profits.

7         So this is all -- these are all going to go to profit

8    as opposed to volumes.  So that's where in the NB trade profit

9    percentage in row 18, that's one where he says, I've got this

10   data point, and -- I'm sorry.  I am paraphrasing.  He pulls the

11   -- he has the March 2007 data point from this data provider

12   called CPR that show that Prilosec's trade profit percentage

13   was something like 12 or 13 percent, and so he then lowers that

14   percentage that you see on row 18 from 25 percent, which was

15   their standard percentage, down to 15 percent, which pumps up

16   the price and the profits for that first year in the forecast.

17        If there is -- the numbers in the 2010 and forward

18   aren't really factoring into the calculations here because in

19   2010, Mr. -- or the second year, Mr. Schutt also assumes that

20   there is competition.

21   Q    And that happens here in this 2006 forecast before

22   Mr. Schutt, right?

23   A    Correct.  That's the standard assumption that the analysts

24   are using, is that there is a one-year period of no

25   competition, and there is competition thereafter, and there is

1    a different pricing model that is assumed to occur when

2    competition occurs, and that's when you go down to row 21 where

3    it says store brand manufacturing gross margin of percentage,

4    and that's the parameter that Mr. Schutt also said or decided

5    was too low based on what he saw as the market opportunities

6    for omeprazole, and so he increases that parameter, which

7    further increases the profits in the out years.

8    Q    Now, at the risk of pushing my luck, Dr. DeRamus, we're

9    going to go to the Mr. Schutt forecast that you reviewed.

10   Let's go to Exhibit 5317, and that's also a spreadsheet.

11   Exhibit 5317, please.  And you recognize this is the business

12   case that Mr. Schutt was working with in July, correct?

13   A    Correct.

14   Q    Okay.  Now, could you help us compare the pricing

15   assumptions here in the June forecast that we just looked at,

16   and, to start, let's go to row 10.  Row 10, please.

17   A    So, correct.  Row 10, that's the number that I mentioned

18   before.  I think it is 25 percent in the other model was based

19   on their standard product, and this is where Mr. Schutt lowers

20   it to 15 percent in the far column, the column K, I believe,

21   right after J.  I can't quite see it.  It says, the 13 percent

22   per CPR.  That's where he discussed this other data provider,

23   and there is another sheet, a tab on there for CPR.  You

24   doesn't necessarily need to go through that.  I believe we saw

25   it the other day where you see the actual data that shows the

national brand trade profit percentage for Prilosec.

Q    And do you recall that data had a date of March 2007?

A    Correct.

Q    And so would that data have been available if someone was doing a high level of due diligence back in 2006?

A    Yes.  Just like the IRI data, this is data that's readily available.  This is commercially available data if someone was doing the minimum due diligence that I would expect for a transaction.  I don't fault the person who did this for general budgeting purposes, but in a transaction, there is a much higher level of diligence required in order to come up with an accurate number because real dollars are on the line.  If they underestimate the ability to -- of the prices that they can charge, then they are giving away their asset for a below fair market value.

Q    Okay.  Now, how does using that trade profit impact the value that you derive when you look at cash flows?

A    Well, it has a substantial impact.  It increases the price that Perrigo US was expected to be able to charge for omeprazole and, therefore, substantially increases the amount of profits.  So I would say both in conjunction with that parameter and then the one parameter that we didn't talk about was the store brand consumer savings.

Q    Let's go to cell D-11.  Cell D-11.  D as in dog 11.

A    Right.  So for year one it says 20 percent.  Again, I

1    mentioned this earlier as that summary statistic for does -- is

2    the lack of a compare to statement a huge risk factor or not?

3    That's the data point that Mr. Schutt -- so by decreasing that

4    store brand consumer savings that increases the retail price

5    and, therefore, increases the price that Perrigo is going to

6    receive relative to that earlier forecast.

7             And as I understood his testimony, it was a decision

8    that management made at the time based on what they observed

9    the prospects were for that particular product and the strength

10   of customer demand for that product.

11   Q    And if we go to cell E-14, let's talk about what Mr. Schutt

12   did with the store brand gross margin.  Cell E-14.  This would

13   be in the out years?

14   A    Correct.  So out years meaning effectively 2010 and

15   forward.  So not very far out year.  It's the near-term out

16   years.  So this is where he substantially increases that margin

17   that they are expecting to be able to earn, i.e., the price

18   that they expect to be able to charge even in the case of

19   competitive entry in year two.  And I would say a 55 percent

20   gross margin in year two with competition, that's not a lot of

21   competition.  I have seen competitive markets.  I know what

22   margins are in competitive markets.  And 55 percent and even

23   the 40 percent margins that he has in those out years is not

24   indicative of the kind of robust competition that I believe or

25   I heard Mr. Hendrickson describe as saying competition comes

1    along and the bottom drops out of prices.  The pricing dynamics

2    in this market, they are very different than the pricing

3    dynamics that you see in regular generic prescription generic

4    companies.

5    Q    Let's go back to one other tab here.  IRI 707.

6    A    Yes.

7    Q    This may have been looked at with Mr. Schutt.  And if we

8    just go to the top, cell A-1, now we are looking at volume

9    information, correct?

10   A    Correct.

11   Q    And can you describe here what Mr. Schutt found with

12   respect to volume -- or essentially what he was assuming when

13   he was computing volume?

14   A    So actually this is a data point.  This is not an

15   assumption.  So Mr. Schutt is doing what I would have hoped

16   that the analysts would have done back in June of 2006 or in

17   November of 2006, which is to reach out to the IRI database and

18   get a current data pull for that month.  It gives you the year

19   to date sales for Prilosec OTC.  It's terrific information,

20   very detailed, very granular, and he uses that both -- he can

21   compare it to the prior 52 weeks.

22         If you go over to the block starting on column G, and

23   you'll see he's got -- this is where he is in column M, this

24   unit growth and dollar growth percentage as 14 percent, 18

25   percent per year.  I'm referring to row 10, which is kind of

1    the overall market growth.  So row 10, column M.  So this is a

2    phenomenally fast growing business at the time, and so he has

3    actually been using this data to update his forecasts of the

4    future sales as well.

5         So it gives you a current data point for year zero,

6    and it gives you a basis for more reliable forecasts for the

7    out years because whatever you put in year zero is feeding

8    right through to your out years.  So your out years are going

9    to be way too low if your year zero number is too low.

10   Q    And if you look at column I -- don't move anything.  But if

11   you look at column I, you see that $67 million -- 67 million

12   units number?

13   A    Yes.  I do.

14   Q    Is that what Mr. Schutt computed for essentially June,

15   2006?

16   A    Correct.  So 67 million is what his calculations here would

17   produce if you would apply -- if the analyst in June 2006 or

18   November 2006, which is the better date to be thinking about,

19   if they had applied that number.  So actually it should have

20   been north of 67 million had the -- had there actually been a

21   November forecast that pulled October information.

22        And keep in mind, all these numbers are 52-week

23   totals, right, so they are always lagging a little bit.  You

24   have this baked in average where kind of the changes are

25   actually more rapid than these -- they are effectively weighted

1     averages across an entire year.

2     Q    Okay.  At this point I think let's just talk without going

3     to cells at this point or else I'll never finish.  Can you talk

4     about the concepts of pipe fill and the ORx that we've heard

5     about and how those impact both Mr. Schutt's work as contrasted

6     to the June 2006 spreadsheet that Dr. Frisch is relying on?

7     A    Sure.  So pipe fill is, as Mr. Schutt described, is the

8     attempt to incorporate into the forecast the fact that you've

9     got effectively inventory that's going to be sitting on

10    retailers' shelves.  So when you launch the product, you got to

11    get a whole bunch of stuff out to fill up the shelves, and then

12    consumers are going to be coming in the stores and drawing down

13    that inventory.  So that actually represents kind of a big

14    chunk of early sales to fill up that pipe.  And so it's an

15    important source of revenue.

16          And the amount that retailers are going to purchase in

17    that initial pipe fill to fill it up depends on their

18    perceptions of the strengths of consumer demand and then how

19    quickly the individual customers come in and buy that product

20    off the shelf.  And so they were expecting that as a high, high

21    demand product.  This is a blockbuster product as Dr. Manning

22    described.  They were expecting that pipe fill to be a big

23    number.  And the first time they ever put a number on that is

24    Mr. Schutt's June 2007 forecast.  And that's a significant

25    increase particularly in that year one volume number.

1    The second issue -- I don't know if you want me to

2  stop there and talk about pipe fill or go onto --

3  Q    Before we leave pipe fill, if we could pull 5020 back up,

4  the earlier forecast, and go to the volume page -- volume and

5  price page.  And you go over and you see the add 100 percent

6  for WDM, Club, and Dollars and RX.  Is there any express

7  adjustment for pipe fill that you can find in this spreadsheet?

8  A    No, there is not.

9  Q    Okay.  Back to the other spreadsheet, 5317.  Bear with me.

10 Why don't you go on and let's go past pipe fill ORx.

11 A    So ORx was also an additional source of demand that we

12 heard Mr. Schutt describe.  So, again, ORx is at the pharmacy

13 level.  If there is a Rx prescription, a prescription that's

14 then going to be converted to an OTC fill at the pharmacy

15 level, i.e., by the pharmacist, and there were, as I understood

16 it, some significant expectations that omeprazole and Perrigo's

17 omeprazole product in particular would be a very good candidate

18 to get additional sales through this ORx channel.  It's still

19 in the same pharmacy.  You go to the CVS, but it's for the

20 individuals who are coming in with a prescription rather than

21 the individuals who are going to the OTC shelf that's in front

22 of the counter.

23    So it's -- you know, I saw in Mr. Schutt's cover

24 e-mail to the spreadsheet he describes the ORx volumes that he

25 is assuming.  He actually describes a potential increase to

1    this based on, I believe it was, a recommendation of a

2    consultant that talked about, I believe, potentially 120

3    million tablets from the ORx channel.  Mr. Schutt puts in a

4    hundred million additional ORx units.  But he does so only in

5    year one, and that's the part that I couldn't quite figure out,

6    because he's got the units in the spreadsheet for the place

7    holders for years two and forward, but he didn't carry through

8    the ORx volumes in the out years, i.e., 2010 and forward even

9    though he's got -- you look in the spreadsheet and you see the

10   volumes, if you go down to the actual calculations for the

11   Perrigo volume projections, they don't include additional ORx

12   numbers, which is why I think even his forecast -- here it

13   contains an error.

14          I don't know if he did that on purpose, or I still

15   would consider it to be an underestimate of the total volumes,

16   and particularly if I were being in the shoes of an investment

17   banker trying to sell this product I would want to see those

18   ORx numbers in every single year because it was a significant

19   opportunity.

20          I should say that one thing I disagreed -- disagree --

21   I don't know if you can disagree with a fact witness, but I

22   heard Mr. Schutt say that this was the first time that they

23   incorporated the ORx into the forecasts, but in that June 2006

24   forecast that we just saw --

25   Q    Let me back up.

A    When you read out that caption, it said, you know, it's a gross-up factor W*M, which I assume is Walmart or W*M.

Q    Keep going.

A    So it says add 100 percent for W*M, Club, which I understand to mean Club -- Club sales, and Dollar, which is I think Dollar General, another big customer that's not included in the IRI data, and then RX.  And that RX number -- my inference is that RX was intended to encompass some amount of ORx switches.  The percentage increase is higher than their standard assumption for the Club -- the Club adjustment.

        So, again, I think you talked about the X factor.  The X factor is what you need to apply to the higher data to account for the Walmarts of the world to gross that number up. That was previously 35 percent until Mr. Schutt in June of 2007 comes out with a more accurate number and that -- realize that number should be a lot higher.

Q    To be fair, the analyst in this June 2006 takes all of that into some account and then multiplies times, essentially doubles the IRI, right?

A    That's why I think the analyst was being very imprecise, but by doubling it, by applying a factor of two to the IRI data, my inference as an economist, based on all the data that I've looked at, is that there is some combination of Club purchases in there, plus ORx assumptions.  It's just that analyst in June 2006 was not precise in terms of laying out

1    their assumptions in order for us to figure that out now after

2    the fact, unlike Mr. Schutt whose work product I really

3    appreciated because I could see each one of his assumptions on

4    a step-by-step basis, which also gave me much greater

5    confidence in the reliability of that as a -- as a forecast.

6    Q    Now, do you consider it appropriate to update a forecast

7    for information that was known or knowable as of November 2006,

8    to essentially take this June 2006 forecast as it is, and then

9    adjust it for what you consider to be known or knowable?

10   A    I think it's not only appropriate, I think it's necessary.

11   It's a basic premise of any kind of arm's-length standard

12   applied to a transaction, as well as a basic fair market value

13   approach to valuing transactions, but ultimately you assume

14   that the buyers and sellers are knowledgeable and haven't made

15   a mistake in their assessment of the opportunities.

16   Q    So we are going to look at Exhibit 5511.  Exhibit 5511.

17   And when you are updating or adjusting these numbers, are you

18   including adjustments for, like, rows C and D or at least D and

19   E that are essentially, you believe, were known or knowable and

20   then making those adjustments to the 2006 forecasts we were

21   just looking at?

22   A    Yes.  I would say, you know, the row C, again, is just

23   updating.  It's that one parameter that Dr. Frisch used that I

24   believe is incorrect, his use of a nine percent or nine percent

25   plus SG&A, a percentage that's how I go from row B to row C.

1    So you see it has a substantial impact.  What do you assume

2    about the SG&A?  Is it five percent or nine percent?  Well,

3    that drives $21 million of value in Mr. -- in Dr. Frisch's

4    analysis.  So the -- to go from C to D, D is really where I

5    incorporate this additional information that I think was known

6    or knowable and, frankly, not everything.  I think that's why

7    the number is in my mind low.  So I come up with a $126 million

8    NPV as of November 2006.

9          So because I am using the 2006 forecast, I am bringing

10   it back in present value terms to that same November 2006 that

11   Dr. Frisch uses.  But there are two important or maybe three

12   different important parameters that I haven't included in that.

13   The cost of goods sold -- when Mr. Schutt got the forecast, the

14   forecasting responsibility, he actually increased that cost of

15   goods sold from what had previously been calculated as a 1.40

16   per unit to a 1.50 per unit, and so he actually went the wrong

17   direction relative to the costs that actually were reflected in

18   the Dexcel contract and that are embedded in Mr. Epple's

19   December 2007 forecast.  So that $175 million number on row --

20   either row D or E, both of those contain inaccurate COGS

21   numbers.  So the row D includes a 1.40, whereas row E includes

22   a 1.50, whereas the number used by Mr. Epple was a 1.20 or a

23   1.25, if you include some additional spoilage and obsolescence.

24          So there is -- as I said before, Dr. -- I'm sorry,

25   the -- there is some other market share forecasts that

1    Mr. Schutt had implemented in his July 2007 forecast that went

2    the other way, i.e., he lowered the forecast below the 40

3    percent that was the standard and that were used in

4    Mr. Frisch's June 2006 forecast.  So by lowering the expected

5    market share for omeprazole, for Perrigo's omeprazole, he

6    lowered the profits, and he lowered it well below 40 percent

7    even though 40 percent was their standard and 40 percent was

8    actually what they were able to achieve very quickly upon

9    launch.

10   Q    Now, there is something missing from this demonstrative

11   table.  You did a calculation for June or July 2007, correct?

12   A    That's correct.

13   Q    And so why don't we briefly touch on those results.  If we

14   go to Exhibit 5457 --

15          THE COURT:  Before you leave 5511, when we heard from

16   Dr. Frisch, and his exhibit was 2231-D that did a comparison in

17   reverse, he broke out two assumptions, not just the SG&A move

18   from five to nine percent but also a different discount rate on

19   sales.  I think he used eight percent as opposed to ten percent

20   on one level and said you had used the eight percent.  But when

21   you were looking at row C, that's your calculation?  It

22   doesn't -- it uses Frisch's discount rates in both categories

23   or not?

24          THE WITNESS:  So to be clear, the assignment price --

25   he and I use the same discount rate.  There is no dispute.

1          THE COURT:  But he said that he used the eight percent

2     in discounting sales to do a different ratio and that you

3     continued to use ten percent at that level.

4          THE WITNESS:  So, correct, in the royalty --

5          THE COURT:  When you are looking at row C --

6          THE WITNESS:  When you were in row C --

7          THE COURT:  -- the only correct assumptions -- you

8     have correct assumptions, plural, but the only one you

9     mentioned was the SG&A change that he made.  Does that also

10    reflect a difference in the discount rate or not?

11         THE WITNESS:  I'm sorry, Your Honor.  I was probably

12    maybe a little bit less precise then I should have been.  The

13    additional adjustment correction that I made with regard to his

14    use of discount rates was in the royalty rate calculation.  So

15    the 11.12 percent, that includes --

16         THE COURT:  That includes both?

17         THE WITNESS:  That includes both.  So the eight

18    percent doesn't factor into either his or my assignment price

19    valuation numbers.  When you are looking at a lump sum NPV

20    amount, we are both on the same page with the ten percent.

21    It's only when you convert that to a royalty rate equivalent

22    that he inserts this additional eight percent assumption that I

23    didn't.  So all of my numbers from row C down under the royalty

24    rate have what I consider to be the correct approach.

25         THE COURT:  All right.  Thank you.  You can go to the

1   next slide.  I can't remember what it was.

2              MR. WEAVER:  It's Exhibit 5457.

3              THE COURT:  Thank you.

4   BY MR. WEAVER:

5   Q   And we will get back to royalties in a second.  Before we

6   do that, I just want to make sure we have this in.  Can you,

7   Dr. DeRamus, describe what you are doing here just so we have

8   that data point in as well?

9   A   Sure.  So this is the forecast -- the valuation using a

10  forecast that is based on Mr. Schutt's July 18th, 2007,

11  forecast.  So this is the result if you just use that forecast

12  and then calculate through the terminal value, row 22 gives

13  you -- under that total column you see it's $127.8 million is

14  the value of the assignment, and this is NPV terms as of June

15  2007.

16              So this assumes that if the Court were to decide that

17  the appropriate valuation date were the date on which the

18  assignment agreement, or the approximate date on which the

19  assignment agreement was actually signed, then this is the

20  closest forecast that we have to that date.  And if the use --

21  use of any forecast is appropriate, then this would be what I

22  think is a lower bound estimate of the value of the assignment.

23  Q   To be clear, it would still provide, I think what you call,

24  a windfall, correct?

25  A   Correct.  Anything less than that actual assignment value,

that $474 million NPV number, or the 21.5 percent royalty

number, will result in LLC getting a windfall, kind of a risk-

free return.  And I should have -- on this -- since you have

this exhibit just to -- exhibit up just to make sure it's in

the record, that 17.06 percent royalty that's right next to the

$127.8 million, that is the royalty equivalent calculated

according to the way I consider to be the only economically

reasonable way to calculate an effective royalty, i.e., using a

consistent discount rate for both the numerator and the

denominator.

Q    With that, let's segue back to Exhibit 5511, and now let's

turn to royalties, royalty rates.  Essentially, could you

please describe the purpose first of -- well, first, for each

of those assignment price valuations that you did, did you also

calculate the royalty equivalent?

A    Yes.  I did.

Q    And could you describe the purpose of this conversion of a

lump sum payment to a royalty?

A    Sure.  So there are some provisions in the regulations that

describe this kind of calculation.  I would say it's a bit of

an odd concept to apply in this particular instance.  So the

typical way it's applied is, you know, imagine a foreign

related party is going to purchase U.S. intellectual property

for -- to exploit in a foreign market.  It can purchase it

outright.  It can say I want to buy the German rights to a new

drug that the U.S. has developed for $50 million, and it can acquire those rights either by making that $50 million lump sum payment or through a royalty paid over time because we often observe licensing transactions for intellectual property like patents or trademarks.

In this instance here, the concept is a royalty that's being paid by LLC for the assignment of contract rights to -- from LPC in 2006 that are being exploited by LPC for which LPC needs to continue to perform all the functions. So this is one of those mental gymnastics moment. The math is pretty straightforward, but the concept is in my view very odd in this kind of situation because of the odd nature of the transaction because this is ultimately all about U.S. profits and, in my view, additional U.S. intangibles that Perrigo US is contributing.

So, nonetheless, I kind of set my reservations aside. I do the math that I think the regs describe, which is you can take a lump sum payment and turn it into a royalty equivalent by simply taking those cash flows -- the net present value of the cash flows back to a particular date, and in that present value of the sales to a given date divide one by the other, and that gives you a royalty rate. And now if the royalty -- if the sales come in as expected, then you should get back the same net present value as the assignment price. That's why it's a royalty rate equivalent, if that makes sense.

1    Q    What happens if things turn out better?

2    A    Well, it depends.  It really depends on that -- on kind of

3    what turns out better.  It can result in a -- you know, a --

4    and under Dr. Frisch's scenario, it turns out to provide a

5    windfall.  There can be an adjustment for that.  That's why you

6    see the difference between E and F is -- on a royalty rate

7    number, it's actually not that large.  It's 19 percent versus

8    21.5 percent.  And, in fact, if you were to calculate the --

9    that number on column E over a shorter time period, that number

10   would actually be much higher than 21 percent.

11             So a lot of it depends on the margins that are

12   expected in -- that are built into that forecast relative to

13   the margins that are realized.  So if the margins that are

14   realized are much higher than expected, then there is a

15   windfall, which is why Dr. Frisch's -- particularly his 5.24

16   percent or any of these other ones are going to produce a

17   windfall because it effectively gives the party that's

18   receiving a royalty too low a royalty because those royalty

19   rates are derived based on forecasts of margins that were

20   ultimately much lower than realized, which is what we know

21   occurred in this case particularly because of, in my view, the

22   lack of attention to detail to those out year forecasts.

23   Q    All right.  Now, I think it's already clear you did not

24   apply the same methodology as Dr. Frisch when you were

25   converting the values, the net present values into royalty

1    equivalence.  So can you talk about the differences in the two

2    approaches?

3    A    Right.  And I think the difference is pretty

4    straightforward and I think pretty stark.  There are many

5    things I think reasonable economists can agree on, but I really

6    don't think there is any basis that I have ever seen in

7    economics or transfer pricing that would support what

8    Dr. Frisch has done.

9        So you -- again, it's supposed to be a royalty rate

10    equivalent.  That term equivalent means something to me.  As an

11    economist it means the dollars have to be the same.  If you

12    have a lump sum amount and then you convert that lump sum

13    amount to a royalty and then you apply that royalty to those

14    sales and pull it back again, if you can't get that same number

15    there is something screwy about your calculation procedure.

16        And the reason Mr. -- Dr. Frisch's calculation

17    procedure is, for lack of a better term, kind of screwy is

18    because he applies this differential discount rate to the sales

19    which he discounts back at eight percent and the operating

20    profits.

21    Q    What's he discount the operating profits at?

22    A    We are both discounting cash flows who are -- he and I

23    were -- that's an assignment price.  That's that value that's

24    brought back -- that cash flow is brought back at the ten

25    percent discount rate.  So that's going to be the numerator,

1    the number on top of the ratio.  And then we have to divide by

2    a present value of sales.  Now, he discounts those sales by

3    eight percent rather than ten percent.  So that's going to

4    inflate that denominator.  So that's going to lower the

5    resulting royalty rate.

6         And I just find that to be an absurd approach.  There

7    is no -- these are -- these are effectively a single set of

8    cash flows.  With cash flows you start with sales, and you go

9    through all your expenses down to net cash flows.  It's not

10   like we are comparing different projects or different types of

11   opportunities that might have different discount rates.

12   Q    What about that demonstrative that I believe was put up on

13   a slide during Dr. Frisch's testimony where there was some

14   citation to a transfer pricing reg?  Do you recall that?

15   A    I do.  I do not think that in any way proves this novel

16   proposition that Dr. Frisch is advancing, and I think -- in

17   fact, I think it disproves it because, as I recall that

18   proposition, there was something about the possibility of

19   discounting a stream of royalty payments at a higher discount

20   rate than a lump sum payment, and -- which actually makes some

21   intuitive sense.  As you think about if a party -- would a

22   party prefer a lump sum payment, in this case $474 million or

23   21.57 percent as of March 1, 2008?  And I think most people are

24   risk averse.  Actually, a risk-neutral party probably would be

25   indifferent to the two, but a risk-averse company would

1    actually say, I would rather have the $474 million because I

2    don't know what's going to come of sales in the future.

3        So if you apply his concept to say -- or that citation

4    of the regs, that would say the discount rate, that 21.57

5    percent, actually has to be a higher number, not a lower

6    number.  In order for a party to be, you know, the same or

7    indifferent on a true risk-adjusted basis, if those cash flows

8    under the royalty scenario are riskier because the royalty

9    income is riskier then your lump sum payment, then his 5.24

10   percent shouldn't be the number that I calculate when you

11   divide by the -- using a -- kind of a consistent 10 percent,

12   but it should be a much higher number.  There should be a

13   premium on the royalty rate in those calculations.

14   Q    All right.  Before we move to another topic, can you just

15   again summarize your view of whether these forecasts are the

16   most reliable way to value the assignment?

17   A    No.  I don't.  I think you obviously see how much they vary

18   over time, but the biggest conceptual issue that I have as a

19   transfer pricing practitioner is that using any of these

20   forecasts gives LLC a windfall for risks it did not assume, and

21   it assumes a hypothetical that would be, I think, the worst

22   possible way of calculating anything that even pretends to

23   approximate an arm's-length price.

24        MR. WEAVER:  Your Honor, I am going to now turn to

25   another topic, and if Your Honor will indulge me about 20

1    minutes or so, I can probably finish.

2        THE COURT:  Okay.  Well, is this going to be the topic

3    that Mr. Magee objects to?

4        MR. WEAVER:  I think so.

5        THE COURT:  All right.  Let's -- there is a number of

6    slides coming up on calculations.  Is that where you're going?

7        MR. WEAVER:  Yes.

8        THE COURT:  Okay.  What's your objection to that,

9    Mr. Magee?  You started earlier, and I said you'd get a chance

10   to renew it when we got to it.

11       MR. MAGEE:  I don't have any objection to the

12   calculations that were requested by counsel.  What I object to

13   is characterizing him as part of a CWI or commensurate with

14   income analysis which does not appear in the report.  These are

15   just numbers, calculations requested by counsel.

16       THE COURT:  So you are fine to go with the numbers?

17       MR. WEAVER:  Yeah.  I am not expecting him to apply

18   the commensurate with income regulations.  I am just asking him

19   to do calculations that counsel will apply.

20       THE COURT:  It sounds like, at least as long as it's

21   in that fashion, we can continue.  And is that your last topic?

22       MR. WEAVER:  That is my last topic with a wrap-up that

23   might take another five minutes.

24       THE COURT:  All right.  Well, we have -- I've got a

25   couple different things on the calendar this afternoon, the

1    internal thing, and I also have a chance to eliminate the jury

2    trial next week if we have a plea go through.  So I guess we

3    can go for a little while here, but the bottom line is I'll

4    have more time, I think, Monday afternoon than I have this

5    afternoon.  On the other hand, it's nice to finish a bundle of

6    direct.  What I'm worried about is we are going to go for 20

7    minutes, but then we'll need 35 or 40 minutes, and then I'm

8    going to get pushed into my afternoon schedule.

9         MR. WEAVER:  That I can't promise.

10         THE COURT:  Let's do that.  Let's just take our leave

11    today.  We're at -- let's see.  I have got about 3:43 left for

12    Perrigo, about 2:20 or so left for the government.  So that

13    would take us a little over 2 o'clock on Monday with normal

14    breaks, but not bad, and I think we can finish up on Monday

15    with that.

16         MR. WEAVER:  Your Honor, if I could make a request?  I

17    know we can't talk to Dr. DeRamus over the weekend.  Can we

18    e-mail him a copy of the transcript for today so he can read

19    what he said, or is that not possible?

20         THE COURT:  I think we shouldn't do that because, you

21    know, that would put him in a different league than all the

22    other witnesses who didn't have a chance to look back over the

23    actual words as they were transcribed.

24         MR. WEAVER:  Fair enough.  So he is going to have a

25    nice weekend.

1          THE COURT:  It's going to be warm and sunny.  All

2    right.  Is there anything else we should do for today?

3          MR. MAGEE:  Let me mention, Your Honor, I don't think

4    we'll use all of the three hours and 45 minutes that we have

5    remaining --

6          THE COURT:  Okay.

7          MR. MAGEE:  -- on Monday.  So we are likely to finish.

8          THE COURT:  You won't break my heart.

9          MR. MAGEE:  I know I won't.

10         MR. WEAVER:  Your Honor, I would add, after we finish

11   with Dr. DeRamus, the plan is to way cut down on the Jeff

12   Needham transcript.  Maybe 15 minutes of reading, and I think

13   we'll be done.

14         THE COURT:  Fair enough.  Great.  I hope you do have a

15   good weekend.  And, you know, I am not disappointed that you

16   get a chance to see some of Michigan at its best, but I do hope

17   that at least some of you can go forward, and you know, start

18   packing up and getting out, but maybe you need the whole team.

19   We'll see.

20         Before we end -- I was going to do this on Monday, but

21   in case I forget, you know, in the spirit of, you know, the

22   movie producer team, I think we talked about that, or the

23   director, we should, if you haven't already, and I don't think

24   you have, introduce the people you have working your machines.

25   They are doing a great job.  I've said before, both sides are

1    incredibly well organized through a bunch of tedious material.

2    But you couldn't do any of it without the people in the back

3    row.  So you want to introduce the people you have here?

4         MR. MAGEE:  Absolutely, Your Honor.  Our top seat

5    director is Alex Rennick.  And I have got to give credit to my

6    lead paralegal, Jeannie Hensel.

7         THE COURT:  Okay.  Good.  Thank you.  This is like the

8    movie credits, the fine print, if you stay to the end of the

9    movie.  And I am not charging any of you time for this by the

10   way.  I am not.

11        MR. WEAVER:  For us, Your Honor, Dawn Miller, who

12   is -- actually, I've never met Dawn in person until recently.

13        THE COURT:  Really?

14        MR. WEAVER:  She's stepped in and done a great job,

15   and then a longstanding colleague, Tyrone Bowie.

16        THE COURT:  Thank you.  Yes.  All of you folks have

17   done a terrific job making this legible.  What you didn't know

18   is I heard you both mutter sometimes frustrations about the

19   lack of resolution.  My upgrade is scheduled for July.  I'm

20   serious.  It's been scheduled for a long time.  And the main

21   difference will be a much higher resolution on the cameras and

22   screens.  So after we are all done and whoever loses appeals

23   and comes back for a retrial, you can have -- you can have

24   yourself -- you can have yourself a higher resolution at trial.

25   All right.  Have a good weekend, everybody.

1              MR. MAGEE:  Thank you.

2              MR. WEAVER:  Thank you, Your Honor.

3              LAW CLERK:  Court is in recess.

4              (Proceeding concluded, 2:06 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                         INDEX

2

3        Defendant's Witnesses:                        Page

4        RICHARD MANNING

5         Cross Examination(Cont.) by Mr. Linguanti      3
          Redirect Examination by Mr. Weaver           63
6
         DAVID DERAMUS
7
          Direct Examination by Mr. Weaver             67
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE


I, Paul G. Brandell, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.



                    /s/ Paul G. Brandell

                    Paul G. Brandell, CSR-4552, RPR, CRR

                    U.S. District Court Reporter

                    399 Federal Building

                    Grand Rapids, Michigan  49503

**$**

**$10** [1] - 119:21
**$100,000** [2] - 20:25, 100:5
**$110** [1] - 118:18
**$126** [2] - 97:10, 170:7
**$175** [4] - 97:14, 98:1, 118:24, 170:19
**$2.18** [11] - 129:3, 129:6, 130:2, 130:14, 130:22, 130:23, 131:4, 131:10, 131:14, 133:17, 135:14
**$20** [1] - 11:16
**$20,000** [1] - 120:22
**$21** [1] - 170:3
**$25,000** [2] - 106:2, 106:3
**$37** [13] - 29:16, 29:17, 29:24, 31:4, 31:23, 32:9, 32:15, 32:19, 32:24, 33:4, 33:7, 33:17, 95:7
**$43** [1] - 95:7
**$44** [1] - 138:13
**$44,000** [1] - 138:13
**$474** [8] - 93:18, 96:4, 99:7, 118:22, 139:21, 174:1, 178:22, 179:1
**$5,000** [1] - 105:21
**$50** [2] - 175:1, 175:2
**$500,000** [7] - 21:2, 21:3, 21:6, 100:8, 100:10, 100:21, 130:1
**$600,000** [2] - 20:24, 21:3
**$63,000** [1] - 129:18
**$630** [1] - 85:24
**$632** [1] - 93:17
**$663** [1] - 93:16
**$67** [1] - 164:11
**$69** [1] - 118:16
**$700,000** [1] - 10:17
**$740,000** [1] - 129:24
**$750,000** [1] - 100:17
**$80** [2] - 21:14, 23:4
**$832,000** [1] - 90:7
**$870,000** [1] - 96:1
**$873,000** [1] - 130:21
**$877,000** [15] - 82:12, 82:19, 86:5, 90:9, 90:10, 95:9, 95:10, 95:11, 97:22, 108:18, 108:20, 109:21, 127:10, 138:13, 140:7

**$877,832** [1] - 90:3

**'**

**'05** [5] - 9:24, 10:16, 10:19, 11:10, 11:19
**'07** [5] - 10:14, 10:21, 62:21, 62:23, 63:6
**'08** [4] - 11:10, 11:11, 11:12, 142:12
**'09** [1] - 142:12
**'80s** [1] - 7:1
**'90s** [1] - 69:5

**/**

**/s** [1] - 186:14

**0**

**0.7** [1] - 10:17
**06/04/2021** [1] - 3:1

**1**

**1** [12] - 62:6, 66:6, 66:14, 82:7, 85:25, 92:19, 105:21, 105:23, 109:22, 139:22, 149:8, 178:23
**1.05** [1] - 157:23
**1.1** [9] - 22:8, 22:9, 23:3, 25:13, 25:15, 25:23, 26:21, 26:22, 27:6
**1.20** [1] - 170:22
**1.25** [1] - 170:23
**1.33** [1] - 135:23
**1.35** [1] - 139:10
**1.40** [2] - 170:15, 170:21
**1.50** [2] - 170:16, 170:22
**1.58** [1] - 136:18
**1.7** [2] - 11:19, 143:10
**10** [24] - 60:25, 96:6, 115:17, 116:3, 130:17, 130:23, 131:1, 131:12, 133:16, 133:19, 137:17, 138:3, 138:15, 139:20, 149:2, 149:16, 149:21, 150:11, 160:16, 160:17, 163:25, 164:1, 179:11
**100** [2] - 166:5, 168:4
**10038** [1] - 2:11

**10:04** [2] - 67:1, 67:8
**10:28** [2] - 67:9, 67:17
**11** [5] - 9:18, 13:10, 13:16, 13:20, 161:24
**11.12** [1] - 172:15
**11.5** [1] - 133:14
**110** [3] - 21:20, 21:25, 22:2
**1111** [1] - 1:17
**116** [4] - 35:17, 37:21, 38:17, 39:11
**118** [1] - 68:12
**12** [1] - 159:13
**120** [1] - 167:2
**121** [2] - 38:2, 38:3
**121.5** [1] - 138:22
**125** [1] - 118:24
**127.8** [3] - 98:19, 173:13, 174:6
**12:00** [1] - 122:21
**12:22** [1] - 122:22
**12th** [1] - 2:10
**13** [2] - 159:13, 160:21
**130** [1] - 76:12
**14** [1] - 163:24
**14-count** [3] - 155:15, 157:1
**140** [6] - 39:25, 40:8, 40:12, 40:13, 43:1, 43:2
**15** [6] - 20:10, 58:21, 140:1, 159:15, 160:20, 182:12
**150** [1] - 2:2
**1500** [1] - 2:2
**151** [3] - 44:3, 44:4, 44:11
**152** [5] - 44:4, 44:11, 45:1, 45:16, 46:12
**153** [1] - 76:12
**16** [1] - 9:25
**17** [1] - 59:1
**17.06** [1] - 174:5
**18** [6] - 57:6, 58:13, 158:14, 159:9, 159:14, 163:24
**18.5** [2] - 118:13, 119:21
**180-day** [1] - 110:22
**181** [1] - 68:12
**18th** [3] - 98:9, 113:8, 173:10
**19** [2] - 158:14, 176:7
**192** [1] - 138:12
**1982** [1] - 7:1
**1984** [1] - 68:19
**1992** [1] - 68:20
**1993** [1] - 72:2
**1999** [2] - 68:22, 69:1

**19th** [3] - 155:23, 156:2, 156:10
**1:17cv737** [1] - 1:5

**2**

**2** [2] - 62:10, 181:13
**2.16** [1] - 141:4
**2.18** [2] - 129:9, 135:16
**2.6** [1] - 126:8
**20** [11] - 4:9, 4:16, 4:18, 10:15, 116:7, 122:13, 122:17, 158:14, 161:25, 179:25, 181:6
**200** [1] - 22:19
**20004** [1] - 1:17
**2000s** [1] - 74:14
**2004** [2] - 9:16, 47:19
**20044** [2] - 2:8, 2:14
**2005** [14] - 9:25, 20:6, 20:16, 21:12, 22:7, 23:2, 23:3, 25:20, 26:10, 28:18, 35:23, 100:24, 103:15, 103:20
**2006** [80] - 28:20, 29:16, 34:6, 34:8, 35:8, 35:19, 36:22, 39:9, 39:17, 51:10, 87:20, 90:5, 90:6, 95:7, 97:2, 97:8, 100:23, 103:2, 103:12, 103:20, 104:20, 105:16, 106:7, 118:13, 119:4, 119:14, 121:19, 121:20, 121:23, 135:21, 136:10, 138:3, 139:24, 141:19, 147:24, 148:1, 148:5, 148:9, 149:9, 150:18, 151:18, 153:9, 153:18, 155:17, 155:18, 155:23, 156:2, 156:3, 156:6, 156:10, 156:12, 157:2, 157:3, 157:7, 158:2, 158:5, 158:9, 158:10, 158:16, 159:21, 161:5, 163:16, 163:17, 164:15, 164:17, 164:18, 165:6, 167:23, 168:17, 168:25, 169:7, 169:8, 169:20,

**19th**

170:8, 170:9, 170:10, 171:4, 175:8
**2007** [45] - 39:20, 40:25, 42:6, 43:5, 43:25, 45:2, 45:20, 46:15, 55:16, 61:11, 61:20, 63:2, 84:4, 97:6, 98:1, 98:9, 98:17, 113:8, 141:21, 142:7, 142:16, 142:18, 142:20, 142:22, 143:3, 143:4, 143:18, 144:12, 148:2, 148:4, 148:6, 158:1, 158:2, 158:10, 158:24, 159:11, 161:2, 165:24, 168:14, 170:19, 171:1, 171:11, 173:10, 173:15
**2008** [27] - 7:15, 44:17, 81:21, 82:7, 82:20, 84:9, 85:25, 93:8, 93:10, 95:11, 97:19, 98:7, 105:14, 109:22, 129:4, 131:9, 137:20, 137:25, 139:22, 140:3, 142:5, 142:15, 142:19, 143:20, 146:12, 149:8, 178:23
**2009** [13] - 84:14, 98:7, 109:25, 123:21, 130:22, 136:19, 142:5, 143:21, 146:12, 156:22, 157:6, 157:8, 157:12
**2010** [7] - 98:8, 110:1, 142:21, 159:17, 159:19, 162:14, 167:8
**2012** [7] - 93:8, 93:10, 123:21, 130:22, 136:19, 138:6, 155:15
**2013** [2] - 93:11, 138:19
**2015** [1] - 85:8
**2017** [5] - 93:11, 110:25, 138:19, 139:1, 139:11
**2018** [1] - 39:15
**2019** [1] - 39:15
**202** [3] - 1:18, 2:8, 2:15
**2020** [1] - 109:8
**2021** [2] - 1:12, 109:7

**21** [6] - 155:3, 155:5, 155:10, 158:22, 160:2, 176:10
**21-some** [1] - 93:20
**21.5** [2] - 174:1, 176:8
**21.57** [3] - 99:8, 178:23, 179:4
**22** [1] - 173:12
**2231-D** [1] - 171:16
**227** [1] - 2:14
**230** [1] - 51:15
**24** [2] - 57:2, 58:15
**25** [4] - 116:7, 131:10, 159:14, 160:18
**259-8012** [1] - 2:11
**25th** [1] - 134:4
**26** [1] - 93:17
**27** [2] - 93:18, 155:21
**28** [5] - 69:12, 69:13, 155:15, 186:5
**28th** [1] - 55:16
**29th** [1] - 149:9
**2:06** [1] - 184:4
**2:20** [1] - 181:12

**3**

**3** [2] - 56:8, 185:5
**30** [1] - 116:7
**30(b)(6)** [2] - 58:15, 58:16
**30-month** [2] - 44:25, 45:14
**305-4929** [1] - 2:8
**30th** [4] - 9:24, 11:12, 35:8, 40:25
**312** [1] - 1:21
**31st** [1] - 35:23
**324-1486** [1] - 1:21
**33** [1] - 2:10
**331** [1] - 31:11
**34** [1] - 52:23
**35** [6] - 65:3, 116:8, 168:14, 181:7
**37** [1] - 108:25
**37.4** [8] - 14:16, 14:21, 15:3, 15:13, 96:9, 96:13, 96:15, 140:15
**373-6229** [1] - 1:18
**380** [5] - 50:11, 51:15, 52:9, 53:4, 53:8
**388** [3] - 59:12, 59:13, 62:5
**39** [1] - 21:18
**399** [2] - 52:4, 186:17
**3:43** [1] - 181:11

**4**

**4** [6] - 1:12, 56:23,

56:25, 57:5, 136:19
**4.31** [7] - 96:5, 115:16, 116:2, 116:3, 137:17, 138:2, 138:15
**40** [8] - 7:2, 116:8, 162:23, 171:2, 171:6, 171:7, 181:7
**404** [4] - 55:6, 55:14, 57:3, 57:5
**42** [1] - 155:15
**43** [3] - 35:17, 108:25
**43.1** [1] - 140:15
**45** [2] - 57:21, 182:4
**458** [2] - 111:6
**482** [7] - 71:22, 71:23, 76:9, 77:18, 80:4, 131:21, 136:3
**49503** [2] - 2:3, 186:18
**4th** [1] - 2:7

**5**

**5** [3] - 52:9, 52:10, 58:21
**5.24** [2] - 176:15, 179:9
**50** [5] - 66:3, 66:4, 156:16, 156:21, 157:20
**500** [1] - 1:20
**5020** [3] - 153:10, 166:3
**505** [1] - 51:15
**5136** [1] - 51:19
**52** [4] - 40:1, 57:13, 155:23, 163:21
**52-week** [1] - 164:22
**5207** [3] - 8:20, 9:2, 144:23
**5317** [3] - 160:10, 160:11, 166:9
**5334** [3] - 54:3, 61:4
**5344** [4] - 47:24, 48:1, 48:9, 63:25
**5392** [4] - 68:1, 117:21, 118:1, 136:25
**5393** [10] - 3:20, 13:6, 13:20, 20:10, 35:17, 65:2, 65:4, 117:23, 117:25
**5422** [1] - 143:23
**5434** [1] - 91:3
**5441** [2] - 141:17, 141:18
**5445** [1] - 132:4
**5455** [1] - 93:3
**5457** [2] - 171:14, 173:2

**55** [6] - 2:7, 44:4, 44:5, 162:19, 162:22
**5504** [1] - 63:18
**5504-D** [4] - 46:25, 51:7, 53:12, 61:3
**5505** [1] - 87:6
**5507** [1] - 129:7
**5508** [4] - 128:18, 128:19, 130:8, 134:7
**5509** [1] - 137:13
**5511** [5] - 95:21, 169:16, 171:15, 174:11
**555** [1] - 2:7
**56** [2] - 44:6, 44:7
**58.4** [1] - 96:21

**6**

**6** [3] - 60:11, 158:9
**60601-5803** [1] - 1:20
**61** [3] - 157:1, 157:17, 157:22
**61,000** [2] - 157:5, 157:18
**61,021** [1] - 156:25
**616** [1] - 2:3
**616-9832** [1] - 2:15
**62** [3] - 117:22, 118:7
**63** [1] - 185:5
**64** [3] - 157:20, 157:21
**64,072** [1] - 156:17
**646** [1] - 2:11
**65** [1] - 3:21
**67** [4] - 164:11, 164:16, 164:20, 185:7

**7**

**7** [5] - 13:10, 52:23, 60:17, 60:19, 118:7
**705** [1] - 9:12
**707** [2] - 9:19, 163:5
**74** [5] - 48:12, 48:13, 48:24, 48:25, 49:3
**740,000** [1] - 129:22
**75** [1] - 134:4
**750,000** [1] - 21:10
**752-2000** [1] - 2:3
**753** [1] - 186:6
**77** [1] - 1:20
**77,000** [1] - 74:20

**8**

**8** [7] - 3:21, 3:25, 4:7, 20:10, 60:19, 60:22, 74:20
**80** [3] - 22:4, 22:10,

22:19
**800** [1] - 97:22
**800,000s** [2] - 86:24, 86:25
**800-some** [1] - 121:24
**83** [1] - 136:24
**86** [2] - 65:1, 65:6
**872** [1] - 86:16, 86:21
**875** [2] - 86:16, 86:21
**877** [3] - 93:24, 129:17, 136:11
**877,000** [3] - 14:17, 85:10, 106:7
**8:30** [1] - 3:2
**8th** [1] - 9:16

**9**

**9** [7] - 3:21, 4:9, 9:10, 9:11, 74:4, 74:5, 133:13
**90** [1] - 65:7
**92** [1] - 136:24
**95** [1] - 21:25
**97** [1] - 49:13
**98** [1] - 22:2

**A**

**A-1** [1] - 163:8
**a.m** [5] - 3:2, 67:1, 67:8, 67:9, 67:17
**A.T** [1] - 69:2
**ability** [27] - 12:23, 13:25, 14:24, 15:3, 66:14, 66:19, 78:25, 80:18, 82:4, 82:8, 86:12, 100:13, 102:15, 102:20, 105:11, 105:12, 105:23, 106:6, 106:9, 107:3, 114:13, 116:1, 117:16, 118:10, 122:8, 125:13, 161:13
**able** [21] - 14:9, 15:9, 16:19, 37:7, 37:12, 40:1, 40:3, 44:16, 44:24, 45:13, 46:9, 66:9, 88:13, 101:16, 125:2, 125:14, 142:10, 161:19, 162:17, 162:18, 171:8
**absolute** [1] - 102:17
**absolutely** [3] - 21:8, 52:17, 183:4
**abstraction** [1] - 24:15
**absurd** [3] - 109:8,

152:24, 178:6
**abuse** [1] - 78:10
**academia** [1] - 7:7
**academics** [1] - 7:9
**accept** [2] - 18:22, 31:16
**accepted** [3] - 6:3, 6:9, 26:18
**accepting** [1] - 27:13
**access** [5] - 30:11, 30:14, 30:15, 102:12, 102:23
**acclimate** [1] - 9:13
**accomplished** [1] - 14:25
**Accord** [1] - 133:22
**according** [3] - 23:6, 129:22, 174:7
**accordingly** [1] - 34:24
**account** [2] - 168:13, 168:18
**accounting** [2] - 120:10, 120:11
**accrual** [1] - 100:21
**accrue** [1] - 100:9
**accuracy** [1] - 144:18
**accurate** [4] - 49:20, 146:15, 161:12, 168:15
**accurately** [2] - 78:3, 109:18
**achieve** [1] - 171:8
**acknowledge** [1] - 6:12
**acknowledging** [1] - 121:22
**acquire** [1] - 175:2
**action** [1] - 54:23
**active** [2] - 5:23, 125:4
**activities** [4] - 18:19, 82:9, 84:20, 84:24
**activity** [4] - 79:14, 107:23, 127:13, 128:12
**actual** [44] - 53:1, 71:19, 75:5, 78:2, 82:13, 82:17, 85:24, 86:1, 91:12, 93:7, 93:10, 93:15, 95:1, 96:1, 96:3, 96:16, 97:22, 101:18, 110:22, 111:19, 111:20, 118:20, 124:13, 127:10, 135:19, 137:4, 139:11, 140:2, 142:2, 143:10, 144:19, 146:2, 153:17,

154:8, 154:19, 154:22, 157:9, 160:25, 167:10, 173:25, 181:23

**actuality** [1] - 100:16

**actuals** [5] - 93:13, 109:2, 126:19, 138:6, 141:12

**add** [6] - 89:17, 90:20, 90:23, 166:5, 168:4, 182:10

**added** [2] - 128:4, 132:13

**addition** [1] - 125:23

**additional** [25] - 72:11, 84:13, 92:14, 97:12, 98:6, 110:3, 110:16, 120:8, 120:17, 134:8, 138:22, 139:25, 141:11, 145:6, 154:22, 157:11, 166:11, 166:18, 167:4, 167:11, 170:5, 170:23, 172:13, 172:22, 175:14

**additionally** [1] - 13:24

**address** [3] - 16:19, 74:16, 116:14

**addressed** [1] - 111:8

**addressing** [2] - 42:2, 153:7

**adjust** [2] - 148:19, 169:9

**adjusted** [3] - 23:4, 82:14, 179:7

**adjusting** [3] - 148:17, 148:20, 169:17

**adjustment** [6] - 148:16, 149:20, 166:7, 168:10, 172:13, 176:5

**adjustments** [2] - 169:18, 169:20

**administered** [3] - 72:23, 77:22

**administrative** [2] - 120:9, 128:1

**adopt** [1] - 139:14

**advance** [3] - 69:17, 69:21, 69:25

**advancing** [1] - 178:16

**advantage** [1] - 123:20

**advantages** [1] - 123:15

**advice** [12] - 34:20,

36:8, 37:19, 37:20, 37:22, 37:24, 40:3, 41:9, 43:22, 44:10, 50:18

**advise** [5] - 34:17, 36:1, 36:11, 40:21, 45:10

**advising** [1] - 40:19

**advisors** [1] - 146:3

**affect** [3] - 65:19, 125:13, 147:1

**affected** [1] - 84:1

**affecting** [1] - 151:8

**affiliates** [1] - 83:9

**afternoon** [4] - 180:25, 181:4, 181:5, 181:8

**aggregate** [1] - 113:1

**aggressive** [5] - 37:9, 112:6, 113:7, 114:13, 114:15

**ago** [3] - 7:2, 9:25, 64:2

**agree** [22] - 5:5, 23:18, 24:11, 26:23, 30:24, 32:17, 33:2, 40:7, 40:11, 40:13, 46:5, 61:17, 63:4, 64:4, 64:21, 93:25, 100:15, 107:9, 126:3, 126:5, 140:14, 177:5

**agreed** [12] - 14:16, 18:21, 20:18, 20:19, 21:9, 29:19, 30:6, 33:3, 62:7, 62:16, 93:24, 108:19

**agreement** [85] - 12:13, 12:25, 14:1, 20:16, 20:19, 20:24, 21:12, 22:7, 28:18, 30:24, 35:23, 38:21, 69:21, 69:22, 69:25, 75:8, 75:10, 79:23, 80:15, 80:16, 80:17, 81:11, 81:16, 81:19, 84:14, 87:5, 87:12, 88:5, 89:1, 89:4, 89:5, 89:10, 89:15, 89:17, 90:3, 90:12, 91:6, 91:23, 92:6, 92:10, 92:21, 92:23, 93:1, 96:7, 98:15, 98:25, 99:3, 100:20, 101:1, 110:4, 114:22, 115:2, 115:9, 115:10, 116:17, 116:19, 116:20, 117:7, 117:8, 120:15,

123:10, 123:14, 123:17, 123:25, 126:17, 126:18, 126:21, 127:2, 127:8, 127:9, 128:15, 135:14, 137:4, 137:5, 137:12, 137:16, 137:25, 141:5, 141:10, 173:18, 173:19

**agreements** [3] - 69:18, 88:3, 92:5

**agrees** [4] - 29:23, 82:15, 85:16, 86:4

**ahead** [6] - 26:13, 38:15, 47:16, 53:12, 64:16, 123:6, 130:11, 131:18

**aid** [1] - 141:18

**Alex** [1] - 183:5

**ALEXANDER** [1] - 1:16

**allocated** [1] - 91:9

**allocation** [3] - 25:3, 108:5, 135:5

**allow** [2] - 4:14, 57:23

**allowed** [1] - 36:16

**allowing** [1] - 152:22

**allows** [2] - 5:2, 104:11

**almost** [2] - 77:8, 134:22

**alone** [4] - 88:14, 101:14, 104:18, 104:19

**alternative** [3] - 89:12, 91:16, 99:5

**amended** [3] - 52:15, 52:19, 120:14

**AMERICA** [1] - 1:7

**America** [1] - 26:16

**Amherst** [2] - 68:20, 68:22

**amount** [34] - 15:7, 15:8, 27:6, 30:15, 70:25, 72:11, 85:11, 85:14, 100:5, 100:16, 108:16, 119:25, 121:14, 121:25, 128:3, 129:2, 131:5, 131:10, 138:12, 138:14, 139:21, 139:23, 146:1, 146:7, 146:11, 146:14, 154:21, 155:8, 161:20, 165:16, 168:8, 172:20, 177:12,

177:13

**amounts** [5] - 101:3, 120:21, 140:1, 142:6, 156:5

**analogize** [1] - 132:15

**analyses** [13] - 49:18, 76:20, 91:11, 91:17, 95:25, 97:13, 128:13, 129:1, 136:23, 149:8, 149:9, 149:22, 150:12

**analysis** [67] - 7:14, 12:10, 13:12, 13:21, 14:19, 16:12, 23:8, 23:11, 23:16, 29:24, 35:21, 36:5, 49:15, 54:14, 54:20, 58:5, 59:8, 65:1, 65:9, 65:10, 65:22, 69:11, 74:7, 76:25, 77:6, 77:9, 77:12, 90:14, 90:19, 90:21, 99:18, 99:19, 99:21, 102:1, 102:25, 103:2, 105:9, 106:17, 106:18, 107:9, 108:4, 108:17, 116:16, 117:18, 118:10, 124:6, 126:8, 127:5, 127:18, 128:18, 128:20, 129:13, 131:16, 131:20, 132:10, 134:6, 136:22, 137:3, 138:2, 141:20, 150:13, 153:24, 154:11, 170:4, 180:14

**analyst** [7] - 145:3, 148:13, 153:15, 164:17, 168:17, 168:20, 168:25

**analysts** [8] - 24:7, 25:6, 97:4, 146:25, 148:11, 149:14, 159:23, 163:16

**analytic** [3] - 77:3, 77:5, 78:15

**analytical** [1] - 77:7

**analyze** [4] - 16:15, 16:16, 46:24, 78:19

**analyzed** [5] - 12:23, 13:24, 77:11, 117:15, 134:9

**analyzing** [1] - 49:24

**and-a-half** [1] - 155:14

**ANDA** [3] - 9:25, 116:6, 125:16

**Andy** [3] - 33:10, 50:20, 60:4

**annual** [1] - 105:21

**answer** [9] - 37:24, 38:4, 38:13, 41:13, 41:20, 64:16, 64:18, 76:6, 133:21

**answers** [1] - 38:6

**anticipated** [1] - 62:1

**antitrust** [6] - 70:14, 70:19, 71:10, 71:11, 125:12, 156:10

**anyways** [1] - 88:19

**API** [2] - 47:23, 58:24

**apologies** [5] - 44:7, 48:19, 48:20, 52:17, 54:1

**apologize** [1] - 117:25

**app** [1] - 24:2

**appeals** [1] - 183:22

**appear** [1] - 180:14

**APPEARANCES** [1] - 1:13

**appearances** [1] - 55:19

**appeared** [1] - 55:2

**Appendix** [3] - 68:13, 68:14, 76:12

**application** [1] - 136:3

**applied** [8] - 96:3, 97:8, 136:9, 143:19, 157:11, 164:19, 169:12, 174:22

**applies** [8] - 89:20, 104:4, 106:18, 118:13, 135:8, 146:16, 154:9, 177:18

**apply** [21] - 77:10, 89:23, 91:15, 94:5, 96:25, 99:5, 105:8, 106:10, 132:1, 135:9, 136:4, 139:3, 149:1, 164:17, 168:12, 174:21, 176:24, 177:13, 179:3, 180:17, 180:19

**applying** [4] - 90:17, 96:2, 151:14, 168:21

**appointed** [1] - 186:5

**appreciated** [1] - 169:3

**approach** [22] - 8:22, 29:21, 48:4, 78:15, 78:16, 79:22, 90:17, 94:4, 95:8, 99:6, 118:23, 126:25, 131:20, 134:21, 140:22, 141:6,

151:22, 152:14,
152:15, 169:13,
172:24, 178:6
**approaches** [1] -
177:2
**approaching** [1] -
135:10
**appropriate** [13] -
26:19, 27:5, 62:4,
97:16, 98:18, 108:5,
116:21, 151:19,
169:6, 169:10,
173:17, 173:21
**appropriately** [2] -
77:14, 92:21
**approvable** [7] -
28:21, 34:7, 35:9,
39:21, 40:7, 41:1,
115:1
**approval** [17] - 21:4,
31:22, 34:7, 44:1,
85:8, 100:12,
102:13, 103:22,
103:25, 110:22,
111:2, 114:24,
115:3, 121:13,
121:14, 121:18,
121:20
**approved** [1] - 31:13
**approximate** [2] -
173:18, 179:23
**approximates** [1] -
134:14
**April** [3] - 47:19,
51:10, 137:20
**apt** [1] - 92:18
**area** [11] - 16:22,
69:10, 70:3, 70:18,
73:3, 78:9, 81:24,
84:18, 115:12, 154:5
**areas** [2] - 70:14,
70:21
**arguing** [1] - 26:17
**argument** [1] - 57:19
**ARIE** [1] - 2:6
**arises** [1] - 72:17
**arm's** [62] - 16:24,
17:3, 17:14, 18:16,
18:18, 19:16, 28:14,
29:13, 75:7, 75:10,
77:7, 77:10, 78:1,
79:23, 87:5, 87:11,
88:16, 88:24, 88:25,
91:5, 91:22, 93:25,
94:12, 94:13, 94:17,
95:13, 99:6, 108:20,
108:21, 108:23,
115:19, 118:20,
119:6, 119:10,
119:12, 119:19,

119:22, 120:1,
120:13, 122:2,
123:13, 124:1,
124:12, 126:7,
127:7, 127:11,
128:14, 134:15,
140:5, 141:6, 145:1,
145:23, 147:14,
150:23, 151:18,
152:3, 152:4, 152:5,
152:20, 154:19,
169:11, 179:23
**arm's-length** [54] -
17:14, 18:16, 18:18,
29:13, 75:7, 75:10,
77:7, 77:10, 78:1,
79:23, 87:5, 87:11,
88:16, 88:24, 88:25,
91:5, 91:22, 93:25,
94:12, 94:13, 94:17,
95:13, 99:6, 108:20,
108:21, 108:23,
115:19, 118:20,
119:10, 119:12,
120:1, 120:13,
123:13, 124:1,
124:12, 126:7,
127:7, 127:11,
128:14, 134:15,
140:5, 141:6, 145:1,
145:23, 147:14,
150:23, 151:18,
152:3, 152:4, 152:5,
152:20, 154:19,
169:11, 179:23
**arrangement** [7] -
18:12, 18:24, 19:10,
19:11, 19:12, 20:6,
28:25
**artwork** [1] - 125:3
**aside** [7] - 12:4, 18:4,
59:10, 101:3,
117:14, 152:1,
175:16
**assembly** [1] - 107:16
**asserted** [4] - 90:4,
103:13, 115:13,
136:11
**assertedly** [1] -
106:21
**assertively** [6] - 78:21,
79:3, 79:4, 80:19,
82:5, 82:21
**assess** [6] - 12:11,
13:21, 47:14, 58:1,
58:2, 66:19
**assessment** [3] -
102:11, 109:16,
169:15
**asset** [9] - 124:6,

133:3, 133:16,
133:17, 133:18,
135:3, 135:12,
147:5, 161:14
**assets** [23] - 24:17,
77:11, 78:14, 81:18,
83:4, 90:14, 90:19,
106:19, 123:18,
124:3, 124:4, 124:8,
124:13, 125:20,
125:21, 126:1,
126:6, 126:10,
133:11, 133:12,
135:1, 135:2
**assign** [3] - 28:5, 28:7,
135:13
**assigned** [5] - 16:18,
17:11, 22:21, 25:17,
119:22
**assigning** [2] - 27:14,
28:3
**assignment** [117] -
12:17, 12:18, 12:19,
14:25, 25:18, 26:8,
26:11, 26:12, 26:18,
26:19, 27:3, 27:20,
34:16, 37:1, 53:16,
74:17, 74:21, 75:10,
77:4, 79:24, 80:15,
80:16, 80:24, 81:10,
81:11, 81:15, 81:19,
82:2, 82:12, 82:13,
84:5, 85:11, 86:5,
86:12, 86:15, 86:19,
88:5, 89:2, 89:5,
89:13, 89:14, 89:17,
90:2, 90:10, 91:23,
92:2, 92:5, 92:13,
92:19, 93:15, 93:18,
94:6, 96:1, 96:5,
97:10, 97:19, 97:23,
98:15, 98:19, 98:22,
98:23, 98:24, 99:2,
99:6, 100:20, 103:3,
103:13, 106:7,
110:4, 114:21,
116:17, 116:19,
117:7, 117:13,
118:21, 120:4,
120:7, 120:15,
120:24, 121:3,
121:16, 121:19,
121:22, 122:6,
123:12, 123:25,
126:15, 126:16,
126:17, 126:23,
126:25, 127:2,
135:14, 135:20,
136:11, 137:4,
137:10, 138:23,

140:14, 141:7,
148:3, 152:7, 153:5,
153:22, 156:3,
171:24, 172:18,
173:14, 173:18,
173:19, 173:22,
173:25, 174:14,
175:7, 175:24,
177:23, 179:16
**assignments** [3] -
27:24, 88:2, 124:11
**assigns** [1] - 126:8
**assist** [1] - 47:2
**assisted** [1] - 51:8
**associate** [1] - 69:5
**associated** [16] -
19:19, 19:22, 80:23,
83:3, 83:23, 84:7,
84:11, 85:4, 87:18,
91:12, 92:8, 100:13,
106:6, 110:7,
115:18, 154:3
**assume** [15] - 18:24,
28:13, 30:24, 31:8,
34:22, 89:25, 92:4,
115:23, 115:25,
129:1, 129:14,
168:2, 169:13,
170:1, 179:20
**assumed** [2] - 26:12,
160:1
**assumes** [3] - 159:19,
173:16, 179:21
**assuming** [3] - 36:4,
163:12, 166:25
**assumption** [13] -
92:25, 96:20,
113:15, 132:14,
139:14, 139:15,
153:14, 153:25,
157:9, 159:23,
163:15, 168:10,
172:22
**assumptions** [24] -
49:19, 92:24, 96:19,
97:3, 97:8, 113:7,
136:1, 139:8,
140:16, 142:2,
146:8, 146:17,
148:11, 150:3,
150:6, 158:16,
158:20, 160:15,
168:24, 169:1,
169:3, 171:17,
172:7, 172:8
**assurance** [1] - 84:14
**AstraZeneca** [18] -
31:21, 52:2, 52:7,
52:24, 53:6, 54:12,
54:16, 54:19, 55:15,

55:21, 59:6, 60:22,
60:25, 62:15, 62:16,
62:18, 62:20, 103:23
**AstraZeneca's** [2] -
51:14, 62:13
**at-risk** [1] - 100:11
**attachment** [1] - 61:14
**attempt** [2] - 140:25,
165:8
**attention** [6] - 6:19,
7:25, 142:1, 146:16,
158:25, 176:22
**attorney** [6] - 15:23,
37:18, 39:4, 53:9,
64:9, 64:13
**attorneys** [2] - 50:18,
63:21
**attributable** [2] -
90:23, 154:18
**August** [16] - 21:12,
22:7, 23:2, 25:20,
26:10, 28:18, 35:23,
63:1, 100:22,
100:24, 121:23,
142:16, 142:18,
143:3, 143:14
**authorized** [1] - 4:15
**available** [13] - 4:19,
76:25, 89:11, 95:17,
96:23, 97:25,
140:23, 141:25,
152:9, 156:13,
161:4, 161:7
**Avenue** [2] - 1:17, 2:2
**average** [3] - 154:13,
154:16, 164:24
**averages** [1] - 165:1
**averse** [2] - 178:24,
178:25
**avoid** [1] - 66:9
**AVON** [1] - 2:10
**aware** [2] - 8:2, 12:2
**AZ** [1] - 60:12

**B**

**background** [2] -
68:17, 130:10
**bad** [4] - 66:7, 66:9,
66:16, 181:14
**baked** [2] - 150:3,
164:24
**balance** [1] - 23:23
**balls** [1] - 8:17
**banker** [1] - 167:17
**bankers** [3] - 145:23,
145:25, 146:3
**bankruptcies** [1] -
73:9
**BARDELLI** [1] - 2:1

**bargain** [4] - 95:6, 95:14, 140:21
**bargained** [1] - 104:16
**barnacle** [1] - 38:11
**barnacle-laced** [1] - 38:11
**based** [43] - 49:18, 50:12, 73:5, 85:15, 85:16, 90:18, 93:7, 96:22, 97:2, 97:15, 100:21, 101:11, 101:19, 104:25, 112:15, 112:16, 114:8, 121:15, 123:18, 126:23, 131:25, 133:12, 134:17, 135:21, 139:10, 144:8, 144:14, 149:17, 151:20, 151:23, 155:8, 157:2, 157:9, 160:5, 160:18, 162:8, 167:1, 168:22, 173:10, 176:19
**basic** [12] - 13:7, 72:10, 72:11, 73:7, 83:9, 91:24, 140:22, 148:10, 148:13, 157:13, 169:11, 169:12
**basics** [1] - 122:6
**basis** [16] - 61:19, 65:15, 81:4, 82:14, 92:22, 95:12, 98:18, 107:2, 119:24, 145:22, 148:8, 156:13, 164:6, 169:4, 177:6, 179:7
**Bates** [6] - 9:12, 9:19, 49:2, 49:6, 69:1, 71:16
**bear** [14] - 9:6, 14:10, 15:10, 34:10, 56:3, 78:22, 82:5, 84:7, 86:13, 105:9, 105:11, 105:12, 106:6, 166:9
**bearing** [7] - 17:22, 78:22, 78:23, 107:23, 115:23, 129:20
**beat** [1] - 108:18
**became** [2] - 5:13, 6:3
**becomes** [2] - 34:1, 92:17
**becoming** [1] - 107:8
**beginning** [3] - 52:24, 59:1, 72:2
**begins** [3] - 20:11,

36:18, 36:19
**behalf** [2] - 2:4, 2:16
**behind** [1] - 133:5
**below** [5] - 86:17, 116:4, 161:14, 171:2, 171:6
**Ben** [1] - 2:13
**Bench** [1] - 1:12
**benchmark** [3] - 103:11, 104:11, 130:19
**benefit** [10] - 22:1, 35:20, 55:14, 95:6, 95:14, 108:24, 140:20, 140:21, 151:20, 152:23
**BENJAMIN** [1] - 1:15
**Berndt** [2] - 46:6, 46:14
**best** [7] - 45:6, 62:3, 98:24, 132:15, 134:21, 143:14, 182:16
**bets** [1] - 110:14
**better** [10] - 17:10, 24:8, 45:10, 69:12, 109:2, 152:21, 164:18, 176:1, 176:3, 177:17
**between** [43] - 4:14, 14:4, 16:24, 17:7, 18:9, 18:20, 19:7, 29:13, 36:18, 41:7, 43:7, 53:1, 54:4, 54:11, 54:19, 55:15, 56:7, 59:2, 69:22, 75:8, 79:4, 81:25, 87:21, 100:25, 103:14, 107:25, 108:19, 115:6, 118:24, 126:19, 134:18, 136:17, 140:15, 141:24, 149:19, 154:12, 155:13, 156:3, 156:6, 157:7, 176:6
**beyond** [4] - 40:20, 47:11, 66:13, 142:21
**big** [15] - 20:22, 22:13, 22:15, 42:9, 74:11, 78:24, 107:20, 107:25, 111:24, 119:1, 132:11, 165:13, 165:22, 168:6
**bigger** [1] - 94:20
**biggest** [3] - 110:6, 147:24, 179:18
**billion** [1] - 143:10
**binder** [3] - 48:14,

59:13
**bioavailability** [3] - 103:10, 103:15, 103:19
**bioequivalence** [3] - 35:25, 36:15, 37:15
**bit** [22] - 8:7, 8:8, 37:9, 53:13, 71:21, 77:5, 88:7, 98:20, 99:20, 100:19, 107:11, 114:6, 129:23, 130:18, 131:3, 131:11, 133:14, 134:16, 135:24, 164:23, 172:12, 174:20
**Black** [1] - 133:23
**blades** [3] - 80:7, 80:10, 80:14
**blesses** [1] - 6:11
**block** [4] - 112:14, 129:17, 159:4, 163:22
**blockbuster** [1] - 165:21
**blocks** [2] - 37:4, 159:5
**blood** [1] - 58:7
**blowup** [1] - 55:13
**board** [17] - 9:16, 10:20, 20:9, 20:15, 34:13, 76:20, 115:7, 144:8, 144:22, 145:5, 145:8, 145:14, 145:16, 145:22, 147:7, 147:18, 147:21
**Bockius** [2] - 1:14, 1:19
**bonus** [1] - 21:3
**book** [2] - 95:25, 133:18
**book-ended** [1] - 95:25
**books** [1] - 133:3
**borrow** [4] - 24:21, 24:23, 24:24, 117:16
**borrowed** [2] - 118:18, 119:25
**borrowing** [1] - 119:24
**bothered** [2] - 147:25, 156:24
**bottle** [1] - 125:23
**bottom** [11] - 38:12, 49:2, 57:1, 69:7, 87:25, 96:2, 112:12, 112:14, 154:24, 163:1, 181:3
**bound** [2] - 133:10,

173:22
**Bowie** [1] - 183:15
**Box** [2] - 2:7, 2:14
**box** [11] - 4:13, 4:16, 4:17, 4:21, 4:22, 5:22, 7:20, 8:2, 53:15, 87:21, 106:14
**boxes** [3] - 4:2, 86:10, 157:1
**brand** [10] - 4:17, 5:24, 113:10, 124:22, 125:6, 160:3, 161:1, 161:23, 162:4, 162:12
**branded** [1] - 114:1
**BRANDELL** [1] - 2:17
**Brandell** [4] - 73:12, 186:3, 186:14, 186:15
**breach** [2] - 70:24, 71:12
**break** [7] - 18:13, 27:23, 58:11, 67:2, 122:15, 123:4, 182:8
**breaks** [1] - 181:14
**brief** [2] - 115:7, 127:7
**briefly** [9] - 68:24, 76:10, 76:17, 123:9, 123:11, 128:23, 134:8, 171:13
**bring** [7] - 34:10, 111:6, 116:1, 116:2, 149:7, 149:21, 157:12
**bringing** [4] - 91:1, 149:9, 157:4, 170:9
**brings** [2] - 124:14, 126:2
**broad** [4] - 72:8, 76:19, 82:9, 150:15
**broader** [10] - 12:17, 71:16, 72:20, 79:10, 79:18, 84:19, 84:24, 125:19, 135:17, 135:18
**broadest** [1] - 140:19
**Broadhurst** [3] - 16:8, 68:7, 138:7
**Broadhurst's** [3] - 75:13, 129:23, 154:8
**broadly** [2] - 72:22, 106:12
**broke** [1] - 171:17
**brought** [7] - 77:4, 135:14, 142:17, 145:23, 177:24
**brush** [1] - 72:8
**bucket** [14] - 74:11, 75:1, 75:3, 75:5,

84:19, 84:24, 87:3, 87:4, 120:5, 122:10, 122:11, 122:13, 123:5, 126:25
**buckets** [2] - 74:11, 78:18
**budgeting** [3] - 94:15, 144:10, 161:10
**building** [1] - 37:4
**Building** [2] - 2:2, 186:17
**built** [1] - 176:12
**bulk** [1] - 155:6
**bullet** [3] - 10:7, 10:25, 131:15
**bunch** [2] - 165:11, 183:1
**bundle** [4] - 80:11, 102:7, 181:5
**bundles** [1] - 102:5
**burn** [1] - 38:10
**Business** [1] - 133:24
**business** [36] - 7:10, 19:20, 19:22, 69:6, 80:23, 82:11, 85:3, 85:5, 87:17, 88:17, 91:1, 92:13, 99:9, 111:16, 111:17, 115:18, 115:25, 123:19, 123:22, 124:14, 124:18, 124:22, 126:2, 127:15, 133:9, 139:1, 143:15, 143:19, 145:24, 147:10, 151:2, 151:5, 160:11, 164:2
**busy** [1] - 93:4
**buy** [6] - 31:3, 33:15, 73:7, 80:9, 165:19, 174:25
**buyer** [2] - 88:18, 147:3
**buyers** [1] - 169:14
**buys** [1] - 127:21
**buzz** [1] - 107:11
**BY** [20] - 2:17, 3:13, 9:1, 38:7, 38:16, 41:23, 44:8, 47:18, 48:8, 52:22, 58:9, 63:16, 64:17, 67:23, 74:3, 76:5, 90:8, 118:6, 123:3, 173:4
**Byron** [2] - 49:9, 49:20

**C**

**C-67** [3] - 153:12, 153:13, 153:14
**C-81** [2] - 153:23

**CAI** [1] - 133:23
**calculate** [9] - 129:3, 136:16, 137:10, 151:19, 173:12, 174:8, 174:15, 176:8, 179:10
**calculated** [3] - 139:21, 170:15, 174:6
**calculating** [1] - 179:22
**calculation** [9] - 96:18, 138:24, 148:23, 171:11, 171:21, 172:14, 174:20, 177:15, 177:16
**calculations** [18] - 75:16, 76:2, 76:7, 95:19, 95:23, 137:18, 139:13, 139:17, 141:7, 146:19, 159:18, 164:16, 167:10, 179:13, 180:6, 180:12, 180:15, 180:19
**calendar** [1] - 180:25
**cameras** [1] - 183:21
**candidate** [1] - 166:17
**cap** [1] - 21:6
**capabilities** [1] - 125:24
**capability** [4] - 78:22, 78:23, 116:16, 125:1
**capable** [1] - 115:23
**capacity** [6] - 15:2, 43:20, 70:6, 105:9, 118:14, 119:24
**capital** [10] - 19:2, 87:23, 94:15, 116:11, 130:18, 130:19, 131:3, 133:2, 145:15, 149:17
**capitalized** [4] - 81:20, 82:6, 105:13, 136:13
**capped** [1] - 100:9
**capsule** [1] - 10:21
**capsule/Schwarz** [1] - 10:7
**caption** [1] - 168:1
**captures** [1] - 149:14
**care** [1] - 41:20
**career** [3] - 27:25, 70:16, 72:2
**careful** [2] - 12:15, 19:8
**carry** [2] - 133:2, 167:7

**case** [26] - 19:3, 19:5, 28:21, 32:24, 42:6, 43:5, 44:14, 50:4, 50:24, 52:2, 56:10, 68:2, 71:12, 71:15, 76:20, 143:14, 143:15, 143:16, 143:19, 160:12, 162:18, 176:21, 178:22, 182:21
**cases** [2] - 57:24, 70:20
**cash** [37] - 24:20, 25:8, 82:18, 91:13, 91:14, 93:6, 93:7, 93:11, 94:5, 95:24, 96:2, 105:15, 105:23, 129:15, 135:15, 138:5, 138:9, 138:18, 138:21, 139:4, 139:12, 139:16, 148:24, 148:25, 149:11, 149:15, 150:8, 161:17, 175:19, 175:20, 177:22, 177:24, 178:8, 178:9, 179:7
**categories** [1] - 171:22
**caught** [1] - 6:19
**caveat** [1] - 40:23
**cc** [2] - 60:4, 60:5
**cease** [1] - 104:1
**cell** [8] - 153:12, 153:14, 156:15, 161:24, 162:11, 162:12, 163:8
**cells** [2] - 142:5, 165:3
**cent** [1] - 155:7
**centralize** [1] - 79:16
**centralized** [1] - 106:24
**cents** [1] - 155:14
**CEO** [2] - 33:25, 41:17
**certain** [15] - 30:10, 42:23, 57:15, 68:6, 68:7, 75:16, 76:7, 79:25, 80:1, 99:20, 107:15, 127:19, 127:25, 146:17
**certainly** [19] - 4:25, 12:23, 19:9, 63:21, 68:18, 68:25, 69:11, 70:16, 74:5, 74:9, 77:6, 78:18, 79:25, 82:18, 111:14, 112:1, 114:5, 134:10, 146:11
**CERTIFICATE** [1] -

186:1
**certify** [2] - 186:6, 186:9
**chagrin** [1] - 34:4
**chain** [1] - 112:17
**challenged** [1] - 152:19
**chance** [6] - 56:5, 57:11, 180:9, 181:1, 181:22, 182:16
**chances** [1] - 34:18
**change** [8] - 85:10, 96:18, 96:19, 96:20, 96:22, 102:18, 143:8, 172:9
**changed** [3] - 14:19, 22:23, 99:14
**changes** [5] - 15:18, 58:5, 144:5, 159:3, 164:24
**channel** [2] - 166:18, 167:3
**characterization** [2] - 52:16, 92:18
**characterize** [2] - 91:13, 107:7
**characterized** [1] - 139:17
**characterizing** [2] - 126:11, 180:13
**charge** [5] - 60:23, 61:1, 161:14, 161:19, 162:18
**charged** [2] - 146:5, 158:25
**charging** [1] - 183:9
**chart** [4] - 53:13, 54:2, 61:7, 61:9
**check** [3] - 106:14, 152:8, 152:13
**check-the-box** [1] - 106:14
**checking** [1] - 146:8
**Chemical** [2] - 49:10, 49:20
**Chicago** [1] - 1:20
**Chief** [2] - 2:9, 3:5
**choices** [1] - 6:23
**choose** [2] - 30:2, 131:1
**chooses** [1] - 102:6
**chose** [4] - 47:12, 101:25, 102:12
**Chris** [2] - 31:2, 98:3
**chunk** [1] - 165:14
**Cipla** [12] - 47:23, 49:1, 49:9, 49:20, 50:11, 50:12, 50:24, 53:2, 58:13, 58:23, 59:7, 64:5

**Cipla's** [1] - 51:6
**circle** [1] - 117:10
**circles** [1] - 117:4
**citation** [2] - 178:14, 179:3
**claim** [3] - 52:9, 108:9, 128:11
**clarify** [1] - 36:21
**clean** [1] - 3:17
**clear** [14] - 12:8, 17:14, 26:6, 63:18, 63:24, 120:25, 121:1, 130:23, 140:2, 149:4, 155:17, 171:24, 173:23, 176:23
**clearly** [2] - 52:15, 109:8
**CLERK** [6] - 3:3, 67:7, 67:10, 122:20, 122:23, 184:3
**client** [1] - 71:20
**clock** [1] - 41:21
**close** [3] - 23:24, 120:5, 158:25
**closer** [1] - 134:14
**closest** [5] - 132:17, 142:9, 146:10, 173:20
**Club** [7] - 166:6, 168:4, 168:5, 168:10, 168:23
**Co** [1] - 72:7
**Co-Operation** [1] - 72:7
**coated** [16] - 74:24, 86:7, 86:13, 86:16, 86:25, 88:1, 119:5, 119:12, 119:14, 120:2, 121:6, 121:9, 121:11, 121:19, 152:5, 153:4
**Code** [2] - 71:24, 186:6
**coffee** [2] - 80:7, 80:10
**COGS** [3] - 155:6, 155:10, 170:20
**colleague** [1] - 183:15
**colleague's** [1] - 71:9
**colleagues** [1] - 71:14
**colloquy** [1] - 56:7
**color** [1] - 88:1
**column** [26] - 10:3, 10:6, 10:13, 10:15, 10:16, 11:4, 11:15, 11:20, 138:8, 138:9, 138:18, 138:25, 155:9, 157:17, 157:20, 157:22,

160:20, 163:22, 163:23, 164:1, 164:10, 164:11, 173:13, 176:9
**combination** [1] - 168:23
**combine** [1] - 98:8
**combined** [4] - 98:5, 113:1, 124:2, 130:13
**coming** [9] - 7:3, 34:19, 103:9, 145:19, 151:25, 152:2, 165:12, 166:20, 180:6
**commenced** [1] - 100:9
**commencement** [2] - 52:15, 100:6
**commences** [1] - 53:17
**commensurate** [6] - 75:18, 75:20, 75:24, 76:9, 180:13, 180:18
**comments** [1] - 151:14
**commercial** [11] - 31:22, 70:14, 70:21, 74:12, 74:18, 79:11, 81:9, 81:12, 115:21, 153:5, 155:25
**commercialize** [1] - 100:13
**commercially** [2] - 79:19, 161:7
**commitment** [4] - 20:25, 21:2, 22:8, 100:10
**common** [1] - 106:12
**communicate** [4] - 5:9, 6:21, 34:17, 35:5
**communicated** [4] - 43:7, 53:22, 61:24, 142:8
**communication** [3] - 41:7, 54:8, 59:22
**communications** [2] - 59:2, 115:7
**companies** [21] - 6:21, 6:24, 15:19, 18:2, 19:13, 24:24, 106:13, 106:15, 128:4, 132:8, 132:12, 132:16, 132:18, 133:1, 133:4, 134:1, 134:19, 134:25, 146:4, 163:4
**companies'** [1] - 73:4
**company** [48] - 9:24,

14:7, 14:12, 14:15, 15:10, 15:17, 15:19, 15:22, 20:5, 28:15, 32:4, 34:1, 34:10, 35:2, 41:16, 43:19, 58:23, 66:20, 74:19, 76:21, 78:7, 79:14, 81:13, 101:10, 105:23, 106:3, 107:14, 108:13, 109:10, 109:11, 118:15, 125:10, 127:21, 127:25, 128:2, 128:3, 128:7, 128:9, 132:20, 133:6, 144:4, 145:4, 151:6, 154:22, 178:25

**COMPANY** [1] - 1:4
**Company** [3] - 17:16, 49:10, 49:20
**company's** [2] - 73:7, 79:13
**comparability** [1] - 134:18
**comparable** [5] - 131:19, 131:23, 132:8, 132:12, 132:17
**comparables** [4] - 131:16, 131:17, 132:1, 132:5
**compare** [29] - 3:19, 5:1, 5:2, 5:4, 5:23, 6:2, 6:5, 7:14, 7:21, 7:23, 8:5, 84:22, 110:13, 110:14, 111:8, 111:13, 111:20, 112:16, 113:4, 113:23, 114:3, 114:11, 114:16, 125:3, 143:9, 160:14, 162:2, 163:21
**compared** [1] - 158:9
**comparing** [1] - 178:10
**comparison** [2] - 4:14, 171:16
**compensated** [3] - 34:24, 92:21, 128:5
**compensation** [8] - 73:5, 89:16, 90:11, 90:22, 96:7, 123:21, 138:15, 141:5
**competing** [1] - 102:22
**competition** [10] - 110:21, 111:19, 159:20, 159:25,

160:2, 162:20, 162:21, 162:24, 162:25
**competitive** [3] - 162:19, 162:21, 162:22
**competitors** [1] - 111:22
**complaint** [5] - 52:7, 52:10, 52:14, 52:16, 52:19
**complementary** [2] - 80:13, 133:8
**complete** [2] - 58:10, 72:21
**completed** [6] - 35:24, 36:14, 37:13, 38:22, 38:25, 109:15
**completely** [1] - 152:24
**complexity** [1] - 124:18
**complicated** [2] - 41:18, 135:24
**component** [1] - 130:12
**components** [1] - 107:15
**computations** [2] - 75:23, 128:24
**computed** [1] - 164:14
**computing** [1] - 163:13
**concentrated** [1] - 107:4
**concept** [8] - 16:23, 40:25, 121:8, 148:15, 174:21, 175:6, 175:11, 179:3
**concepts** [1] - 165:4
**conceptual** [6] - 18:15, 92:7, 96:17, 119:1, 140:19, 179:18
**conceptualizing** [1] - 130:3
**conceptually** [2] - 104:10, 131:19
**concern** [2] - 107:6, 113:4
**concerned** [1] - 110:13
**concerning** [3] - 16:7, 52:9, 59:7
**conclude** [9] - 66:18, 80:22, 81:9, 85:10, 90:17, 99:24, 139:23, 145:13, 145:21
**concluded** [30] -

80:12, 81:1, 81:11, 82:4, 82:12, 83:1, 85:13, 85:23, 86:15, 87:22, 90:18, 90:20, 95:11, 96:17, 97:2, 97:21, 99:25, 100:1, 105:12, 106:5, 109:19, 118:21, 119:5, 122:10, 132:16, 133:15, 139:22, 150:11, 154:1, 184:4
**conclusion** [12] - 45:20, 49:13, 81:8, 85:9, 89:21, 91:12, 93:14, 98:23, 127:7, 128:14, 137:14, 147:20
**conclusions** [14] - 77:2, 77:3, 79:21, 80:21, 83:6, 84:1, 86:6, 86:8, 87:4, 87:11, 91:22, 93:22, 123:6, 140:13
**conditional** [1] - 100:11
**conduct** [19] - 70:20, 77:13, 77:15, 78:2, 78:11, 83:25, 84:19, 90:15, 150:16, 150:20, 150:22, 150:24, 151:3, 151:4, 151:5, 151:8, 151:10
**conference** [6] - 55:15, 56:14, 56:17, 56:18, 56:19, 56:21
**conferences** [1] - 56:9
**confidence** [2] - 62:17, 169:5
**confirm** [3] - 91:17, 128:13, 136:22
**confirmed** [1] - 99:15
**confront** [1] - 45:2
**confronted** [1] - 46:15
**confused** [2] - 36:18, 39:3
**confusing** [1] - 39:6
**conjunction** [4] - 98:24, 116:23, 145:6, 161:21
**connected** [1] - 88:2
**connection** [3] - 4:11, 50:11, 111:9
**consequence** [2] - 27:20, 108:14
**consequences** [2] - 81:15, 94:2
**conservative** [3] - 139:8, 143:16, 150:3

**consider** [12] - 59:8, 91:16, 91:25, 134:11, 134:20, 135:22, 157:13, 167:15, 169:6, 169:9, 172:24, 174:7
**considerable** [2] - 45:2, 46:16
**considerably** [2] - 94:25, 156:24
**consideration** [1] - 85:11
**considered** [7] - 55:9, 74:18, 76:13, 76:18, 81:12, 81:13, 150:2
**considering** [3] - 13:2, 53:21, 109:5
**consistent** [12] - 10:23, 38:24, 77:17, 80:3, 85:12, 98:15, 112:13, 131:2, 140:5, 140:7, 174:9, 179:11
**consistently** [1] - 158:11
**consolidated** [2] - 111:16, 138:10
**consultant** [7] - 34:9, 34:15, 36:24, 37:7, 39:22, 43:19, 167:2
**consulting** [3] - 69:1, 69:2, 70:6
**consumer** [11] - 4:6, 4:14, 4:19, 4:24, 5:2, 6:22, 6:23, 7:15, 161:23, 162:4, 165:18
**consumers** [3] - 5:9, 114:1, 165:12
**contain** [1] - 170:20
**contains** [2] - 75:24, 167:13
**contemplated** [1] - 74:13
**contemporaneously** [1] - 131:8
**context** [8] - 73:9, 79:1, 79:18, 107:12, 107:16, 134:21, 144:4, 144:7
**continue** [13] - 11:3, 16:16, 18:13, 38:13, 39:19, 89:12, 102:16, 102:20, 102:21, 112:21, 123:1, 175:9, 180:21
**continued** [8] - 8:15, 62:20, 62:23, 81:16, 84:7, 92:12, 103:8, 172:3

**continues** [3] - 49:11, 53:3, 60:14
**continuing** [4] - 53:14, 84:21, 85:6, 138:25
**contract** [78] - 14:17, 17:16, 22:21, 23:3, 25:13, 25:17, 27:2, 28:3, 28:5, 28:17, 29:16, 31:4, 31:5, 32:15, 33:5, 34:7, 66:6, 66:8, 70:22, 71:12, 74:15, 74:17, 74:22, 76:22, 77:21, 80:19, 81:7, 81:10, 84:8, 84:13, 85:12, 85:18, 85:21, 85:24, 86:3, 86:20, 87:18, 88:11, 90:22, 93:2, 93:16, 94:18, 99:9, 99:22, 100:2, 100:4, 100:25, 103:8, 105:20, 107:2, 107:13, 109:8, 109:9, 116:22, 118:21, 119:11, 120:1, 120:2, 120:13, 120:16, 120:20, 121:21, 122:7, 122:9, 127:17, 127:25, 128:6, 135:13, 135:18, 151:6, 153:16, 153:17, 155:11, 155:12, 170:18, 175:7
**contracting** [2] - 107:1, 127:23
**contracts** [5] - 27:24, 77:12, 77:16, 77:22, 119:22
**contrary** [1] - 120:8
**contrasted** [1] - 165:5
**contribute** [2] - 92:12, 135:1
**contributed** [2] - 123:19, 135:5
**contributing** [4] - 126:10, 127:14, 136:12, 175:15
**contribution** [1] - 127:11
**controversy** [1] - 53:1
**conversations** [1] - 113:14
**conversion** [1] - 174:17
**convert** [2] - 172:21, 177:12
**converted** [2] - 93:19, 166:14

**converting** [1] - 176:25
**converts** [1] - 99:7
**convey** [1] - 5:25
**convince** [1] - 125:4
**copied** [1] - 142:22
**copies** [1] - 48:2
**copy** [4] - 3:22, 9:5, 48:16, 181:18
**core** [2] - 77:11, 81:24
**Corp** [2] - 133:23, 133:24
**corporate** [2] - 26:2, 72:19
**Corporation** [1] - 26:17
**correct** [76] - 7:18, 8:10, 16:5, 20:2, 33:7, 42:21, 44:5, 48:10, 48:14, 55:1, 56:12, 61:18, 63:19, 64:2, 64:3, 65:13, 65:15, 65:19, 65:20, 75:2, 76:13, 76:14, 76:16, 87:8, 87:9, 91:7, 93:20, 93:21, 95:19, 98:5, 99:11, 100:18, 110:2, 111:11, 114:15, 119:18, 122:5, 128:15, 130:25, 132:6, 132:7, 134:2, 134:3, 136:25, 137:1, 138:9, 138:18, 142:24, 143:17, 143:25, 144:1, 155:18, 156:7, 156:8, 157:18, 158:4, 158:17, 158:18, 159:23, 160:12, 160:13, 160:17, 161:3, 162:14, 163:9, 163:10, 164:16, 171:11, 171:12, 172:4, 172:7, 172:8, 172:24, 173:24, 173:25, 186:7
**corrected** [1] - 153:19
**correction** [1] - 172:13
**corrections** [2] - 68:6, 68:8
**correctly** [6] - 4:6, 65:17, 109:25, 111:8, 139:6, 140:15
**corresponded** [1] - 74:21
**corresponds** [1] - 79:5

**cost** [17] - 14:10, 84:7, 85:15, 101:19, 120:6, 120:7, 130:17, 130:18, 131:2, 133:2, 136:13, 149:17, 152:6, 155:13, 170:13, 170:14
**cost-plus** [2] - 85:15, 152:6
**costly** [3] - 45:24, 46:2, 46:19
**costs** [17] - 21:5, 21:6, 46:1, 83:23, 84:8, 84:10, 85:17, 85:21, 101:19, 104:24, 120:17, 120:23, 150:5, 154:21, 155:1, 155:7, 170:17
**Counsel** [2] - 2:9, 52:20
**counsel** [10] - 3:23, 29:5, 50:2, 55:20, 55:22, 56:12, 75:16, 180:12, 180:15, 180:19
**counsel's** [1] - 64:12
**counter** [3] - 5:17, 112:13, 166:22
**country** [1] - 79:15
**couple** [16] - 3:17, 6:8, 9:18, 19:18, 21:17, 30:7, 53:14, 64:2, 98:2, 120:6, 120:10, 124:7, 141:15, 150:14, 159:3, 180:25
**course** [12] - 17:8, 32:22, 55:25, 59:20, 70:16, 72:2, 99:10, 99:13, 101:24, 113:5, 141:13, 151:2
**court** [8] - 67:7, 70:2, 70:9, 73:15, 99:10, 122:20, 184:3
**Court** [20] - 3:3, 39:8, 53:7, 56:9, 65:10, 67:10, 69:10, 74:7, 91:11, 91:15, 97:16, 98:12, 122:23, 123:9, 123:11, 140:18, 173:16, 186:3, 186:4, 186:16
**COURT** [52] - 1:1, 3:6, 8:24, 38:10, 41:14, 47:13, 48:6, 57:12, 63:10, 63:14, 64:16, 66:22, 66:25, 67:2, 67:6, 67:11, 67:15, 67:19, 73:21, 74:1,

75:21, 75:25, 88:12, 118:1, 118:3, 122:12, 122:15, 122:19, 122:24, 123:1, 171:15, 172:1, 172:5, 172:7, 172:16, 172:25, 173:3, 180:2, 180:5, 180:8, 180:16, 180:20, 180:24, 181:10, 181:20, 182:1, 182:6, 182:8, 182:14, 183:7, 183:13, 183:16
**Court's** [2] - 42:3, 55:14
**cover** [3] - 66:16, 73:24, 166:23
**covered** [2] - 69:18, 121:1
**covers** [1] - 109:7
**CPR** [3] - 159:12, 160:22, 160:23
**create** [1] - 151:6
**creating** [1] - 132:25
**credibility** [1] - 58:2
**credit** [1] - 183:5
**creditors** [1] - 66:10
**credits** [1] - 183:8
**critical** [1] - 109:16
**criticisms** [1] - 151:22
**criticize** [1] - 139:7
**criticized** [1] - 139:5
**critique** [1] - 158:19
**Cross** [1] - 185:5
**cross** [5] - 3:8, 3:18, 57:25, 73:25, 146:8
**CROSS** [1] - 3:12
**cross-checking** [1] - 146:8
**cross-examination** [2] - 3:18, 73:25
**crown** [2] - 78:6, 83:15
**CRR** [2] - 2:17, 186:15
**CSR-4552** [2] - 2:17, 186:15
**CUMMINGS** [1] - 1:16
**curiosity** [1] - 84:25
**curious** [1] - 23:13
**current** [4] - 88:14, 155:23, 163:18, 164:5
**customer** [6] - 92:15, 102:4, 125:7, 127:4, 162:10, 168:6
**customers** [6] - 113:16, 113:18, 113:21, 124:21, 125:4, 165:19

**customization** [2] - 92:15, 125:7
**cut** [1] - 182:11
**CV** [1] - 68:14
**CVS** [2] - 124:23, 166:19
**CWI** [2] - 75:18, 180:13

**D**

**D-11** [2] - 161:24
**damages** [2] - 70:19, 70:23
**Dan** [4] - 31:12, 54:4, 59:17, 60:1
**data** [48] - 85:17, 95:17, 104:7, 114:8, 114:10, 121:7, 127:11, 138:4, 145:18, 148:7, 148:13, 153:20, 155:25, 156:1, 156:7, 156:12, 156:25, 157:2, 157:3, 157:4, 157:18, 158:1, 158:2, 158:5, 158:8, 159:10, 159:11, 160:22, 160:25, 161:2, 161:4, 161:6, 161:7, 162:3, 163:14, 163:18, 164:3, 164:5, 168:7, 168:12, 168:22, 173:8
**database** [1] - 163:17
**date** [36] - 12:20, 46:18, 71:4, 71:7, 84:5, 97:20, 97:24, 98:14, 98:15, 103:3, 103:13, 109:19, 109:22, 110:25, 120:19, 121:19, 129:11, 139:11, 139:22, 142:10, 148:3, 156:1, 156:3, 161:2, 163:19, 164:18, 173:17, 173:18, 173:20, 175:20, 175:21, 186:9
**dates** [2] - 41:5, 141:24
**David** [1] - 67:13
**DAVID** [1] - 185:6
**Dawn** [2] - 183:11, 183:12
**day-to-day** [1] - 106:20

**days** [2] - 120:10, 131:7
**DC** [3] - 1:17, 2:8, 2:14
**DCF** [1] - 99:5
**dead** [1] - 108:18
**deal** [12] - 29:9, 30:5, 30:11, 32:8, 32:12, 32:15, 89:3, 101:21, 125:2, 146:25, 147:2
**dealing** [3] - 78:4, 84:16, 84:21
**dealings** [1] - 78:1
**dealt** [2] - 27:24, 28:2
**death** [1] - 109:7
**debt** [1] - 118:14
**December** [6] - 84:4, 97:25, 142:7, 142:20, 143:18, 170:19
**decide** [6] - 79:15, 97:16, 98:12, 104:15, 127:25, 173:16
**decided** [5] - 57:21, 104:17, 104:18, 104:21, 160:4
**decides** [2] - 104:1, 154:6
**deciding** [2] - 107:17, 112:18
**decision** [16] - 5:1, 24:1, 24:5, 24:8, 24:9, 24:16, 24:18, 30:1, 34:23, 73:8, 112:15, 112:21, 114:15, 162:7
**decisions** [1] - 73:5
**declarative** [1] - 44:19
**decline** [1] - 103:8
**declined** [1] - 103:7
**declining** [3] - 81:6, 103:5, 147:21
**decreased** [1] - 83:11
**decreasing** [1] - 162:3
**deduct** [1] - 101:16
**deeply** [1] - 64:25
**Defendant** [3] - 1:8, 2:16, 67:13
**Defendant's** [3] - 51:8, 59:13, 185:3
**defined** [1] - 155:12
**definition** [3] - 78:7, 83:19, 95:6
**degree** [6] - 12:5, 12:11, 13:21, 68:18, 104:12, 144:18
**Delaware** [1] - 55:16
**demand** [7] - 80:13, 90:4, 105:18, 162:10, 165:18,

165:21, 166:11
**demanding** [1] -
112:11
**demonstrated** [1] -
57:25
**demonstrative** [16] -
46:25, 47:6, 47:13,
51:8, 76:12, 87:7,
87:10, 87:14, 97:14,
98:21, 128:17,
128:19, 130:10,
130:15, 171:10,
178:12
**demonstratives** [2] -
47:12, 124:16
**Denmark** [5] - 86:9,
86:11, 119:3, 122:1
**denominator** [3] -
136:8, 174:10, 178:4
**Department** [2] - 2:5,
2:12
**departments** [2] -
7:10, 73:3
**dependent** [1] -
143:11
**deposition** [3] - 58:15,
58:16, 76:23
**DeRamus** [20] - 27:11,
67:14, 67:15, 67:24,
73:19, 74:4, 76:6,
87:7, 91:4, 99:17,
116:13, 118:9,
123:4, 128:19,
137:2, 157:25,
160:8, 173:7,
181:17, 182:11
**DERAMUS** [1] - 67:20,
185:6
**DeRamus's** [2] - 74:2,
118:1
**derive** [6] - 91:5, 96:4,
124:12, 150:23,
152:7, 161:17
**derived** [5] - 130:14,
136:14, 155:8,
157:2, 176:19
**deriving** [2] - 130:20,
147:14
**describe** [16] - 19:9,
19:10, 35:4, 75:3,
124:7, 150:24,
151:14, 159:3,
162:25, 163:11,
166:12, 173:7,
174:13, 174:17,
174:20, 175:17
**described** [18] - 20:8,
25:10, 33:7, 50:22,
91:10, 92:3, 94:7,
100:1, 112:3,

118:16, 124:4,
130:13, 131:21,
136:23, 144:15,
165:7, 165:22
**describes** [2] -
166:24, 166:25
**describing** [3] - 58:13,
59:2, 113:6
**design** [1] - 80:9
**designs** [1] - 107:14
**desire** [1] - 109:13
**desloratadine** [13] -
74:25, 86:7, 86:16,
87:1, 119:12,
119:15, 120:2,
121:3, 150:10,
151:13, 151:15,
152:4, 153:1
**despite** [2] - 95:18,
111:1
**detail** [9] - 61:23,
76:11, 91:2, 121:2,
136:23, 142:2,
146:16, 146:20,
176:22
**detailed** [1] - 163:20
**details** [2] - 91:19,
150:14
**determination** [1] -
72:23
**determine** [6] - 77:13,
93:2, 107:19, 108:4,
123:13, 130:16
**determined** [2] -
86:15, 100:8
**determining** [3] -
14:19, 15:22, 94:17
**detour** [2] - 129:6,
130:9
**develop** [5] - 8:12,
17:17, 71:17, 85:7,
102:21
**developed** [3] - 64:6,
85:18, 175:1
**developer** [1] - 101:9
**developing** [3] - 8:9,
110:15, 146:5
**Development** [1] -
72:8
**development** [20] -
11:7, 34:12, 35:15,
35:24, 36:14, 36:25,
37:13, 38:21, 38:25,
39:11, 85:3, 85:20,
102:16, 102:22,
104:2, 104:24,
110:7, 114:23,
125:24
**develops** [1] - 101:9
**Dexcel** [100] - 4:2,

4:10, 4:18, 4:22, 8:4,
8:11, 8:16, 12:13,
12:24, 13:24, 14:1,
14:17, 20:5, 20:16,
20:20, 20:24, 21:13,
23:3, 25:12, 25:20,
27:1, 28:17, 28:25,
29:11, 29:25, 30:4,
30:7, 31:18, 32:16,
33:5, 33:6, 34:6,
34:12, 35:23, 36:14,
37:13, 38:20, 39:24,
40:16, 44:16, 52:2,
52:24, 53:1, 54:2,
54:11, 54:15, 54:17,
54:19, 55:4, 55:15,
55:22, 58:16, 59:25,
64:7, 74:15, 74:17,
74:22, 76:22, 80:19,
81:7, 81:10, 84:3,
84:8, 84:14, 84:17,
85:12, 85:18, 86:3,
87:16, 87:18, 88:10,
88:24, 93:2, 93:16,
99:22, 100:24,
100:25, 101:18,
101:21, 103:8,
103:9, 103:16,
110:10, 111:5,
113:2, 114:25,
115:6, 120:13,
120:15, 120:19,
129:19, 130:1,
135:13, 135:18,
153:16, 153:17,
155:11, 155:12,
170:18
**Dexcel's** [12] - 35:14,
36:25, 38:19, 38:24,
39:10, 44:15, 51:13,
52:8, 62:13, 62:16,
101:19, 101:25
**Diamond** [1] - 133:23
**dictated** [1] - 6:4
**die** [1] - 106:2
**differ** [1] - 150:19
**difference** [8] - 16:12,
107:25, 126:19,
154:12, 172:10,
176:6, 177:3, 183:21
**differences** [1] - 177:1
**different** [32] - 6:8,
8:12, 14:6, 22:16,
23:1, 30:8, 37:1,
50:6, 70:17, 91:10,
102:5, 124:21,
128:25, 129:10,
135:9, 136:9,
138:17, 151:7,
151:22, 159:3,

160:1, 163:2,
170:12, 171:18,
172:2, 178:10,
178:11, 180:25,
181:21
**differential** [1] -
177:18
**differently** [1] - 30:6
**difficult** [3] - 31:9,
31:13, 31:17
**digging** [1] - 112:20
**digit** [1] - 158:11
**diligence** [9] - 50:16,
50:19, 94:11, 94:14,
140:23, 146:1,
161:5, 161:8, 161:11
**DIRECT** [1] - 67:22
**direct** [10] - 47:11,
47:14, 57:20, 57:25,
59:22, 60:6, 68:1,
111:9, 123:1, 181:6
**Direct** [1] - 185:7
**direction** [2] - 170:17,
186:11
**directly** [1] - 71:19
**director** [2] - 182:23,
183:5
**directors** [2] - 9:17,
10:20
**disagree** [7] - 46:20,
91:11, 107:10,
139:8, 140:22,
167:20, 167:21
**disagreed** [2] - 46:7,
167:20
**disagreeing** [1] -
26:11
**disagreement** [1] -
81:25
**disagreements** [1] -
140:18
**disagrees** [1] - 86:2
**disappointed** [1] -
182:15
**disaster** [2] - 114:7,
114:9
**discount** [28] - 113:16,
113:18, 113:19,
113:25, 139:19,
139:20, 139:24,
139:25, 148:24,
149:2, 149:4,
149:14, 149:17,
150:1, 150:11,
171:18, 171:22,
171:25, 172:10,
172:14, 174:9,
177:18, 177:21,
177:25, 178:11,
178:19, 179:4

**discounted** [6] - 93:5,
94:5, 95:24, 96:2,
139:21, 148:25
**discounting** [4] -
140:3, 172:2,
177:22, 178:19
**discounts** [3] -
149:10, 177:19,
178:2
**discovery** [3] - 56:10,
57:1, 58:23
**discuss** [2] - 112:19,
134:8
**discussed** [6] - 20:18,
26:10, 42:20, 105:8,
141:21, 160:22
**discussing** [2] - 3:23,
4:6
**discussion** [6] - 12:5,
22:9, 22:12, 30:12,
47:22, 130:11
**discussions** [1] -
22:23
**disposal** [1] - 24:17
**disproves** [1] - 178:17
**dispute** [2] - 70:18,
171:25
**disputes** [6] - 69:17,
70:15, 70:22, 70:23,
70:24, 73:10
**disregarded** [1] -
116:23
**distribute** [1] - 32:21
**distribution** [53] -
12:13, 18:19, 20:23,
28:18, 32:10, 32:16,
33:18, 75:8, 79:23,
80:15, 80:17, 87:5,
87:12, 88:3, 88:5,
89:1, 89:4, 89:17,
90:12, 91:6, 92:1,
92:5, 92:9, 92:20,
92:23, 93:1, 96:7,
98:25, 99:3, 115:9,
115:10, 116:20,
117:8, 120:14,
123:10, 123:14,
123:17, 123:25,
124:12, 125:22,
126:9, 126:12,
126:17, 126:21,
127:8, 127:9,
128:15, 137:5,
137:12, 137:16,
137:24, 141:5,
141:10
**distributor** [5] - 29:10,
71:13, 124:10,
124:15, 125:18
**DISTRICT** [2] - 1:1, 1:2

**District** [6] - 1:11, 3:3, 3:4, 186:4, 186:16
**dive** [1] - 150:14
**diversified** [1] - 83:5
**divide** [4] - 135:22, 175:21, 178:1, 179:11
**dividend** [1] - 108:14
**dividends** [1] - 128:10
**division** [1] - 73:6
**Division** [2] - 2:5, 2:12
**DIVISION** [1] - 1:3
**docs** [1] - 55:9
**doctor** [1] - 31:1
**Doctor** [1] - 8:8
**document** [13] - 9:7, 9:8, 12:4, 22:3, 48:13, 55:8, 56:17, 57:10, 59:9, 59:21, 60:9, 111:12, 145:4
**documentation** [2] - 69:16, 70:1
**documents** [20] - 7:19, 8:22, 21:21, 49:23, 51:19, 57:15, 58:1, 59:3, 61:6, 76:19, 104:25, 144:8, 145:5, 145:8, 145:16, 145:17, 145:22, 147:19, 147:21, 149:18
**dog** [3] - 117:3, 161:24
**Dollar** [2] - 168:5, 168:6
**dollar** [5] - 101:22, 102:18, 121:25, 157:21, 163:24
**dollars** [18] - 22:10, 66:4, 86:17, 95:16, 100:17, 105:2, 105:3, 105:4, 108:25, 120:22, 140:10, 147:23, 149:6, 149:7, 149:8, 152:11, 161:12, 177:11
**Dollars** [1] - 166:6
**domestic** [1] - 110:5
**done** [27] - 7:4, 16:20, 30:3, 30:4, 36:5, 62:25, 70:2, 71:7, 94:14, 94:15, 95:19, 101:14, 102:18, 120:11, 121:25, 122:13, 144:18, 145:11, 146:1, 146:21, 146:24, 163:16, 177:8, 182:13, 183:14,

183:17, 183:22
**double** [1] - 158:11
**doubles** [1] - 168:19
**doubling** [1] - 168:21
**doubtful** [1] - 122:14
**DOUGLAS** [1] - 1:15
**dove** [1] - 64:24
**down** [33] - 10:6, 18:13, 20:12, 21:23, 27:23, 33:24, 56:7, 57:1, 57:7, 58:7, 58:21, 60:16, 65:5, 69:7, 77:19, 77:23, 88:13, 96:11, 104:11, 108:6, 114:24, 126:20, 131:15, 141:9, 142:22, 159:15, 160:2, 165:12, 167:10, 172:23, 178:9, 182:11
**downside** [5] - 20:20, 100:3, 115:23, 115:24, 116:12
**Dr** [151] - 3:7, 3:14, 3:16, 3:20, 3:22, 6:8, 9:2, 13:8, 13:14, 27:11, 28:15, 28:16, 28:24, 29:7, 29:9, 29:14, 29:19, 30:20, 30:25, 31:19, 31:23, 32:5, 32:6, 32:14, 32:19, 33:3, 33:10, 33:12, 33:15, 33:21, 35:16, 35:22, 36:7, 36:21, 37:4, 37:12, 37:15, 37:19, 38:4, 38:8, 39:10, 41:2, 42:14, 44:10, 44:13, 44:21, 47:1, 48:21, 52:19, 54:2, 55:7, 57:6, 57:10, 57:15, 58:1, 58:10, 63:9, 63:17, 64:23, 66:25, 67:13, 67:15, 67:24, 68:8, 71:10, 73:1, 73:19, 74:2, 74:4, 75:12, 76:6, 81:14, 81:25, 82:15, 85:16, 86:2, 87:7, 89:20, 91:4, 92:17, 93:10, 93:23, 93:24, 94:4, 95:8, 96:9, 96:15, 96:18, 97:9, 99:17, 107:7, 107:22, 108:20, 109:3, 111:18, 111:22, 111:23, 112:2, 112:3, 115:14, 116:13, 118:1,

118:9, 123:4, 126:3, 126:5, 126:22, 126:24, 128:19, 137:2, 138:20, 139:5, 139:14, 139:19, 140:12, 140:18, 141:20, 147:6, 147:13, 149:7, 149:16, 150:15, 150:19, 151:12, 151:15, 151:16, 153:7, 153:19, 154:5, 155:19, 157:25, 158:17, 160:8, 165:6, 165:21, 169:23, 170:3, 170:11, 170:24, 171:16, 173:7, 176:4, 176:15, 176:24, 177:8, 177:16, 178:13, 178:16, 181:17, 182:11
**draw** [1] - 7:25
**drawing** [1] - 165:12
**draws** [1] - 89:20
**drew** [1] - 83:6
**DREW** [1] - 1:16
**Drive** [1] - 1:20
**drives** [1] - 170:3
**drop** [5] - 7:20, 7:22, 69:7, 112:6, 131:15
**dropping** [1] - 112:25
**drops** [1] - 163:1
**drove** [1] - 144:5
**drug** [7] - 5:18, 17:17, 35:24, 36:14, 37:13, 105:5, 175:1
**due** [6] - 50:16, 123:21, 140:23, 146:1, 161:5, 161:8
**Duke** [1] - 68:18
**duly** [1] - 67:21
**during** [8] - 60:12, 80:24, 93:8, 111:9, 112:23, 149:19, 150:17, 178:13
**dynamics** [2] - 163:1, 163:3

## E

**E-14** [2] - 162:11, 162:12
**E-50** [3] - 156:15, 156:17, 156:19
**e-mail** [12] - 54:4, 59:12, 59:17, 59:24, 60:6, 61:14, 112:8,

112:12, 112:17, 113:25, 166:24, 181:18
**e-mails** [2] - 115:5, 144:9
**earliest** [2] - 109:19, 139:22
**early** [10] - 5:14, 5:16, 5:17, 62:1, 67:2, 69:5, 74:14, 115:8, 124:5, 165:14
**earn** [10] - 111:3, 111:4, 113:13, 125:15, 125:18, 126:16, 127:12, 127:14, 132:1, 162:17
**earned** [4] - 93:8, 114:6, 131:6, 131:7
**earning** [8] - 109:22, 110:10, 113:10, 116:6, 119:4, 122:2, 131:9, 133:11
**earns** [3] - 116:5, 125:15, 128:3
**easier** [2] - 74:10, 114:6
**easily** [1] - 41:6
**EBITDA** [4] - 118:12, 119:4, 119:19, 119:23
**econometric** [1] - 71:17
**economic** [28] - 15:24, 23:8, 23:11, 27:15, 27:18, 27:20, 29:23, 30:21, 43:19, 43:23, 58:4, 65:9, 65:21, 65:22, 68:25, 73:3, 74:12, 74:17, 81:9, 81:11, 95:13, 99:18, 102:2, 106:17, 108:23, 121:2, 121:4, 121:5
**Economic** [1] - 72:7
**economically** [7] - 29:12, 29:19, 30:1, 34:23, 82:24, 89:11, 174:7
**economics** [8] - 5:20, 7:10, 17:25, 68:19, 73:15, 73:20, 73:22, 177:7
**economist** [19] - 42:20, 43:4, 44:10, 45:13, 77:19, 78:19, 79:11, 102:9, 104:13, 107:25, 111:15, 120:12, 125:12, 147:13,

148:21, 150:21, 151:23, 168:22, 177:11
**economists** [7] - 25:5, 90:13, 102:3, 104:6, 104:10, 125:10, 177:5
**Ecuador** [1] - 70:8
**educational** [1] - 68:16
**Edward** [1] - 156:16
**EDWARD** [2] - 2:1, 2:6
**effect** [4] - 26:11, 26:18, 111:20, 141:8
**effective** [3] - 99:7, 103:3, 174:8
**effectively** [38] - 69:23, 72:8, 72:23, 77:18, 81:22, 82:17, 83:7, 86:9, 89:7, 89:23, 90:21, 90:23, 92:13, 95:15, 97:14, 100:5, 104:21, 106:5, 107:2, 110:6, 111:2, 112:20, 113:11, 113:12, 116:10, 119:22, 122:1, 126:22, 127:23, 131:12, 133:16, 134:11, 142:8, 162:14, 164:25, 165:9, 176:17, 178:7
**effects** [7] - 74:18, 81:12, 99:18, 121:2, 121:4, 121:6
**efficiencies** [1] - 120:7
**efficient** [1] - 25:3
**efficiently** [5] - 79:17, 85:20, 102:22, 104:2
**efforts** [5] - 8:9, 85:6, 85:20, 102:22, 104:2
**eight** [9] - 149:19, 155:7, 171:19, 171:20, 172:1, 172:17, 172:22, 177:19, 178:3
**eight-and-a-half** [1] - 149:19
**either** [13] - 12:1, 51:15, 64:15, 70:9, 74:18, 81:12, 123:24, 134:25, 149:8, 170:20, 172:18, 175:2
**elaborate** [1] - 78:15
**element** [5] - 47:15, 85:2, 101:17, 101:20, 108:16
**elements** [1] - 83:25

eliminate [1] - 181:1
elsewhere [1] - 14:25
embedded [3] - 153:25, 157:14, 170:18
employees [2] - 81:17, 86:11
empty [3] - 86:9, 87:21, 128:7
enable [2] - 111:3, 111:4
encompass [1] - 168:8
encompasses [1] - 6:17
encourage [3] - 123:23, 124:9, 142:4
end [11] - 44:25, 53:3, 57:8, 58:22, 94:24, 114:1, 120:5, 133:13, 151:7, 182:20, 183:8
ended [1] - 95:25
ending [3] - 9:12, 11:12, 155:23
ends [4] - 3:17, 9:24, 36:19
Energy [1] - 133:25
energy [2] - 70:15, 71:2
engage [2] - 132:18, 133:1
engaged [1] - 151:2
engagements [1] - 71:5
enormous [2] - 115:20
ensure [4] - 77:25, 82:10, 105:22, 111:2
entails [1] - 136:1
enter [5] - 88:25, 89:9, 89:14, 109:6, 109:9
entered [9] - 20:5, 20:16, 21:12, 25:12, 74:15, 81:7, 86:19, 100:4, 103:7
entering [3] - 22:7, 105:19, 122:7
enterprise [3] - 79:11, 108:10, 135:1
enters [1] - 89:15
entire [8] - 13:2, 72:2, 74:19, 75:20, 88:23, 99:9, 148:8, 165:1
entirely [3] - 107:10, 112:22, 114:2
entirety [4] - 81:13, 87:17, 111:17, 135:18
entities [1] - 151:7
entitled [2] - 68:4,

108:14, 130:5, 186:8
entity [6] - 27:15, 116:23, 135:2, 135:4, 150:18, 151:5
entrepreneur [2] - 107:8, 107:11
entrepreneurial [2] - 107:17, 108:11
entrepreneurs [1] - 108:12
entry [1] - 162:19
Epple [5] - 98:3, 142:6, 143:1, 146:11, 170:22
Epple's [1] - 170:18
equate [1] - 9:6
equation [2] - 89:8, 89:24
equipment [4] - 107:21, 132:21, 132:22
equity [1] - 135:11
equivalence [1] - 177:1
equivalent [14] - 4:8, 4:16, 4:22, 5:9, 5:10, 8:1, 172:21, 174:6, 174:15, 175:18, 175:25, 177:10
er [6] - 31:19, 37:19, 78:19, 94:25, 138:20, 144:12
Ernst [1] - 115:15
error [4] - 96:17, 119:1, 157:13, 167:13
errors [1] - 146:18
especially [3] - 41:18, 78:4, 99:21
essentially [7] - 4:12, 163:12, 164:14, 168:18, 169:8, 169:19, 174:12
establish [1] - 134:6
established [9] - 5:14, 108:19, 119:10, 121:9, 134:17, 137:19, 137:23, 137:25, 138:3
establishment [3] - 35:25, 36:15, 37:14
estate [2] - 105:23, 106:3
esteemed [2] - 26:16, 26:17
estimate [8] - 93:13, 94:5, 94:6, 97:18, 104:25, 154:3, 155:7, 173:22
estimated [3] -

104:12, 138:22, 154:25
estimates [1] - 93:12
estimating [1] - 104:9
evaluate [13] - 12:19, 22:20, 74:12, 74:20, 74:23, 80:3, 80:11, 80:14, 96:22, 96:23, 98:25, 153:3
evaluated [4] - 82:3, 82:17, 95:16, 98:24
evaluating [8] - 12:17, 77:15, 79:19, 106:9, 108:2, 116:22, 131:25, 149:22
event [3] - 91:11, 110:17, 116:11
eventually [2] - 117:2, 157:15
evidence [3] - 50:15, 55:15, 62:13
evolving [1] - 55:3
ex [1] - 154:6
ex-post [1] - 154:6
exact [3] - 12:16, 31:16, 79:7
exactly [4] - 39:13, 54:9, 78:11, 104:23, 109:18, 111:15, 148:4, 148:6
examination [2] - 3:18, 73:25
EXAMINATION [2] - 63:15, 67:22
Examination [2] - 185:5, 185:7
Examination(Cont [1] - 185:5
EXAMINATION( Continuing [1] - 3:12
examined [1] - 121:2
example [20] - 5:19, 7:16, 11:6, 14:15, 17:2, 39:15, 56:20, 66:1, 70:20, 70:25, 71:20, 73:5, 79:12, 80:7, 80:14, 105:5, 109:13, 128:1, 150:22, 157:12
exceeded [1] - 100:22
exceptionally [2] - 100:3, 111:25
excerpt [1] - 57:5
excerpts [1] - 57:10
excess [1] - 116:7
exchange [1] - 54:4
exclude [1] - 119:18
excluded [1] - 119:17
excluding [1] - 119:16
exclusive [2] - 29:10,

32:10
exclusivity [1] - 110:23
excuse [5] - 11:25, 28:16, 31:19, 60:19, 64:5
excused [1] - 67:1
executing [1] - 115:2
executive [1] - 60:12
executives [1] - 154:18
exercise [2] - 107:19, 148:8
exercises [1] - 19:3
exhibit [10] - 31:10, 47:6, 51:8, 61:8, 87:14, 111:9, 171:16, 174:4
Exhibit [50] - 3:20, 8:20, 9:2, 13:6, 31:11, 46:25, 47:24, 48:1, 48:9, 51:19, 52:4, 54:3, 55:6, 55:14, 57:3, 57:5, 59:12, 61:4, 62:5, 63:18, 63:25, 65:2, 65:4, 68:1, 87:6, 91:3, 93:3, 95:21, 111:6, 128:18, 129:7, 130:8, 132:4, 134:7, 136:25, 137:13, 141:17, 141:18, 143:23, 144:23, 153:10, 160:10, 160:11, 169:16, 171:14, 173:2, 174:11
exhibits [1] - 124:17
exist [2] - 13:3, 19:12
existing [1] - 110:16
expand [1] - 108:17
expect [10] - 77:19, 79:11, 82:24, 105:3, 105:4, 125:18, 133:10, 144:19, 161:8, 162:18
expectation [2] - 59:23, 128:11
expectations [2] - 85:20, 166:16
expected [17] - 84:15, 89:18, 94:12, 99:8, 103:24, 132:23, 146:19, 147:17, 152:21, 152:22, 155:8, 156:12, 161:19, 171:4, 175:23, 176:12, 176:14
expecting [4] -

162:17, 165:20, 165:22, 180:17
expenditures [1] - 84:11
expenses [5] - 100:7, 100:21, 129:19, 129:20, 178:9
experience [15] - 68:23, 69:9, 70:14, 71:8, 73:24, 86:1, 95:1, 96:4, 121:15, 139:11, 144:14, 146:23, 154:9, 157:10
experienced [1] - 137:5
expert [19] - 6:7, 6:13, 6:15, 41:15, 41:16, 42:4, 42:8, 42:16, 42:18, 44:10, 62:3, 62:4, 70:7, 70:8, 71:10, 73:19, 147:17, 148:22, 151:25
expertise [4] - 40:20, 43:4, 43:23, 64:15
experts [3] - 29:15, 75:13, 78:13
explain [7] - 55:10, 65:10, 104:4, 111:12, 118:9, 129:6, 132:8
explained [1] - 56:8
explanation [1] - 64:24
explicitly [2] - 149:25, 152:12
exploit [1] - 174:24
exploited [2] - 79:17, 175:8
explored [2] - 10:11
express [1] - 166:6
expressed [2] - 93:6, 95:19, 113:5
extensive [4] - 71:9, 73:3, 99:19, 146:2
extent [2] - 73:23, 75:12
external [4] - 14:5, 14:22, 15:5, 15:11
externally [1] - 34:18
extremely [4] - 66:20, 81:3, 147:22, 151:9

**F**

face [1] - 152:2
faced [6] - 12:11, 13:22, 74:13, 102:5, 103:12

**fact** [35] - 8:1, 20:9, 21:8, 26:18, 58:17, 62:4, 62:18, 77:13, 78:13, 84:2, 84:6, 84:10, 84:12, 99:15, 100:18, 101:14, 101:15, 101:24, 109:2, 111:1, 114:21, 119:10, 131:3, 141:2, 145:5, 147:20, 150:18, 151:17, 152:17, 156:6, 165:8, 167:21, 169:2, 176:8, 178:17
**factor** [9] - 106:8, 149:20, 162:2, 168:2, 168:11, 168:12, 168:21, 172:18
**factoring** [1] - 159:18
**factors** [1] - 105:7
**factory** [2] - 24:4, 24:6, 125:21
**facts** [5] - 15:14, 25:11, 26:7, 28:21, 32:13
**factually** [1] - 35:1
**fail** [1] - 19:25
**fails** [1] - 33:6
**failure** [1] - 66:1
**fair** [29] - 10:25, 12:21, 18:10, 22:22, 23:5, 25:14, 25:15, 27:8, 28:9, 30:21, 36:12, 51:7, 52:17, 53:11, 56:22, 60:8, 64:11, 119:16, 128:24, 143:13, 146:14, 156:2, 161:14, 168:17, 169:12, 181:24, 182:14
**fairly** [9] - 6:12, 19:19, 41:6, 72:22, 93:4, 99:19, 139:15, 150:2, 156:2
**fall** [2] - 103:20, 121:24
**familiar** [2] - 22:4, 71:22
**far** [24] - 10:16, 12:2, 19:3, 28:18, 28:22, 34:15, 35:5, 36:22, 36:25, 43:20, 47:9, 47:19, 62:12, 75:25, 78:8, 86:17, 112:24, 124:14, 134:20, 148:25, 160:20, 162:15
**fashion** [2] - 153:8,

180:21
**fashioned** [1] - 49:5
**fast** [4] - 147:22, 148:5, 158:13, 164:2
**fasting** [2] - 103:18, 103:19
**fault** [2] - 13:14, 161:9
**favor** [1] - 44:15
**favorable** [2] - 82:10, 103:16
**FDA** [20] - 4:15, 6:4, 6:11, 21:4, 31:21, 35:9, 39:20, 100:12, 102:13, 103:22, 110:22, 111:1, 114:24, 115:1, 115:3, 121:13, 121:18, 121:20, 125:25
**February** [8] - 148:9, 155:23, 156:2, 156:3, 156:10, 157:2, 157:3, 158:9
**fed** [1] - 103:17
**federal** [1] - 70:9
**Federal** [1] - 186:17
**fee** [2] - 101:16, 153:15
**feeding** [1] - 164:7
**fees** [1] - 21:2
**felt** [1] - 58:3
**Fertin** [2] - 121:11, 121:21
**few** [5] - 23:10, 63:13, 131:7, 150:14, 156:6
**fexofenadine** [7] - 74:24, 86:7, 86:18, 119:13, 122:3, 152:5, 153:4
**field** [1] - 73:19
**fiery** [1] - 37:8
**fifth** [1] - 79:9
**fighting** [1] - 153:1
**figure** [13] - 3:25, 4:7, 4:9, 29:6, 88:17, 109:17, 118:14, 119:8, 127:18, 129:15, 158:15, 167:5, 169:1
**figures** [1] - 3:21
**file** [1] - 103:22
**filed** [1] - 52:7
**fill** [13] - 142:25, 165:4, 165:7, 165:11, 165:14, 165:17, 165:22, 166:2, 166:3, 166:7, 166:10, 166:14
**final** [4] - 68:11, 100:12, 112:15,

130:1
**finally** [6] - 64:23, 68:9, 97:11, 97:12, 114:17
**finance** [5] - 117:17, 118:11, 118:20, 120:1, 146:4
**Financial** [2] - 133:23, 133:24
**financial** [16] - 16:10, 17:23, 19:25, 25:6, 78:22, 86:12, 107:24, 108:1, 114:4, 116:15, 120:6, 128:8, 130:3, 130:4, 130:20, 149:13
**financing** [2] - 132:23, 133:7
**Finco** [11] - 16:7, 16:10, 116:15, 116:25, 117:5, 117:16, 118:10, 118:13, 119:7, 119:9, 119:20
**Finco's** [1] - 116:15
**fine** [3] - 145:14, 180:16, 183:8
**finger** [1] - 17:24
**finish** [9] - 33:23, 38:4, 76:6, 165:3, 180:1, 181:5, 181:14, 182:7, 182:10
**firm** [6] - 14:7, 65:15, 65:19, 69:1, 69:2, 128:12
**first** [48] - 6:9, 22:3, 35:19, 37:21, 39:11, 40:11, 46:12, 48:25, 49:8, 55:6, 56:7, 63:17, 67:21, 70:11, 72:3, 75:6, 78:20, 78:21, 82:4, 84:2, 86:20, 87:13, 91:18, 92:20, 113:16, 118:3, 118:22, 119:18, 121:25, 123:11, 129:1, 130:6, 134:13, 136:4, 137:15, 138:8, 138:9, 142:5, 150:15, 153:13, 156:14, 156:15, 156:22, 159:16, 165:23, 167:22, 174:13
**first-to-market** [3] - 153:13, 156:14, 156:15

**fiscal** [8] - 9:23, 10:14, 10:19, 10:21, 11:10, 11:11, 93:9
**five** [17] - 20:12, 69:4, 78:18, 78:19, 82:3, 106:1, 153:16, 153:25, 154:2, 157:6, 157:8, 157:20, 157:23, 158:12, 170:2, 171:18, 180:23
**fix** [3] - 89:25, 90:2, 92:25
**fixed** [1] - 133:3
**flag** [1] - 153:21
**flash** [2] - 22:15, 143:22
**flaws** [1] - 92:7
**flip** [2] - 92:2, 92:19
**Floor** [1] - 2:10
**flow** [5] - 93:6, 94:5, 95:24, 96:2, 177:24
**flows** [23] - 93:8, 93:11, 138:5, 138:9, 138:19, 138:21, 139:4, 139:12, 139:16, 148:25, 149:11, 149:15, 150:8, 161:17, 175:19, 175:20, 177:22, 178:8, 178:9, 179:7
**focus** [8] - 12:8, 12:10, 13:11, 13:21, 34:1, 99:20, 123:20, 142:4
**focused** [1] - 25:25
**focuses** [1] - 92:23
**focusing** [2] - 19:8, 96:10
**folders** [1] - 8:22
**folks** [2] - 53:7, 183:16
**follow** [2] - 60:16, 69:8
**following** [2] - 49:19, 147:8
**follows** [1] - 67:21
**footnote** [7] - 21:20, 21:25, 22:2, 22:12, 38:2, 38:3, 38:19
**FOR** [1] - 1:2
**for-profit** [1] - 18:5
**forecast** [70] - 97:8, 97:15, 97:25, 98:4, 98:7, 98:10, 98:17, 135:21, 140:8, 141:19, 141:20, 141:21, 142:2, 142:9, 142:12, 142:21, 142:22, 142:24, 143:1,

143:2, 143:4, 143:9, 143:12, 143:14, 143:18, 146:13, 147:24, 148:1, 148:2, 148:16, 149:24, 153:9, 153:19, 154:10, 155:17, 155:18, 156:9, 156:10, 158:16, 158:25, 159:1, 159:16, 159:21, 160:9, 160:15, 162:6, 164:21, 165:8, 165:24, 166:4, 167:12, 167:24, 169:5, 169:6, 169:8, 170:9, 170:13, 170:19, 171:1, 171:2, 171:4, 173:9, 173:10, 173:11, 173:20, 173:21, 176:12
**forecasted** [1] - 112:24
**forecasting** [5] - 107:19, 145:19, 146:10, 156:24, 170:14
**forecasts** [65] - 70:25, 76:23, 92:25, 94:5, 94:8, 94:21, 94:24, 95:5, 96:23, 96:25, 97:3, 97:13, 97:16, 98:3, 98:8, 98:9, 98:13, 109:3, 112:7, 118:23, 123:16, 126:18, 126:19, 126:24, 140:20, 140:24, 141:13, 141:16, 141:18, 143:24, 144:5, 144:7, 144:12, 144:14, 144:16, 145:1, 145:6, 145:7, 145:11, 145:18, 145:25, 146:5, 146:12, 146:21, 150:7, 150:13, 151:20, 152:9, 152:22, 153:21, 154:1, 157:14, 164:3, 164:6, 167:23, 169:20, 170:25, 176:19, 176:22, 179:15, 179:20
**forego** [2] - 102:12, 104:15
**foregoing** [2] - 186:7,

186:10
foregone [1] - 45:20
foreign [3] - 70:7, 174:22, 174:24
foremost [1] - 84:2
forestall [1] - 110:20
forget [1] - 182:21
form [2] - 151:5, 153:11
formation [3] - 13:3, 13:4, 151:4
formed [2] - 87:16, 150:18
former [2] - 33:25, 71:9
forms [1] - 134:10
formula [1] - 113:17
forth [1] - 186:9
forward [8] - 41:19, 57:23, 98:8, 159:17, 162:15, 167:7, 167:8, 182:17
forward-looking [1] - 41:19
foundational [1] - 13:8
foundationally [1] - 35:6
founded [1] - 69:1
four [8] - 62:7, 83:7, 83:18, 91:10, 91:16, 128:25, 134:1, 159:5
fourth [6] - 10:25, 74:23, 79:6, 82:16, 84:18
fraction [1] - 135:16
frames [1] - 138:17
framework [11] - 72:19, 77:3, 77:5, 77:7, 79:21, 89:19, 91:15, 91:25, 123:7, 123:8
Franklin [1] - 2:13
frankly [3] - 97:18, 146:17, 170:6
free [4] - 95:15, 140:9, 174:3
freedom [1] - 102:20
Friday [1] - 1:12
Frisch [42] - 68:8, 81:14, 81:25, 82:15, 85:16, 86:2, 89:20, 92:17, 93:24, 94:4, 96:18, 97:9, 107:7, 107:22, 108:20, 109:3, 112:3, 126:3, 126:5, 139:5, 139:19, 140:18, 141:20, 147:6, 149:7, 149:16,

150:15, 150:19, 151:12, 151:16, 153:7, 153:19, 154:5, 155:19, 158:17, 165:6, 169:23, 170:11, 171:16, 176:24, 177:8, 178:16
Frisch's [21] - 75:12, 93:10, 93:23, 95:8, 96:9, 96:15, 115:14, 126:22, 126:24, 138:20, 139:14, 140:12, 147:13, 151:15, 170:3, 171:4, 171:22, 176:4, 176:15, 177:16, 178:13
front [13] - 3:23, 9:3, 9:13, 13:10, 13:18, 48:9, 48:22, 52:5, 55:7, 55:8, 59:14, 166:21
frustrating [3] - 31:9, 31:14, 31:18
frustrations [1] - 183:18
full [3] - 30:11, 48:25, 186:7
fully [5] - 62:7, 84:4, 100:14, 103:24, 114:25
function [5] - 16:17, 79:15, 106:14, 106:16, 107:17
functional [5] - 124:6, 126:20, 136:4, 136:17, 141:9
functions [24] - 77:11, 78:14, 79:13, 80:18, 81:16, 86:12, 87:23, 88:23, 89:13, 90:14, 90:18, 90:20, 90:24, 123:18, 124:3, 124:4, 124:8, 124:13, 125:19, 126:1, 127:17, 132:13, 133:5, 175:9
fund [3] - 15:17, 19:2, 116:1
fundamental [2] - 106:19, 148:8
funds [4] - 16:2, 19:13, 27:6, 31:1
furthermore [1] - 81:20
future [6] - 139:4, 139:16, 148:24, 149:11, 164:4, 179:2
FY [15] - 118:13,

130:22, 131:9, 136:19, 138:19, 142:5, 142:12, 142:15, 142:19, 142:21, 143:20

**G**

gallery [1] - 99:10
gamut [2] - 69:15, 69:19
gate [1] - 103:25
gears [1] - 8:7
general [5] - 64:19, 76:21, 77:6, 108:15, 161:9
General [2] - 133:23, 168:6
generally [3] - 6:3, 78:6, 89:19
generate [1] - 132:23
generated [1] - 108:10
generates [1] - 78:8
generating [1] - 132:24
generic [2] - 163:3
generous [2] - 131:12, 133:15
gentler [1] - 37:9
GERLING [1] - 1:16
German [1] - 174:25
given [25] - 14:25, 26:12, 36:6, 39:5, 40:20, 73:6, 85:25, 90:7, 90:10, 96:7, 99:2, 116:7, 123:12, 127:11, 131:3, 131:13, 135:1, 137:6, 137:11, 137:16, 137:19, 146:24, 147:9, 150:23, 175:21
glorified [1] - 27:19
go-it-alone [1] - 104:19
goal [2] - 19:14, 33:10
goals [3] - 17:23, 18:2, 18:4
goods [9] - 69:19, 72:18, 80:5, 150:5, 155:1, 155:8, 155:13, 170:13, 170:15
govern [1] - 71:24
governed [1] - 35:4
government [8] - 29:5, 47:2, 47:5, 57:17, 63:21, 152:3, 181:12
government's [2] - 46:25, 67:12

grad [2] - 6:25, 7:4
graduate [4] - 5:18, 6:19, 69:5, 69:6
Grand [3] - 1:11, 2:3, 186:18
grand [1] - 94:19
granular [1] - 163:20
great [11] - 9:23, 11:3, 17:4, 18:23, 19:5, 48:24, 56:4, 76:11, 182:14, 182:25, 183:14
greater [8] - 78:10, 78:11, 83:23, 86:4, 126:21, 141:12, 142:1, 169:4
greatest [1] - 83:16
grind [1] - 21:23
gross [6] - 116:7, 160:3, 162:12, 162:20, 168:2, 168:13
gross-up [1] - 168:2
ground [3] - 13:7, 21:22, 28:11
growing [5] - 81:3, 147:22, 156:4, 158:13, 164:2
growth [13] - 139:4, 139:6, 139:10, 139:15, 139:16, 157:8, 157:10, 158:8, 158:11, 158:12, 163:24, 164:1
guarantee [4] - 84:3, 88:1, 120:16, 120:18
guaranteeing [1] - 115:16
guess [7] - 27:19, 33:9, 48:15, 124:9, 132:5, 153:11, 181:2
guidance [6] - 34:20, 41:18, 72:3, 72:9, 72:12, 77:18
guidelines [5] - 72:4, 72:5, 72:6, 80:4
gum [17] - 74:24, 86:7, 86:14, 86:16, 86:25, 119:5, 119:12, 119:14, 120:2, 121:6, 121:9, 121:11, 121:12, 121:15, 121:19, 152:5, 153:4
guy [1] - 65:11
gymnastics [4] - 88:7, 88:9, 88:12, 175:10

**H**

HAGERMAN [1] - 2:13
half [4] - 100:16, 149:19, 155:14
hand [8] - 10:3, 47:9, 47:19, 53:2, 59:13, 90:15, 181:5
handed [5] - 9:2, 48:3, 48:16, 48:17, 62:6
Handgards [1] - 60:23
handing [1] - 48:17
handle [1] - 66:19
handles [1] - 80:10
handy [1] - 48:1
hang [1] - 33:18
HANS [1] - 1:16
happily [1] - 48:13
happy [2] - 73:24, 150:4
hard [5] - 3:22, 9:5, 90:6, 104:16
Harvard [1] - 69:6
haven [1] - 106:25
head [1] - 92:19
headquarters [1] - 107:3
heads [1] - 152:14
hear [5] - 23:10, 74:2, 88:14, 99:13, 113:3
heard [30] - 8:14, 16:6, 16:9, 29:1, 29:4, 30:10, 33:25, 35:4, 45:5, 78:13, 84:22, 85:4, 86:21, 99:15, 101:23, 107:7, 109:24, 115:4, 120:9, 124:16, 147:25, 150:21, 151:25, 159:3, 162:25, 165:4, 166:12, 167:22, 171:15, 183:18
heart [1] - 182:8
heavily [1] - 148:25
hedging [1] - 110:14
held [5] - 9:17, 15:19, 16:1, 55:16, 135:2
help [4] - 18:15, 36:24, 104:7, 160:14
helped [4] - 110:20, 111:2, 111:3, 111:4
helpful [1] - 5:10
helping [1] - 71:17
helps [1] - 110:15
Hendrickson [1] - 110:12, 111:7, 111:8, 162:25
Heneveld [2] - 48:18, 64:1

**Hensel** [1] - 183:6
**hereby** [1] - 186:6
**hereinbefore** [1] - 186:9
**hesitate** [4] - 91:13, 93:3, 131:4, 153:7
**high** [10] - 65:4, 77:5, 86:24, 91:21, 112:8, 140:17, 154:3, 161:5, 165:20
**higher** [22] - 113:13, 125:17, 133:14, 139:12, 141:7, 143:4, 143:17, 149:12, 158:5, 158:7, 161:11, 168:9, 168:12, 168:16, 176:10, 176:14, 178:19, 179:5, 179:12, 183:21, 183:24
**highlight** [3] - 153:23, 158:15, 158:22
**highlighting** [1] - 112:14
**highly** [2] - 88:8, 94:22
**hired** [4] - 34:8, 34:14, 36:24, 43:3
**history** [2] - 6:6, 113:22
**hits** [2] - 31:25, 32:2
**hold** [4] - 15:25, 66:6, 112:21, 112:22
**holders** [1] - 167:7
**holding** [2] - 14:10, 15:14
**honor** [1] - 55:25
**Honor** [32] - 3:10, 8:21, 47:10, 47:17, 48:4, 52:18, 56:23, 57:9, 58:8, 63:8, 63:12, 66:21, 66:24, 67:13, 67:18, 73:18, 73:23, 75:19, 76:4, 117:25, 122:18, 122:25, 172:11, 179:24, 179:25, 181:16, 182:3, 182:10, 183:4, 183:11, 184:2
**HONORABLE** [1] - 1:10
**Honorable** [1] - 3:4
**hope** [7] - 23:18, 25:13, 25:16, 25:23, 59:22, 182:14, 182:16
**hoped** [1] - 163:15
**hopefully** [8] - 10:20,

12:5, 33:23, 65:3, 105:25, 106:1, 111:7, 131:23
**hoping** [1] - 23:19
**horse** [1] - 108:18
**hours** [3] - 57:13, 57:22, 182:4
**house** [1] - 25:7
**huge** [4] - 46:5, 109:1, 119:25, 162:2
**hugely** [1] - 143:11
**hum** [2] - 9:20, 61:16
**hundred** [2] - 105:1, 167:4
**hundreds** [2] - 95:16, 140:10
**hypothesize** [1] - 14:14
**hypothetical** [50] - 15:13, 18:6, 18:22, 19:1, 19:6, 20:4, 27:2, 28:10, 29:20, 30:18, 30:23, 30:25, 31:19, 32:4, 32:7, 32:9, 32:13, 32:25, 33:6, 33:14, 33:15, 33:16, 33:19, 33:20, 33:22, 34:2, 34:5, 34:14, 34:22, 35:10, 36:3, 36:4, 36:18, 36:21, 38:12, 39:3, 39:6, 39:13, 39:17, 40:9, 40:14, 43:3, 46:14, 66:2, 108:24, 119:8, 119:20, 140:21, 151:21, 179:21
**hypothetically** [1] - 17:8
**hypotheticals** [1] - 64:25

**I**

**i.e** [15] - 84:8, 92:4, 100:3, 100:12, 112:6, 113:25, 126:25, 134:13, 154:6, 155:10, 162:17, 166:15, 167:8, 171:2, 174:8
**idea** [4] - 40:19, 116:25, 127:16, 144:2
**identified** [1] - 39:8
**identifies** [2] - 4:15, 4:18
**identify** [4] - 120:6, 121:8, 131:22, 142:10

**IL** [1] - 1:20
**imagination** [2] - 126:11, 135:8
**imagine** [5] - 17:9, 87:14, 88:10, 109:6, 174:22
**impact** [10] - 42:10, 73:7, 81:9, 111:15, 144:25, 150:19, 161:16, 161:18, 165:5, 170:1
**implement** [1] - 89:21
**implementation** [3] - 71:19, 97:7, 140:22
**implemented** [3] - 96:18, 97:5, 171:1
**implicated** [1] - 95:5
**implications** [1] - 120:13
**imply** [1] - 152:2
**important** [2] - 5:5, 5:6, 5:7, 14:23, 73:4, 76:25, 78:25, 79:8, 85:22, 92:7, 94:20, 102:8, 107:5, 109:16, 120:12, 137:18, 146:14, 148:21, 150:16, 165:15, 170:11, 170:12
**importantly** [4] - 92:8, 104:1, 110:19, 116:3
**impose** [1] - 46:19
**imposed** [2] - 46:3, 120:16
**imprecise** [1] - 168:20
**impression** [1] - 61:23
**improved** [1] - 110:18
**IN** [1] - 1:1
**inaccurate** [1] - 170:20
**incapable** [1] - 88:22
**incentive** [1] - 152:15
**incentivize** [2] - 113:19, 113:20
**include** [2] - 167:11, 170:23
**included** [2] - 168:6, 170:12
**includes** [6] - 127:1, 170:21, 172:15, 172:16, 172:17
**including** [7] - 35:25, 36:15, 37:14, 72:9, 76:20, 113:7, 169:18
**income** [14] - 23:22, 75:18, 75:20, 76:9, 91:8, 108:5, 108:6, 108:8, 108:10, 141:8, 179:9,

180:14, 180:18
**inconsistencies** [1] - 145:16
**inconsistency** [1] - 145:20
**inconsistent** [3] - 8:10, 110:5, 114:2
**incorporate** [5] - 140:25, 154:16, 154:17, 165:8, 170:5
**incorporated** [4] - 148:23, 149:25, 150:2, 167:23
**incorporating** [2] - 148:20, 150:12
**incorrect** [5] - 60:7, 139:9, 139:17, 154:11, 169:24
**increase** [7] - 21:9, 141:23, 142:11, 145:20, 165:25, 166:25, 168:9
**increased** [6] - 83:10, 100:16, 100:18, 143:6, 159:5, 170:14
**increases** [7] - 160:6, 160:7, 161:18, 161:20, 162:4, 162:5, 162:16
**increasing** [2] - 81:5, 83:12
**incredibly** [1] - 183:1
**incremental** [4] - 10:15, 11:16, 154:3, 154:15
**incrementing** [1] - 157:6
**incur** [3] - 19:25, 83:21, 154:23
**incurred** [4] - 90:21, 120:24, 129:2, 131:14
**incurs** [2] - 108:1, 117:7
**independent** [5] - 7:15, 29:13, 54:20, 132:16, 147:18
**independently** [1] - 152:12
**INDEX** [1] - 185:1
**indicate** [1] - 152:10
**indicated** [2] - 109:25, 147:7
**indications** [1] - 56:17
**indicative** [1] - 162:24
**indicator** [2] - 110:3, 125:13
**indicators** [1] - 104:11
**indifferent** [2] - 178:25, 179:7

**individual** [4] - 24:16, 29:5, 33:3, 165:19
**individual's** [1] - 25:7
**individuals** [2] - 166:20, 166:21
**indulge** [1] - 179:25
**industrial** [6] - 5:20, 6:17, 16:22, 42:23, 43:4, 44:10
**industries** [1] - 69:15
**industry** [7] - 17:2, 17:5, 64:21, 71:6, 71:8, 71:12, 101:8
**inefficiencies** [1] - 120:9
**inefficiency** [1] - 120:25
**inertia** [1] - 5:13
**infer** [1] - 102:6
**inference** [2] - 168:8, 168:22
**inflate** [1] - 178:4
**influence** [1] - 113:4
**inform** [2] - 101:1, 107:8
**information** [40] - 4:13, 4:19, 4:25, 5:9, 5:11, 5:25, 6:22, 7:20, 30:11, 30:14, 76:18, 76:22, 77:1, 96:24, 97:1, 97:25, 98:5, 98:6, 102:13, 102:20, 102:24, 113:8, 113:9, 135:21, 140:25, 141:25, 144:21, 145:14, 146:22, 147:1, 154:6, 156:13, 163:9, 163:19, 164:21, 169:7, 170:5
**informed** [1] - 118:9
**infringe** [2] - 51:5, 51:16
**ingredient** [2] - 5:23, 125:4
**inherent** [1] - 80:5
**inherently** [3] - 80:2, 80:16, 110:9
**initial** [2] - 68:9, 165:17
**initiates** [1] - 103:23
**innovative** [1] - 105:5
**input** [8] - 63:21, 137:17, 148:7, 148:13, 153:20, 156:25, 157:18, 158:23
**inputs** [1] - 85:17

inserted [1] - 87:20
inserts [1] - 172:22
inside [1] - 100:24
insight [1] - 145:7
instance [6] - 86:20, 97:17, 128:7, 145:12, 174:21, 175:6
instead [4] - 14:17, 105:17, 112:7, 127:22
insulate [4] - 65:25, 66:8, 66:14, 66:20
insurance [12] - 104:21, 105:6, 105:19, 105:22, 106:3, 109:7, 109:10, 109:11, 109:14, 110:16
intangible [18] - 69:19, 78:5, 78:6, 78:8, 83:4, 106:19, 106:23, 108:2, 124:8, 125:20, 126:6, 126:10, 132:24, 135:2, 135:3, 136:11, 144:20, 152:16
intangibles [10] - 90:25, 92:11, 92:12, 92:14, 92:22, 125:11, 127:1, 136:7, 136:13, 175:14
integrated [1] - 92:2
intellectual [4] - 71:2, 135:3, 174:23, 175:4
intended [4] - 75:17, 76:8, 151:21, 168:8
intensive [1] - 77:13
intent [1] - 10:24
intention [1] - 151:18
intentions [1] - 151:24
inter [1] - 151:6
interacting [1] - 151:1
intercompany [3] - 69:14, 69:24, 72:18
interdependence [1] - 80:6
interest [4] - 17:22, 50:25, 108:6, 129:18
interested [2] - 28:25, 29:11
interesting [1] - 5:24
internal [15] - 14:6, 14:21, 15:5, 15:16, 15:22, 73:8, 73:10, 85:19, 102:16, 104:2, 104:24, 110:15, 112:9,

120:11, 181:1
Internal [1] - 71:24
internally [2] - 34:18, 64:6
international [1] - 79:18
International [1] - 133:23
interpret [3] - 112:17, 112:19, 114:8
interpretation [1] - 57:16
interpretations [1] - 62:2
interquartile [1] - 134:6
interrelated [3] - 80:2, 80:16, 110:9
interrelatedness [1] - 80:6
interrupt [1] - 26:13
interruption [1] - 48:20
intimately [1] - 88:2
introduce [2] - 182:24, 183:3
introduction [1] - 111:18
intuitive [1] - 178:21
invalid [6] - 51:4, 51:16, 64:10, 64:22
inventory [2] - 165:9, 165:13
invest [3] - 24:13, 25:13, 107:20
invested [2] - 25:15, 133:18
investigate [1] - 43:7
investigation [3] - 53:20, 54:11, 54:18
investing [4] - 33:13, 128:9, 133:19, 135:11
investment [43] - 9:25, 20:1, 20:14, 22:18, 23:3, 23:9, 23:12, 23:13, 23:15, 23:23, 24:1, 24:5, 24:7, 24:9, 24:16, 24:22, 24:23, 24:24, 25:7, 25:23, 26:1, 26:2, 26:22, 27:7, 70:24, 71:1, 91:13, 91:14, 108:13, 130:3, 130:4, 130:15, 130:17, 130:24, 131:5, 131:11, 145:15, 145:23, 145:25, 146:3, 167:16

investor [9] - 19:13, 23:25, 24:4, 107:24, 108:1, 128:9, 130:7, 135:11
investors [1] - 34:13
involve [1] - 18:11
involved [5] - 70:23, 70:25, 71:19, 94:13, 154:15
involves [2] - 41:18, 106:23
involving [5] - 70:22, 71:11, 71:12, 144:20
IP [2] - 31:20, 79:17
IRI [7] - 156:1, 161:6, 163:5, 163:17, 168:7, 168:19, 168:21
irrational [1] - 29:20
IRS [5] - 2:9, 38:20, 69:23, 130:6, 151:17
isolation [2] - 74:19, 81:13
Israel [1] - 14:15
issue [37] - 39:22, 40:5, 40:6, 40:17, 40:22, 41:3, 41:6, 41:10, 41:17, 42:5, 42:9, 42:10, 54:22, 58:14, 64:21, 74:16, 77:14, 78:24, 79:2, 79:9, 81:25, 82:16, 84:6, 84:12, 92:24, 94:20, 108:7, 114:18, 115:22, 123:20, 133:14, 151:11, 154:15, 166:1, 179:18
issued [4] - 28:22, 35:9, 39:21, 44:1
issues [14] - 27:9, 56:10, 58:23, 62:7, 70:19, 70:20, 72:25, 74:23, 78:19, 82:3, 103:4, 111:13, 114:25, 125:2
it'll [2] - 33:23, 107:12
items [1] - 50:11
iterations [1] - 128:25
itself [5] - 5:12, 81:19, 88:8, 127:22, 150:7
IV [12] - 51:10, 51:24, 52:8, 52:25, 84:8, 100:7, 102:14, 103:23, 115:3, 121:16, 129:19

J

JAMES [1] - 2:6

January [8] - 39:20, 40:25, 42:6, 43:5, 148:1, 148:2, 148:4, 148:6
Jeannie [1] - 183:6
Jeff [2] - 60:4, 182:11
JEREMY [1] - 2:13
jewels [2] - 78:7, 83:15
job [5] - 19:2, 124:12, 182:25, 183:14, 183:17
Joe [12] - 31:11, 31:14, 33:25, 34:1, 35:12, 35:18, 36:22, 37:8, 37:9, 39:22, 43:16, 43:17
JOHN [1] - 1:15
joined [1] - 72:3
joint [1] - 134:22
Jonker [1] - 3:5
JONKER [1] - 1:10
Judd [1] - 2:1
Judge [3] - 1:11, 3:5, 55:25
judgments [1] - 58:2
July [15] - 62:23, 98:9, 98:17, 113:8, 121:23, 144:12, 158:1, 158:10, 158:24, 160:12, 171:1, 171:11, 173:10, 183:19
jump [3] - 53:12, 88:9, 131:17
June [52] - 1:12, 9:16, 9:24, 11:12, 43:25, 45:2, 45:20, 53:17, 54:12, 55:16, 62:21, 97:5, 97:8, 98:14, 115:6, 121:20, 141:19, 144:12, 147:24, 148:5, 153:9, 153:18, 155:17, 155:18, 156:6, 156:9, 156:11, 158:1, 158:2, 158:5, 158:9, 158:10, 158:16, 158:24, 160:15, 163:16, 164:14, 164:17, 165:6, 165:24, 167:23, 168:14, 168:17, 168:25, 169:8, 171:4, 171:11, 173:14
June/July [4] - 141:21, 142:11, 142:22, 143:3

jurisdictions [1] - 70:7
jury [1] - 181:1
Justice [2] - 2:5, 2:12
justiciable [1] - 53:1
justification [1] - 27:21

K

Kearney [1] - 69:3
keep [8] - 20:14, 73:12, 89:3, 91:21, 127:5, 127:6, 164:22, 168:3
keeping [2] - 124:20, 127:9
Kennelly [4] - 117:15, 118:12, 119:1, 119:16
Kennelly's [2] - 16:7, 75:13
key [5] - 9:25, 14:20, 15:4, 55:3, 125:13
kicker [4] - 96:6, 115:17, 137:17, 138:3
kind [48] - 17:8, 22:18, 52:13, 57:20, 72:19, 72:20, 77:8, 77:9, 77:23, 78:18, 82:23, 84:19, 84:23, 87:25, 88:4, 90:24, 106:14, 107:23, 109:8, 114:24, 118:22, 125:25, 126:19, 127:5, 133:13, 138:4, 138:10, 142:11, 145:18, 147:2, 148:20, 150:22, 151:4, 151:10, 157:13, 158:8, 162:24, 163:25, 164:24, 165:13, 169:11, 174:2, 174:20, 175:12, 175:16, 176:2, 177:17, 179:11
kinder [1] - 37:9
kinds [1] - 104:10
knowable [8] - 96:24, 97:1, 135:22, 141:1, 169:7, 169:9, 169:19, 170:6
knowledge [4] - 16:21, 17:21, 24:18, 125:25
knowledgeable [1] - 169:14
known [9] - 90:3,

96:24, 97:1, 135:22, 141:1, 169:7, 169:9, 169:19, 170:5
**knows** [2] - 22:19, 36:2
**KPMG** [3] - 69:3, 72:3

**L**

**label** [6] - 3:24, 4:7, 4:15, 5:24, 8:5
**labels** [1] - 4:1
**laced** [1] - 38:11
**Lane** [1] - 2:10
**language** [5] - 4:22, 6:1, 6:9, 8:1, 12:15
**large** [10] - 20:21, 72:11, 81:1, 81:2, 81:3, 83:17, 117:17, 118:11, 120:21, 176:7
**largest** [2] - 20:21, 83:7
**last** [22] - 11:20, 18:23, 22:23, 23:10, 33:22, 40:4, 43:15, 60:13, 62:12, 64:23, 75:15, 79:9, 84:25, 101:17, 115:12, 130:9, 134:10, 138:14, 138:25, 141:22, 180:21, 180:22
**lastly** [1] - 122:3
**late** [4] - 23:2, 46:15, 103:14, 115:5
**laudable** [1] - 18:4
**launch** [19] - 10:14, 11:9, 11:11, 11:12, 44:16, 44:24, 45:14, 46:9, 46:18, 110:23, 115:8, 121:17, 142:7, 142:10, 142:19, 146:12, 159:2, 165:10, 171:9
**launched** [2] - 110:24, 111:1
**launches** [1] - 121:23
**launching** [1] - 81:22
**LAW** [6] - 3:3, 67:7, 67:10, 122:20, 122:23, 184:3
**lawyer** [1] - 28:8

**lawyers** [6] - 36:16, 50:4, 50:16, 51:14, 56:23, 62:7
**lay** [1] - 52:24
**laying** [1] - 168:25
**lead** [1] - 183:6
**leaders** [1] - 147:10
**leading** [1] - 80:24
**league** [1] - 181:21
**lean** [1] - 151:25
**learned** [2] - 121:13, 121:14
**lease** [1] - 132:23
**leases** [1] - 132:21
**leasing** [7] - 132:18, 132:20, 133:1, 133:5, 133:6, 133:8, 134:19
**least** [18] - 10:19, 14:18, 30:21, 41:9, 50:16, 51:4, 84:25, 102:9, 110:25, 115:13, 117:15, 117:16, 139:1, 142:18, 144:11, 169:18, 180:20, 182:17
**leave** [3] - 166:3, 171:15, 181:10
**led** [3] - 145:13, 145:21, 147:19
**ledger** [1] - 136:15
**left** [13] - 3:16, 10:3, 15:25, 16:2, 47:9, 47:19, 57:13, 65:18, 87:16, 110:6, 128:7, 181:11, 181:12
**left-hand** [3] - 10:3, 47:9, 47:19
**legal** [23] - 15:21, 16:14, 27:9, 27:21, 28:1, 28:4, 28:5, 28:8, 36:8, 36:10, 40:22, 42:18, 43:22, 45:8, 47:22, 53:10, 54:14, 54:22, 62:2, 62:4, 62:7, 64:22, 72:13
**legible** [1] - 183:17
**legitimacy** [1] - 27:4
**legitimate** [1] - 18:3
**legitimately** [1] - 27:2
**leisure** [1] - 88:20
**length** [62] - 16:24, 17:3, 17:14, 18:16, 18:18, 19:16, 28:14, 29:13, 75:7, 75:10, 77:7, 77:10, 78:1, 79:23, 87:5, 87:11, 88:16, 88:24, 88:25,

91:5, 91:22, 93:25, 94:12, 94:13, 94:17, 95:13, 99:6, 108:20, 108:21, 108:23, 115:19, 118:20, 119:6, 119:10, 119:12, 119:19, 119:22, 120:1, 120:13, 122:2, 123:13, 124:1, 124:12, 126:7, 127:7, 127:11, 128:14, 134:15, 140:5, 141:6, 145:1, 145:23, 147:14, 150:23, 151:18, 152:3, 152:4, 152:5, 152:20, 154:19, 169:11, 179:23
**less** [11] - 5:7, 30:15, 83:22, 94:25, 112:24, 121:2, 129:23, 136:2, 140:1, 172:12, 173:25
**lesser** [1] - 75:12
**letter** [21] - 28:21, 31:11, 35:9, 39:21, 40:7, 41:1, 44:1, 48:18, 48:21, 50:1, 50:2, 50:10, 50:15, 50:21, 51:10, 51:17, 51:20, 51:24, 64:1, 64:5, 115:1
**letters** [2] - 34:7
**letting** [2] - 53:7
**level** [22] - 47:14, 50:19, 66:13, 77:5, 91:22, 94:11, 94:14, 103:11, 105:2, 107:4, 112:6, 112:12, 139:12, 140:17, 140:19, 146:20, 161:5, 161:11, 166:13, 166:15, 171:20, 172:3
**Lewis** [2] - 1:14, 1:19
**Leydig** [1] - 55:22
**license** [2] - 101:8, 101:10
**licenses** [1] - 101:7
**licensing** [1] - 175:4
**life** [5] - 99:8, 105:21, 105:22, 109:6, 114:6
**light** [1] - 153:3
**likely** [3] - 45:5, 154:22, 182:7
**limit** [1] - 128:1
**limited** [6] - 20:20,

66:20, 72:25, 99:20, 100:3, 131:13
**limits** [1] - 57:18
**line** [21] - 40:5, 51:9, 57:2, 57:6, 58:13, 58:15, 58:21, 59:1, 60:5, 87:24, 91:18, 112:19, 112:21, 112:22, 119:2, 136:2, 142:3, 142:4, 145:24, 161:12, 181:3
**lines** [3] - 20:12, 143:8, 147:8
**LINGUANTI** [25] - 1:19, 3:10, 3:13, 8:21, 8:25, 9:1, 38:6, 38:7, 38:16, 41:22, 41:23, 44:7, 44:8, 47:17, 47:18, 48:4, 48:7, 48:8, 52:17, 52:22, 58:8, 58:9, 63:8, 64:12, 66:20, 66:24
**Linguanti** [7] - 3:9, 52:14, 63:25, 64:4, 64:24, 65:14, 185:5
**link** [1] - 100:20
**lion's** [1] - 141:13
**list** [4] - 55:9, 74:9, 76:13, 132:4
**listed** [1] - 61:8
**listening** [3] - 34:4, 142:13, 144:8
**litigate** [2] - 62:20, 62:23
**litigating** [2] - 63:1, 63:6
**litigation** [48] - 21:2, 21:5, 31:20, 31:21, 45:3, 45:4, 45:6, 45:7, 45:16, 46:16, 46:17, 47:7, 47:15, 49:24, 51:20, 51:25, 52:15, 53:8, 53:13, 53:17, 53:21, 53:23, 54:11, 54:19, 54:20, 54:23, 54:25, 55:4, 59:24, 60:20, 61:25, 62:1, 70:4, 70:5, 70:18, 70:21, 84:8, 100:7, 100:9, 100:15, 100:21, 102:14, 103:23, 115:3, 121:16, 129:19, 129:20
**LL** [2] - 127:11, 129:4
**LLC** [121] - 12:7, 12:13, 12:23, 13:3, 13:24, 13:25, 14:15, 14:20, 16:11, 26:12,

26:20, 27:2, 27:7, 28:13, 53:16, 64:25, 65:25, 66:8, 66:19, 74:17, 75:8, 80:18, 81:17, 81:20, 82:2, 82:4, 82:8, 84:10, 85:6, 86:9, 86:10, 86:19, 87:15, 87:21, 88:22, 88:24, 89:1, 90:15, 90:19, 91:8, 91:14, 93:18, 94:1, 95:4, 95:6, 95:14, 95:15, 95:25, 97:22, 99:3, 105:12, 105:15, 106:5, 107:7, 108:24, 109:1, 111:4, 113:1, 115:15, 115:22, 115:25, 116:10, 116:17, 116:18, 116:21, 116:22, 116:23, 117:6, 117:12, 119:10, 119:16, 121:3, 122:7, 123:19, 124:4, 126:22, 127:4, 127:10, 127:13, 127:14, 127:16, 129:2, 129:14, 129:24, 130:5, 130:21, 131:9, 131:13, 132:9, 132:12, 132:14, 133:11, 133:16, 133:17, 134:19, 135:14, 135:23, 136:12, 136:18, 138:11, 138:12, 138:23, 140:6, 140:9, 140:20, 141:8, 141:10, 141:11, 141:13, 150:18, 151:20, 174:2, 175:7, 179:20
**LLC's** [5] - 65:5, 65:23, 105:9, 116:20, 119:10
**LLP** [3] - 1:14, 1:19, 2:1
**loan** [1] - 108:7
**local** [2] - 135:4, 135:5
**location** [1] - 79:16
**logical** [1] - 89:21
**longstanding** [1] - 183:15
**look** [45] - 4:6, 19:15, 24:13, 25:21, 25:22, 35:21, 38:2, 38:19, 39:25, 40:2, 44:12,

54:21, 56:5, 56:6, 57:15, 58:12, 59:19, 59:21, 60:3, 60:8, 61:22, 74:4, 77:16, 78:2, 87:14, 88:6, 90:13, 95:21, 104:8, 105:14, 108:6, 119:7, 125:10, 128:17, 141:15, 143:8, 150:6, 154:6, 154:8, 161:17, 164:10, 164:11, 167:9, 169:16, 181:22

**looked** [11] - 37:11, 98:3, 116:21, 141:16, 143:24, 144:22, 146:18, 148:1, 160:15, 163:7, 168:23

**looking** [34] - 20:11, 25:19, 28:16, 34:20, 35:20, 40:25, 41:19, 44:11, 45:1, 46:12, 53:17, 58:4, 61:3, 61:5, 64:11, 65:15, 65:18, 68:14, 79:22, 90:13, 104:6, 104:8, 104:10, 120:12, 140:17, 141:18, 148:16, 148:19, 163:8, 169:21, 171:21, 172:5, 172:19

**looks** [6] - 10:16, 57:2, 61:12, 117:9, 149:18

**loose** [1] - 3:17

**loratadine** [1] - 153:4

**lose** [1] - 152:15

**loses** [1] - 183:22

**losing** [2] - 23:16, 33:13

**loss** [2] - 66:9, 100:3

**losses** [6] - 19:25, 111:21, 111:22, 111:25, 115:25, 116:1

**love** [1] - 109:10

**low** [13] - 86:24, 92:11, 97:18, 116:4, 116:9, 120:3, 150:9, 157:9, 160:5, 164:9, 170:7, 176:18

**lower** [9] - 14:10, 21:7, 134:3, 134:4, 149:12, 173:22, 176:20, 178:4, 179:5

**lowered** [4] - 113:25, 171:2, 171:6

**lowering** [2] - 145:18,

171:4

**lowers** [3] - 154:10, 159:13, 160:19

**LPC** [3] - 175:8

**luck** [1] - 160:8

**lump** [10] - 131:11, 172:19, 174:18, 175:2, 175:18, 177:12, 178:20, 178:22, 179:9

---

## M

**M-27** [1] - 155:21

**MA** [1] - 68:19

**machine** [1] - 125:2

**machines** [1] - 182:24

**Magee** [4] - 73:21, 75:25, 180:3, 180:9

**MAGEE** [11] - 1:15, 73:22, 75:19, 75:23, 76:4, 180:11, 182:3, 182:7, 182:9, 183:4, 184:1

**magnesium** [1] - 109:24

**magnitude** [3] - 85:14, 86:4, 108:22

**Maiden** [1] - 2:10

**mail** [12] - 54:4, 59:12, 59:17, 59:24, 60:6, 61:14, 112:8, 112:12, 112:17, 113:25, 166:24, 181:18

**mails** [2] - 115:5, 144:9

**main** [10] - 21:20, 21:22, 22:1, 44:22, 44:23, 45:11, 45:13, 124:9, 143:7, 183:20

**maintain** [1] - 104:20

**maintained** [2] - 112:5, 112:8

**major** [4] - 96:17, 96:19, 106:21, 114:4

**makers** [2] - 80:8, 80:10

**manage** [11] - 14:11, 14:23, 16:10, 16:18, 27:17, 31:22, 78:25, 82:8, 106:9, 107:4

**managed** [2] - 8:3, 13:4

**management** [10] - 65:6, 65:24, 69:2, 84:20, 106:11, 106:13, 106:16, 106:21, 113:15, 162:8

**managers** [1] - 73:5

**managing** [2] - 92:15, 108:11

**manner** [1] - 6:11

**Manning** [39] - 3:7, 3:14, 3:16, 3:22, 6:8, 9:2, 13:8, 13:14, 35:16, 35:22, 36:7, 36:21, 37:4, 37:12, 37:15, 38:4, 38:8, 39:10, 41:2, 42:14, 44:10, 44:13, 47:1, 48:21, 52:19, 54:2, 55:7, 57:6, 57:10, 57:15, 58:1, 58:10, 63:9, 63:17, 64:23, 66:25, 71:10, 73:1, 165:21

**MANNING** [1] - 185:4

**Manning's** [2] - 3:20, 117:24

**manufacturer** [2] - 71:13, 121:10

**manufacturers** [1] - 80:8

**manufacturing** [7] - 17:5, 18:7, 18:17, 18:20, 18:25, 107:13, 160:3

**march** [1] - 145:17

**March** [27] - 54:7, 54:12, 59:11, 60:13, 61:11, 61:20, 81:21, 82:6, 82:20, 84:9, 85:25, 95:11, 97:19, 98:13, 98:14, 105:14, 105:16, 109:22, 129:4, 139:22, 142:9, 142:10, 149:8, 159:11, 161:2, 178:23

**margin** [9] - 96:6, 113:9, 113:12, 115:16, 126:9, 160:3, 162:12, 162:16, 162:20

**marginal** [1] - 154:13

**margins** [12] - 113:24, 116:4, 116:6, 116:7, 125:14, 125:15, 162:22, 162:23, 176:11, 176:13, 176:19

**market** [42] - 11:23, 11:25, 12:1, 29:6, 32:11, 34:19, 35:24, 36:7, 36:15, 37:14, 38:22, 72:24, 74:14, 80:2, 80:11, 83:23,

101:10, 111:19, 111:23, 125:11, 125:12, 125:13, 127:22, 130:16, 148:5, 150:5, 153:13, 156:14, 156:15, 156:17, 156:21, 158:12, 158:13, 160:5, 161:15, 163:2, 164:1, 169:12, 170:25, 171:5, 174:24

**marketer** [1] - 101:12

**marketing** [16] - 5:21, 6:15, 6:16, 6:17, 6:18, 7:8, 7:10, 7:11, 71:18, 84:23, 101:16, 125:1, 125:2, 136:13, 145:11, 153:15

**marketplace** [2] - 34:18, 35:5

**markets** [6] - 36:13, 40:4, 42:2, 43:17, 162:21, 162:22

**Marlin** [1] - 133:24

**Marwick** [1] - 69:3

**mass** [2] - 92:15, 125:7

**Massachusetts** [2] - 68:20, 68:22

**match** [2] - 82:21, 147:23

**material** [1] - 183:1

**materialize** [1] - 152:18

**materials** [4] - 5:21, 76:13, 76:15, 147:7

**math** [4] - 69:13, 93:5, 175:10, 175:17

**matter** [8] - 16:4, 26:18, 29:12, 64:10, 65:17, 71:11, 95:2, 99:16

**matters** [5] - 15:24, 70:5, 70:17, 71:2, 71:3

**MATTHEW** [1] - 2:10

**maximization** [4] - 17:20, 17:25, 18:1, 18:8

**maximize** [1] - 23:22

**maximized** [1] - 113:1

**maximizing** [5] - 18:3, 19:11, 112:21, 147:3

**May/June** [2] - 53:15, 114:23

**McGrath** [1] - 133:24

**MDS** [8] - 40:6, 40:17,

41:3, 41:6, 41:10, 42:5, 42:8, 42:10

**mean** [20] - 12:16, 19:9, 20:24, 28:7, 35:20, 38:10, 38:14, 41:25, 42:8, 47:16, 54:6, 54:15, 54:17, 57:22, 82:9, 103:6, 103:18, 133:25, 137:16, 168:5

**meaning** [3] - 16:1, 26:16, 162:14

**meaningful** [1] - 57:24

**meaningless** [1] - 57:14

**means** [7] - 15:8, 103:25, 108:20, 114:9, 147:14, 177:10, 177:11

**meant** [2] - 48:17, 119:18

**measure** [1] - 119:19

**meat** [1] - 12:5

**medium** [1] - 150:10

**meet** [3] - 60:12, 112:18, 117:8

**meeting** [12] - 9:17, 35:12, 35:14, 37:3, 37:6, 37:8, 37:11, 37:16, 37:18, 39:23, 40:15, 61:11

**Meijer's** [1] - 124:23

**members** [1] - 72:9

**memorandum** [1] - 54:2

**memory** [4] - 7:6, 60:7, 117:23, 118:5

**mental** [3] - 88:7, 88:9, 175:10

**mention** [5] - 75:20, 75:22, 75:24, 150:17, 182:3

**mentioned** [10] - 6:18, 59:11, 65:14, 78:14, 117:7, 122:5, 124:3, 160:17, 162:1, 172:9

**mentioning** [1] - 147:11

**mentions** [1] - 49:19

**met** [1] - 183:12

**method** [13] - 85:15, 94:6, 126:23, 131:19, 131:22, 134:17, 134:21, 136:3, 140:5, 140:8, 141:2, 152:7

**methodological** [2] - 137:9, 157:13

**methodology** [3] - 96:3, 151:15, 176:24

**metric** [1] - 149:10
**Mexico** [2] - 70:8, 107:16
**MI** [1] - 2:3
**Michael** [1] - 155:21
**MICHIGAN** [1] - 1:2
**Michigan** [5] - 1:11, 3:4, 182:16, 186:5, 186:18
**middle** [4] - 7:1, 34:6, 34:8, 87:15
**might** [14] - 21:7, 44:21, 66:9, 72:21, 106:25, 107:1, 107:13, 107:15, 114:5, 127:25, 135:24, 152:18, 178:11, 180:23
**Milbank** [2] - 55:21, 56:8
**milestone** [4] - 101:4, 101:5, 102:19, 130:1
**milestones** [1] - 103:6
**Miller** [1] - 183:11
**milligram** [1] - 4:9
**milligrams** [2] - 4:16, 4:18
**million** [105] - 10:15, 10:17, 11:16, 11:20, 14:16, 14:21, 15:4, 15:13, 21:14, 22:4, 22:8, 22:10, 22:19, 23:3, 23:4, 25:13, 25:15, 25:23, 26:21, 26:22, 27:6, 29:16, 29:17, 29:24, 31:4, 31:23, 32:9, 32:15, 32:19, 32:24, 33:4, 33:7, 33:17, 66:4, 66:6, 66:14, 85:24, 93:16, 93:17, 93:18, 95:7, 95:8, 96:5, 96:9, 96:13, 96:15, 96:21, 97:10, 97:14, 98:1, 98:19, 99:7, 100:16, 105:21, 105:24, 108:25, 118:13, 118:16, 118:18, 118:22, 118:24, 119:21, 129:3, 129:6, 129:9, 130:2, 130:14, 130:22, 130:24, 131:4, 131:10, 131:14, 133:17, 135:15, 135:16, 136:19, 138:12, 138:14, 138:22, 139:21, 140:15, 157:1, 157:17,

157:20, 157:21, 157:22, 164:11, 164:16, 164:20, 167:3, 167:4, 170:3, 170:7, 170:19, 173:13, 174:1, 174:6, 175:1, 175:2, 178:22, 179:1
**millions** [5] - 95:16, 105:3, 105:4, 140:10, 152:10
**mind** [7] - 6:24, 58:6, 73:12, 120:25, 127:5, 164:22, 170:7
**minds** [1] - 34:10
**minimum** [1] - 161:8
**minus** [1] - 135:19
**minute** [2] - 129:8, 143:13
**minutes** [12] - 57:13, 57:21, 63:13, 64:2, 122:13, 122:17, 180:1, 180:23, 181:7, 182:4, 182:12
**mischaracterized** [1] - 41:12
**missing** [1] - 171:10
**mistake** [1] - 169:15
**mitigate** [2] - 12:24, 13:25
**mitigated** [2] - 12:12, 13:23
**mitigating** [1] - 14:4
**model** [5] - 113:8, 130:7, 142:15, 160:1, 160:18
**models** [1] - 113:18
**modest** [6] - 20:1, 20:14, 101:4, 105:5, 111:25, 112:1
**molecule** [1] - 101:9
**moment** [19] - 18:14, 19:21, 20:4, 20:15, 21:21, 21:22, 23:5, 25:11, 26:22, 44:12, 54:7, 55:11, 55:13, 56:4, 56:24, 59:4, 59:19, 103:7, 175:10
**momentarily** [1] - 62:5
**moments** [1] - 124:7
**Monday** [5] - 181:4, 181:13, 181:14, 182:7, 182:20
**money** [21] - 14:21, 15:5, 15:7, 15:8, 15:9, 15:19, 15:25, 23:16, 24:12, 27:6, 31:3, 33:13, 33:18, 66:16, 101:13, 109:11, 114:7,

117:17, 128:3, 152:19
**monies** [1] - 141:11
**monograph** [2] - 116:5, 125:17
**monopolization** [1] - 70:20
**month** [3] - 81:4, 163:18
**month-to-month** [1] - 81:4
**monthly** [1] - 156:13
**months** [1] - 156:6
**Morgan** [2] - 1:14, 1:19
**morning** [12] - 3:6, 3:11, 3:14, 3:15, 3:18, 8:22, 8:23, 21:24, 33:23, 67:2, 67:24, 67:25
**mortgage** [1] - 25:8
**most** [24] - 19:19, 19:21, 20:11, 20:13, 20:20, 23:3, 25:4, 25:6, 25:7, 46:7, 79:13, 85:2, 89:22, 92:8, 97:17, 97:24, 104:1, 110:19, 147:1, 147:25, 154:1, 178:23, 179:16
**moth** [1] - 8:17
**mother** [1] - 107:2
**motivated** [1] - 51:3
**motivations** [1] - 51:6
**Move** [1] - 7:23
**move** [8] - 19:18, 53:25, 79:15, 80:21, 85:9, 164:10, 171:17, 179:14
**moves** [1] - 96:21
**movie** [3] - 182:22, 183:8, 183:9
**moving** [1] - 148:5
**MR** [86] - 1:15, 1:15, 1:16, 1:16, 1:19, 2:1, 2:6, 2:6, 2:10, 2:13, 2:17, 3:10, 3:13, 8:21, 8:25, 9:1, 38:4, 38:6, 38:7, 38:9, 38:16, 41:12, 41:22, 41:23, 44:6, 44:7, 44:8, 47:10, 47:17, 47:18, 48:4, 48:7, 48:8, 52:13, 52:17, 52:22, 57:9, 58:8, 58:9, 63:8, 63:12, 63:16, 64:12, 64:17, 66:21, 66:24, 67:5, 67:13, 67:18, 67:23,

73:18, 73:22, 74:3, 75:19, 75:23, 76:4, 76:5, 90:8, 118:2, 118:5, 118:6, 122:14, 122:18, 122:25, 123:2, 123:3, 173:2, 173:4, 179:24, 180:4, 180:7, 180:11, 180:17, 180:22, 181:9, 181:16, 181:24, 182:3, 182:7, 182:9, 182:10, 183:4, 183:11, 183:14, 184:1, 184:2
**multinational** [1] - 79:14
**multiple** [2] - 105:2, 118:14
**multiples** [1] - 96:16
**multiplied** [1] - 157:23
**multiplies** [1] - 168:18
**multiply** [1] - 133:19
**must** [1] - 88:25
**mutter** [1] - 183:18
**mystery** [1] - 100:19

## N

**name** [2] - 84:23, 107:19
**namely** [3] - 85:21, 90:14, 100:2
**narrowed** [1] - 113:24
**national** [4] - 113:10, 114:1, 125:5, 161:1
**natural** [1] - 122:16
**nature** [6] - 17:20, 42:7, 56:14, 112:10, 124:7, 175:12
**NB** [1] - 159:8
**near** [2] - 71:9, 162:15
**near-term** [1] - 162:15
**nearly** [2] - 118:20, 144:18
**necessarily** [5] - 26:25, 72:18, 143:20, 151:8, 160:24
**necessary** [2] - 80:12, 169:10
**need** [42] - 5:1, 12:22, 23:2, 23:25, 24:4, 24:6, 24:7, 24:9, 24:10, 24:11, 31:10, 69:25, 73:12, 78:1, 78:10, 78:19, 80:2, 80:11, 80:14, 88:6, 89:24, 89:25, 91:25,

92:24, 105:22, 106:11, 107:3, 109:17, 110:18, 119:11, 119:15, 119:18, 130:16, 136:21, 143:22, 146:13, 148:13, 149:10, 160:24, 168:12, 181:7, 182:18
**needed** [3] - 119:25, 120:11, 121:12
**Needham** [3] - 54:5, 60:4, 182:12
**needs** [5] - 14:23, 15:1, 108:10, 137:23, 175:9
**negative** [2] - 139:3, 139:5, 139:10
**negotiated** [3] - 20:19, 30:7, 69:22
**negotiating** [1] - 94:16
**negotiation** [1] - 77:24
**negotiations** [1] - 112:10
**net** [3] - 136:16, 141:8, 148:23, 152:13, 175:19, 175:24, 176:25, 178:9
**network** [2] - 72:20, 125:22
**neutral** [1] - 178:24
**never** [9] - 5:6, 28:2, 45:17, 57:11, 70:8, 108:25, 165:3, 183:12
**nevertheless** [1] - 138:2
**new** [8] - 17:17, 85:3, 108:7, 110:18, 113:8, 113:9, 141:25, 174:25
**New** [2] - 2:11, 9:17
**news** [1] - 103:9
**next** [17] - 10:13, 10:14, 11:15, 12:4, 12:22, 55:20, 56:3, 58:20, 67:3, 67:12, 81:8, 93:5, 96:22, 138:25, 173:1, 174:5, 181:2
**nice** [2] - 181:5, 181:25
**nicotine** [14] - 74:24, 86:7, 86:13, 86:16, 86:25, 119:5, 119:12, 119:14, 120:2, 121:6, 121:9, 121:19, 152:5, 153:4
**nine** [6] - 154:9,

169:24, 170:2, 171:18
**nit** [2] - 94:20
**nominal** [4] - 86:5, 106:7, 121:24, 149:6
**non** [10] - 18:4, 64:22, 108:14, 108:15, 119:6, 119:19, 119:21, 119:22, 122:2
**non-arm's-length** [4] - 119:6, 119:19, 119:22, 122:2
**non-legal** [1] - 64:22
**non-profit** [1] - 18:4
**non-tax** [2] - 108:14, 108:15
**none** [1] - 8:6
**nonetheless** [1] - 175:16
**Norcross** [1] - 2:1
**normal** [1] - 181:13
**normally** [1] - 101:6
**north** [1] - 164:20
**NORTON** [1] - 1:15
**note** [10] - 60:12, 68:4, 86:21, 90:5, 93:9, 100:15, 105:18, 121:25, 137:18, 151:12
**nothing** [3] - 56:18, 81:18, 128:6
**notice** [9] - 51:10, 51:14, 51:19, 51:24, 52:8, 52:25, 119:2, 153:16, 155:6
**noticed** [2] - 5:21, 6:23
**notion** [8] - 27:12, 77:21, 114:2, 115:15, 125:7, 134:18, 141:4, 151:16
**notwithstanding** [1] - 95:24
**novel** [1] - 178:15
**November** [27] - 28:20, 29:16, 35:8, 35:19, 36:22, 39:9, 44:17, 84:5, 87:20, 97:2, 100:23, 103:2, 103:12, 105:16, 106:7, 136:10, 139:24, 149:9, 150:18, 156:3, 156:4, 163:17, 164:18, 164:21, 169:7, 170:8, 170:10
**nowhere** [1] - 71:9
**NPV** [8] - 85:24, 98:19,

138:9, 138:18, 170:8, 172:19, 173:14, 174:1
**number** [64] - 8:12, 44:21, 49:2, 49:3, 49:6, 56:13, 61:8, 70:4, 70:22, 74:6, 76:22, 76:23, 85:23, 90:3, 90:6, 97:3, 97:5, 97:18, 104:23, 111:24, 116:9, 117:23, 118:16, 128:24, 129:6, 129:10, 143:10, 153:17, 156:22, 157:8, 157:11, 157:19, 157:20, 157:21, 157:22, 158:9, 160:17, 161:12, 164:9, 164:12, 164:19, 165:23, 165:25, 168:7, 168:13, 168:15, 168:16, 170:7, 170:19, 170:22, 174:1, 174:2, 176:7, 176:9, 177:14, 178:1, 179:5, 179:6, 179:10, 179:12, 180:5
**numbered** [2] - 49:14, 186:8
**numbers** [34] - 22:15, 49:5, 68:10, 68:11, 86:22, 87:1, 130:2, 138:7, 139:20, 142:19, 142:20, 142:21, 143:4, 143:5, 143:17, 143:18, 143:19, 143:21, 145:8, 147:23, 148:4, 148:6, 148:8, 157:16, 159:17, 164:22, 167:12, 167:18, 169:17, 170:21, 172:19, 172:23, 180:15, 180:16
**numerator** [3] - 136:8, 174:9, 177:25
**NW** [3] - 1:17, 2:2, 2:7
**NY** [1] - 2:11

## O

**o'clock** [1] - 181:13
**object** [5] - 38:9, 47:10, 52:16, 57:9, 180:12

**objection** [10] - 41:12, 52:13, 57:18, 64:12, 73:22, 75:19, 76:3, 180:8, 180:11
**objective** [1] - 147:8
**objects** [1] - 180:3
**obligated** [1] - 101:12
**obligation** [5] - 15:16, 27:3, 66:16, 100:16, 117:6
**obligations** [7] - 15:21, 15:22, 16:11, 18:17, 84:16, 116:18, 116:20
**observation** [3] - 7:5, 20:15, 42:3
**observe** [8] - 84:20, 102:4, 104:15, 111:21, 127:20, 133:10, 157:9, 175:4
**observed** [8] - 53:22, 85:1, 103:14, 112:4, 112:7, 120:8, 145:8, 162:8
**obsolescence** [1] - 170:23
**obtained** [3] - 110:22, 111:1
**obviates** [1] - 69:25
**obviously** [8] - 16:22, 38:10, 50:25, 96:16, 102:6, 133:20, 135:16, 179:17
**occasionally** [1] - 108:6
**occur** [3] - 140:11, 149:12, 160:1
**occurred** [2] - 121:17, 176:21
**occurs** [2] - 79:8, 160:2
**October** [1] - 164:21
**odd** [3] - 174:21, 175:11, 175:12
**OECD** [4] - 72:4, 72:5, 72:6, 72:9
**OF** [2] - 1:2, 1:7
**offer** [2] - 29:22, 112:18
**offered** [2] - 113:18, 113:19
**offering** [3] - 53:10, 72:13, 73:19
**offers** [1] - 46:14
**office** [1] - 23:25
**Office** [1] - 2:9
**Official** [1] - 186:3
**often** [15] - 9:8, 31:9, 31:13, 31:18, 69:15, 70:22, 72:11, 78:7,

101:9, 104:6, 104:8, 106:12, 106:13, 133:1, 175:3
**old** [2] - 49:5, 158:2
**omeprazole** [43] - 4:9, 4:11, 4:16, 4:19, 8:9, 8:12, 10:7, 10:21, 11:1, 11:4, 11:25, 19:20, 19:22, 47:23, 50:7, 64:5, 74:14, 80:23, 85:5, 85:7, 87:19, 109:24, 111:5, 111:17, 113:21, 118:21, 119:11, 119:15, 119:17, 120:1, 123:19, 125:5, 145:9, 145:24, 150:9, 153:5, 153:22, 160:6, 161:20, 166:16, 166:17, 171:5
**one** [129] - 10:10, 10:15, 11:16, 14:10, 17:2, 17:5, 17:9, 18:6, 18:16, 18:17, 18:18, 18:23, 18:24, 19:1, 21:21, 24:9, 24:10, 24:13, 24:18, 26:5, 28:3, 28:5, 30:10, 30:21, 33:22, 39:7, 43:15, 46:11, 47:12, 47:15, 49:14, 49:23, 51:5, 51:19, 52:13, 53:2, 57:16, 58:5, 58:10, 71:14, 73:4, 77:17, 79:15, 79:16, 79:21, 83:11, 84:4, 84:25, 85:4, 86:24, 88:7, 89:7, 89:24, 89:25, 90:1, 90:15, 94:23, 95:5, 96:3, 96:18, 96:19, 96:20, 97:13, 98:14, 100:25, 101:23, 102:6, 103:4, 103:14, 103:22, 103:25, 104:6, 104:7, 104:18, 109:10, 111:14, 111:24, 112:19, 113:21, 113:23, 114:9, 114:16, 115:12, 122:5, 123:16, 124:19, 125:8, 125:11, 129:1, 129:8, 133:20, 134:13, 134:16, 135:2, 135:10, 135:19, 135:20, 135:21,

135:22, 136:9, 137:22, 139:23, 139:24, 140:4, 145:7, 146:22, 148:16, 148:24, 154:5, 157:8, 159:9, 159:24, 161:22, 161:25, 163:5, 165:25, 167:5, 167:20, 169:3, 169:23, 171:20, 172:8, 175:9, 175:21
**one-year** [1] - 159:24
**ones** [4] - 147:9, 152:17, 152:20, 176:16
**ongoing** [5] - 84:20, 92:22, 110:7, 120:23
**open** [1] - 104:20
**operate** [1] - 102:21
**operating** [14] - 96:6, 108:1, 108:5, 108:7, 108:9, 115:16, 116:6, 126:9, 128:11, 143:25, 151:3, 177:19, 177:21
**Operation** [1] - 72:7
**operation** [4] - 107:13, 107:16, 128:2, 135:5
**operational** [4] - 81:15, 94:2, 127:17, 151:3
**operations** [5] - 79:18, 125:21, 127:15, 132:22, 134:23
**opine** [1] - 16:16
**opinion** [34] - 15:23, 27:10, 27:22, 36:13, 42:9, 42:10, 46:14, 47:22, 48:21, 50:1, 50:2, 50:21, 54:25, 55:2, 64:1, 64:4, 64:22, 75:7, 75:10, 86:9, 91:5, 91:7, 96:9, 96:16, 97:11, 98:22, 109:3, 110:2, 117:15, 145:22, 147:13, 147:18, 151:25, 152:6
**opinions** [7] - 45:8, 49:15, 49:18, 53:10, 72:13, 74:2, 99:16
**opportunities** [11] - 74:12, 74:13, 80:23, 81:2, 83:16, 86:18, 88:20, 149:23, 160:5, 169:15, 178:11
**opportunity** [23] -

20:22, 21:14, 21:15, 22:10, 22:13, 22:16, 29:11, 32:21, 74:21, 81:4, 81:5, 82:14, 83:2, 83:3, 83:22, 87:18, 88:24, 89:9, 113:11, 115:21, 135:11, 135:17, 167:19
**opposed** [5] - 26:1, 49:5, 64:7, 159:8, 171:19
**opposite** [1] - 147:19
**option** [12] - 30:10, 30:14, 89:11, 101:23, 101:24, 101:25, 102:12, 104:16, 104:17, 104:18, 104:20
**optionality** [2] - 101:23, 102:25
**options** [1] - 30:8
**order** [13] - 14:23, 50:23, 60:13, 77:25, 78:2, 82:10, 109:18, 113:19, 134:12, 148:14, 161:11, 169:1, 179:6
**orders** [3] - 85:14, 86:4, 108:22
**Oren** [7] - 31:12, 53:22, 54:4, 59:17, 60:1, 60:11, 62:10
**Oren's** [2] - 61:14, 62:7
**Organisation** [1] - 72:7
**organization** [15] - 6:17, 14:24, 15:1, 16:13, 16:15, 16:17, 17:10, 18:6, 18:7, 27:5, 42:23, 43:4, 44:11, 106:24
**organizations** [3] - 5:20, 16:22, 18:5
**organized** [2] - 17:10, 183:1
**orientation** [1] - 62:11
**origin** [1] - 6:1
**original** [2] - 37:1, 120:19
**originally** [1] - 14:18
**ORx** [14] - 165:4, 166:10, 166:11, 166:12, 166:18, 166:24, 167:3, 167:4, 167:8, 167:11, 167:18, 167:23, 168:9, 168:24

**OTC** [16] - 4:2, 4:7, 4:15, 4:17, 4:18, 4:21, 8:2, 8:4, 9:25, 113:10, 148:7, 156:4, 163:19, 166:14, 166:21
**otherwise** [3] - 16:20, 42:24, 120:19
**Ottawa** [1] - 2:2
**ought** [1] - 57:11
**ourselves** [3] - 9:13, 13:7, 25:11
**outcome** [2] - 45:16, 46:17, 82:10
**outright** [1] - 174:25
**outside** [2] - 89:10, 127:20
**over-the-counter** [2] - 5:17, 112:13
**overall** [6] - 47:14, 82:23, 85:23, 86:3, 91:17, 164:1
**overarching** [1] - 77:7
**overhead** [2] - 154:17, 154:20
**overlap** [1] - 72:22
**overseas** [4] - 83:8, 83:13, 107:15, 135:3
**overview** [1] - 99:17
**overviews** [1] - 76:21
**owe** [3] - 152:19, 152:21
**own** [10] - 8:12, 11:5, 11:6, 66:6, 83:4, 85:19, 102:16, 102:21, 125:24, 154:20
**owned** [1] - 135:4
**owners** [1] - 136:6
**ownership** [1] - 72:22

**P**

**p.m** [3] - 122:21, 122:22, 184:4
**P.O** [2] - 2:7, 2:14
**pace** [1] - 88:14
**pack** [2] - 155:15, 155:16
**package** [4] - 124:23, 126:1
**packages** [1] - 157:1
**packaging** [1] - 84:23
**packing** [1] - 182:18
**Page** [1] - 185:3
**page** [44] - 9:10, 9:11, 9:18, 13:10, 20:10, 39:25, 48:12, 48:13, 48:24, 48:25, 49:3, 49:5, 49:13, 52:9,

52:10, 52:23, 55:20, 56:3, 56:8, 56:23, 56:25, 57:1, 57:5, 57:8, 58:20, 58:21, 58:22, 65:3, 68:12, 69:7, 74:4, 74:5, 117:22, 117:25, 118:7, 136:24, 166:4, 166:5, 172:20
**pages** [4] - 9:6, 9:18, 56:13, 76:12
**paid** [18] - 25:8, 79:3, 82:19, 86:19, 90:4, 91:14, 95:4, 95:8, 95:11, 101:12, 106:2, 127:10, 131:5, 140:6, 140:7, 175:3, 175:7
**Papa** [35] - 31:11, 31:14, 33:25, 34:1, 34:8, 35:4, 35:12, 35:18, 36:6, 36:22, 37:8, 37:9, 37:19, 37:22, 39:2, 39:8, 39:12, 39:22, 40:3, 40:14, 41:1, 41:2, 42:2, 42:4, 43:3, 43:16, 43:17, 44:9, 44:22, 54:5, 85:4, 98:3, 109:24, 110:12, 142:8
**paper** [2] - 81:19, 133:6
**paragraph** [50] - 13:10, 13:15, 13:16, 13:20, 20:10, 21:25, 22:2, 35:17, 35:20, 37:21, 38:17, 39:11, 39:25, 40:2, 40:12, 40:13, 43:1, 43:2, 44:19, 49:1, 49:9, 49:14, 51:10, 51:24, 52:8, 52:23, 52:25, 60:11, 60:17, 60:19, 60:22, 60:25, 62:6, 62:10, 65:1, 65:6, 65:7, 84:8, 100:7, 102:14, 103:23, 115:3, 118:15, 121:16, 129:19
**paragraphs** [6] - 44:3, 44:4, 44:11, 60:16, 65:21, 65:23
**paralegal** [1] - 183:6
**parameter** [6] - 104:9, 160:4, 160:6, 161:22, 169:23
**parameters** [4] - 144:13, 158:22, 158:23, 170:12

**paraphrasing** [2] - 154:7, 159:10
**pardon** [2] - 34:5, 56:8
**parent** [8] - 15:10, 16:1, 116:25, 117:4, 117:5, 117:9
**parlance** [1] - 106:13
**part** [16] - 7:14, 14:15, 17:9, 17:11, 23:16, 32:8, 32:12, 32:15, 69:12, 112:12, 146:8, 148:21, 153:2, 156:24, 167:5, 180:13
**particular** [15] - 26:2, 89:15, 104:6, 111:9, 127:24, 133:4, 147:5, 153:20, 154:4, 154:19, 154:23, 162:9, 166:17, 174:21, 175:20
**particularly** [27] - 60:25, 74:15, 76:24, 78:20, 78:25, 79:8, 81:6, 101:7, 106:17, 106:18, 107:5, 108:2, 109:17, 120:3, 121:7, 125:16, 128:2, 143:5, 145:16, 146:21, 149:1, 151:23, 159:4, 165:25, 167:16, 176:15, 176:21
**parties** [52] - 14:5, 16:25, 17:6, 17:14, 17:21, 18:14, 18:17, 19:5, 19:6, 19:15, 19:16, 21:9, 26:10, 26:15, 28:3, 29:13, 29:15, 41:8, 43:8, 53:7, 54:13, 54:15, 56:7, 56:25, 58:12, 58:22, 59:2, 59:3, 59:8, 68:9, 72:20, 77:19, 77:23, 78:2, 78:12, 79:4, 82:25, 92:10, 105:14, 107:1, 127:20, 131:23, 132:21, 134:22, 134:25, 136:5, 136:18, 138:20, 146:3, 151:1, 151:8
**parties'** [1] - 83:25
**partly** [1] - 154:25
**partner** [1] - 68:25
**partners** [1] - 134:23
**partnership** [3] - 8:11,

8:16, 14:16
**partnerships** [1] - 10:10
**party** [47] - 14:5, 14:6, 14:9, 15:17, 17:5, 17:6, 18:16, 18:18, 18:21, 18:25, 19:1, 19:2, 27:16, 28:14, 28:15, 29:20, 77:21, 78:21, 78:24, 84:4, 84:13, 86:20, 88:11, 101:7, 105:20, 106:20, 108:7, 108:9, 116:21, 117:17, 121:21, 122:7, 122:8, 131:24, 132:2, 144:19, 155:25, 174:23, 176:17, 178:21, 178:22, 178:24, 179:6
**pass** [1] - 105:24
**passive** [3] - 107:23, 108:1, 108:13
**passive-risk-bearing** [1] - 107:23
**past** [6] - 95:16, 120:10, 123:8, 124:11, 143:3, 166:10
**patent** [14] - 47:7, 47:15, 49:24, 50:11, 50:17, 51:4, 52:10, 53:8, 54:23, 54:25, 64:9, 64:13, 64:22
**patents** [7] - 45:8, 45:11, 45:12, 51:15, 53:4, 64:21, 175:5
**PAUL** [1] - 2:17
**Paul** [3] - 186:3, 186:14, 186:15
**pay** [13] - 14:16, 15:3, 29:16, 32:9, 95:7, 95:10, 105:20, 105:23, 106:3, 116:11, 151:18, 151:21
**paycheck** [1] - 27:16
**paying** [5] - 101:18, 104:22, 147:4, 152:3, 158:25
**payment** [28] - 20:25, 82:21, 96:16, 97:23, 100:11, 101:3, 105:15, 108:24, 109:21, 121:24, 129:4, 129:15, 129:16, 129:17, 129:25, 130:1, 130:21, 131:8,

131:10, 136:19,
138:13, 174:18,
175:3, 175:18,
178:20, 178:22,
179:9
**payments** [6] - 96:1,
101:4, 101:5,
102:19, 108:16,
178:19
**payoff** [5] - 31:24,
31:25, 32:1, 32:2,
32:3
**PDF** [24] - 3:21, 9:5,
9:10, 9:18, 13:10,
20:10, 21:18, 35:17,
39:25, 44:4, 44:5,
48:12, 48:24, 52:9,
52:23, 56:22, 56:25,
57:5, 58:21, 65:3,
68:12
**PDKS** [1] - 119:3
**Peat** [1] - 69:3
**pending** [2] - 45:12,
146:13
**Pennsylvania** [1] -
1:17
**people** [17] - 5:25,
6:22, 24:20, 42:11,
45:5, 87:23, 106:15,
108:12, 133:5,
133:7, 145:19,
146:4, 146:5,
178:23, 182:24,
183:2, 183:3
**per** [6] - 120:22,
155:7, 160:22,
163:25, 170:16
**perceived** [4] - 22:16,
103:12, 104:14,
150:8
**percent** [98] - 66:3,
66:4, 93:20, 96:5,
96:6, 99:8, 101:16,
115:16, 115:17,
116:2, 116:3, 116:4,
116:7, 116:8, 126:8,
130:17, 130:23,
131:1, 131:12,
133:13, 133:15,
133:16, 133:19,
135:23, 136:18,
137:17, 138:2,
138:3, 138:15,
139:10, 139:20,
140:1, 141:4, 149:2,
149:16, 149:19,
149:21, 150:11,
153:16, 153:18,
153:25, 154:2,
154:9, 154:10,

157:6, 157:8,
157:20, 157:23,
158:12, 159:13,
159:14, 159:15,
160:18, 160:20,
160:21, 161:25,
162:19, 162:22,
162:23, 163:24,
163:25, 166:5,
168:4, 168:14,
169:24, 170:2,
171:3, 171:6, 171:7,
171:18, 171:19,
171:20, 172:1,
172:3, 172:15,
172:18, 172:20,
172:22, 174:1,
174:5, 176:7, 176:8,
176:10, 176:16,
177:19, 177:25,
178:3, 178:23,
179:5, 179:10,
179:11
**percentage** [9] -
159:9, 159:12,
159:14, 159:15,
160:3, 161:1,
163:24, 168:9,
169:25
**percentages** [1] -
112:7
**percentile** [2] - 134:4,
134:5
**perceptions** [1] -
165:18
**perfect** [1] - 4:1
**perfectly** [1] - 145:14
**perform** [8] - 75:15,
76:7, 80:18, 81:16,
84:21, 122:8,
132:13, 175:9
**performance** [5] -
73:6, 84:3, 87:25,
120:16, 120:18
**performed** [5] - 81:17,
86:11, 87:23, 91:10,
94:2
**performing** [2] -
88:22, 107:17
**perhaps** [1] - 46:24
**period** [21] - 7:16,
12:19, 13:2, 53:18,
54:12, 80:24,
104:25, 112:23,
114:23, 115:6,
119:13, 129:21,
130:22, 136:20,
138:21, 141:23,
149:20, 156:2,
156:12, 159:24,

176:9
**PERRIGO** [1] - 1:4
**Perrigo** [224] - 7:19,
8:5, 8:11, 9:17, 9:24,
10:11, 12:11, 12:12,
13:23, 14:14, 14:17,
14:20, 20:5, 20:13,
20:16, 22:8, 22:20,
25:12, 25:17, 25:19,
25:20, 26:9, 26:12,
26:17, 26:19, 26:20,
26:21, 27:2, 27:7,
28:13, 28:17, 28:24,
29:9, 29:23, 30:2,
30:20, 32:9, 32:11,
32:15, 32:21, 32:25,
33:3, 33:7, 33:9,
33:16, 33:19, 33:20,
35:1, 35:22, 38:11,
40:4, 40:5, 45:2,
46:15, 50:2, 50:7,
50:20, 53:23, 54:17,
58:3, 59:22, 64:6,
65:25, 66:5, 74:13,
74:18, 74:19, 75:8,
80:20, 81:6, 81:10,
81:12, 81:13, 81:16,
82:2, 82:10, 82:19,
82:25, 83:4, 83:6,
83:10, 83:24, 84:3,
84:6, 84:12, 84:15,
84:21, 86:9, 86:11,
87:16, 87:17, 87:20,
87:25, 88:22, 88:23,
89:3, 89:9, 89:10,
89:18, 90:11, 90:16,
90:21, 90:24, 91:9,
91:15, 92:12, 92:14,
92:21, 93:8, 94:1,
94:2, 94:25, 95:4,
95:5, 96:4, 97:2,
97:22, 99:22, 100:4,
100:25, 101:6,
101:15, 101:22,
101:25, 102:10,
102:15, 102:23,
103:7, 103:12,
103:15, 103:24,
104:1, 104:14,
105:16, 109:21,
110:3, 110:21,
111:3, 111:4,
111:15, 112:1,
112:5, 112:18,
112:20, 112:25,
113:1, 113:12,
113:17, 114:24,
115:7, 115:16,
115:17, 115:20,
115:24, 116:1,
116:2, 116:5,

116:11, 116:17,
116:18, 117:6,
117:7, 117:11,
117:12, 119:3,
119:23, 120:17,
120:18, 121:10,
121:13, 122:1,
123:18, 123:22,
124:6, 124:8,
124:10, 124:13,
125:4, 125:15,
126:1, 126:5, 126:8,
126:10, 126:16,
126:21, 127:12,
129:1, 129:4,
129:15, 129:20,
129:24, 130:4,
131:13, 135:11,
135:18, 136:15,
136:17, 138:11,
138:12, 138:14,
138:20, 140:6,
140:7, 141:10,
142:25, 149:21,
150:8, 151:17,
151:21, 152:2,
161:19, 162:5,
167:11, 175:14,
181:12
**Perrigo's** [23] - 8:9,
11:5, 19:20, 19:22,
20:20, 50:4, 57:13,
80:22, 83:12, 85:19,
95:1, 101:2, 111:16,
112:15, 112:16,
124:18, 130:17,
139:11, 140:2,
149:17, 153:15,
166:16, 171:5
**person** [2] - 24:16,
24:18, 24:23, 31:2,
31:3, 32:5, 33:15,
45:6, 45:10, 161:9,
183:12
**perspective** [17] -
4:24, 14:7, 14:20,
15:4, 15:24, 16:3,
17:7, 27:15, 27:18,
28:1, 79:10, 83:15,
95:13, 95:14,
106:17, 108:23,
129:12
**Pfizer** [2] - 17:16, 28:2
**PH** [1] - 47:22
**Ph.D** [1] - 68:21
**pharma** [2] - 17:2,
17:5
**pharmaceutical** [11] -
18:6, 18:7, 64:20,
71:5, 71:8, 71:11,

71:13, 71:14, 71:18,
101:7, 101:8
**pharmacist** [1] -
166:15
**pharmacy** [3] -
166:12, 166:14,
166:19
**phenomenally** [1] -
164:2
**physical** [2] - 6:2,
24:17
**pick** [4] - 3:9, 3:16,
96:13, 122:16
**picked** [1] - 8:18
**piece** [5] - 24:14, 36:8,
81:18, 107:20,
127:24
**pieces** [2] - 9:9, 127:5
**pills** [1] - 101:18
**pin** [1] - 104:11
**pipe** [9] - 165:4, 165:7,
165:14, 165:17,
165:22, 166:2,
166:3, 166:7, 166:10
**PITLP** [4] - 14:16,
16:11, 116:24, 117:1
**place** [3] - 82:22,
92:10, 167:6
**placeholder** [1] -
155:11
**Plaintiff** [2] - 1:5, 2:4
**Plaintiff's** [2] - 57:3,
111:6
**plaintiffs** [1] - 53:2
**plan** [2] - 150:17,
182:11
**planning** [5] - 69:16,
94:15, 144:10,
150:22, 151:4
**plant** [1] - 107:20
**play** [2] - 17:21, 62:2
**played** [1] - 110:20
**plea** [1] - 181:2
**pleased** [1] - 31:12
**plug** [1] - 138:5
**plural** [1] - 172:8
**plus** [10] - 85:15,
101:19, 115:16,
116:3, 130:18,
131:3, 138:15,
152:6, 168:24,
169:25
**pocket** [7] - 15:25,
16:1, 16:2, 65:17,
65:18
**pods** [2] - 80:8, 80:9
**point** [42] - 4:12, 4:13,
8:15, 10:7, 12:20,
21:16, 22:21, 29:4,
30:25, 31:5, 31:23,

32:7, 32:14, 36:12, 46:8, 47:14, 56:24, 59:6, 73:18, 76:11, 104:7, 108:3, 116:13, 121:7, 122:16, 127:11, 131:15, 136:10, 138:4, 139:1, 142:14, 150:4, 157:2, 157:4, 159:10, 159:11, 162:3, 163:14, 164:5, 165:2, 165:3, 173:8
**pointless** [1] - 41:20
**points** [6] - 18:15, 22:16, 50:10, 50:15, 114:10, 144:23
**policies** [1] - 73:11
**policy** [4] - 105:6, 105:22, 109:7, 110:16
**portfolio** [6] - 83:5, 83:8, 83:9, 83:11, 83:13, 83:19
**portion** [3] - 79:13, 85:3, 85:4
**position** [1] - 62:17
**positive** [2] - 62:11, 103:24
**possibility** [1] - 178:18
**possible** [6] - 6:4, 45:24, 46:3, 46:19, 179:22, 181:19
**possibly** [1] - 117:12
**post** [1] - 154:6
**potential** [35] - 10:13, 10:15, 11:9, 11:12, 11:16, 18:11, 19:23, 21:13, 22:10, 23:4, 23:19, 24:13, 25:14, 25:24, 26:23, 27:7, 27:8, 29:18, 30:3, 31:6, 46:17, 51:25, 65:25, 78:10, 81:2, 83:7, 83:17, 83:18, 109:7, 115:8, 142:19, 149:22, 159:2, 166:25
**potentially** [3] - 34:9, 102:21, 167:2
**power** [1] - 125:13
**practice** [1] - 28:8
**practitioner** [6] - 6:16, 72:1, 152:25, 179:19
**practitioners** [1] - 107:6
**precise** [6] - 21:5, 22:13, 41:5, 104:23,

168:25, 172:12
**precisely** [2] - 5:10, 69:8
**preclosing** [1] - 57:19
**predicated** [1] - 80:17
**prefer** [1] - 178:22
**preferable** [1] - 104:17
**preference** [3] - 102:4, 102:8, 103:1
**preferences** [2] - 7:15, 102:11
**prefers** [1] - 102:6
**premise** [1] - 169:11
**premium** [4] - 104:21, 105:21, 179:13
**premiums** [1] - 106:2
**prepare** [1] - 47:1
**prepared** [7] - 47:3, 63:19, 71:1, 87:7, 94:11, 141:16, 186:10
**preparing** [1] - 159:1
**prescription** [4] - 163:3, 166:13, 166:20
**present** [9] - 46:20, 148:23, 149:1, 170:10, 175:19, 175:20, 175:24, 176:25, 178:2
**presentation** [1] - 7:24
**presentations** [2] - 76:21, 144:22
**presents** [1] - 146:11
**presiding** [1] - 3:5
**pressure** [1] - 58:7
**presume** [1] - 51:2
**pretend** [3] - 95:3, 95:4, 138:2
**pretends** [1] - 179:22
**pretty** [8] - 69:18, 81:4, 123:7, 125:8, 134:20, 175:10, 177:3, 177:4
**previous** [1] - 8:9
**previously** [3] - 71:4, 168:14, 170:15
**price** [69] - 29:12, 71:25, 74:21, 75:7, 75:10, 77:14, 78:3, 79:2, 79:5, 82:13, 86:5, 88:17, 88:25, 90:10, 91:5, 92:5, 93:25, 94:17, 95:5, 96:2, 97:15, 97:23, 98:19, 99:2, 106:7, 107:18, 108:21, 109:18, 112:23, 114:1, 118:20,

119:6, 119:11, 119:12, 123:12, 123:13, 123:17, 125:13, 127:7, 127:10, 128:14, 130:12, 140:6, 147:15, 150:23, 151:18, 151:21, 151:23, 152:4, 152:5, 152:20, 155:12, 155:13, 155:20, 159:16, 161:18, 162:4, 162:5, 162:17, 166:5, 171:24, 172:18, 174:14, 175:24, 177:23, 179:23
**Price** [2] - 48:18, 64:1
**prices** [15] - 69:24, 72:21, 72:23, 72:24, 73:9, 78:1, 80:11, 112:6, 112:8, 112:11, 113:12, 113:24, 137:4, 161:13, 163:1
**pricing** [75] - 27:11, 65:11, 69:10, 69:11, 69:18, 69:21, 70:2, 70:5, 70:10, 71:15, 71:25, 72:6, 72:10, 72:16, 72:17, 72:25, 73:2, 73:10, 73:20, 73:24, 75:6, 77:6, 77:12, 77:22, 79:1, 79:23, 84:23, 87:5, 87:11, 88:4, 90:14, 91:25, 92:10, 100:25, 101:5, 106:17, 106:18, 107:6, 107:11, 107:24, 108:4, 112:5, 112:10, 112:15, 112:20, 112:22, 113:7, 113:16, 113:18, 114:13, 114:15, 115:10, 117:2, 120:12, 123:9, 123:24, 124:11, 124:11, 126:23, 131:20, 134:6, 137:11, 137:21, 137:24, 151:10, 152:24, 160:1, 160:14, 163:1, 163:2, 177:7, 178:14, 179:19
**Prilosec** [14] - 4:2, 4:7, 4:15, 4:21, 7:23, 8:2, 113:10, 113:11,

147:22, 148:7, 156:4, 157:10, 161:1, 163:19
**Prilosec's** [1] - 159:12
**primarily** [6] - 71:18, 72:3, 81:17, 118:16, 142:4, 144:9
**primary** [7] - 12:10, 13:11, 13:21, 46:7, 82:6, 148:22, 149:24
**principal** [1] - 123:15
**principles** [2] - 72:10, 72:11
**print** [1] - 183:8
**priority** [4] - 10:3, 10:4, 10:6
**probability** [2] - 66:3, 66:4
**problem** [1] - 39:21
**problematic** [1] - 121:7
**procedure** [2] - 177:15, 177:17
**proceed** [2] - 67:18, 74:1
**proceeding** [1] - 70:10
**Proceeding** [4] - 3:2, 67:9, 122:22, 184:4
**Proceedings** [1] - 1:12
**proceedings** [3] - 70:18, 73:16, 186:8
**Process** [1] - 61:1
**process** [17] - 5:14, 29:19, 31:9, 31:14, 31:18, 34:11, 34:19, 51:24, 102:13, 102:16, 104:1, 114:24, 121:15, 125:25, 146:8, 146:10, 147:16
**produce** [6] - 107:18, 125:3, 138:21, 143:1, 164:17, 176:16
**produced** [4] - 58:24, 76:20, 142:6, 143:4
**producer** [1] - 182:22
**producers** [1] - 110:21
**produces** [2] - 98:19, 141:6
**producing** [1] - 148:12
**product** [74] - 4:10, 4:18, 5:23, 8:4, 11:5, 11:22, 11:25, 19:24, 20:1, 20:14, 22:17, 29:6, 29:10, 30:1, 32:12, 32:21, 33:6, 34:9, 34:12, 34:19,

35:15, 36:25, 38:21, 38:25, 39:10, 39:24, 40:16, 50:6, 50:7, 59:7, 64:6, 64:7, 64:10, 66:1, 80:12, 81:21, 85:3, 85:7, 86:2, 86:14, 100:13, 102:22, 104:2, 110:15, 110:17, 110:18, 113:10, 113:20, 113:21, 113:22, 114:2, 114:16, 121:11, 121:12, 121:17, 124:19, 124:24, 125:5, 125:6, 125:24, 127:24, 132:25, 154:4, 160:19, 162:9, 162:10, 165:10, 165:19, 165:21, 166:17, 167:17, 169:2
**productive** [4] - 15:1, 15:2, 16:17, 125:21
**products** [23] - 6:21, 8:4, 44:16, 80:1, 80:8, 83:5, 83:8, 83:18, 83:20, 102:5, 107:18, 112:13, 116:5, 116:6, 116:8, 119:14, 125:16, 125:17, 145:10, 150:10, 152:10, 152:13
**professionals** [1] - 62:10
**Professor** [1] - 46:6
**professor** [2] - 7:11, 46:14
**professors** [2] - 7:8, 7:9
**proffered** [1] - 41:15
**profile** [3] - 25:21, 25:23, 33:19
**profit** [39] - 17:19, 17:25, 18:1, 18:3, 18:4, 18:5, 18:8, 19:11, 19:23, 23:19, 24:13, 25:14, 26:23, 29:18, 31:5, 83:7, 86:1, 95:1, 96:3, 101:14, 101:20, 101:22, 112:21, 134:10, 134:19, 134:21, 134:24, 135:25, 136:6, 136:17, 139:11, 143:25, 149:22, 159:7, 159:8,

159:12, 161:1, 161:16
**profitable** [1] - 120:3
**profits** [24] - 89:14, 109:21, 110:9, 111:3, 111:5, 113:1, 113:13, 122:1, 128:11, 131:6, 131:7, 131:19, 132:24, 135:6, 138:21, 144:17, 159:6, 159:16, 160:7, 161:21, 171:6, 175:13, 177:20, 177:21
**program** [3] - 11:7, 109:24, 110:5
**programs** [1] - 7:8
**progressing** [1] - 61:25
**project** [3] - 110:8, 154:19, 154:23
**projected** [1] - 156:22
**projection** [2] - 23:6, 159:5
**projections** [10] - 22:23, 41:19, 112:2, 113:4, 139:13, 147:9, 149:5, 149:6, 167:11
**projects** [1] - 178:10
**promise** [2] - 9:9, 181:9
**pronged** [1] - 137:3
**pronounce** [1] - 132:5
**property** [8] - 71:3, 78:5, 78:6, 78:8, 78:9, 135:4, 174:23, 175:4
**proportion** [1] - 141:14
**proposition** [2] - 178:16, 178:18
**prospects** [1] - 162:9
**proven** [1] - 49:21
**proves** [1] - 178:15
**provide** [12] - 14:12, 19:13, 72:8, 75:7, 75:9, 83:16, 110:15, 134:3, 140:20, 145:6, 173:23, 176:4
**provided** [6] - 49:1, 49:9, 90:20, 113:11, 144:22, 155:10
**provider** [3] - 156:1, 159:11, 160:22
**providers** [1] - 127:21
**provides** [3] - 90:19, 133:9, 152:15
**providing** [3] - 128:4,

147:17, 151:17
**provision** [1] - 89:5
**provisions** [3] - 75:18, 174:19, 186:5
**proxy** [1] - 155:10
**public** [9] - 35:1, 35:12, 35:14, 36:7, 39:23, 40:15, 41:16, 42:1, 43:17
**publicly** [2] - 35:2, 76:25
**published** [1] - 72:7
**PUKAL** [1] - 119:23
**pull** [24] - 3:20, 3:25, 12:22, 13:6, 31:10, 48:2, 61:3, 61:4, 63:18, 91:3, 93:3, 102:2, 137:12, 137:13, 153:9, 153:10, 155:25, 156:1, 156:7, 156:12, 158:8, 163:18, 166:3, 177:14
**pulled** [2] - 157:25, 164:21
**pulling** [4] - 87:6, 93:4, 157:3, 158:1
**pulls** [1] - 159:10
**pump** [1] - 141:11
**pumps** [1] - 159:15
**punch** [1] - 136:2
**purchase** [7] - 89:2, 107:15, 113:21, 118:11, 165:16, 174:23, 174:24
**purchased** [1] - 32:5
**purchases** [2] - 132:21, 168:24
**pure** [2] - 107:22, 128:8
**purely** [1] - 137:22
**purportedly** [1] - 15:9
**purpose** [8] - 15:2, 98:10, 99:1, 142:23, 153:5, 167:14, 174:13, 174:17
**purposes** [10] - 94:9, 94:14, 94:16, 116:23, 144:10, 145:1, 156:11, 161:10
**pursuant** [1] - 186:5
**pursue** [1] - 19:14
**pursues** [1] - 88:20
**push** [1] - 113:20
**pushed** [2] - 126:14, 181:8
**pushing** [1] - 160:8
**put** [17] - 8:17, 17:24,

20:9, 27:16, 32:12, 68:13, 77:19, 78:18, 92:10, 110:18, 129:7, 142:18, 146:14, 164:7, 165:23, 178:12, 181:21
**puts** [1] - 167:3
**putting** [4] - 18:4, 25:11, 51:14, 117:14
**puzzle** [1] - 24:14

**Q**

**qualified** [3] - 36:9, 41:16, 73:15
**quality** [1] - 84:14
**quarter** [2] - 120:22
**quartile** [2] - 134:3, 134:4
**quasi** [1] - 134:22
**questions** [10] - 16:14, 27:11, 30:21, 36:11, 38:20, 62:3, 62:4, 120:6, 137:9, 150:15
**quicker** [1] - 53:25
**quickly** [5] - 19:19, 141:17, 153:12, 165:19, 171:8
**quite** [8] - 23:10, 94:22, 120:8, 146:2, 154:25, 156:5, 160:21, 167:5
**quote** [2] - 46:6, 126:7
**quote-unquote** [1] - 126:7

**R**

**R&D** [14] - 7:6, 17:10, 17:12, 18:8, 18:17, 18:20, 18:25, 79:12, 79:15, 106:25, 107:2, 107:3, 107:4, 110:8
**radically** [2] - 152:16, 154:10
**Ragu** [4] - 92:17, 126:13, 126:14, 126:24
**raise** [1] - 113:12
**raised** [4] - 40:6, 113:23, 113:25, 115:1
**ramifications** [1] - 73:4
**range** [6] - 70:17, 71:2, 76:19, 82:9, 134:6, 140:16
**rank** [1] - 134:12

**rapid** [2] - 121:17, 164:25
**Rapids** [3] - 1:11, 2:3, 186:18
**rate** [38] - 93:19, 93:20, 99:8, 130:6, 132:23, 139:4, 139:6, 139:10, 139:16, 139:20, 139:25, 140:9, 148:24, 149:2, 149:4, 149:14, 149:17, 150:1, 150:11, 158:8, 158:11, 171:18, 171:25, 172:10, 172:14, 172:21, 172:24, 174:9, 175:22, 175:25, 176:6, 177:9, 177:18, 177:25, 178:5, 178:20, 179:4, 179:13
**rates** [5] - 171:22, 172:14, 174:12, 176:19, 178:11
**rather** [12] - 12:20, 19:24, 29:24, 29:25, 72:23, 89:1, 98:13, 117:4, 123:14, 166:20, 178:3, 179:1
**ratio** [3] - 136:16, 172:2, 178:1
**rational** [3] - 29:18, 30:1, 34:23
**razor** [2] - 80:10
**razors** [2] - 80:7, 80:13
**re** [1] - 81:8
**reach** [4] - 30:24, 60:13, 93:22, 163:17
**reached** [1] - 20:19
**reaction** [1] - 112:9
**read** [10] - 49:2, 57:11, 59:3, 59:4, 74:5, 112:9, 127:1, 151:24, 168:1, 181:18
**readily** [2] - 156:13, 161:6
**reading** [2] - 46:2, 182:12
**reads** [1] - 44:13
**ready** [3] - 3:8, 67:11, 131:17
**real** [10] - 35:10, 36:19, 39:3, 40:9, 42:13, 81:24, 133:5, 153:20, 159:2, 161:12

**reality** [2] - 23:1, 41:15
**realize** [2] - 19:24, 168:15
**realized** [3] - 176:13, 176:14, 176:20
**really** [48] - 5:1, 5:12, 16:18, 20:24, 21:3, 21:15, 22:13, 24:7, 27:22, 29:11, 32:11, 34:11, 38:14, 40:2, 41:20, 45:1, 46:12, 58:5, 69:8, 75:5, 78:18, 80:3, 82:1, 84:19, 84:20, 85:18, 89:20, 103:21, 107:22, 112:10, 123:20, 124:1, 124:5, 127:3, 138:10, 141:3, 154:14, 154:18, 154:21, 155:5, 156:11, 159:18, 169:2, 170:4, 176:2, 177:5, 183:13
**reason** [9] - 6:19, 27:14, 61:24, 69:8, 82:6, 88:7, 109:9, 148:5, 177:16
**reasonable** [15] - 23:17, 79:19, 82:24, 89:11, 89:22, 89:23, 97:17, 98:13, 130:19, 133:15, 135:25, 139:15, 154:2, 174:8, 177:5
**reasonableness** [1] - 91:18
**reasons** [5] - 25:18, 33:6, 50:22, 91:9, 148:24
**receipt** [1] - 100:12
**receive** [5] - 85:8, 90:11, 90:22, 126:22, 162:6
**received** [4] - 68:18, 68:19, 68:21, 138:23
**receiving** [1] - 176:18
**recent** [1] - 97:25
**recently** [1] - 183:12
**recess** [3] - 67:7, 122:20, 184:3
**Recess** [2] - 67:8, 122:21
**recognize** [1] - 160:11
**recognized** [2] - 18:2, 81:14
**recollection** [6] - 5:16, 5:17, 5:22, 8:11, 59:21, 60:5
**recommendation** [1] -

167:1

**recoop** [1] - 152:23

**record** [6] - 43:8, 63:17, 63:24, 76:11, 133:22, 174:5

**recorded** [1] - 14:18

**recount** [1] - 66:2

**recover** [1] - 19:25

**recross** [1] - 66:23

**red** [4] - 53:15, 87:24, 88:1, 153:21

**Reddy** [20] - 28:15, 28:16, 28:24, 29:7, 29:9, 29:19, 30:20, 30:25, 31:19, 31:23, 32:5, 32:6, 32:14, 32:19, 33:3, 33:10, 33:12, 33:15, 33:21

**Reddy's** [4] - 29:14, 111:18, 111:22, 111:23

**redirect** [3] - 63:11, 63:12, 63:13

**Redirect** [1] - 185:5

**REDIRECT** [1] - 63:15

**reduced** [1] - 113:15

**reduction** [3] - 101:15, 101:17, 112:11

**reductions** [1] - 112:23

**refer** [7] - 13:1, 65:1, 72:3, 72:4, 87:2, 102:3, 130:7

**reference** [3] - 22:3, 51:17, 121:6

**referenced** [4] - 47:24, 125:16, 125:19, 141:1

**references** [1] - 9:5

**referencing** [1] - 151:9

**referred** [4] - 61:7, 69:15, 72:1, 73:1

**referring** [14] - 40:6, 52:14, 54:3, 54:4, 58:12, 59:18, 61:10, 61:15, 98:2, 107:22, 143:19, 150:25, 153:9, 163:25

**reflect** [7] - 75:17, 76:8, 78:1, 112:10, 124:17, 126:9, 172:10

**reflected** [5] - 13:2, 68:11, 74:22, 158:6, 170:17

**reflecting** [1] - 13:3

**refresh** [1] - 44:12

**reg** [1] - 178:14

**regard** [15] - 50:6, 50:16, 74:24, 81:24,

82:1, 82:23, 85:20, 86:8, 86:10, 96:19, 116:19, 117:7, 124:1, 172:13

**regarding** [17] - 16:14, 47:23, 65:23, 72:10, 72:13, 76:22, 80:22, 81:9, 86:6, 87:4, 87:11, 91:22, 93:22, 118:10, 121:2, 128:14, 145:24

**regardless** [2] - 27:21, 101:12

**regs** [4] - 150:24, 150:25, 175:17, 179:4

**regular** [1] - 147:20, 163:3

**regularly** [2] - 81:6, 145:10

**regulations** [10] - 71:22, 71:23, 72:1, 72:14, 77:18, 130:7, 131:21, 136:4, 174:19, 180:18

**regulatory** [12] - 6:1, 6:6, 6:7, 6:9, 6:12, 42:8, 42:9, 42:11, 42:16, 43:22, 121:14, 125:25

**rehabilitated** [1] - 118:5

**reimbursed** [2] - 84:9, 129:24

**relate** [1] - 103:2

**related** [17] - 70:5, 72:20, 77:19, 77:21, 85:18, 85:19, 86:13, 106:20, 107:1, 116:21, 127:20, 131:24, 132:2, 134:22, 134:25, 174:23

**relates** [1] - 91:4

**relating** [2] - 64:5, 71:5

**relationship** [3] - 30:20, 82:13, 121:10

**relationships** [3] - 92:16, 125:8, 127:4

**relative** [13] - 73:6, 92:11, 102:11, 111:25, 112:2, 114:1, 134:13, 135:15, 142:11, 146:20, 162:6, 170:17, 176:12

**relatively** [5] - 5:7, 20:1, 63:12, 128:23, 148:25

**released** [2] - 84:16, 101:5

**relevance** [2] - 101:25, 117:14

**relevant** [4] - 68:23, 70:13, 116:16, 151:10

**reliability** [2] - 134:13, 169:5

**reliable** [7] - 93:24, 123:12, 136:2, 148:14, 153:21, 164:6, 179:16

**reliance** [3] - 94:7, 140:20, 147:18

**relied** [5] - 21:21, 51:20, 112:3, 140:24, 153:19

**relief** [1] - 52:9

**relies** [3] - 97:19, 109:3, 141:20

**relieved** [1] - 115:17

**rely** [8] - 7:19, 58:2, 123:16, 127:20, 142:25, 145:4, 145:21, 159:1

**relying** [6] - 127:22, 147:10, 155:19, 156:9, 158:17, 165:6

**remainder** [1] - 99:2

**remaining** [9] - 12:24, 13:25, 20:21, 83:19, 91:8, 92:13, 100:10, 182:5

**remarkable** [3] - 125:1, 125:8, 126:1

**remember** [9] - 5:19, 30:11, 31:16, 35:1, 64:8, 115:14, 123:23, 126:15, 173:1

**reminded** [2] - 54:8, 56:24

**removed** [3] - 83:17, 134:16, 134:20

**renegotiating** [1] - 120:14

**renew** [2] - 76:2, 180:10

**Rennick** [1] - 183:5

**Rentals** [1] - 133:25

**RentCorp** [1] - 133:24

**repaid** [1] - 122:1

**repeated** [1] - 142:23

**report** [63] - 3:20, 3:22, 12:22, 13:7, 20:10, 21:18, 35:16, 36:5, 37:12, 37:21, 38:18, 39:15, 39:25, 42:14, 43:1, 43:13,

44:3, 46:13, 46:23, 61:22, 62:21, 65:2, 65:4, 66:2, 68:2, 68:4, 68:5, 68:7, 68:8, 68:9, 68:11, 68:13, 69:9, 71:4, 71:7, 74:5, 75:12, 75:14, 75:20, 75:24, 76:12, 87:1, 91:4, 93:4, 93:11, 93:23, 98:11, 99:19, 115:14, 117:21, 117:22, 117:24, 118:1, 118:15, 118:17, 118:25, 134:9, 136:24, 138:20, 140:12, 154:8, 180:14

**reported** [3] - 10:20, 118:12, 145:9

**REPORTED** [1] - 2:17

**Reporter** [2] - 186:3, 186:16

**REPORTER'S** [1] - 186:1

**reporting** [1] - 76:1

**reports** [4] - 69:16, 70:7, 115:15, 126:4

**represent** [2] - 56:12, 56:17

**representation** [1] - 61:14

**representations** [5] - 49:9, 49:19, 50:12, 51:1, 51:4

**represents** [1] - 165:13

**reps** [1] - 70:24

**request** [2] - 75:16, 181:16

**requested** [2] - 180:12, 180:15

**require** [6] - 64:24, 86:6, 101:11

**required** [2] - 89:6, 161:11

**requirements** [2] - 75:17, 76:8

**research** [3] - 69:5, 94:14, 146:7

**reservation** [1] - 106:16

**reservations** [6] - 73:23, 93:6, 95:18, 95:24, 137:9, 175:16

**residual** [2] - 136:5, 136:6

**resolution** [6] - 45:12, 55:2, 60:13, 183:19, 183:21, 183:24

**resolve** [2] - 79:7, 104:7

**resolved** [12] - 41:6, 44:14, 53:24, 55:5, 81:23, 82:20, 84:11, 95:12, 100:14, 115:4, 137:23, 138:1

**resources** [6] - 24:12, 24:21, 25:3, 27:6, 31:1, 105:23

**respect** [1] - 98:22, 103:2, 111:12, 136:22, 143:24, 143:25, 148:17, 150:19, 151:15, 151:17, 163:12

**respective** [1] - 150:20

**respond** [2] - 5:8, 75:12

**responding** [1] - 114:25

**response** [5] - 38:20, 52:8, 57:18, 68:6, 68:8

**responsibilities** [1] - 144:11

**responsibility** [3] - 17:11, 71:16, 170:14

**responsible** [1] - 148:12

**restarted** [2] - 109:25, 110:8

**restate** [1] - 43:11

**rested** [1] - 19:23

**restrictions** [4] - 40:20, 45:23, 46:2, 46:18

**restructuring** [1] - 69:16

**result** [20] - 82:2, 92:19, 93:7, 99:6, 108:24, 109:1, 115:10, 117:13, 120:15, 120:23, 120:24, 134:15, 135:6, 136:16, 140:5, 152:14, 152:24, 173:11, 174:2, 176:3

**resulted** [1] - 100:2

**resulting** [3] - 79:17, 93:12, 178:5

**results** [7] - 23:1, 93:10, 97:9, 103:16, 130:21, 140:2, 171:13

**resume** [1] - 130:11

**Resume** [3] - 3:2, 67:9, 122:22

retail [1] - 162:4
retailer [1] - 113:13
retailers [4] - 113:19, 113:20, 113:24, 165:16
retailers' [1] - 165:10
retained [3] - 71:10, 110:4, 138:14
retrial [1] - 183:23
return [31] - 23:13, 23:23, 25:16, 95:15, 102:14, 124:12, 126:9, 126:12, 126:20, 127:13, 128:10, 130:6, 130:16, 130:20, 130:21, 130:23, 131:13, 132:2, 132:23, 133:11, 133:12, 133:16, 136:4, 136:17, 138:13, 140:9, 141:9, 174:3
returns [6] - 78:8, 127:13, 132:1, 133:10, 133:12, 134:1
revealed [3] - 102:3, 102:8, 103:1
reveals [2] - 102:8, 102:10
Revenue [1] - 71:24
revenue [1] - 165:15
reverse [2] - 123:14, 171:17
review [13] - 41:5, 75:11, 77:13, 78:16, 99:21, 99:24, 114:8, 126:4, 140:12, 144:8, 144:21, 147:14, 149:18
reviewed [6] - 49:10, 54:13, 76:22, 147:7, 154:1, 160:9
reviewing [2] - 144:9, 150:16
revise [1] - 68:5
revised [3] - 68:4, 68:6, 158:23
reward [3] - 23:9, 23:11, 140:10
rewards [1] - 26:9
rich [1] - 31:2
Richard [1] - 117:24
RICHARD [3] - 2:13, 67:20, 185:4
rights [8] - 28:3, 29:5, 32:10, 32:16, 33:18, 174:25, 175:2, 175:7
rigor [5] - 78:11,

146:7, 146:11, 146:14, 147:17
risk [137] - 5:8, 12:7, 12:17, 13:4, 14:11, 14:19, 14:23, 15:10, 15:18, 16:18, 16:19, 16:23, 16:24, 17:18, 17:19, 17:22, 17:23, 19:9, 19:10, 19:24, 23:9, 23:11, 23:15, 23:23, 25:21, 25:23, 26:1, 26:21, 27:14, 27:17, 29:17, 33:12, 33:15, 33:16, 33:19, 40:18, 41:3, 41:11, 42:5, 45:3, 45:4, 45:6, 45:7, 46:16, 47:15, 58:4, 64:25, 65:6, 65:23, 66:19, 66:20, 78:14, 78:16, 78:17, 78:20, 78:21, 78:22, 78:23, 78:25, 79:3, 79:10, 79:19, 82:14, 82:24, 83:10, 83:12, 84:1, 84:20, 95:15, 97:21, 99:21, 100:3, 100:6, 100:11, 101:15, 101:17, 102:10, 103:11, 103:23, 105:7, 105:9, 105:11, 105:12, 106:4, 106:6, 106:8, 106:9, 106:11, 106:13, 106:16, 107:23, 108:17, 109:16, 109:17, 109:18, 109:19, 109:20, 110:3, 110:6, 114:4, 114:7, 114:11, 114:19, 115:11, 115:13, 116:10, 116:17, 120:3, 121:8, 129:11, 129:14, 137:23, 139:23, 140:9, 148:15, 148:17, 148:19, 148:20, 148:22, 149:20, 149:25, 150:9, 153:6, 160:8, 162:2, 174:2, 178:24, 178:25, 179:7
risk-adjusted [2] - 82:14, 179:7
risk-averse [1] - 178:25
risk-neutral [1] - 178:24

risked [1] - 31:23
riskier [2] - 179:8, 179:9
risks [82] - 12:11, 12:19, 12:24, 13:22, 13:25, 14:4, 17:7, 17:20, 18:8, 18:14, 18:20, 18:21, 19:7, 19:17, 20:20, 26:9, 30:6, 31:22, 49:24, 51:21, 55:1, 65:15, 77:11, 78:15, 79:6, 80:23, 81:5, 81:22, 82:1, 82:5, 82:8, 82:20, 82:21, 83:1, 83:2, 83:21, 84:10, 84:16, 85:1, 85:2, 85:5, 86:13, 90:15, 90:19, 90:21, 91:12, 95:12, 100:3, 100:12, 101:2, 101:6, 102:10, 102:11, 103:5, 103:6, 103:8, 104:14, 106:6, 106:21, 107:5, 107:25, 108:1, 108:11, 115:2, 115:18, 115:23, 120:17, 123:18, 124:3, 129:2, 131:4, 131:14, 138:1, 140:10, 149:11, 149:15, 150:8, 150:12, 179:20
risky [3] - 79:13, 83:20, 85:2
ROBERT [1] - 1:10
Robert [1] - 3:5
Robinson [1] - 55:25
robust [1] - 162:24
Rock [1] - 31:2
role [1] - 65:5, 65:23
roll [1] - 95:3
Ron [2] - 29:1, 29:4
round [1] - 41:14
routine [1] - 90:24
routinely [2] - 116:5, 149:21
row [39] - 91:7, 93:17, 93:18, 96:2, 96:9, 96:20, 97:9, 98:20, 99:3, 110:10, 111:5, 115:10, 116:20, 117:8, 123:10, 123:17, 123:25, 126:17, 126:20, 127:8, 127:9, 128:14, 137:24, 141:10, 144:20
sales [60] - 10:15, 11:16, 12:13, 20:23,

164:1, 169:22, 169:25, 170:19, 170:20, 170:21, 171:21, 172:5, 172:6, 172:23, 173:12, 183:3
rows [3] - 155:5, 158:14, 169:18
royalties [2] - 173:5, 174:12
royalty [34] - 93:19, 99:8, 101:11, 172:4, 172:14, 172:21, 172:23, 174:1, 174:5, 174:6, 174:8, 174:12, 174:15, 174:18, 175:3, 175:6, 175:18, 175:22, 175:25, 176:6, 176:18, 176:25, 177:9, 177:13, 178:5, 178:19, 179:8, 179:13
RPR [2] - 2:17, 186:15
RUBENSTEIN [1] - 2:6
rules [1] - 43:18
run [3] - 67:3, 108:12, 153:11
running [3] - 41:21, 57:13, 117:3
runs [1] - 65:6
rush [1] - 45:9
RX [4] - 166:6, 168:7, 168:8
Rx [1] - 166:13
Ryder [1] - 133:25

S

safely [1] - 41:17
safer [1] - 28:11
salaries [1] - 154:17
sale [37] - 75:8, 79:23, 80:17, 87:5, 87:11, 87:18, 88:4, 88:10, 89:3, 90:12, 91:6, 92:1, 92:4, 92:9, 92:20, 92:22, 93:1, 94:16, 96:6, 98:25, 99:3, 110:10, 111:5, 115:10, 116:20, 117:8, 123:10, 123:17, 123:25, 126:17, 126:20, 127:8, 127:9, 128:14, 137:24, 141:10, 144:20

21:14, 22:4, 22:10, 23:4, 28:17, 66:4, 66:5, 66:13, 81:2, 86:1, 88:3, 88:25, 89:16, 93:11, 93:12, 101:11, 110:17, 111:22, 111:24, 115:9, 123:13, 136:13, 137:5, 137:11, 137:15, 138:19, 141:5, 141:23, 142:5, 142:15, 142:19, 143:10, 143:24, 144:17, 145:20, 147:22, 148:7, 153:15, 156:4, 163:19, 164:4, 165:14, 166:18, 168:5, 171:19, 172:2, 175:21, 175:23, 177:14, 177:18, 178:2, 178:8, 179:2
sales-based [2] - 101:11
satisfied [1] - 145:25
savings [3] - 120:7, 161:23, 162:4
saw [12] - 37:9, 60:9, 62:21, 64:1, 83:5, 113:24, 115:5, 157:2, 160:5, 160:24, 166:23, 167:24
scaleup [1] - 31:22
scarce [1] - 25:3
scenario [9] - 106:4, 115:23, 115:24, 116:12, 123:11, 128:8, 140:8, 176:4, 179:8
scenarios [1] - 91:16
schedule [4] - 142:6, 142:16, 142:17, 181:8
scheduled [2] - 183:19, 183:20
schedules [1] - 129:23
scheme [1] - 94:19
school [5] - 5:18, 6:19, 6:25, 69:5, 69:6
schools [1] - 7:10
Schutt [39] - 29:1, 29:4, 97:5, 112:2, 112:3, 113:3, 113:6, 113:14, 141:21, 142:13, 143:3,

143:13, 144:11, 144:15, 146:16, 155:24, 157:25, 158:23, 158:24, 159:19, 159:22, 160:4, 160:9, 160:12, 160:19, 162:3, 162:11, 163:7, 163:11, 163:15, 164:14, 165:7, 166:12, 167:3, 167:22, 168:14, 169:2, 170:13, 171:1

**Schutt's** [8] - 29:1, 98:9, 98:17, 158:8, 165:5, 165:24, 166:23, 173:10

**Schwarz** [8] - 10:10, 10:22, 11:6, 11:22, 85:21, 155:6, 155:9, 155:10

**scintilla** [2] - 97:21, 109:20

**scope** [3] - 40:20, 47:11, 74:7

**scratch** [1] - 116:2

**screen** [12] - 9:12, 22:15, 48:2, 48:10, 61:5, 68:2, 68:13, 134:12, 142:18, 143:22, 155:5, 156:20

**screens** [1] - 183:22

**screwy** [2] - 177:15, 177:17

**scroll** [1] - 156:18

**SDA** [2] - 12:12, 13:24

**sea** [1] - 38:13

**seat** [1] - 183:4

**SEC** [7] - 35:4, 36:10, 40:20, 41:18, 41:24, 42:3, 43:18

**second** [27] - 10:6, 13:11, 13:20, 14:14, 26:7, 32:13, 44:18, 48:13, 48:25, 51:9, 63:25, 74:16, 75:9, 78:24, 82:8, 84:6, 94:6, 106:8, 118:23, 119:2, 125:14, 130:12, 134:16, 141:20, 159:19, 166:1, 173:5

**section** [5] - 7:25, 65:2, 65:5, 66:2, 71:24

**Section** [1] - 186:6

**secure** [1] - 45:8

**see** [106] - 3:7, 4:10,

9:16, 9:21, 9:23, 9:25, 10:3, 10:7, 10:13, 10:14, 10:17, 11:2, 11:6, 11:9, 11:13, 11:14, 11:17, 11:20, 11:21, 13:10, 14:2, 15:18, 21:19, 21:23, 27:18, 29:17, 29:25, 46:21, 47:20, 47:24, 49:11, 49:15, 49:17, 49:21, 51:10, 51:17, 52:23, 53:4, 53:12, 53:13, 53:15, 55:9, 55:19, 55:22, 56:4, 56:10, 56:18, 58:15, 58:23, 59:1, 60:1, 60:3, 60:11, 60:14, 60:15, 60:20, 60:23, 61:1, 61:4, 62:8, 65:7, 87:25, 101:6, 108:23, 112:9, 112:11, 121:5, 127:2, 127:3, 133:13, 134:12, 134:24, 141:22, 142:10, 143:7, 146:9, 146:10, 154:8, 154:25, 155:5, 155:22, 156:12, 156:21, 156:24, 158:7, 158:11, 159:14, 160:21, 160:25, 163:3, 163:23, 164:11, 166:5, 167:9, 167:17, 169:3, 170:1, 173:13, 176:6, 179:17, 181:11, 182:16, 182:19

**See** [1] - 10:4

**seeing** [5] - 5:19, 55:10, 59:25, 60:10, 125:10

**seek** [1] - 8:12

**seeking** [3] - 59:2, 59:3, 59:6

**seem** [1] - 28:10

**sees** [1] - 28:16

**segue** [2] - 116:13, 174:11

**selected** [1] - 97:20

**selective** [1] - 151:9

**sell** [6] - 6:21, 66:8, 88:17, 88:23, 135:17, 167:17

**seller** [2] - 88:19, 147:3

**sellers** [1] - 169:14

**selling** [1] - 18:18,

18:21, 19:1, 19:24, 112:1, 119:5, 121:12, 132:25

**sells** [1] - 107:14

**senior** [1] - 60:12

**sense** [3] - 28:4, 175:25, 178:21

**sensitivities** [4] - 134:8, 134:9, 134:11, 134:13

**sensitivity** [14] - 91:10, 91:17, 128:13, 128:18, 128:20, 128:25, 129:9, 129:13, 130:6, 130:11, 132:10, 133:20, 136:22, 136:23

**sentence** [11] - 13:11, 13:20, 20:9, 20:11, 35:19, 37:21, 37:24, 39:11, 46:11, 49:8, 53:3

**sentences** [1] - 46:13

**separate** [1] - 96:7

**September** [2] - 46:15, 63:6

**sequence** [1] - 135:25

**series** [2] - 56:9, 64:25

**serious** [1] - 183:20

**service** [3] - 14:12, 127:21, 128:4

**services** [6] - 69:20, 72:18, 80:5, 127:25, 128:1, 133:8

**Services** [1] - 133:24

**session** [3] - 3:4, 67:10, 122:23

**set** [14] - 12:4, 18:9, 46:12, 59:10, 65:22, 69:24, 73:8, 73:10, 106:24, 116:4, 175:16, 178:7, 186:9

**sets** [1] - 69:23

**setting** [3] - 17:8, 101:3, 116:9

**settled** [3] - 59:24, 62:19, 62:24

**settlement** [9] - 45:20, 45:24, 46:3, 46:17, 46:19, 56:16, 56:18, 56:19, 61:20

**seven** [2] - 149:19, 155:14

**seven-and-a-half** [1] - 149:19

**several** [3] - 22:15, 73:17, 105:1

**severely** [1] - 20:20

**SG&A** [11] - 96:20,

153:25, 154:3, 154:9, 154:15, 154:22, 169:25, 170:2, 171:17, 172:9

**sham** [4] - 53:23, 55:4, 59:23, 60:20

**share** [8] - 30:5, 125:11, 125:12, 129:19, 141:13, 150:5, 170:25, 171:5

**shared** [2] - 19:6, 21:6

**shareholder** [4] - 37:3, 37:6, 37:10, 40:22

**shareholders** [6] - 35:12, 35:14, 37:8, 37:15, 37:18, 41:17

**shares** [1] - 54:2

**sharing** [3] - 17:22, 17:23, 19:10

**sheds** [1] - 153:3

**sheet** [5] - 97:14, 119:23, 155:1, 157:3, 160:23

**shelf** [4] - 124:24, 125:23, 165:20, 166:21

**shell** [1] - 128:7

**shelves** [2] - 165:10, 165:11

**shift** [1] - 8:7

**shifted** [4] - 17:7, 18:8, 18:20, 19:6

**shifting** [6] - 12:7, 16:24, 17:18, 17:19, 83:8

**ship** [1] - 107:3

**shoebox** [3] - 27:17, 27:19

**shoes** [4] - 26:20, 104:15, 119:10, 167:16

**short** [3] - 63:12, 141:23, 155:25

**shorter** [1] - 176:9

**shortly** [1] - 142:7

**shot** [2] - 33:10, 39:7

**show** [3] - 21:19, 41:7, 159:12

**showed** [3] - 13:1, 63:25, 144:16

**showing** [1] - 145:19

**shows** [3] - 23:1, 91:8, 160:25

**side** [4] - 47:9, 47:19, 96:8, 136:15

**sides** [4] - 13:22, 30:20, 57:14, 182:25

**signal** [1] - 103:24

**signed** [14] - 35:22,

38:21, 53:16, 62:25, 63:3, 84:3, 84:13, 90:5, 98:16, 114:22, 146:25, 155:12, 173:19

**significance** [1] - 104:9

**significant** [19] - 19:19, 19:21, 19:25, 20:12, 20:13, 25:7, 25:14, 29:18, 34:9, 70:25, 73:7, 104:12, 115:11, 126:5, 128:3, 144:20, 165:24, 166:16, 167:18

**significantly** [2] - 112:25, 158:17

**signing** [1] - 100:5

**similar** [4] - 5:10, 74:23, 86:8, 132:2

**simple** [4] - 37:22, 43:11, 124:10, 124:15

**simplify** [1] - 39:7

**simply** [25] - 42:4, 77:23, 80:17, 86:19, 88:23, 89:1, 89:12, 108:13, 123:17, 128:9, 130:16, 132:12, 132:14, 133:2, 133:6, 134:5, 139:14, 140:11, 142:1, 142:21, 145:4, 145:21, 151:5, 152:6, 175:19

**single** [3] - 99:1, 167:18, 178:7

**site** [1] - 71:20

**sitting** [1] - 165:9

**situation** [4] - 15:14, 25:19, 106:5, 175:12

**six** [4] - 20:12, 101:16, 153:18, 155:13

**sizable** [1] - 45:7

**size** [1] - 21:15

**skews** [1] - 124:20

**skinny** [2] - 126:20, 141:9

**slide** [3] - 131:17, 173:1, 178:13

**slides** [1] - 180:6

**slight** [1] - 102:18

**slightly** [2] - 30:15, 141:7

**sliver** [1] - 129:14

**slow** [3] - 88:13, 96:11

**slower** [1] - 53:25

**small** [2] - 85:14, 139:23

**smart** [1] - 24:7
**so-called** [1] - 141:6
**sold** [8] - 8:5, 33:21, 80:1, 150:5, 155:8, 155:13, 170:13, 170:15
**Solomon** [4] - 33:10, 50:20, 60:4, 62:24
**solve** [3] - 41:24, 41:25, 90:1
**someone** [4] - 29:21, 33:14, 161:4, 161:7
**sometimes** [13] - 17:19, 24:20, 31:8, 31:13, 31:17, 72:19, 79:13, 79:14, 80:4, 80:8, 130:7, 183:18
**somewhere** [5] - 118:24, 140:15, 140:16, 149:18, 155:13
**soon** [2] - 53:24, 59:24
**sooner** [1] - 44:16
**sorry** [59] - 4:8, 4:17, 13:13, 13:14, 13:22, 16:24, 20:7, 22:1, 23:10, 25:22, 26:13, 31:25, 35:17, 36:21, 40:9, 41:25, 44:18, 46:1, 46:10, 46:11, 48:19, 48:25, 49:17, 56:3, 57:3, 69:12, 72:6, 88:24, 90:10, 90:16, 93:16, 94:1, 94:25, 95:4, 96:15, 97:22, 100:23, 103:16, 105:16, 111:4, 111:16, 112:2, 114:25, 116:2, 117:23, 124:17, 126:22, 129:2, 130:4, 135:2, 140:6, 141:4, 148:2, 154:7, 155:15, 157:21, 159:10, 170:24, 172:11
**sort** [10] - 3:16, 4:11, 5:13, 17:3, 51:3, 53:6, 53:16, 104:8, 137:22, 151:13
**sorts** [1] - 23:1
**sound** [2] - 22:4, 135:24
**sounds** [4] - 28:8, 30:23, 36:8, 180:20
**source** [8] - 14:22, 15:5, 15:6, 15:9, 15:11, 165:15, 166:11

**sourced** [1] - 47:23
**SOUTHERN** [1] - 1:3
**spanned** [1] - 69:15
**specialty** [2] - 16:23, 42:23
**specific** [3] - 6:2, 12:20, 20:3
**specifically** [3] - 19:21, 22:21, 51:18
**speed** [1] - 123:8
**spend** [3] - 57:21, 116:14, 124:7
**spending** [2] - 10:16, 11:19
**spirit** [1] - 182:21
**split** [8] - 101:14, 101:17, 134:21, 134:24, 135:25, 136:6, 136:17, 136:18
**splits** [2] - 134:10, 134:19
**spoilage** [1] - 170:23
**spreadsheet** [13] - 148:7, 148:12, 150:6, 153:11, 157:4, 158:1, 160:10, 165:6, 166:7, 166:9, 166:24, 167:6, 167:9
**spreadsheets** [1] - 148:18
**spring** [1] - 103:20, 104:20
**squeeze** [1] - 113:12
**staff** [1] - 63:19
**stand** [4] - 3:7, 39:24, 96:25, 147:25
**standard** [17] - 77:8, 77:10, 95:13, 113:17, 131:20, 134:5, 135:10, 136:3, 139:15, 149:13, 159:15, 159:23, 160:19, 168:10, 169:11, 171:3, 171:7
**standards** [1] - 76:9
**stands** [1] - 39:10
**stark** [1] - 177:4
**start** [16] - 47:9, 47:19, 49:14, 57:6, 67:16, 68:16, 74:4, 77:3, 87:6, 105:11, 121:4, 123:9, 141:16, 160:16, 178:8, 182:17
**started** [3] - 32:7, 100:9, 180:9
**starting** [2] - 142:15,

163:22
**starts** [1] - 65:6
**state** [5] - 66:7, 66:9, 66:16, 66:17
**statement** [29] - 3:19, 5:1, 5:4, 7:14, 7:23, 20:4, 38:1, 38:17, 38:23, 38:24, 39:12, 40:7, 40:11, 55:3, 64:11, 84:22, 110:13, 110:15, 111:8, 111:20, 112:16, 112:19, 113:23, 114:3, 114:12, 114:16, 125:3, 139:9, 162:2
**statements** [1] - 41:19
**states** [1] - 62:10
**States** [12] - 3:3, 19:23, 26:16, 70:10, 72:9, 81:22, 85:7, 87:19, 110:6, 124:18, 186:4, 186:6
**STATES** [2] - 1:1, 1:7
**Station** [1] - 2:13
**statistic** [6] - 104:3, 104:4, 104:8, 114:10, 125:9, 162:1
**statistical** [1] - 104:9
**statistics** [2] - 104:7, 114:11
**status** [8] - 40:16, 53:20, 54:11, 54:19, 56:10, 57:1, 61:20, 62:21
**stay** [5] - 19:16, 44:25, 45:14, 89:2, 183:8
**steady** [1] - 103:19
**step** [7] - 18:23, 26:20, 134:16, 146:20, 150:17, 169:4
**step-by-step** [1] - 169:4
**stepped** [2] - 119:9, 183:14
**steps** [2] - 135:25, 136:1
**stiffing** [1] - 66:10
**still** [20] - 3:23, 5:4, 5:12, 15:19, 21:18, 33:7, 46:15, 46:19, 57:3, 63:1, 63:6, 83:20, 100:19, 121:12, 148:9, 153:2, 156:9, 166:18, 167:14, 173:23
**stipulated** [4] - 47:5, 68:10, 68:11, 138:7
**stock** [1] - 124:20

**stock-keeping** [1] - 124:20
**stop** [3] - 129:5, 149:3, 166:2
**stopper** [1] - 41:7
**stopping** [1] - 122:16
**store** [8] - 4:17, 5:19, 5:23, 124:22, 160:3, 161:23, 162:4, 162:12
**stores** [1] - 165:12
**story** [1] - 39:14
**straightforward** [2] - 175:11, 177:4
**strategic** [1] - 76:20
**strategy** [2] - 62:8, 104:19
**stream** [1] - 178:19
**Street** [1] - 2:7
**strength** [1] - 162:9
**strengths** [1] - 165:18
**stretch** [3] - 126:10, 132:11, 135:7
**strictly** [1] - 18:3
**strong** [1] - 45:11
**structure** [2] - 18:11, 138:16
**structured** [1] - 105:15
**structures** [1] - 19:12
**stuck** [1] - 6:23
**student** [1] - 7:4
**studies** [1] - 103:10
**study** [6] - 6:18, 7:15, 73:3, 103:17, 103:18, 103:19
**studying** [4] - 5:20, 5:21, 6:20
**stuff** [2] - 13:8, 165:11
**submitted** [3] - 68:2, 70:6, 70:8
**subsidiaries** [1] - 16:11
**subsidiary** [1] - 16:2
**substantial** [22] - 40:5, 40:18, 41:3, 41:11, 42:5, 44:15, 45:25, 46:4, 46:8, 78:8, 121:14, 125:15, 131:5, 141:22, 142:11, 144:16, 144:17, 146:7, 156:5, 161:18, 170:1
**substantially** [4] - 103:7, 159:5, 161:20, 162:16
**succeeded** [1] - 32:6
**success** [1] - 34:13
**successful** [7] - 31:18, 31:20, 31:21,

32:16, 35:25, 36:15, 37:14
**successfully** [1] - 61:25
**succession** [1] - 121:17
**sue** [1] - 52:2
**sufficient** [2] - 140:23, 150:11
**suggest** [3] - 22:17, 27:13, 62:3
**suggests** [1] - 64:13
**suite** [1] - 71:17
**Suite** [1] - 1:20
**sum** [12] - 89:16, 130:1, 152:10, 172:19, 174:18, 175:2, 175:18, 177:12, 178:20, 178:22, 179:9
**summaries** [1] - 141:15
**summarize** [8] - 65:22, 68:24, 69:9, 70:13, 74:7, 76:17, 140:17, 179:15
**summarizes** [1] - 128:17
**summary** [10] - 77:2, 104:3, 104:4, 105:8, 114:10, 114:11, 125:9, 128:19, 153:8, 162:1
**sunk** [1] - 38:12
**sunny** [1] - 182:1
**supply** [2] - 80:14, 120:14
**support** [1] - 177:7
**supportable** [1] - 147:14
**suppose** [5] - 44:25, 46:6, 60:7, 66:1, 66:5
**supposed** [1] - 177:9
**surmise** [1] - 6:3
**surprise** [2] - 111:24, 112:5
**surrounding** [1] - 46:18
**swapping** [1] - 102:19
**sweep** [2] - 119:11, 133:4
**sweeps** [1] - 92:14
**switch** [1] - 123:5
**switches** [1] - 168:9
**sworn** [3] - 67:15, 67:17, 67:21
**synchronized** [1] - 145:10
**Systems** [1] - 133:25

**T**

**t-minus** [1] - 135:19
**tab** [9] - 150:7, 150:9, 153:13, 155:1, 155:20, 156:14, 156:15, 160:23, 163:5
**table** [8] - 9:23, 91:3, 93:3, 118:7, 118:9, 119:3, 135:12, 171:11
**tablet** [4] - 11:1, 11:4, 11:25, 155:7
**tablets** [3] - 110:10, 111:5, 167:3
**tabs** [1] - 154:24
**tail** [1] - 117:3
**tails** [1] - 152:14
**takeaway** [1] - 124:9
**talks** [6] - 22:3, 53:3, 60:19, 60:20, 60:22, 112:15
**tangible** [4] - 69:19, 78:9, 81:18, 124:8
**target** [1] - 143:15
**targeted** [1] - 44:17
**taught** [1] - 73:2
**Tax** [2] - 2:5, 2:12
**tax** [13] - 69:16, 70:4, 70:9, 72:25, 73:10, 106:25, 108:14, 108:15, 116:23, 123:21, 150:22, 151:4, 152:24
**taxpayer** [5] - 69:22, 69:24, 78:10, 138:6, 152:15
**taylor** [1] - 56:8
**team** [6] - 24:7, 59:25, 143:1, 145:11, 182:18, 182:22
**techniques** [1] - 71:17
**technology** [2] - 106:24, 135:1
**tedious** [1] - 183:1
**ten** [5] - 171:19, 172:3, 172:20, 177:24, 178:3
**tens** [3] - 105:4, 120:21, 152:10
**tentative** [1] - 44:1
**tenuous** [1] - 134:18
**term** [6] - 5:12, 6:2, 103:1, 162:15, 177:10, 177:17
**terminal** [4] - 93:13, 138:24, 139:3, 173:12
**termination** [1] - 62:1

**terms** [39] - 45:24, 46:2, 46:19, 57:17, 69:23, 74:10, 85:24, 86:2, 92:9, 92:11, 99:22, 100:2, 100:19, 100:24, 101:1, 101:5, 102:2, 102:19, 105:3, 107:17, 110:19, 114:19, 115:10, 120:10, 121:7, 134:12, 137:11, 137:18, 137:21, 137:24, 146:21, 149:1, 150:5, 151:9, 153:24, 168:25, 170:10, 173:14
**terrific** [2] - 163:19, 183:17
**tested** [2] - 131:24, 132:2
**testified** [7] - 8:14, 50:20, 67:21, 70:6, 70:19, 147:6, 155:24
**testify** [2] - 73:15, 78:14
**testimony** [22] - 4:3, 4:5, 10:11, 16:7, 21:9, 29:1, 51:23, 57:18, 57:24, 58:17, 65:14, 70:8, 94:1, 111:10, 113:3, 118:17, 124:17, 141:22, 142:17, 144:9, 162:7, 178:13
**tests** [2] - 129:9, 130:11
**text** [3] - 21:20, 21:22, 22:1
**THE** [61] - 1:1, 1:2, 1:10, 3:6, 8:24, 38:10, 41:14, 47:13, 48:6, 52:21, 57:12, 63:10, 63:14, 64:14, 66:22, 66:25, 67:2, 67:6, 67:11, 67:15, 67:19, 73:21, 74:1, 75:21, 75:25, 88:12, 88:15, 118:1, 118:3, 122:12, 122:15, 122:19, 122:24, 123:1, 171:15, 171:24, 172:1, 172:4, 172:5, 172:6, 172:7, 172:11, 172:16, 172:17, 172:25, 173:3, 180:2, 180:5, 180:8, 180:16, 180:20, 180:24, 181:10,

181:20, 182:1, 182:6, 182:8, 182:14, 183:7, 183:13, 183:16
**themselves** [6] - 59:8, 77:16, 101:5, 101:19, 132:25, 146:4
**theoretical** [1] - 118:10
**theory** [2] - 83:10, 117:16
**thereafter** [2] - 80:25, 159:25
**therefore** [7] - 6:4, 52:25, 83:9, 94:17, 113:13, 161:20, 162:5
**therefrom** [1] - 89:14
**they've** [5] - 8:6, 27:1, 33:20, 58:15
**thinking** [4] - 8:3, 62:15, 106:11, 164:18
**thinks** [1] - 151:10
**third** [24] - 14:9, 19:2, 28:14, 29:20, 74:20, 75:11, 79:2, 82:12, 84:4, 84:12, 84:13, 86:20, 88:11, 101:7, 105:20, 117:17, 121:21, 122:7, 127:20, 142:3, 142:4, 142:20, 144:19, 155:25
**third-party** [5] - 84:13, 101:7, 121:21, 144:19, 155:25
**THOMAS** [1] - 1:19
**thoughtful** [1] - 29:14
**thoughts** [1] - 35:21
**thousand** [3] - 86:17, 105:1, 121:25
**thousands** [1] - 120:22
**three** [10] - 18:24, 19:5, 51:15, 57:13, 103:21, 119:14, 157:7, 159:4, 170:11, 182:4
**three-way** [1] - 18:24
**threshold** [1] - 100:22
**throat** [1] - 131:11
**throughout** [2] - 8:23, 146:23
**tied** [1] - 83:3
**timeline** [5] - 13:1, 13:2, 35:10, 47:7, 63:19
**timely** [1] - 46:2

**timing** [15] - 10:14, 11:9, 41:4, 45:23, 46:18, 79:6, 79:7, 82:16, 82:17, 82:20, 109:4, 109:5, 109:15, 114:17, 114:19
**tiny** [1] - 135:16
**Title** [1] - 186:5
**today** [12] - 34:5, 85:25, 124:5, 136:21, 139:2, 151:20, 152:3, 152:13, 153:22, 181:11, 181:18, 182:2
**together** [2] - 80:3, 88:6
**tomorrow** [1] - 105:24
**took** [6] - 22:17, 33:10, 97:7, 123:4, 130:9, 144:11
**top** [13] - 49:3, 60:1, 91:7, 95:25, 101:20, 112:19, 129:17, 141:19, 150:7, 156:20, 163:8, 178:1, 183:4
**topic** [10] - 12:4, 46:11, 73:2, 116:13, 116:15, 179:14, 179:25, 180:2, 180:21, 180:22
**total** [17] - 89:8, 89:16, 89:18, 93:2, 93:16, 126:15, 129:3, 129:16, 136:19, 138:11, 143:8, 152:10, 156:17, 156:21, 167:15, 173:13
**totals** [2] - 143:8, 164:23
**touch** [1] - 171:13
**touched** [3] - 19:18, 123:7, 124:5
**towards** [1] - 75:5
**trade** [5] - 102:18, 159:8, 159:12, 161:1, 161:16
**trade-off** [1] - 102:18
**traded** [1] - 35:2
**trademarks** [1] - 175:5
**training** [1] - 40:21
**transaction** [28] - 75:6, 83:6, 88:8, 88:16, 92:2, 92:3, 94:12, 99:1, 105:14, 105:17, 106:20, 115:19, 117:17,

130:13, 131:25, 132:3, 132:15, 136:5, 137:22, 145:24, 146:6, 146:24, 150:24, 154:19, 161:9, 161:10, 169:12, 175:12
**transactions** [21] - 77:14, 78:3, 80:1, 80:5, 82:18, 86:10, 92:1, 94:13, 119:19, 127:19, 132:18, 133:1, 133:7, 144:19, 146:2, 146:23, 151:11, 153:2, 154:14, 169:13, 175:4
**transcribe** [1] - 88:14
**transcribed** [1] - 181:23
**transcript** [5] - 57:2, 181:18, 182:12, 186:7, 186:10
**transcripts** [1] - 76:23
**transfer** [66] - 12:24, 14:1, 15:17, 27:10, 65:11, 69:10, 69:11, 70:2, 70:5, 70:10, 71:14, 71:25, 72:6, 72:10, 72:16, 72:17, 72:21, 72:25, 73:2, 73:8, 73:20, 73:24, 77:6, 77:12, 78:20, 79:1, 79:7, 79:12, 79:20, 84:1, 90:14, 91:25, 106:4, 106:17, 106:18, 106:23, 107:6, 107:11, 107:24, 108:4, 109:16, 109:20, 114:19, 115:11, 116:10, 117:2, 117:12, 120:12, 122:2, 124:11, 127:4, 129:12, 129:14, 131:20, 134:6, 137:22, 139:23, 152:24, 153:6, 177:7, 178:14, 179:19
**transferrable** [1] - 127:3
**transferred** [17] - 12:12, 13:23, 16:2, 79:4, 82:1, 82:25, 85:2, 85:5, 97:21, 106:22, 109:18, 110:4, 116:17,

119:6, 121:8, 127:2, 152:16
**transferring** [1] - 83:13
**transfers** [4] - 69:14, 69:19, 69:20, 108:2
**transpired** [1] - 126:4
**travel** [2] - 109:14
**treat** [2] - 130:14, 130:15
**treats** [1] - 134:22
**trial** [9] - 99:11, 99:13, 101:24, 113:5, 144:23, 148:15, 150:17, 181:2, 183:24
**Trial** [1] - 1:12
**tried** [1] - 139:7
**trip** [1] - 109:15
**trouble** [1] - 36:10
**true** [20] - 4:25, 8:19, 14:8, 14:13, 20:3, 20:4, 20:16, 23:9, 23:11, 25:12, 33:21, 38:1, 38:8, 38:17, 38:23, 51:1, 57:20, 78:4, 179:7, 186:7
**try** [7] - 95:3, 107:19, 109:6, 131:22, 151:23, 153:8, 153:11
**trying** [9] - 5:25, 18:9, 91:5, 100:20, 108:4, 119:7, 121:7, 146:25, 167:17
**turn** [16] - 12:4, 12:7, 35:16, 56:3, 81:8, 88:18, 106:8, 108:16, 122:11, 130:5, 140:12, 143:23, 174:12, 175:18, 176:1, 179:24
**turning** [2] - 74:13, 75:5
**turns** [4] - 21:7, 124:19, 176:3, 176:4
**Tweed** [1] - 55:21
**two** [47] - 4:15, 17:21, 18:16, 18:21, 22:23, 30:14, 41:8, 46:13, 57:22, 60:3, 70:7, 74:10, 79:4, 89:8, 89:24, 92:1, 97:12, 101:24, 101:25, 102:4, 102:12, 103:20, 103:22, 104:16, 104:17, 114:9, 114:11, 123:15, 127:4,

134:8, 134:10, 134:25, 135:9, 135:15, 137:3, 141:24, 157:11, 162:19, 162:20, 167:7, 168:21, 170:11, 171:17, 177:1, 178:25
**two-pronged** [1] - 137:3
**type** [6] - 79:10, 107:13, 109:8, 110:3, 144:7, 148:23
**types** [8] - 69:14, 70:17, 70:18, 76:18, 79:25, 80:1, 128:25, 178:10
**typical** [7] - 53:9, 88:16, 101:8, 106:23, 125:18, 144:14, 174:22
**typically** [5] - 107:12, 134:24, 137:21, 146:5, 154:20
**Tyrone** [1] - 183:15

## U

**U.K** [1] - 119:23
**U.S** [22] - 1:11, 2:5, 2:12, 20:5, 35:24, 36:14, 37:13, 38:22, 70:9, 74:14, 85:5, 90:25, 107:14, 123:19, 127:15, 127:18, 174:23, 175:1, 175:13, 175:14, 186:16
**U.S.'s** [8] - 25:21, 83:4, 89:9, 92:14, 94:25, 102:10, 111:16, 124:8
**UK** [11] - 16:7, 16:10, 116:15, 116:25, 117:5, 117:16, 118:10, 118:12, 119:7, 119:9
**ultimately** [9] - 16:13, 83:2, 83:4, 85:7, 88:1, 103:10, 169:13, 175:13, 176:20
**um-hum** [2] - 9:20, 61:16
**uncapitalized** [1] - 83:9
**uncertain** [1] - 104:13
**uncertainties** [1] - 46:17
**uncertainty** [15] -

14:10, 19:19, 19:21, 20:12, 20:13, 20:21, 44:15, 44:22, 44:23, 45:15, 45:17, 45:18, 46:8, 46:16, 104:13
**unclear** [1] - 142:14
**uncoated** [2] - 121:12, 121:15
**under** [35] - 10:6, 28:3, 69:23, 77:18, 80:19, 85:21, 89:16, 90:12, 90:22, 92:25, 99:3, 117:7, 118:22, 119:2, 120:19, 126:17, 126:20, 127:8, 127:9, 136:3, 137:5, 138:14, 138:15, 141:5, 141:10, 150:9, 153:15, 153:17, 155:9, 172:23, 173:13, 176:4, 179:8, 186:10
**underestimate** [3] - 152:16, 161:13, 167:15
**undergraduate** [1] - 68:18
**underlying** [1] - 128:24
**understood** [6] - 8:6, 12:18, 76:8, 88:15, 162:7, 166:15
**undertook** [1] - 116:18
**unit** [8] - 157:16, 157:19, 157:21, 157:22, 157:25, 163:24, 170:16
**UNITED** [2] - 1:1, 1:7
**United** [13] - 3:3, 19:22, 26:16, 70:10, 72:9, 81:22, 85:6, 87:19, 110:6, 124:18, 133:25, 186:4, 186:6
**units** [7] - 124:20, 156:17, 156:21, 156:22, 164:12, 167:4, 167:6
**University** [4] - 68:19, 68:20, 68:21, 69:6
**unknown** [1] - 90:2
**unknowns** [3] - 89:8, 89:24, 89:25
**unless** [2] - 59:25, 122:12
**unlike** [1] - 169:2
**unquote** [1] - 126:7
**unrelated** [6] - 17:3,

18:18, 18:25, 19:6, 82:25, 131:22
**unreliable** [2] - 94:8, 152:7
**unsecured** [1] - 105:17
**unusual** [1] - 88:8
**up** [85] - 3:9, 3:16, 3:17, 3:20, 3:25, 8:18, 9:12, 12:22, 13:6, 18:9, 20:9, 21:6, 21:22, 22:15, 25:13, 31:10, 33:23, 46:12, 48:2, 48:10, 58:11, 61:3, 61:5, 62:24, 63:18, 68:13, 73:9, 73:10, 80:24, 82:21, 84:9, 87:6, 89:18, 91:3, 93:3, 93:4, 96:13, 96:21, 98:21, 100:20, 106:24, 107:12, 111:6, 112:17, 115:20, 116:2, 118:18, 122:16, 129:7, 129:20, 137:12, 137:13, 137:14, 138:12, 142:17, 143:4, 143:11, 143:13, 144:11, 145:10, 146:20, 147:23, 148:15, 149:21, 151:25, 153:9, 153:11, 157:12, 159:15, 161:11, 165:11, 165:14, 165:17, 166:3, 167:25, 168:2, 168:13, 170:7, 174:4, 178:12, 180:6, 180:22, 181:14, 182:18
**update** [2] - 164:3, 169:6
**updated** [4] - 146:22, 147:1, 148:10, 148:12
**updates** [2] - 68:6, 147:20
**updating** [4] - 56:9, 143:20, 169:17, 169:23
**upfront** [6] - 20:25, 29:25, 32:10, 33:7, 33:18, 101:3
**upgrade** [1] - 183:19
**upper** [4] - 133:10, 133:13, 134:3, 134:4
**upside** [24] - 19:23,

20:22, 21:13, 22:10, 23:4, 23:19, 24:13, 25:14, 25:24, 26:23, 27:7, 29:18, 31:5, 32:5, 32:6, 32:14, 33:21, 83:16, 83:17, 83:22, 115:20, 126:21, 141:14
**US** [119] - 12:12, 13:23, 14:17, 20:13, 20:16, 25:12, 25:17, 25:19, 26:9, 26:19, 26:21, 28:24, 74:13, 74:18, 75:8, 80:20, 81:12, 81:16, 82:2, 82:10, 82:19, 83:4, 83:6, 84:3, 84:6, 84:12, 84:15, 84:21, 87:16, 87:17, 88:23, 89:3, 89:10, 89:18, 90:11, 90:16, 90:21, 90:24, 91:9, 91:15, 92:12, 92:21, 93:8, 94:1, 94:2, 95:4, 95:5, 97:22, 100:4, 101:6, 101:15, 101:22, 103:7, 103:12, 103:24, 104:1, 104:14, 105:16, 107:16, 109:21, 110:3, 110:21, 111:3, 112:1, 112:5, 112:20, 112:25, 113:1, 113:17, 114:24, 115:7, 115:16, 115:17, 115:20, 115:24, 116:2, 116:5, 116:11, 116:17, 117:7, 117:11, 117:12, 120:17, 120:18, 121:10, 123:18, 123:22, 124:6, 124:10, 124:13, 126:1, 126:5, 126:8, 126:10, 126:16, 127:12, 129:1, 129:4, 129:15, 129:20, 129:24, 130:4, 135:11, 135:18, 136:15, 136:17, 138:11, 138:12, 138:14, 140:7, 141:10, 161:19, 175:14
**US's** [1] - 83:11
**useful** [1] - 14:12
**uses** [3] - 163:20, 170:11, 171:22

utilizing [1] - 158:19

**V**

vacuum [1] - 145:5
valuable [8] - 90:25, 102:15, 102:23, 104:19, 122:2, 125:10, 127:1, 135:12
valuation [33] - 29:14, 91:24, 94:8, 94:22, 94:24, 96:5, 96:21, 96:25, 97:20, 97:24, 98:12, 98:14, 129:11, 139:10, 140:14, 143:10, 145:2, 145:4, 145:22, 147:18, 148:14, 148:21, 148:22, 149:22, 150:12, 151:13, 154:11, 156:8, 156:11, 172:19, 173:9, 173:17
valuations [7] - 70:22, 135:20, 146:24, 147:21, 150:20, 152:8, 174:14
value [84] - 6:22, 18:1, 19:11, 22:20, 74:21, 79:3, 79:5, 82:12, 82:13, 83:2, 85:12, 85:23, 85:24, 86:3, 86:19, 89:8, 89:18, 90:2, 90:11, 90:20, 90:23, 91:23, 92:13, 92:14, 92:20, 93:2, 93:13, 93:15, 93:16, 93:17, 94:6, 97:10, 97:19, 98:22, 98:24, 99:2, 99:7, 102:17, 126:15, 128:4, 129:16, 132:13, 133:18, 135:15, 135:17, 136:11, 137:3, 137:10, 138:10, 138:11, 138:23, 138:24, 139:3, 141:7, 144:17, 147:2, 147:3, 148:23, 149:1, 152:2, 152:12, 152:16, 152:22, 153:22, 154:10, 161:15, 161:17, 169:12, 170:3, 170:10, 173:12, 173:14, 173:22, 173:25, 175:19, 175:21,

175:24, 177:23, 178:2, 179:16
value-add [2] - 90:20, 90:23
value-added [2] - 128:4, 132:13
values [6] - 86:15, 86:17, 145:20, 152:7, 176:25
valuing [2] - 109:17, 169:13
vantage [1] - 136:10
variable [1] - 94:22
variants [1] - 124:21
variety [2] - 69:13, 69:14
various [8] - 12:11, 13:22, 103:6, 105:7, 115:6, 129:9, 144:23
vary [1] - 179:17
vastest [1] - 141:14
vehicles [1] - 107:14
venture [2] - 53:10, 134:23
verify [1] - 5:16
versus [4] - 73:7, 108:1, 132:16, 176:7
via [1] - 89:3
view [39] - 5:13, 7:5, 14:5, 14:9, 15:7, 15:8, 39:9, 40:1, 40:5, 40:17, 40:24, 41:1, 41:2, 41:10, 42:5, 43:1, 43:2, 43:5, 43:9, 45:25, 51:14, 51:20, 52:24, 53:8, 53:23, 62:13, 101:1, 111:12, 113:4, 141:25, 144:25, 148:16, 152:9, 154:13, 175:11, 175:14, 176:21, 179:15
viewed [1] - 55:4
views [4] - 12:7, 57:17, 61:20, 99:14
VIII [1] - 1:6
visit [1] - 42:1
Voit [1] - 55:22
volume [9] - 155:20, 157:25, 163:8, 163:12, 163:13, 165:25, 166:4, 167:11
Volume [1] - 1:6
volumes [9] - 111:25, 155:14, 156:4, 157:12, 159:8, 166:24, 167:8, 167:10, 167:15

vs [1] - 1:6
vulnerable [2] - 60:22, 60:25

**W**

W*M [3] - 168:2, 168:4
Wacker [1] - 1:20
wagging [1] - 117:3
wait [1] - 29:25
Walgreens' [1] - 124:23
walk [6] - 88:18, 89:2, 95:23, 128:22, 137:14, 143:22
Walker [1] - 61:1
Walmart [5] - 112:9, 112:11, 112:18, 113:25, 168:2
Walmarts [1] - 168:13
wants [12] - 24:19, 34:10, 34:13, 34:17, 35:18, 36:1, 39:9, 39:23, 40:1, 40:4, 88:17
warehouses [1] - 125:22
warm [1] - 182:1
Warner [2] - 2:1, 2:2
warranties [1] - 70:24
wary [1] - 88:9
Washington [3] - 1:17, 2:8, 2:14
ways [6] - 5:8, 8:13, 25:10, 33:9, 131:23, 135:9
WDM [1] - 166:6
weakest [2] - 151:24
wealthy [2] - 31:2, 31:3
WEAVER [42] - 2:6, 38:4, 38:9, 41:12, 44:6, 47:10, 52:13, 57:9, 63:12, 63:16, 64:17, 66:21, 67:5, 67:13, 67:18, 67:23, 73:18, 74:3, 76:5, 90:8, 118:2, 118:5, 118:6, 122:14, 122:18, 122:25, 123:2, 123:3, 173:2, 173:4, 179:24, 180:4, 180:7, 180:17, 180:22, 181:9, 181:16, 181:24, 182:10, 183:11, 183:14, 184:2
Weaver [5] - 9:8, 76:2, 122:24, 185:5, 185:7

week [3] - 60:13, 141:22, 181:2
weekend [4] - 181:17, 181:25, 182:15, 183:25
weeks [3] - 22:23, 155:23, 163:21
weighted [1] - 164:25
West [1] - 1:20
WESTERN [1] - 1:2
Western [2] - 3:4, 186:4
whereas [3] - 92:19, 170:21, 170:22
wherewithal [1] - 16:10
White [2] - 69:1, 71:16
whole [12] - 7:20, 9:9, 35:20, 40:2, 64:25, 77:21, 85:3, 107:10, 108:3, 151:16, 165:11, 182:18
wide [3] - 14:7, 26:2, 65:15, 69:13, 69:14, 70:17, 71:2
willing [3] - 14:9, 29:16, 29:17
Wilmington [1] - 55:16
win [1] - 152:14
windfall [8] - 109:1, 152:23, 173:24, 174:2, 176:5, 176:15, 176:17, 179:20
winding [1] - 114:24
wise [1] - 39:21
wish [2] - 8:23, 47:16
Witness [2] - 67:1, 67:17
WITNESS [7] - 52:21, 88:15, 171:24, 172:4, 172:6, 172:11, 172:17
witness [5] - 58:17, 67:3, 67:12, 100:1, 167:21
Witnesses [1] - 185:3
witnesses [3] - 58:3, 78:13, 181:22
wonder [1] - 27:20
word [2] - 107:10, 107:11
words [8] - 6:5, 23:10, 25:4, 31:16, 33:11, 81:21, 155:22, 181:23
works [3] - 51:24, 148:17, 149:4
world [13] - 17:9,

17:25, 36:19, 40:9, 40:10, 42:13, 43:5, 107:12, 116:11, 119:8, 119:9, 119:20, 168:13
world's [1] - 39:3
worried [1] - 181:6
worry [1] - 12:16
worst [1] - 179:21
worth [4] - 22:17, 104:22, 115:19, 131:7
wrap [3] - 58:11, 98:21, 180:22
wrap-up [1] - 180:22
wrapper [2] - 77:9, 82:23
wrestled [1] - 103:4
write [1] - 77:20
writing [1] - 28:6
written [3] - 36:5, 49:9, 77:23
wrote [1] - 39:15

**Y**

year [35] - 9:24, 10:14, 10:15, 10:19, 10:21, 11:10, 11:11, 11:12, 11:16, 22:3, 84:4, 98:2, 105:2, 113:16, 156:22, 157:16, 158:2, 159:16, 159:19, 159:24, 161:25, 162:15, 162:19, 162:20, 163:18, 163:25, 164:5, 164:7, 164:9, 165:1, 165:25, 167:5, 167:18, 176:22
year-old [1] - 158:2
years [38] - 7:2, 9:25, 69:4, 69:12, 69:13, 92:23, 93:9, 93:14, 95:16, 98:7, 106:2, 107:6, 123:20, 123:21, 133:14, 134:1, 137:6, 142:25, 143:2, 143:5, 143:20, 152:17, 157:7, 157:11, 157:19, 160:7, 162:13, 162:14, 162:16, 162:23, 164:7, 164:8, 167:7, 167:8
yesterday [8] - 3:17, 3:24, 7:13, 20:18, 31:15, 33:25, 37:10,

57:17
**yoga** [1] - 88:12
**York** [2] - 2:11, 9:17
**young** [1] - 37:8
**Young** [1] - 115:15
**yourself** [4] - 44:12, 59:3, 183:24

## Z

**Zedcor** [1] - 133:25
**zero** [15] - 45:17, 45:18, 66:3, 66:7, 71:21, 91:8, 99:4, 127:14, 149:13, 157:16, 157:19, 164:5, 164:7, 164:9

## §

**§** [2] - 71:22, 71:23