1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF MICHIGAN

3              SOUTHERN DIVISION

4   PERRIGO COMPANY,

5       Plaintiff,              No.  1:17cv737

6    vs.

7   UNITED STATES OF AMERICA,

8       Defendant.

9

10   Before:

11                THE HONORABLE ROBERT J. JONKER
                    U.S. District Judge
12                  Grand Rapids, Michigan
                  Monday, June 7, 2021
13              Excerpt of Bench Trial Proceedings
                  David DeRamus Testimony

14   APPEARANCES:

15            Morgan Lewis & Bockius LLP
              MR. JOHN BENJAMIN MAGEE
16            MR. ALEX EDMUND SADLER
              MR. DREW ALEXANDER CUMMINGS
17            1111 Pennsylvania Avenue, NW
              Washington, DC 20004
18            (202) 373-6229

19

20            Warner Norcross & Judd LLP
              MR. EDWARD J. BARDELLI
21            1500 Warner Building
              150 Ottawa Avenue, NW
22            Grand Rapids, MI 49503
              (616) 752-2000

23                    On behalf of the Plaintiff;

24

25

```
 1              U.S. Department of Justice, Tax Division
                MR. JAMES EDWARD WEAVER
 2              MR. ARIE M. RUBENSTEIN
                555 4th Street, NW
 3              P.O. Box 55
                Washington, DC 20044
 4              (202) 305-4929

 5              IRS Office of Chief Counsel
                MR. MATTHEW AVON
 6              33 Maiden Lane, 12th Floor
                New York, NY 10038
 7              (646) 259-8012

 8              U.S. Department of Justice, Tax Division
                MR. RICHARD JEREMY HAGERMAN
 9              Ben Franklin Station
                P.O. Box 227
10              Washington, DC 20044
                (202) 616-9832
11
                     On behalf of the Defendant.
12
          REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          06/07/2021

2          (Proceedings, 8:29 a.m.)

3          LAW CLERK:  United States District Court for the

4    Western District of Michigan is now in session.  The Honorable

5    Robert J. Jonker presiding.

6          THE COURT:  All right.  Welcome back everybody.  We're

7    here on Monday for our ninth day, I think, or something close

8    to that, and we had Dr. DeRamus on the stand in the middle of

9    direct, so please retake that, Dr. DeRamus, and we'll turn it

10   back to you whenever you are ready, Mr. Weaver.

11         MR. WEAVER:  Thank you, Your Honor.

12                   DIRECT EXAMINATION (Continued)

13   BY MR. WEAVER:

14   Q    Good morning, Dr. DeRamus.

15   A    Good morning.

16   Q    The next topic that we are going to turn to is certain

17   calculations that you prepared at our request.

18         MR. WEAVER:  Now, before we get started in this

19   segment, Your Honor, let's go to Dr. DeRamus's report that is

20   Exhibit 5392.  5392.  And let's go to page 91, please.  Page

21   91.  Go to the bottom of the page and blow up part 7, including

22   the footnote.  So, Your Honor, I am about to launch into this

23   segment, but in reading the transcript of Friday over the

24   weekend, there is a little bit of ambiguity about where you are

25   on Mr. Magee's objection, and I don't want to inadvertently

1    step over the line with you, so let me just indicate what I am

2    planning to do with Dr. DeRamus is have him run through

3    calculations that he has described in this part 7 of his

4    report.  Now, Mr. Magee said on Friday that Dr. DeRamus did not

5    address the commensurate with income standard in his report.  I

6    will direct you to footnote 304, which cites to a treasury reg

7    which we call -4(f)(2), and if we could pull -4(f)(2) on screen

8    for the Court's benefit?  -4(f)(2).  Please put the regulation

9    up and go to page 7.  We have highlighted the part we want to

10   look at on page 7.  Blow up (f)(2), please.  I'll try it again.

11       This regulation is about if an intangible is

12   transferred under an arrangement that covers more than one year

13   the consideration charged in each taxable year may be adjusted

14   to ensure that it is commensurate with the income attributable

15   to the intangible.  So Dr. DeRamus cites to (f)(2).  And in

16   addition, if we go to page 9 of this document and look at

17   (f)(6), there is a corresponding provision, page 9.  Maybe it's

18   page 10.  Try page 8.  All right.  I will represent that F6 has

19   to do with royalty calculations.

20       The point being, Your Honor, Dr. DeRamus did address

21   commensurate with income in his report.  I am not asking him to

22   interpret that commensurate with income provision, but I am

23   going to ask him in connection with what he is doing his

24   calculations about, what he is applying to the best of his

25   ability so that these calculations aren't somewhere in the air

1   but are in boxes for you to review.  Because if Your Honor gets

2   to this issue in (f)(2), back to page 7, this issue has to do

3   with adjustments under the commensurate with income standard.

4   I am sure we will be briefing it, and I just need to have the

5   calculations that in our view follow along with the reg in the

6   record.

7        THE COURT:  Okay.  Anything you want to add to -- on

8   the issue, Mr. Magee, from your perspective?

9        MR. MAGEE:  Well, the mention is merely a footnote and

10  commensurate with income is not explained, as Mr. Weaver

11  acknowledged.  If it's just the calculations and they want the

12  calculations in the record, I'd be happy to stipulate to

13  admission of the demonstratives, if that would shorten the

14  direct examination.

15       MR. WEAVER:  Your Honor, we want to walk through this

16  with you so that you understand.

17       THE COURT:  Well, let's go ahead then.  It sounds like

18  he doesn't have any objection to the calculations themselves,

19  and as a practical matter, even if there is objection to some

20  of it, my guess is it's the kind of objection that's going to

21  have to get ruled on in the final matter in the briefing, but

22  let's see how far we can get without objection, and if it comes

23  a point of crossing the line, as you say, I'm sure Mr. Magee

24  will let us know.

25       MR. WEAVER:  Thank you, Your Honor.

BY MR. WEAVER:

Q    So with that, if we could go back to Exhibit 5392, and go to page 91 at the bottom.  And, Dr. DeRamus, in accordance with what you wrote in paragraph 211, which runs -- you know, first starts on page 92, goes over to page -- page 91, goes over to page 92.  At a high level starting with the second of the two tasks, can you just describe what you are about to go through and what you were asked to do?

A    Certainly.  So I was first asked to calculate the income that LLC earned as a result of the assignment.  I was asked to compare it to the assignment price actually paid.  I was asked to convert that to a running royalty over a defined time period, and then I was asked to calculate the difference, and I was also asked to evaluate whether certain, what I understand to be safe harbor provisions applied, i.e., whether the amount of the income attributable to the -- actually attributable to the transferred intangible to the assignment was within 80 to 120 percent of what was foreseen or foreseeable at the time the transaction was actually entered into.

Q    So with that, why don't we pull up Exhibit 5512, please, one of your demonstratives.  Dr. DeRamus, I presume you recognize this and that you prepared it, is that correct?

A    Yes, I do.

Q    All right.  So is this sort of the first step?

A    That's correct.  So here I talk about it as deriving the

1    arm's-length royalty rate.  One thing you'll notice, the 21.53

2    percent is very close but not identical to the arm's-length

3    royalty rate that I described earlier in my testimony, and

4    that's because this is calculated over a shorter time period,

5    FY 8 -- FY '08 to FY 2012, whereas in my calculation of the

6    effective royalty rate associated with the 474 million dollar

7    number, that was calculated over the entire life of the

8    intangible.

9         But effectively the calculations work very similarly

10   in terms of you have LLC stipulated income, i.e., the income

11   attributable to the intangibles that were transferred is row B.

12   So you take that, the present value of that number, over this

13   time period, FY 2008 to 2012, and then you need to divide that

14   by some corresponding present value calculation of revenue, and

15   so here the amount -- the appropriate amount to use is reported

16   revenue, and then dividing one by the other, the net present

17   value of LLC's income attributable to the transferred

18   intangible divided by the actual sales attributable to the U.S.

19   omeprazole business gives you this 21.53 percent.  And I note

20   there, because this is on a cash flow basis, there is a small

21   adjustment in that second star at the bottom where I've

22   provided an additional reduction to LLC's cash flows to account

23   for a -- some imputed interest associated with an earlier

24   payment for some of the Dexcel product in 2008.

25   Q    So have you converted the actual profit experience for this

1    product into -- at least the LLC part into a stipulated royalty

2    rate?

3    A    That's correct.  So that's why I describe it as the

4    arm's-length royalty rate, because it is very consistent with

5    my -- my opinion of the arm's-length royalty rate, which

6    actually is the first asterisk there, the 21.53 percent, which

7    is also consistent with the income attributable to the

8    transferred intangible.

9    Q    Okay.  So with that, then, let's go to step two.

10    A    Okay.

11    Q    Before we leave this, just -- I think you have said it, but

12    the computed royalty rate is?

13    A    21.53 percent.

14    Q    Okay.  Let's go to step two, and for that, first let's go

15    to your report, page 95, I believe it is, I hope, but we want

16    to go to paragraph 216.  Paragraph 216 of your report, which is

17    on page 95.  And if we could blow up paragraph 216.

18         So before we go to your demonstrative, can you tell us

19    generally what you are about to be showing us in the

20    demonstrative?

21    A    So as I understand the sequence of calculations is that I

22    need to divide the actual assignment price paid, the $877 ,832,

23    by some measure of sales.  So I have divided that -- in order

24    to derive an effective royalty, i.e., if the 877,832 were

25    conceived of like a royalty payment as a percentage of sales

1    expected at the time, what would that number be?  Now, I

2    have -- well, I can go into the calculations and why I did them

3    now or I can wait until we go through them in detail.

4    Q    Why don't we do that when we get to the demonstrative, but

5    if we could just highlight the sentence applying the 2.18

6    million -- do you see where I am, Ms. Miller?  Just highlight

7    that sentence applying the 2.81 million.  So, I mean, you can

8    just give us the answer and then you can walk through it, but

9    what did you conclude would be the expected royalty rate if you

10   turned an investment of $2.18 million into a royalty rate?

11   A    Well, in that sentence there are two numbers so I do it two

12   different ways.  So the first way is to use just the basic

13   assignment price, the 877,832 dollar number after the semi

14   colon, and that comes up with a 0.32 percent effective rate

15   using the sales that were forecasted at the time.  And -- but I

16   also use this 2.18 million dollar payment as an alternative way

17   of doing the calculations.  Keep in mind that the $2 .18

18   million actually includes not just the payment to LLC -- I'm

19   sorry, the payment to Perrigo US for the assignment, but it

20   also includes the 500,000 dollar payment to Dexcel for the last

21   milestone payment that I believe is paid in approximately

22   February of 2008.  As the product is launching, and it also

23   includes the March 2008 reimbursement of certain paragraph IV

24   litigation expenses that PRD or Perrigo US paid.  So there is

25   some additional monies in that $2.18 million that are not

1    really simply just the assignment value, but I have,

2    nonetheless, done the calculation in that way and that's how

3    you -- I come up with the 0.79 percent.

4    Q    Now, why don't we, then, walk through that with the aid of

5    your demonstrative, Exhibit 5513, please.  5513.  So,

6    Dr. DeRamus, could you walk us through what you are doing with

7    respect to this calculation?

8    A    Certainly.  So here on row B is the 877,832 dollar number

9    that I referenced before the actual assignment price, and this

10   is where I need to divide it by the present value of some of

11   the forecast revenues.

12        Now, here I use the June 2006 forecast.  This is the

13   one that Dr. Frisch relies on.  This is without any of my

14   additional adjustments to the things that I thought were

15   foreseeable.  And keep in mind here, the lower the revenues

16   are, the higher this equivalent royalty rate will be and,

17   therefore, the lower the delta is going to be in the

18   calculation of any adjustment.  So I think this is a, for lack

19   of a better word, a conservative way of applying this from the

20   taxpayer's perspective, i.e., it will result in a lower

21   adjustment than if I were to use some of the other forecasts

22   that I consider to be more reliable, particularly if you use

23   the information that was known as of March 2008, for example.

24   That would substantially lower the effective royalty rate.

25   Q    So what you are saying, if you used some of the higher work

1    that you did, it would lower the equivalent royalty rate and

2    give the taxpayer less credit?

3    A    That's correct.

4    Q    Okay.  And then, so you have done it both ways here,

5    correct?

6    A    By saying it both ways, just to be clear, I do it on row B

7    divided by A, that middle row.  That's where I derive the 0.32

8    percent using the 877,832 dollar number, and then I -- on the

9    very last row is where I divide the -- I use the $2.18 million

10   that I referred to before that includes more than simply the

11   assignment payment itself, but I use that to then divide that

12   by the present value of the forecast revenue to get the 0.79

13   percent.

14   Q    You have calculated the possibilities into royalties.

15   Let's go to the next step, and for that let's go to

16   demonstrative Exhibit 5514, please.  Exhibit 5514.

17        Now, Dr. DeRamus, explain what you are doing in this

18   particular set of computations that is summarized here.

19   A    Certainly.  So here now that I have calculated the

20   arm's-length royalty rate and then the effective royalty rate

21   or equivalent royalty rate that the taxpayer paid as of 2008 --

22   Q    You mean 2006?

23   A    Well, yeah.  Whenever I say the word payment I mean when

24   LLC actually made the payment, but certainly it's the $877,000

25   reflective of the assignment with an effective date of November

1      2006.

2      Q    Thank you.

3      A    So now that I have done these two calculations, if I can

4      subtract the equivalent royalty rate from the arm's-length

5      royalty rate, apply that to Perrigo US's and LLC's stipulated

6      income, and then derive a royalty adjustment that would then

7      reflect that difference so that the total income that Perrigo

8      US would be -- would receive would be consistent with the

9      income generated by the assignment, and that's -- so you do

10     the -- calculate the difference, the 21.53 percent minus 0.32

11     percent equals 21.21 percent.  That's in that first sublet.

12     Q    That's the royalty rate adjustment, correct?

13     A    That's the royalty rate adjustment, and then apply that to

14     Perrigo US, U.S. omeprazole sales, and that gets you $27.4

15     million as the royalty adjustment.  And then I -- in the next

16     bullet I compare what the net impact is on Perrigo US's profit

17     and Perrigo LLC's profit such that it results in $293.2 million

18     in total profit to Perrigo US, and $4.3 million in total profit

19     to Perrigo LLC.

20     Q    And so what you are doing there is essentially allocating

21     the $298 million of income earned in the four years at issue,

22     is that correct?

23     A    That's correct.

24     Q    All right.  Now, why don't we also take a look at Exhibit

25     5515, which goes into a little more detail.  So can you walk us

1   through this?

2   A    Certainly.  So this simply shows what happens on a

3   year-by-year basis for the four years at issue, FY 2009 to FY

4   2012, if you were to apply this royalty adjustment, and I have

5   done it both for using the 0.32 percent effective royalty rate

6   as a result for the 0.79 percent alternative calculation.  So

7   row D shows that 21.11 percent net royalty adjustment applied

8   to the reported net sales for each of those years, and then you

9   can -- that's where in the total column you see the derivation,

10  then, of $207.4 million for the royalty adjustment and then,

11  I'm sorry, row E it -- in the total column it shows the $4.3

12  million remaining LLC profit just during this FY 2009 and FY

13  2012 time period as well as the share of the total that LLC

14  then would receive as a result of this adjustment; namely, 1.4

15  percent.

16  Q    Okay.  And that matches what we just looked at on the pie

17  chart page, correct?

18  A    That's correct.  And the 1.4 percent is just to make it

19  explicit as to the percentage that LLC would then receive.

20  Q    You then did the same kind of calculation with respect to

21  the other royalty that you had derived?

22  A    That's correct.  Rows G through I do the same set of

23  calculations except this time using the 0.79 percent effective

24  royalty rate.  Again, doing the subtraction, that gets you a

25  royalty rate adjustment of 20.74 percent, and then in that

1    total column, that would then result in a total royalty

2    adjustment of $202.7 million, and in row H effectively giving

3    LLC $8.9 million in income, again, based on just the mechanics

4    of the calculations, and then -- which then would increase

5    LLC's share of the total to three percent -- this would

6    increase LLC's share of the total profits to three percent.

7    Q    Three percent of the $298 million?

8    A    That's correct.

9    Q    Okay.  Now, briefly, Dr. DeRamus, you were asked to do one

10   other calculation.  Let's pull up Exhibit 5516.  5516, please.

11   And let's blow it up just a little bit.

12          Now, Dr. DeRamus, you mentioned a few moments ago the

13   safe harbor test calculation.  Is this that?

14   A    Yes, it is.

15   Q    Okay.  Can you just walk us through what you did here?

16   A    Certainly.  And I believe Dr. Frisch might have actually

17   referred to this in his testimony.  I didn't review his

18   transcript over the weekend, but I recall him talking about the

19   way in which this test is applied is generally attempting to

20   capture whether the profits anticipated at the time of the --

21   of an intangible transfer were within some -- effectively some

22   reasonable range of the actual profit experience that the

23   company ended up having.  And so here in the -- in rows A and B

24   I look at LLC's anticipated income as a result of the

25   assignment.  And here is when I apply the terms of the sales

and distribution agreement as implemented by the parties,

namely, the 4.31 percent operating margin plus the 10 percent

kicker, and that gives me the -- effectively the expected

income that LLC was going to get as a result of the assignment

based on how it was actually implemented by the parties.

Again, it's -- it doesn't bear any correspondence to the

877,000 dollar actual payment, i.e., the amount that they, even

under this approach, was far in excess of the 877,000 dollar

payment, but it, nonetheless, gives you that line of the

expected income as a result -- LLC income as a result of the

assignment.

Q    So had you in row B tried to somehow turn the 877,000

dollar amount, determine a cost plus basis into this, the

numbers would be smaller, correct?

A    Correct.

Q    Okay.  So carry on.

A    So the rows C and D then look at the actual experience that

LLC had.  Row C, it's the actual Perrigo US omeprazole sales.

In row D it's LLC's actual income, the income it actually

earned as a result of the assignment.  And then I compare row D

and row B, and you'll see that row D is vastly in excess of row

B, whether on a year-by-year basis or accumulative basis, i.e.,

if you take the ratio of D divided by B, then you get the

percentages that are in that very last row, and as you can see,

they are not only a little bit above the 120 percent they are,

1   again, orders of magnitude above that 120 percent.  In FY 2008

2   there weren't any profits associated with the -- with the

3   forecast at the time so I have zero in there, so the fact that

4   they actually earned -- that LLC actually earned $22.3 million

5   of income makes that effectively an infinite number.  You can't

6   really divide anything by zero, but it's approaching infinity

7   in terms of a percentage, so if you had a penny in there, for

8   example, in terms of the expected amounts for 2008, then you'd

9   get close to an infinite or exceptionally high percentage rate

10  where I have labeled NA under FY 2008.

11  Q    Can you quickly identify the percentage calculations for

12  each year for the record, please?

13  A    Sure.  So I think I just went through the reason for an NA,

14  or not applicable, in FY 2008.  For FY 2009 -- I'm sorry, I

15  should say -- when I say not applicable, I should say you just

16  can't do the division.  You can't do a division by zero.  In FY

17  2009 it's 169 percent.  In FY 2010 it's 1,009 percent.  In FY

18  2011 it's 1 ,291 percent.  In FY 2012 it's 1,608 percent, and

19  over the entire FY 2008 to FY 2012 time period it's 570

20  percent.

21  Q    Thank you, Dr. DeRamus.  So that concludes what we are

22  going to discuss about your computations.  I have a little bit

23  of wrap up, and I missed a couple of things with you I realized

24  on Friday.  One of the things I missed was I skipped right over

25  one of your demonstratives, so can we pull up Exhibit 5510?

1    Exhibit 5510, please.

2         Dr. DeRamus, this is taking us back into your

3    discussion about your views with respect to Dr. Frisch's work,

4    and so with that background, can you walk us through this set

5    of computations that I inadvertently skipped over?

6    A    Certainly.  So this takes Dr. Frisch's 37.4 million dollar

7    valuation, i.e., the one he derives based on the actual

8    terms -- the actual pricing terms of the sale and distribution

9    agreement, again using the 4.31 percent operating margin and

10   the 10 percent kicker, and so I take that result and I compare

11   that to Perrigo's actual experience and purely LLC's actual

12   experience.

13        So row A shows -- again, these are Perrigo's actual

14   stipulated omeprazole profits.  Row B is Perrigo LLC's profit,

15   and there you see over the -- again, this is just the 2009 to

16   2012 time period, the years at issue.  Just over those four

17   years LLC earned a total of $211.6 million, and as a percentage

18   of the total, that's row C, Perrigo LLC earned 71.1 percent of

19   the total consolidated omeprazole profits.

20        Now -- and, again, a number that simply is

21   inconceivable from my perspective as being in any way

22   consistent with the arm's-length standard.

23        Now, Dr. Frisch takes the 37.4 million dollar numbers,

24   converts it into his 5., I believe, 3 percent effective royalty

25   rate, if I remember right.

Q    5.24, something like that.

A    Thank you.  5.24 percent royalty rate.  He applies that then to the actual income, and so that's row D, and then that gives -- if the Court were to adopt that the Court -- and, again, this is -- I should say that using this 5 -- I'm sorry, 5.24 percent that's derived based on a methodology that I don't believe is in any way reliable but, nonetheless, applying the math, he gets to a 51.3 million dollar total royalty adjustment during the years at issue if one were to apply this effective royalty rate type approach.  So that the -- that LLC's adjusted profit after he applies his 5.24 percent is then a total of $160.4 million, which would still leave LLC with 53.9 percent of the total consolidated profit earned by Perrigo as a result of this U.S. business of selling omeprazole.

Q    In other words, 160.4 million out of the 298 million, plus or minus?

A    That's correct.

Q    All right.  Thank you.  Then can we pull up Exhibit 5508, please?  This is just to orient you, Dr. DeRamus.  Near the beginning of your exam when we were, like, going through your conclusions pretty fast, you described the sensitivity analyses that you did.  Do you recall that?

A    That's correct.

Q    All right.  What I did not, I think, effectively do is get you to actually put some of your numbers into the record.  If

1   we could turn to Exhibit 5434?  Exhibit 5434.  Blow this up,

2   please.  This is the computational table regarding your

3   sensitivity analysis, correct?

4   A    That's correct.

5   Q    So what I would like you to do is just articulate for the

6   record the numbers that you are computing for each alternative.

7   You don't have to read every one, but can you sort of summarize

8   what you are doing year by year in the first two alternatives?

9   A    Certainly.  So the third row is the first of the

10  sensitivities, and I keep -- I start with the third row simply

11  because you had that demonstrative up a moment ago that this is

12  all about, the sensitivities.  So to be clear, my affirmative

13  opinion is in that very top row that shows zero for LLC in all

14  years, but applying the sensitivities that would -- the first

15  sensitivity is what I would call kind of this financing

16  investment approach, or the investor model as it's sometimes

17  referred to in the IRS regulations, would result in $218,000 of

18  annual income to LLC as a result of the omeprazole business

19  and, again, 218 million dollar -- I'm sorry, $218,000 is 10

20  percent of the 2 .18 million dollar assumed investment they

21  have in applying this approach.

22  Q    So in this approach, essentially LLC earns, for each of the

23  taxable years at issue, 10 percent of $2.18 million or

24  $218,000?

25  A    That's correct.

Q    And then you did a comparables analysis using leasing

companies, is that correct?

A    That's right.

Q    And just in summary, you don't need to go through the whole

thing again, what are the computations for each year for LLC

when you apply that sensitivity test?

A    Well, as I said on Friday, the results of that analysis

showed that the return on assets for LLC using a comparable

profits method approach would be coincidentally 10 percent,

which is -- it's 10 percent based on what the comparables show,

which is, coincidentally, similar to the 10 percent in the

financing approach, which is why the numbers in that fifth row

match the numbers in the third row, because I'm still applying

the same 10 percent except it's applied to a slightly different

concept.  So, here, what's the value of the asset to use then

in applying the return on assets?  I've used, again, the $2.18

million as the value of the asset or the value of the

investment.  Think of it like a book value of the investment

that LLC actually made, again, including not just the 877 but

also the 500,000 dollar milestone payment and the reimbursement

of the Dexcel paragraph IV litigation expenditures, so you get

the same $218,000 per year under this comparable profits-type

approach.

Q    Now, Dr. DeRamus, let's go down to the next sensitivity

analysis, the equity investment sensitivity analysis.  You

1  talked about that on Friday, and what I neglected to have you

2  do -- what I would like you to do is actually give us a little

3  preface, but the main thing is to read in the profit that LLC

4  would be allocated or attributable to LLC for each of the

5  years.  I'd actually like you to read those numbers into the

6  record.

7  A    Certainly.  And, again, with the note that I hopefully said

8  on Friday, but I do not believe that -- particularly these last

9  two methods are particularly reliable in the sense of being the

10  most reliable method that -- the two at the top are more

11  reliable, but even those are not as reliable as my primary

12  method if you were to apply those.

13       So the first of the profit split analyses I -- again,

14  I believe it was 1.44 percent.  I'm sorry, I don't recall the

15  exact percentage that I derived.  If I were to treat the $2.18

16  million as an investment like an equity investment relative to

17  the investment that Perrigo US brought, namely, the value of

18  the opportunity at the time, I took the ratio to get that

19  percentage and then the result would be LLC receiving $936,000

20  in FY 2009, $1,115,000 in FY 2010, $1,066,000 in FY 2011, and

21  $844,000 in FY 2012.

22  Q    And, finally -- before we do that, do you recall that your

23  equity investor percentage was 1.33 percent?

24  A    Thank you.  That helps.

25  Q    All right.  And, finally, can you read into the record the

1    numbers that you derived in your last sensitivity so that we

2    have a clear record?

3    A    Certainly.  So the next to the last row shows the result of

4    applying that residual profit split method to the consolidated

5    profit experience of Perrigo with the U.S. sales of omeprazole,

6    and the net result is an 877,000 dollar allocation to LLC in FY

7    2009, $1,071,000 in 2010, $1,026,000 in FY 2011, and $788,000

8    in FY 2012.

9    Q    Thank you, Dr. DeRamus.  One more thing to touch on, and

10   that is, if we could go back for a moment and talk about your

11   razors and blades approach to this?

12   A    Certainly.

13   Q    I did not -- I don't believe --  will you pull up

14   Plaintiff's Exhibit 2, please?  Plaintiff's Exhibit 2.  You

15   reviewed this document, this step plan document as part of your

16   work, correct?

17   A    Yes, I did.

18   Q    And could we go to page 7 of this document and specifically

19   blow up so we can see steps 12 and 14?  And step 12, you recall

20   what that was, correct?

21   A    Yes, I do.

22   Q    And what was that?

23   A    So that's the actual assignment where LLC was expected to

24   acquire the Dexcel contract from Perrigo US in exchange, and

25   here it says in exchange for cash funds or a note.

1    Q    And then how about step 14?

2    A    Step 14 is where -- this is the back-to-back nature that I

3    described.  Particularly the round tripping of the functions

4    and assets and ultimately risks where even though Perrigo US is

5    nominally assigning the contracts to Dexcel -- I'm sorry,

6    assigning the Dexcel contracts to LLC, or in this case also the

7    Fertin contract to Perrigo Denmark, it's at the same time

8    obligated to perform its -- those same functions, the sales,

9    distribution, marketing functions that were contemplated in the

10   actual third-party agreements in the Dexcel contract and then

11   in the Fertin contract.

12   Q    Thank you, Dr. DeRamus.  Now, on Friday I think you made

13   reference to the assignment as containing a requirement LPC

14   stay in the deal, and I wanted to further talk about that with

15   you for a moment.  To do that I've brought along copies of two

16   exhibits, Exhibit 5205 and 5080.  Providing counsel with copy.

17            MR. WEAVER:  May I approach, Your Honor?

18            THE COURT:  Sure.

19   BY MR. WEAVER:

20   Q    Now, Dr. DeRamus, you have some time during the course of

21   your work reviewed each of these documents as well, correct?

22   A    Yes.  I have.

23   Q    So let's pull up Exhibit 5205 first.  And go -- you recall

24   it is a draft of the assignment that I showed to Mr. DeGood?

25   Do you recall that?

1    A    Yes, I do.

2    Q    And if we go down to paragraph 1 and just blow up paragraph

3    1.    In the middle of that there is a sentence that says, such

4    assignment shall not release LPC of any of its obligations

5    under the original agreement to Dexcel.  Do you see that?

6    A    I do see that.

7    Q    Now, let's go to Exhibit 5080 and blow up -- this is the

8    final signed version of the assignment.  Let's blow up

9    paragraph 1, and would you agree that there is no longer any

10   reference to LPC having obligations in this particular

11   document?  Would you agree?

12   A    In that particular document I agree.

13   Q    So would you agree that you misspoke when you said that the

14   assignment contained something requiring LPC to stay in the

15   deal?

16   A    Yes.  I must have been thinking about the draft agreement

17   as opposed to the agreement that was actually executed.  I

18   would also say that I was also thinking primarily about the

19   conduct of the parties, and that's where looking at the conduct

20   of the parties, the whole structure of the assignment was

21   predicated, in my view, on Perrigo US continuing to perform

22   those actions -- or its sales and distribution and marketing

23   and pricing functions that were contemplated in the Dexcel

24   contract, notwithstanding the fact that in the final agreement

25   those words were expunged from the contract.

Q    And, finally and lastly, Dr. DeRamus, let me pull up a

demonstrative prepared by Dr. Frisch.  Dr. Frisch.  And that is

Exhibit 2232-D.  And I don't believe this is in the notebook so

my apologies.  Do you recognize this as being one of

Dr. Frisch's demonstratives?

A    Yes, I do.

Q    All right.  I would like to give you an opportunity to

discuss Dr. Frisch's demonstrative, and if we could start

with -- there is some -- some verbiage above line 4.  Using --

          MR. MAGEE:  Excuse me, Mr. Weaver.  Excuse me, Your

Honor.  This is not the exhibit that Dr. Frisch used.

that's -- you can see that quite obviously because it has the

wrong royalty rate there for the projections, which would be

5.24 percent.

          THE COURT:  Well --

          MR. MAGEE:  That's not the report I used with

Dr. Frisch.

          THE COURT:  2232-D was in the Frisch notebook because

that's what I'm looking at.

          MR. MAGEE:  5.24 percent royalty applied to the

projections and applied to the actuals, and here we have a 7.12

percent royalty applied to the projections.  That's inaccurate.

          THE COURT:  I see.  On line 12, at least the one in my

notebook for Dr. Frisch, has 5.2 percent on line 12, so I don't

know what this one is.

1     MR. WEAVER:  I believe this was one Mr. Magee provided

2     to us, Your Honor.

3           MR. MAGEE:  On the contrary, it's not.

4           THE COURT:  The one that's in my book, anyway, has the

5     5.24 percent.

6           MR. WEAVER:  Okay.  Well, let's just take this down.

7     I don't know where it came from.  We certainly didn't prepare

8     it, Your Honor.

9     BY MR. WEAVER:

10    Q    Can you just briefly describe your issues with Dr. Frisch's

11    demonstrative?  I don't know how we got that, but we'll just

12    talk about it without having it on screen.

13    A    Certainly.  And I believe there may have been two different

14    versions of that.  So the top portion of that demonstrative is

15    probably the same in both versions because it shows the 5.24

16    percent, where it's only the bottom portion that I believe has

17    this alternative 7.12 percent number, but I can talk -- I can

18    talk to the top of that demonstrative if that's helpful,

19    because I do think focusing -- ultimately focusing on the

20    numbers is important.

21          THE COURT:  So just hold on a second.  So when I go to

22    the electronic set of exhibits the parties gave me, 2232-D is

23    the one that you put up, or at least has the 7.12 percent.

24          MR. WEAVER:  Can we at least work with that?

25          THE COURT:  Sure.  I think that was in the electronic

1  set.  We'll have to clarify later what's what, but certainly

2  the version you had appears to be part of the electronic

3  submission.  So, James, do you want to check what's in the hard

4  copy and then go ahead?

5        MR. WEAVER:  Thank you, Your Honor.

6        THE COURT:  Okay.  Your objection is noted, but it's

7  in the electronic exhibits so we will have to sort it out

8  later.  Go ahead.

9        MR. WEAVER:  All right.  And I think we are going more

10  to concept, Your Honor, than we are to particulars.

11  BY MR. WEAVER:

12  Q    So let me go back to where I was, Dr. DeRamus.  So the

13  first thing I want to note with you, right above row 4 there is

14  a reference to using DeRamus tables 11 and 12.  Do you see

15  that?

16  A    Yes, I do.

17  Q    So let's go see what DeRamus tables 11 and 12 are that

18  Dr. Frisch has called your tables 11 and 12.  So let's go back

19  for a moment to Exhibit 5392.  Exhibit 5392 -- sorry, tables 10

20  and 11.  I don't know how I said 11 and 12.  Tables 10 and 11.

21  Let's go to your table 10.  Let's go to Exhibit 5392.  That's

22  your report.  Let's go to -- I believe it's page 71, and let's

23  blow up table 10.

24        So let's see the first thing that Dr. Frisch was

25  referring to.  What is table 10?

1    A   Table 10 is simply the stipulated omeprazole profits for

2    Perrigo on a consolidated basis as well as for Perrigo LLC and

3    Perrigo US.

4    Q   Okay.  So it's not like something that you created.  These

5    are just stipulated numbers, right?

6    A   That's correct.

7    Q   Okay.  Now, let's go to table 11.  That's on page 72, I

8    believe.  Table 11, please.  And can you tell us what table 11

9    is?

10    A   So these are -- I'm sorry, these are based on Dr. Frisch --

11    on actual sales provided by Dr. Frisch.  Oh, so this is FY '13

12    to FY 2017.  As I mentioned before, the taxpayer did not

13    provide their actual profits for FY 2013 through FY 2017, but

14    Dr. Frisch did provide what he represented to be their actual

15    sales, and so I have estimated Perrigo's consolidated operating

16    profit as well as the split between LLC and Perrigo US based on

17    the application of the terms of the sale and distribution

18    agreement.  So that gives me an estimate of the additional

19    profits that LLC earned and that Perrigo US earned as well over

20    this later time period.

21    Q   So your source -- your starting source point was

22    Dr. Frisch's sales numbers, correct?

23    A   That's correct.

24    Q   Okay.  Let's go back now to Dr. Frisch's demonstrative,

25    Exhibit 2232-D.  And can we blow up starting with that

1    explanation using DeRamus tables, can we blow up 4 through 11?

2    4 through 11.  And do you have anything to say about this

3    particular part of Dr. Frisch's work?

4    A    Yes.  And I think it's -- it is important to look at the

5    percentages but it's also very important to look at the

6    absolute dollar amounts.  I think, consistent with my

7    application of the regs or my interpretation of the regs as I

8    have applied it in my own transfer pricing work, there is

9    guidance that I understand to mean that you need to look at the

10   actual results and you need to determine whether those actual

11   results are consistent with the arm's-length standard.  Are

12   they consistent with an -- under any kind of broader reasonable

13   test with what you would expect arm's-length parties to

14   actually do regardless of how you came up with something?

15   There are lots of ways in which transfer pricing practitioners

16   or tax departments can come up with lots of different logics

17   to -- and alternative ways of calculating numbers, but if at

18   the end of the day the number that needs to be evaluated is

19   that actual result, and here the actual result is such that LLC

20   actually earned $466 million over this -- I believe this is

21   2009 through 2017.  I don't believe it encompasses even the FY

22   2008 numbers, and certainly not the amounts after this time

23   period, after 2017.  So $446 million is what LLC actually

24   earned in return for this 877,000 dollar demand note that was

25   never paid until March 1 of 2008 as all of these incredible

1    profits were being generated from the U.S. omeprazole business.

2    And as an economist, I see that as a result in no way could

3    possibly comport with the arm's-length standard.

4         Now, Dr. Frisch appears to agree with me that that's

5    not an arm's-length result, but then he would have the Court

6    apply this 5.2 -- I'm sorry, 5.24 or 5.26 percent royalty rate,

7    this effective royalty rate that corresponds to this 37.4

8    million dollar valuation to the -- again, to the actual

9    profit -- to the actual sales which then -- and profit

10   experience, which would then result in those rows 8 and 9 and

11   10 and 11.

12        But if you go over to the total number, I think I

13   would just absorb the import of what Dr. Frisch is suggesting.

14   He is suggesting that an arm's-length result would give LLC

15   over this time period $339 million, again, before you put in FY

16   2008 and before you think about adding 2018 and forward income

17   as well.  Again, it's a number that has no conceivable

18   relationship to the value of whatever risks that LLC might have

19   incurred in an 877,000 dollar unsecured demand note back in,

20   whether it's November of 2006 or June of 2007 or March of 2008

21   when that was actually paid.

22        So -- and the percentages, I think, are also

23   informative because as an economist who has done transfer

24   pricing for 28 years, the idea that LLC would get 54.4 percent

25   of the profit after the adjustment that Dr. Frisch is proposing

1    is a result that is in no way reconcilable with arm's-length

2    dealings.

3    Q    Now, let's zoom back out, if we could, and let's wrap up by

4    going to the bottom parts.  Maybe can we start with -- if we

5    can blow it up?  Keep the row numbers in so that we can see the

6    row numbers, but go from 12 to 22.

7    A    And I think I might be able to also reference the

8    demonstrative that I remember Dr. Frisch putting up with the --

9    using his 5.24 percent numbers instead of 7.12 percent, but row

10   13 is the same in both demonstratives.  It's net sales.  You'll

11   recognize in 2009, 113,477,000 is the number that pops up in

12   2009.

13   Q    That's the first year sales in the model that Dr. Frisch is

14   relying on, correct?

15   A    Correct.

16   Q    Okay.

17   A    So in that model, so if he takes that -- the terms of that

18   model and he applies his -- both the correction to the five

19   percent sales and marketing fee, the Dexcel credit that Dexcel

20   provided to LLC, he corrects that number from five percent to

21   six percent like I do, but this is also where he applies his

22   nine percent SG&A number, where he updates that SG&A number in

23   the forecast and so he then derives his estimate of the

24   consolidated profit split as a result of that application.  So

25   lines 15 and 18 should be, I think, effectively the same in

this demonstrative as the other demonstrative where he is
applying that different royalty rate, but the bottom line is
that LLC -- again, I would have you look at the anticipated
income that LLC was expected to get from applying that method.
This is -- I'm sorry, this is applying kind of the actual,
sorry, 4.31 percent operating margin and 10 percent kicker
under that structure, LLC was expected to get $39,654,000 of
income over that broader time period.  And, again, the
forecasting probably didn't go out to 2017 but it gives you the
sense of kind of the order of magnitude of the income that LLC
was expecting to earn in return for the 877,000 dollar payment.

So in my view it goes to the foreseeability.  This is
not an outcome that would have been a surprise to LLC.  It was
-- or a surprise to Perrigo.  It was the expected structure and
expected result, even if you use this, what I consider, a very
low forecast, a forecast that is unreliably low because the
analyst in June of 2006 did not appropriately consider all
information that was known or knowable.  If you included that
information, that 39.6 million dollar number, the expected
transfer to -- of value to LLC would have been substantially
higher.  And so that's where you can -- and whether you look at
it in terms of the percentage amounts, so -- that's row 17.  So
LLC was expected to get 61 percent of that -- of that amount.
Again, this is evaluated over the entire 2009 to 2017 time
period.  If you do it over a shorter time period you'll get

1    slightly different percentages, maybe, but nothing that are

2    qualitatively different.  Actually, some of those may actually

3    be higher in other years.  So, for example, in 2009, look at

4    the 72.7 percent number under row 17.  So that's the amount

5    that even in that first year that LLC was expected to get.

6    72.7 percent of the total consolidated profit was going to go

7    to LLC in return for this 877,000 dollar nominal payment.

8        Now, the -- I think the last rows are instructive

9    because it shows what actually this notion of an effective

10   royalty rate actually does.  Because I do think there is some

11   tension between that as a concept and the position of the

12   parties that or -- of Perrigo that there was a risk transfer.

13   So even if you apply the -- whether it's the five percent or

14   the 7.12 percent, look at the results in LLC's operating income

15   in FY 2009.

16   Q    Is that row 19?

17   A    Correct.  Row 19.  So in this demonstrative it has 14.1 --

18   $14.2 million in that very first -- the very first full year of

19   the expected operations of the company, and this is -- this

20   assumes no 37.4 million dollar being paid.  This is taking that

21   37.4 million dollar valuation, converting it into a royalty

22   rate and saying, okay, let's kind of reimagine this transaction

23   a little bit and think about it as it's an assignment in which

24   the right where LPC is obligated to continue to perform the

25   very same functions as before, in return LPC is going -- I'm

1    sorry, LLC is going to pay Perrigo US some kind of royalty

2    rate.  So there is no concept even of a risk transfer in that,

3    and the numbers are, you know, bear that out, again, that $14.1

4    million, and then if you put in Dr. Frisch's actual numbers

5    using the 5.24 percent -- I apologize if I keep forgetting it's

6    5.24 or 5.26 percent for Dr. Frisch's affirmative opinion --

7    that number is even substantially higher.  I believe it's

8    something like $16 million.  So that result simply even on a

9    forecast basis is completely unreliable, and if you put in the

10   numbers, the actual forecast that the party actually created --

11   that Perrigo created, all those numbers in that bottom row are

12   larger because it's not use -- those forecasts did not use

13   Dr. Frisch's nine percent SG&A.  They used a five percent SG&A

14   so there is a bigger pool of profit across the row.  All those

15   negative numbers in row 19 turn positive, particularly if you

16   add on top of that -- you start correcting for things like the

17   cost of goods sold assumption, which we know is too high

18   because it was using this Schwarz proxy instead of the terms of

19   the actual Dexcel contract.

20        So all those numbers, if you actually use either the

21   numbers that were in that actual forecast or if you update them

22   as I think you should based on the information that was known

23   or knowable, all those numbers in the bottom row get even

24   bigger for LLC, both on a percentage basis and on an absolute

25   dollar basis.

Q    All right.  So to wrap up, summarize your view of this

demonstrative prepared by Dr. Frisch.

A    Yes.  So in summary, I think it actually shows the exact

opposite of what Dr. Frisch concludes.  I think it shows how

both the results, the actual result that -- of the parties'

implementation of the assignment and the sale and distribution

agreement led to a completely not arm's-length result.  It also

shows that implementing Dr. Frisch's proposal would similarly

lead to a non-arm's-length result that -- and not simply one

that's off by a few percentage points or a couple of million

dollars, but when it's off by hundreds and hundreds of millions

of dollars over -- over this broader time period and that the

percentages that he refers to are not only not reflective of

arm's-length dealings the way the parties would have actually

divied up that profit had they been dealing at arm's length,

but it's also not a result that as an economist I could ever

expect to be consistent with the arm's-length standard.

MR. WEAVER:  Thank you, Dr. DeRamus.

THE COURT:  All right.  Thank you, Mr. Weaver.  We'll

go to Perrigo 's cross.

CROSS EXAMINATION

BY MR. MAGEE:

Q    Good morning, Dr. DeRamus.

A    Good morning.

Q    Before we start the examination, since this is your first

1   time testifying as an expert witness in court, I want to talk

2   to you a little bit about the way I expect you to answer my

3   questions.  Mr. Weaver on direct left you an opportunity to

4   expand extensively and elaborate extensively.  I am going to

5   try to ask you very direct questions, most of which are

6   susceptible of yes or no answers, and I am not looking for any

7   elaboration.  If there is any necessary, Mr. Weaver can elicit

8   that from you on his clock.  This cross is on my clock, and I'd

9   appreciate you answering my questions very directly, yes or no

10  when possible without elaboration.  Do you understand that?

11  A   I do, but if I may correct something you just said?  This

12  is not my first time testifying in a federal court, but it is

13  my first time testifying on a tax matter in a federal court.

14          MR. WEAVER:  And, Your Honor, I just would lodge an

15  objection to that instruction.  If the question calls for an

16  answer, I believe Dr. DeRamus should be able to provide that

17  answer.

18          THE COURT:  We'll see if the questions are leading or

19  not.

20          MR. MAGEE:  Yeah.

21          THE COURT:  Let's go.

22          MR. MAGEE:  Let's go.

23  BY MR. MAGEE:

24  Q   All right.  Your report, Exhibit 5392, is dated December

25  2nd, 2019, correct?

1    A    Yes.

2    Q    And am I correct that you and Dr. Manning were engaged

3    together under a single contract dated May 5, 2018?

4    A    That's correct.

5    Q    All right.  And you had no information regarding the

6    transactions at issue before you began your assignment after

7    that contract date, is that correct?

8    A    I'm sorry, did I have any knowledge of the transaction at

9    issue before the assignment date?

10   Q    Before you were engaged.

11   A    Before I was engaged?  I do not recall the extent of the

12   discussions I had with counsel before my retention, but I'm

13   sorry, it's been a while now.

14   Q    Without -- with that qualification, you had discussions

15   with counsel before you were engaged in May of 2018?

16   A    I'm sorry, I just don't remember how much discussion I had

17   with counsel before I was engaged.

18   Q    And you testified yesterday that, quote, as an economist

19   it's uncertain to me how Perrigo US perceived the risks because

20   I was not in their shoes, end quote.  You recall that

21   testimony?

22   A    I'm sorry.  Could you repeat the question again?

23   Q    Yesterday is it not true that you testified that, quote, as

24   an economist it's uncertain to me how Perrigo US perceived the

25   risks because I was not in their shoes, end quote?

1           MR. WEAVER:  Objection.

2     BY MR. MAGEE:

3     Q    You recall that testimony?

4           MR. WEAVER:  Objection.  That's an improper question.

5     He wasn't here yesterday, Your Honor.

6     BY MR. MAGEE:

7     Q    I'm sorry.  Friday, or last prior court date.

8     A    I recall the statement.  I also recall some additional, so

9     yes, that is the statement I made on Friday, but if I could

10    elaborate, because there were additional things -- I did some

11    additional inferences that I felt I could make as an economist

12    regarding its perceptions, but that's a true statement in terms

13    of what I said.

14    Q    And my next question regards inferences, so your

15    conclusions are based upon your inferences and that's all they

16    are, isn't that correct?

17    A    Well, all of my conclusions provided in this matter are

18    simply, well, my inferences and my calculations based on the

19    available documents and my conclusions as an economist, reading

20    the deposition transcripts and reviewing the information, so --

21    Q    All right.  All right.  Let's talk about your

22    qualifications for a minute.  You are not a certified valuation

23    expert?

24    A    No, I am not.  I am an economist.

25    Q    You are not a certified valuation expert, are you?

A    No, in the sense that that often refers to the professional qualifications of a valuation professional as opposed to a Ph.D. economist.

Q    That's why I used the word certified.  Not a certified accountant, correct?

A    I am not a certified accountant.

Q    And you are not an expert in chemistry or the drug chemistry industry?

A    No, I'm not, or yes, that is a correct statement.

Q    And you do not have any expertise in FDA practices or procedures, do you?

A    I do not.

Q    Now, we may need to refer to your deposition as we go along here.  Do you recall that I deposed you under oath on March 12, 2019?

A    Yes, I do.

Q    All right.  Let's talk about your transfer pricing experience, if we could?  Let's turn to Appendix A of your report, please.  And the appendices are numbered -- page numbered according -- which they are but it falls immediately -- page 117 in your report.  All right.

A    Okay.

Q    There are no dates in this fairly extensive CV, are there?

A    Well, it depends on the matters, so for things that are not court proceedings, no, there are no dates associated with

1    those.  Many of these are consulting engagements.  I'd be happy

2    to elaborate on those dates.

3    Q    We'll get to that, but it's true, is it not, that even with

4    respect to your testimony -- in your regulatory affairs

5    testimony there are no dates in the CV, isn't that correct?

6    A    Well, the regulatory proceedings actually have a date

7    embedded in the docket number, but I'd have to go through and

8    look.

9    Q    Let's turn to page A-2 and section A-4, selected antitrust

10   experience.

11   A    Yes.

12   Q    You have 13 cases there listed for antitrust experience and

13   only one that reflects a date, I think it's in the third

14   bullet.  I'm just asking why none of this is dated?

15   A    This is from my CV.  It's something I try to keep updated

16   on a running basis.  I provide case captions for people to

17   find, but it's just my practice.  I believe I provided a list

18   of dates for things that I've testified on at least to counsel,

19   which I assume you also received, but -- so to me the

20   disclosure requirements under the rules, I did provide all

21   those dates even if they are not included in my CV here.

22   Q    So in A-4 we have 13 antitrust cases and A-5 we have 19

23   commercial litigation cases.  In A-6 we have 24 regulatory

24   energy proceedings, and then in A-7 you have a number of

25   consulting engagements, none of these include tax matters,

1    correct?

2    A    I'm sorry, when you say none of these?

3    Q    These being A-4, A-5, A-6 and A-7?

4    A    Certainly not A-4 through A-6.  I believe A-7 might

5    actually have some transfer pricing related matters, but it's

6    kind of a catchall category for my other consulting work.

7    Q    All right.  You acknowledged on direct, did you not, that

8    this is your first U.S. court appearance involving a transfer

9    pricing case?

10   A    That's correct.

11   Q    And isn't it true that this is the first time that you have

12   filed an expert report with a U.S. court on a transfer pricing

13   matter?

14   A    That is correct as well.

15   Q    Let's go to A-4 of the Appendix A, selected transfer

16   pricing and tax experience.

17   A    Yes.

18   Q    With respect to the first bullet, Dr. DeRamus, isn't it

19   true that many of the transfer pricing studies you have

20   referred to here that you have been involved in, including the

21   medical products study mentioned here, were done while you were

22   at KPMG in 1993 through 1998 before you joined Bates White in

23   1999?

24   A    Well, I did --

25   Q    Isn't it true is my question?

A    It is true that many were done at KPMG, and it's true that many were done after I left KPMG, so I haven't totalled up the numbers but many of them were done at KPMG, yes.

Q    Let's look at your deposition, please, page 45, and I am starting at line 22. I'm sorry, I'm starting above that. Let's start at line 13. So look at page A-1 of Appendix A, your education. I see -- I'm sorry, I don't want the education. The next sentence in the first bullet under A-3, it says that you have conducted numerous transfer pricing studies for tax planning documentation and audits. Clients include large multinational companies involved in a wide range of industry, and then you list a number of them, among which is a medical products. Answer, yes. How many medical product engagements have you had other than this one? Well, it's difficult for me to recollect everything I have been doing for about 25 years now. Many of the cases that are referenced here occurred while I was working at KPMG in the period 1993 to 1998.

          Did I read that correctly?

A    Yes, you did.

Q    All right. Other than the KPMG experience and this case, isn't it true that your transfer pricing activity in the pharmaceutical industry is limited to one instance in which you consulted another colleague on his engagement?

A    Well, as of the time I wrote my report that was true with

1    regard to transfer pricing.  I think I mentioned other areas

2    that I worked related to the pharmaceutical industry.  I have

3    continued to work quite extensively in the pharmaceutical

4    industry since that time period on other matters.

5    Q    It was true as of the time I took your deposition, was it

6    not?

7    A    That's correct.

8    Q    In your direct qualification testimony you stated that you

9    worked regularly on transfer pricing matters for the past 28

10   years, and I heard you repeat that generally this morning,

11   correct?

12   A    That's correct.

13   Q    All right.  Isn't it fair to say that in your career at

14   Bates White between 1999 and 2016 most of your economic

15   analyses pertained to antitrust and market power issues rather

16   than transfer pricing?

17   A    In terms of the percentage of my hours I think that's

18   probably -- that I am pretty confident that is correct.  I

19   would say that that number fluctuates, and I have worked

20   continuously on transfer pricing matters over my entire career

21   since starting at KPMG in 1993.

22   Q    I'm asking about your experience starting with Bates White

23   in 1999 through 2016, most of your analyses was in antitrust

24   and market power issues, was it not?

25   A    Again, by number of hours worked I would say correct

1    through at least 2016, but from that time to the present I

2    would say it's -- particularly in more recent years most is

3    actually transfer pricing.

4    Q    After your joint engagement with Dr. Manning, you and he

5    were at Bates White in the same D.C. office, were you not,

6    until Dr. Manning left in February?

7    A    That's correct, with a caveat about COVID, but yes.

8    Q    And you coordinated extensively in developing your separate

9    reports, isn't that correct?

10   A    I discussed things with him, yes, and sought out his views

11   on the pharmaceutical industry.

12   Q    Yeah.  In fact, for your economic assessment of the risks

13   and contingencies associated with the omeprazole drug

14   development and patent litigation affecting Dexcel's

15   omeprazole, you relied on Dr. Manning's report, quote, in

16   particular for his greater experience in the pharmaceutical

17   industry, correct?

18   A    It's true that I definitely wanted to know his views on the

19   pharmaceutical industry based on his extensive experience in

20   that.  I would say I also did my own independent evaluation of

21   the matters in the documents that we've heard about for the

22   past two weeks to draw my own conclusions, and those were

23   consistent with what I've understood Dr. Manning's conclusions

24   were.

25   Q    Right.  So you are relying on Dr. Manning's report, your

1    discussions with him, and the documents you reviewed?

2    A    I'm sorry, I did have discussions with him.  Those

3    discussions were informative to me, and I relied on the

4    totality of the information that I reviewed to come to my own

5    independent view of what the risks were associated with the --

6    and opportunities associated with the U.S. omeprazole business.

7    Q    Let's turn to paragraph 8 on page 12 of your report, 5392.

8    Paragraph 8 is on page 12.

9    A    Yes.

10    Q    And the heading that you are addressing here is Perrigo US

11    financial risks associated with a Dexcel contract were very

12    limited.  Paragraph 8 says, as discussed in Dr. Manning's

13    report, the Dexcel contract posed very limited financial risks

14    to Perrigo US.  And then you list three reasons for that, and

15    those are drawn directly from Dr. Manning's report, are they

16    not?

17    A    Well, as I said, I didn't -- I did reference that, but this

18    is also a desire not to be duplicative in terms of the amount

19    of material that I am presenting, but yes, it is referring to

20    Dr. Manning's report.

21    Q    And the only other thing you did was to look at the

22    documents that you reviewed, which were extensive, correct?

23         MR. WEAVER:  Objection.  Mischaracterizes prior

24    testimony.

25         MR. MAGEE:  I don't think it does, Your Honor.

1          THE COURT:  The witness can answer if he's able.  Go
2     ahead.
3          MR. MAGEE:  I'm sorry, Your Honor.  I can't hear you.
4          THE COURT:  The witness can answer if he is able.
5          THE WITNESS:  So I would say that's not correct.  I
6     did review the documents but I also did my own research.  My
7     conclusions were also informed by my own prior experience in
8     the pharmaceutical industry, which I agree was not nearly as
9     extensive as Dr. Manning's, which is one reason why I did want
10    to discuss his views on that, but there was a much broader set
11    of information that I used in coming to my opinions in this
12    matter.
13    BY MR. MAGEE:
14    Q    Your analysis here as an economist does not go so far as to
15    say that the assignment of the Dexcel contract did not occur,
16    isn't that right?
17    A    That's correct.  My understanding is that is a legal
18    determination for the Court to decide and not something that I
19    am providing an opinion on as an economist.
20    Q    Not an economic question, is it?
21    A    As I understand the issue before the Court, it's not a
22    economic question, that's correct.
23    Q    And the same is true, is it not, for the distribution
24    agreement between LLC and LPC?
25    A    When you say the same is true?

Q    The same is true that your conclusions do not go so far as
to say that that contract did not occur?

A    Correct.  My understanding is that that is a legal matter
for the Court to determine and not for me to opine on.

Q    Yeah.  In fact, isn't it correct that there are no
doctrines in economics about shamming a transaction to ignore
or disregard its occurrence, isn't that correct?

A    Well, I think there is a lot packed into that sentence.
There is -- this notion of shamming a transaction is kind of a
weird nomenclature to me.  Economists do look at conduct.  They
make inferences from that conduct with regard to what parties
do.  When I testify in antitrust matters, oftentimes I am asked
to provide my opinion as to whether the evidence is consistent
or inconsistent with an agreement, so there can be -- that's --
I don't by any means consider this a, quote-unquote, shamming
as I understood Dr. Frisch to use that term, but it is one
where I think economic insights can provide -- an economic
analysis and research can provide insights into certain
questions about contracts, but, again, I don't -- I don't think
that there is anything that says shamming a transaction is an
economic issue.

Q    A principle?

A    An economic principle.

Q    And that's also true of antitrust literature, is it not?

A    Well, I think I just provided my response about the

1    antitrust work that I do, which is often looking at whether

2    conduct is consistent or inconsistent with an agreement,

3    whether -- particularly when if a party asserts a justification

4    for a course of conduct, whether it's pretextual or not or

5    whether it's actually borne out by the actual economics.  So I

6    think there are parallels in the antitrust world and what I've

7    done in the antitrust world to evaluating a course of conduct

8    in this instance.

9    Q    But let me ask it more precisely, is there anything in the

10   antitrust literature that suggests ignoring the transactions

11   that, in fact, took place?  Yes or no?

12   A    There is nothing that comes to mind at this point.

13   Q    All right.  In your testimony you have made many references

14   to the arm's-length standard and arm's-length dealings under §

15   482.  It's true, is it not, that the arm's-length standard

16   requires related parties in a transaction to price their

17   intercompany transaction in the same manner as unrelated

18   parties would, isn't that correct?

19   A    That's correct.

20   Q    All right.  And it's also true that the general principle

21   of arm's-length behavior is applied pretty much universally in

22   both transfer pricing regulations and in economic principles?

23   A    I'm sorry, could you repeat the question?

24   Q    It is true also that the general principle of arm's-length

25   behavior is applied pretty much universally in both transfer

pricing regulations and in economic principles?

A    I would probably say generally.  My understanding of the transfer pricing regulations is that they are -- they were written to generally reflect economic principles, but there are also certain specific requirements in many areas of the regulations that are specific to the concerns that a tax authority has in enforcing the regulations given the way in which related parties can structure their affairs in all sorts of ways that might not necessarily comport with what you would expect in arm's-length dealings.

Q    The arm's-length standard means, does it not, that the arm's-length price for a transaction is determined using the best available ex ante information because that is what unrelated parties would know at the time of their transaction, correct?

A    I think there are limits.

Q    Is that correct or not?

A    That's one of those -- those questions that's not really susceptible to a yes or no answer because I think there is a broader issue that I think applies in many other kinds of context involving third-party transactions where third-party transactions are generally done based on the information that is known or knowable at the time, unless those third parties put in certain provisions like a purchase price adjustment for things that happen in the future.  When it comes to transfer

1    pricing analysis, I think there is a recognition both by

2    economists and in the regulations that relying on internal data

3    and solely on internal data to establish an arm's-length price

4    has inherent limitations.  So I do think when you come up into

5    the application of transfer pricing, that's one of those areas

6    where there is a need to conform kind of the way you apply

7    economic principles to the overall rubric that is put forth in

8    the 482 regulations.

9    Q    We'll get to reliability of the information available to

10   related parties, but my question was the standard.  The

11   arm's-length standard is based on what third parties would do

12   using ex ante information because that's all that's known at

13   the time of their transaction unless they have provisions of

14   the type that you describe for future modifications, correct?

15   A    Well, again, I think I said that if you are talking about

16   the arm's-length standard in a vacuum without reference to the

17   regs and without reference to transfer pricing issues, then

18   parties typically make and enter into transactions based only

19   on information that is known or knowable at the time, but when

20   you apply those in a transfer pricing context, that raises

21   significant additional issues because of the fact that there

22   are effectively objectives that the taxpayer might be pursuing,

23   and if it does so -- and it prepares its transfer pricing

24   analysis solely on the basis of internal information, that may

25   not lead to a reliable result.

1   Q    I did not use the word internal.  I said the best available

2   information.

3   A    Well, if that includes outside information as well, then,

4   yes, I probably would include that as well, but I still think

5   that any transfer pricing context is -- using internal

6   information has this important asterisk next to it in a

7   transfer pricing context as reflected in the regs.  And as

8   economists, and as I applied in my 28 years of transfer pricing

9   analysis, I have always looked at internal projections.  If

10  that's all you have or that's all the entirety of the method is

11  relying on is those internal projections, that's a big red

12  flag.

13  Q    Yes.  We understand your testimony over four hours about

14  the reliability of that information.  We are going to talk more

15  directly here about my questions, though.

16          Would you agree with this statement, quote, the ex

17  ante perspective is fundamental to achieving arm's-length

18  results, end quote?  Would you agree with that statement?

19  A    Not as a -- I think there are -- again, it's not

20  susceptible to a yes or no answer.  I think there are elements

21  that I agree in spirit with some of it as it applies in general

22  to third-party transactions, but not as it applies to transfer

23  pricing analysis particularly in the context of a transfer of

24  intangibles.  I think ex post information can provide very

25  useful information.

1    Q    We'll talk about ex post as we come along, but right now I

2    just asked whether you agreed with that statement.  Did you

3    read the preamble to the proposed 2005 cost sharing

4    regulations?

5            MR. WEAVER:  Objection, Your Honor.  He's asking

6    Dr. DeRamus to go into legal analysis.

7            THE COURT:  He is asking him if he read the preamble.

8            MR. MAGEE:  The proposed regs.

9            THE COURT:  That's all.  So I don't know if he did or

10   didn't or if he knows whether he did or didn't.

11   MR. MAGEE:

12   Q    Did you?

13   A    I don't remember at this point.

14   Q    You don't recall.  Would it surprise you that quote was

15   drawn from the proposed regulations preamble?  Would it

16   surprise you?

17   A    It would not surprise me.

18   Q    Let me give you -- let me give you another one, then, and

19   ask if you agree with this statement.  Given the uncertainty

20   about whether and to what extent intangibles will be

21   successfully developed, expert interpretations of ex ante

22   expectations are inherently unreliable and susceptible to

23   abuse.  Do you agree with that statement, yes or no?  Do you

24   agree with that statement?

25   A    I'm sorry, it's one of those it depends.  There are --

1    there are elements that I can see the logic of it, but I also,

2    as a kind of a broad brush statement, I am not quite sure.  So

3    I would need to think further on it.

4    Q    In applying the arm's-length standard, there is nothing in

5    the 482 regulations that requires related parties to maximize

6    or minimize their tax liabilities, isn't that correct?

7    A    That's correct.

8    Q    And it is your understanding, is it not, that under § 482,

9    the related parties are legally bound to pay the arm's-length

10   price in any related party IP transfer transaction, isn't that

11   correct?

12              MR. WEAVER:  Objection.  Calls for a legal conclusion.

13              THE COURT:  Well, he didn't ask him to make the

14   conclusion.  He asked him if it was his understanding, and on

15   cross I think the witness can say yes, no, or I can't answer.

16              MR. MAGEE:  Heavily experienced in 482.  It's a

17   perfectly appropriate question.

18              THE COURT:  Well, I get to make that decision,

19   Mr. Magee.  So you get to ask it.  Mr. Weaver gets to object

20   and I get to rule, and I am saying the way you framed it the

21   witness can answer if he's able.

22   BY MR. MAGEE:

23   Q    Can you answer?

24   A    It's -- I can say that it's generally my understanding that

25   parties are -- the taxpayers are obligated to pay arm's-length

1    prices in related party transactions, but all the nuances and

2    the legal nuances are not opinions that I am here to provide.

3    Q    In fact, in your experience it's not uncommon for related

4    party contract pricing terms to just say that the price or the

5    compensation will be arm's length as determined from time to

6    time, isn't that correct?

7    A    That's correct for certain types of transactions but

8    certainly not intangibles unless it's -- so the tangible

9    transaction is the easiest one to think about because the

10   prices, if they are referencing a market benchmark, those

11   market benchmarks may need to be updated from time to time, but

12   I think for intangibles and particularly an intangibles

13   transfer, then it's critical to know what it is is happening

14   and when it's happening in order to be able to derive that

15   arm's-length price.  It's just, you can't -- because, as I said

16   before, you know, time resolves all risks, and if intangibles

17   are all about risk and if there is any kind of risk associated

18   with that intangible and that intangible transfer, you have to

19   have something that tells you when it occurs, what price was

20   paid, and what exactly the rights were associated with that

21   transfer.  It can't simply be a general understanding whether

22   it's a very defined intangible like intellectual property, like

23   a piece of technology, but particularly in the sense of a

24   broader intangible, that kind of sweeps in a lot of other

25   things.

1    Q    Right.  In your experience, if the pricing of an intangible

2    transfer between related parties is incorrect, isn't the

3    solution to reprice the transaction to be consistent with the

4    arm's-length standard rather than to ignore the transaction?

5    Yes or no, please.

6    A    I would say generally yes in the context of tangible

7    transactions like a widget or an engine, for example, that

8    sold.

9    Q    Sorry.  My question was intangible transfers.

10   A    I'm sorry, tangible or intangible?

11   Q    Intangible transfers was my question.

12   A    I think it would depend.

13   Q    I'm sorry?

14   A    I think it would depend.  I think it would depend on --

15   Q    Right.  That's fine.

16   A    -- a lot of things.

17   Q    Let's go to your deposition at page 92 -- 95, lines 17

18   through 23.  22, I'm sorry.  I asked you there, wouldn't the

19   ordinarily practice be to reprice a transaction rather than

20   ignore it?  And we are talking here about intangible

21   transactions between related parties, if you recall.  Your

22   answer, well -- question, in your practice?  Answer, in my

23   experience one would not ignore it, referring to the

24   transaction.

25           Did I read that correctly?

1    A    Yes, you did.  And I'd be happy to explain the context, but

2    yes, you did read that correctly.

3            MR. WEAVER:  Objection.  He didn't finish the answer,

4    Your Honor.

5            THE COURT:  Well, you can read --

6            MR. MAGEE:  I can stop where I like.

7            THE COURT:  You can read the rest it on the rule of

8    completeness.  Go ahead.

9            MR. MAGEE:  Sorry.

10           THE COURT:  Just read the rest of it for the rule of

11   completeness.

12           MR. MAGEE:  All right.

13   BY MR. MAGEE:

14   Q    My experience one would not ignore it.  So in my experience

15   the transfer of intangibles that I worked on or that I know of

16   involve intangibles that were used by multiple related parties

17   in their ordinary course of business, so you actually had

18   functions, assets and risks on both sides of the transaction.

19   I read that correctly, did I not?

20   A    Yes, you did.  Thank you.

21   Q    And isn't it true, Dr. DeRamus, if LLC had actually paid a

22   significant multimillion dollar sum for the assignment in this

23   case, it would have significantly reduced Perrigo's U.S.

24   risks -- Perrigo US's risks under the contract and

25   significantly increased LLC's risks, isn't it true?

1    A    Certainly from a financial perspective.  I think there is

2    a -- it would not have changed anything about the operating

3    risks, but it certainly would have changed the P&L of -- or

4    reduced the risks to Perrigo US's P&L, if there had been an

5    actual payment of, call it, a hundred million dollars.  Again,

6    it doesn't resolve all the risks but there was -- there would

7    be additional risks, P&L risks that would have been reduced as

8    a result.

9    Q    And the larger the payment, the more the risk reduction to

10   Perrigo US and the more the increase of the risk to LLC,

11   correct?

12   A    To some extent, yes.  As I said before in my earlier

13   testimony, that a critical issue also is LLC's ability to bear

14   risk, so there are a wide range of risks that even if LLC had

15   made a big, call it, a hundred million dollar payment or 200

16   million dollar payment to Perrigo US, LLC in my opinion would

17   not have had the capacity to bear a lot of any downside

18   business risks that ultimately would have come back to Perrigo

19   US in the event of a downside, but certainly a 100 million

20   dollar transfer or 200 million dollar transfer of cash in 2006

21   would have been a different risk profile for Perrigo US than

22   what actually occurred.

23   Q    You agree, don't you, that the commensurate with income

24   standard in § 482 is viewed as being consistent with the

25   arm's-length standard, correct?

1    A    Correct.

2    Q    And you agree that your report doesn't mention commensurate

3    with income in any respect other than the footnote pointed out

4    by counsel, footnote 304, correct, citing the regulation?

5    A    Correct, with regard to my report, but I did discuss it at

6    length in my deposition.

7    Q    In your deposition.

8    A    Yes.

9    Q    Yes.  We're talking here about your testimony today.  I

10   know you did in your deposition.  That's not -- your deposition

11   is not in evidence.

12   A    Thank you.

13        MR. WEAVER:  Objection.  Move to strike the last

14   comment.

15        THE COURT:  Well, we'll let it stand.  Obviously it's

16   not part of the evidentiary record.  Go ahead.

17   BY MR. MAGEE:

18   Q    Alex, can you call up 5512, please?  You testified about

19   this exhibit on direct, correct?

20   A    Yes.

21   Q    And this is a situation in which you computed an

22   arm's-length royalty based on the actual revenues during the

23   years at issue, is that correct?

24   A    Correct.  And it's also consistent with, as I said, my

25   conclusions in the main part of my report about what the

1    arm's-length royalty result would be.

2    Q    Yes.  Is this an application of commensurate with income?

3    A    Well, here I think are you asking me for my --

4    Q    I'm asking you --

5          THE COURT:  Don't talk over each other, all right?  If

6    you ask the question, wait for the answer, and if it's not

7    responsive, you can move to strike, but don't talk over each

8    other.  Go ahead.

9          MR. MAGEE:  I apologize, Your Honor.

10          THE COURT:  Ask the question.

11          MR. MAGEE:  Please.

12          THE WITNESS:  If you are asking whether this is

13    consistent with my understanding of the requirements under the

14    commensurate with income provisions of the § 482 regulations, I

15    would say, yes, it is, but again, I am not here to construe the

16    regulations.  It's just that is my understanding.

17    BY MR. MAGEE:

18    Q    And the royalty here of 21.3 -- 53 percent effectively

19    allocates all of the income, all of the actual income back to

20    the U.S., does it not?

21    A    The way it's applied here actually does not because you

22    subtract out the 0.32 percent and actually Perrigo LLC actually

23    gets a fair lump of credit for -- above and beyond the 877 that

24    it actually paid.  That's why in the calculations you see LLC

25    receiving 4 million, or more if you use the 0.79 percent

1    figure.

2    Q    I'm sorry.  In this exhibit there are no such

3    modifications.  Line A is reported revenue and line B is

4    stipulated income of LLC and line -- the last line is B over A

5    without modification for any other numbers and it computes a

6    royalty rate of 21.53 using reported revenue and stipulated

7    income, does it not?

8    A    That's correct.

9    Q    And that's a hundred percent of the income, is it not?

10   A    That's a hundred percent of the income attributable to the

11   assignment.

12   Q    Right.  And you agree, do you not -- you can take that

13   down, please, Alex.  You agree, do you not, that the IRS view

14   of the commensurate with income standard is, first, that the

15   income in question is the income from the intangible reasonably

16   and conscientiously projected at the time it entered into the

17   controlled transaction, correct?  You understand that?

18   A    I understand those words and those are consistent with my

19   understanding of the commensurate with income provisions of the

20   482 regulations.

21   Q    And, further, is it true that because of the information

22   disparities between taxpayers who are doing the transaction and

23   the IRS, which may later audit the transaction, regarding what

24   actually happened, if the actual later income is larger it may

25   create a rebuttable presumption that the taxpayer failed to

1    consider all available ex ante information?

2            MR. WEAVER:  Objection, Your Honor.  He is reading

3    from an IRS memorandum that is legal in nature so I object.  He

4    is asking for legal analysis here.

5            THE COURT:  Well, I think the way he framed the

6    question it probably did this time, and obviously that's not

7    what the witness can testify about.  If he wants to ask for his

8    understanding, I guess he can, but ultimately both sides are

9    going to be briefing this I'm sure.

10   BY MR. MAGEE:

11   Q    Is that your understanding of the IRS view?

12   A    It's the rebuttable presumption part that I don't really

13   have a view on.  That's not something that I have thought

14   about.  I have looked at the commensurate with income

15   provisions in the IRS -- in the 482 regulations, and I just

16   can't remember who has the bump, as it were, in that.

17   Q    So you are not familiar with the concept of a rebuttable

18   presumption arising from later information?

19   A    Again, I am familiar with the concept of rebuttable

20   presumption.  I just am not here to offer an opinion as to

21   which party has the burden of proof or even my understanding of

22   which party has the burden of proof.  I have applied, you know,

23   calculations that I consider to be consistent with my

24   understanding of those regulations, and that's where I kind of

25   end my analysis.

1    Q    And, finally, is it consistent -- is it your understanding

2    of the IRS view of commensurate with income, finally, that the

3    taxpayer may rebut the presumption by showing that it used the

4    best available information at the time of the transaction?

5    A    I would probably refer to the explicit language in the 482

6    regulations that does provide some certain safe harbor

7    provisions not only with regard to the 80 percent to 120

8    percent but also with regard to the foreseeability.  Again, as

9    I expressed earlier, I do think in this instance those

10   transfers -- the transfer of substantial value was foreseeable

11   at the time.

12   Q    In your experience, have you ever had a situation in which

13   a taxpayer selected an amount that turned out to be lower than

14   arm's length and treated the balance of the value in the

15   transaction as a contribution to capital of the recipient of

16   the asset?  Have you ever had that experience in your practice?

17   A    Not that I recall.

18   Q    Okay.  Do you understand what a contribution to capital in

19   that circumstance might be?

20   A    Yes, I do.

21   Q    Okay.  And if it's a cross border transaction, it's subject

22   to § 367 of the code, you understand that?

23   A    Yes.  But, again, I am not here to offer an opinion about

24   367 or 367(d) because there is a lot of nuances in there in

25   that that I am -- I am not an expert in by any means.

1    Q    But you do understand -- you just mentioned 367(d).  You do

2    understand that a contribution to capital subject to 367(d)

3    triggers a royalty obligation on the part of the recipient, do

4    you not?

5            MR. WEAVER:  Objection, Your Honor.  The witness just

6    said he is not here to testify on the nuances of 367(d).

7            THE COURT:  He did.  And the question is whether he

8    has that understanding or not.  For whatever it's worth, if he

9    does, he can say it.  If he doesn't, he can say it.  Go ahead.

10   BY MR. MAGEE:

11   Q    You yourself mentioned 367(d), that's what triggered the

12   question, Dr. DeRamus.

13   A    Certainly I understand that there are -- there is something

14   called 367(d), and that there are and it relates to transfer of

15   intangibles overseas.  I just don't recall the specifics of

16   what then triggers a payment of a royalty, so I'll take your

17   represent -- if that's what it requires, I'll be happy to take

18   your representation of that.

19   Q    It's true, is it not, that the transfer pricing regulations

20   under § 482 do not require agreements to effectuate related

21   party transactions?

22           THE COURT:  Well, that does ask him, when you say it's

23   true, for a legal opinion.  He is not talking about an

24   understanding so I don't think that's a more --

25           MR. MAGEE:  I'll revise the question, Your Honor.

1    Thank you.

2    BY MR. MAGEE:

3    Q    Is it your understanding that under the transfer pricing

4    regulations under § 482, that they don't anywhere contain a

5    written requirement -- a requirement that written agreements

6    are necessary to effectuate related party transactions?

7    A    I would say generally they do not.  My understanding of the

8    regs is that they do not require agreements, but there are

9    certain provisions, for example, cost sharing regulations,

10   the -- the cost sharing regulations that do require a written

11   agreement, and there is language in various portions of the

12   regulations with regard to potential conflict between a

13   contract and conduct and the need for the arm's-length parties

14   to evaluate conduct if that conflicts with the actual

15   contracts.  So contracts are discussed quite a bit throughout

16   those regulations.  Some portions there is a requirement for

17   certain provisions.  I just don't require -- I just don't

18   recall the kind of broad brush specifics in all the different

19   sections.

20   Q    And there is no principle in economics, is there, that

21   invalidates an oral agreement if it is never reduced to writing

22   or if it is reduced to writing sometimes after the agreement

23   was formed?

24            MR. WEAVER:  Objection.  Compound.

25            THE COURT:  It is compound.  Let's take them one at a

1    time.

2    BY MR. MAGEE:

3    Q    All right.  It's true, is it not, that there are no --

4    there is no economic principle that invalidates an oral

5    agreement if it's never reduced to writing, correct?

6    A    Well, it sounds like that ultimately is a legal issue.  As

7    I said before, economic analysis does in other contexts also

8    looks at whether conduct is consistent with possibly an oral

9    agreement or an understanding of the parties, but, again, this

10   notion of a conflict -- your question as raised sounds like

11   it's asking for a legal opinion as opposed to the economic one.

12   Q    On the contrary.  I just asked you whether there was any

13   principle in economics that invalidates an oral agreement if it

14   is never reduced to writing?  Please, yes or no, a principal in

15   economics?

16   A    I'm sorry.  Just because -- I have a hard time answering

17   the questions because economics does look at contracts.  It

18   does look at conduct, and it looks at -- in certain, very

19   specific instances it looks at oral agreements as well, so I am

20   sorry, I am having a hard time coming up with kind of a blanket

21   statement other than to say kind of this notion of invalidating

22   is not what economics do.  Economics don't invalidate

23   something.  They just provide their opinion as to what parties

24   are actually transacting, why are they transacting that way,

25   and what are the effects of those transactions?

1    Q    And you would not be surprised, would you, if related

2    parties sometimes have made the written recording of prior

3    agreements some time after the agreement was reached?

4    A    That's right.  In certain instances I can see that

5    occurring.  An arm's-length contract I think not necessarily so

6    much, because I think we even heard that with Mr. Solomon that

7    it's not done until the contract is signed.  So third-party

8    agreements generally are pinned down when those are actually

9    executed, not when there is an intention, not even when there

10   is a term sheet, so -- but for related party transactions,

11   sometimes parties do document them after the fact.

12   Q    And in your economic consulting practice, have you ever

13   rendered oral economic advice to a client that was only later

14   reduced to writing?

15   A    I believe so, yes, in the context of updating studies.  If,

16   for example, clients wanted to know what the range was for a

17   set of comparables before the end of the tax year in order to

18   make an adjustment, sometimes I would do that, or before the --

19   kind of the close of the books I would provide that information

20   to them, that advice before I prepared the documentation

21   closing out that year.

22   Q    Yes.  We are going to get to the 6662(e), but this is a

23   more general question.  In your consulting have you ever

24   rendered oral economic advice to a client that was only later

25   reduced to writing?

1    A    Yes.  I just gave you an example of the instance in which I

2    can recall doing such.  So in the context of documentation --

3    Q    Let's turn to documentation.  You have prepared -- I think

4    your appendix shows transfer pricing documentation under §

5    6662(e) for penalty protection, correct?

6    A    Yes.  It's my -- I prepared documentation, and it's

7    generally been my understanding that that documentation was

8    used in part for penalty production under 6662.  It might also

9    have been used for foreign clients as well.

10   Q    And you agree that 6662(e) documentation that you prepared

11   is intended to demonstrate that the taxpayer's transfer pricing

12   is arm's length, correct?

13             MR. WEAVER:  Objection, Your Honor.  Dr. DeRamus never

14   offered an opinion, that I recall, on direct regarding 6662(e),

15   which is a penalty provision.  Therefore, it's beyond the scope

16   of the direct.

17             THE COURT:  All right.  Well, I think that he has been

18   offered as an expert on transfer pricing, and part of the

19   Perrigo critique is that he doesn't have a lot of experience in

20   it compared to their expert, and I didn't see the specific

21   reference in the CV to documentation that was used for the

22   6662(e) safe harbor, but if it's there, if that's really in

23   there, then I think it's a fair part of the cross, so you can

24   go ahead and proceed.

25   BY MR. MAGEE:

Q    And you understand, Dr. DeRamus, do you not, that under §
6662(e) the documentation to be effective for penalty
protection must be in existence by the time the tax return is
filed?  You understand that?

A    Well, again, it is my understanding that the documentation
that I prepare needed to be in existence or be completed before
the tax return is filed.  I have not delved into kind of the
specific provisions of 6662(e).

Q    Have you ever rendered final transfer pricing advice
anticipated to satisfy 6662(e) and later reduced that advice to
writing or supplemented the advice after the return was filed?

A    Again, you keep couching everything within 6662(e), and I
think I said that all of my analysis was documentation, just my
clients were looking for more from me as an economic expert to
provide my opinion as to what the arm's-length result is.  It's
my understanding that that was often used by some clients for
documentation to satisfy some of the requirements under 6662,
but, again, I was not -- that was not a formal opinion I was
offering about those regulations.

        So in terms of kind of the timing of when I would have
provided that advice, as I said before, there is -- there have
been times where I have provided an initial update for what I
thought were -- where I thought a range of comparables was
going to come in and I provided those -- that information to
the taxpayer before they closed out the books for a year but

1   well before they filed their tax return.  I later reduced those

2   conclusions or updated those conclusions based on kind of the

3   actual results prior to the end of their fiscal year or before

4   their tax filing so that they would have it in place.

5           I am trying to remember if there's been other

6   instances in which I've done additional analyses after the tax

7   return was actually filed.  I believe there probably certainly

8   were if there were additional data that may have not have been

9   available at the time.  So, for example, in comparable profits

10  methods analyses there is often a lag in terms of reporting so

11  I may have updated those in that context.

12  Q   I am not referring to additional data.  I am talking about

13  your analysis.

14  A   And, I'm sorry, so the question is whether the analysis

15  that I performed for a tax year happened after the taxpayer

16  actually filed the tax return?

17  Q   Was updated after the taxpayer filed the tax return?

18  A   I am sorry, I just don't recall specifically.  It wouldn't

19  surprise me that there may have been certain circumstances like

20  a restructuring transaction that happened, a bankruptcy

21  proceeding that might have caused that, but I just don't -- I

22  am trying to remember a specific instance in which that may

23  have occurred.

24  Q   Let me refresh your recollection at least with your answer

25  in your deposition.  Let's go to page 151 of the deposition,

1   please, line 8 through 18.  And we've been discussing here in

2   the deposition 6662(e), and my question was -- the question I'm

3   asking is whether the final written report has ever been

4   prepared after the deadline of the return date but based on

5   advice that was given, final advice that was given before the

6   return date?  Answer:  I would say the standard practice that I

7   assume is always being followed is preparing a report by the

8   time the return was due, but there may have been -- there have

9   been certainly -- there have certainly been instances in which

10  I've updated an analysis after the date of the return.  Did I

11  read that correctly?

12  A    Yes, you did.

13          MR. WEAVER:  Objection, Your Honor.  He didn't finish

14  the answer.

15          THE COURT:  All right.  Well, let's read the rest of

16  the answer for completeness.

17          MR. MAGEE:  Well, I'm afraid Dr. DeRamus goes on at

18  length in most of these cases.

19  BY MR. MAGEE:

20  Q    But I don't have a lot of visibility into the tax return

21  filing process.  Every client has different deadlines that --

22  different kind of -- sorry.  Every client has kind of different

23  deadlines that it's dealing with.  Often times it's foreign

24  deadlines.  So I'm often -- yeah, I guess I think I get what

25  you are trying to get at.  I think there have been times in

1    which I've provided initial results.  Those were often to

2    ensure the transfer pricing adjustments were done in a timely

3    manner, and then I might prepare the documentation after that

4    because there was a difference in the clock in terms of what or

5    when they actually had to get the transfer pricing adjustment

6    done relative to when the documentation might have been due for

7    example.  I'll leave it at that.

8              Did I read that correctly?

9    A    Yes.  You did.

10              THE COURT:  Careful what you ask for, Mr. Weaver.  Go

11   ahead.

12   BY MR. MAGEE:

13   Q    Were you present when Mr. Rush testified about the reasons

14   for the delay in preparing a written documentation?

15   A    Yes.  I am trying to remember the specifics.

16   Q    That's all right.  If you don't remember, that's fine.

17   A    But I recall some of what he said.  I'm just trying to put

18   it into that box as we are talking.

19   Q    That's all right.  Let's move on.

20              Isn't it true as a general statement of principle that

21   there are no principles in economics that the owner of a

22   contract is only entitled to the economic benefits of that

23   contract if it performs all the functions required by the

24   contract itself?  Isn't that true?

25   A    Probably as a broad brush statement, yes.  So if -- I'm

1    trying to think of the context.  So yes.  If I have a contract

2    to sell you a particular product and I buy an input for that or

3    I buy service that's part of delivering that contract, there

4    is -- there is nothing in economics to say that I as the

5    provider of that good or service wouldn't get the entirety of

6    the benefit of the contract that I negotiate with you, for

7    example, if you are the third party.

8    Q    I wasn't inquiring about a service contract.  I was asking

9    whether there are any economic principles that the owner of a

10   contract is only entitled to the benefits of the contract if it

11   performs all the functions required by the contract itself?

12   A    Well, that's the part I'm --

13   Q    Yes or no.  Is it not?

14   A    As I understand your question, I think you are saying --

15   the fact -- if I take the question literally, the party has to

16   perform according to the terms of the contract in order to

17   receive any of the benefits of the contract unless the party --

18   because you would not have fulfilled the terms of the contract,

19   but as I think what you are trying to get at is, there are

20   certain circumstances in which the party that's providing the

21   good or the service or whatever it is may subcontract to other

22   parties, and that doesn't necessarily reduce the benefit that

23   it is able to obtain from the primary contract that it has in

24   the first instance.

25   Q    Let's refer to your deposition, if we may, please, starting

1    at page 225?  I asked you precisely this question, and we had a

2    long dialogue, and then I started again at line 20:  I'm sorry.

3    Is there an economic principle?  The answer is no?  I want to

4    make sure you understand the question, and I am understanding

5    the answer.  Let me repeat the question.  Is there any economic

6    principle in the literature that says that an owner of a

7    contract is only entitled the economic benefits of the contract

8    if it can perform fully itself the terms of the contract rather

9    than subcontracting to other parties using arm's-length prices?

10   Answer, I would say, considered in isolation as a general

11   statement of principle, no.

12            MR. WEAVER:  Objection, Your Honor.  I ask that the

13   rest of the answer be read.

14            THE COURT:  Well, at this point I think I've heard

15   enough about it that I can imagine what's in the rest of the

16   answer because it's going to be the same thing he said here,

17   and he at least answered the question that Mr. Magee put to him

18   directly, and it is a question that can be answered yes or no,

19   so I think there is no need to continue reading in this

20   particular case.

21   BY MR. MAGEE:

22   Q    And your understanding, Dr. DeRamus, it's not unusual for

23   subsidiary companies to contract out for various services to be

24   performed by other members of a related party group, correct?

25   A    That's correct.

Q    And are you aware that -- in this case your report
discusses extensively and in many places the Plantex
desloratadine distribution agreement that was assigned to LLC.
Were you aware that LLC paid for R&D research services
performed by Perrigo R&D on the U.S. side?

A    Yes.  And I believe that payment was also made in March of
2008.  It was part of that lump sum payment at the same time
that Perrigo US was reimbursed for its paragraph IV litigation
expenditures.  I believe there were also similar reimbursement
of LLC -- of Perrigo US or Perrigo R&D for expenses related to
the desloratadine.

Q    And are you aware that the IRS never disturbed the
assignment of the Plantex desloratadine contract to LLC or
reversed any R&D service fee income that Perrigo US might have
received?  Are you aware?

A    I am -- that's generally consistent with my understanding,
but I don't recall specifically.

Q    You are familiar with the existence of intellectual
property holding companies, are you not?

A    Yes, I am.

Q    But you have limited knowledge as to whether these
companies have any operational staff, correct?

A    Well, I would say I have -- based on my experience, I have
knowledge that in planning for IP holding companies there is a
general desire for people who are providing that advice to

1    ensure that there are actual people behind those companies, but

2    that there is -- and it may have even been in the context of

3    Ms. Voortman and Ms. Warner I believe also described that there

4    are -- there were certain structures that they were

5    contemplating that they did not put in place because people

6    didn't want to move, so I took that to be consistent with my

7    experience with IP holding companies that -- or not my

8    experience but my understanding of ones that have been put in

9    place, that there is a concern by transfer pricing

10   professionals and by the service that there actually be people

11   attached to those IP holding companies and particularly an

12   ability to manage the risks because that is -- that goes to a

13   fundamental issue of pricing.

14   Q    With respect, Dr. DeRamus, that wasn't my question.  My

15   question was whether you personally have limited knowledge as

16   to whether these companies have any operational staff?  Is the

17   answer yes or no?

18   A    Well, again, when you say my personal knowledge, I have a

19   personal knowledge that these are actual issues and that

20   taxpayers generally are concerned about ensuring that there are

21   staff somewhere in the mix when they set up IP holding company

22   structures.  I don't have -- because I have not myself

23   implemented IP holding companies, I don't have limited

24   knowledge in terms of how that might be done in practice.

25   Q    All right.  Limited knowledge as to whether or not these

1    companies, these IP holding companies have operational staffs?

2    A    Well, again, I think I just answered that.  It is my -- I

3    have given you the best answer I think I can give, is that I

4    understand that there is a concern that transfer pricing

5    practitioners have, that consultants, have and that the tax

6    authorities have with regard to IP transfers, IP holding

7    companies, cost sharing buy-in arrangements, that there is a

8    substantive function performed by actual people if you are

9    moving intangibles around.

10         With regard to how individual taxpayers may have

11   implemented, that's where I have more limited visibility

12   because that has not been part of my practice.  I have not been

13   out there setting up IP holding companies.

14   Q    As part of your analysis --

15         THE COURT:  When you get to a good stopping point we

16   should take a break.

17         MR. MAGEE:  It would be.  I am going on to a new

18   topic, Your Honor.  Thank you.

19         THE COURT:  Let's take our morning break and we'll

20   come back after 20 minutes.

21         LAW CLERK:  Court is in recess.

22         (Recess taken, 10:29 a.m.)

23         (Resume proceedings, 10:49 a.m.)

24         LAW CLERK:  Court is in session.

25         THE COURT:  All right.  We'll continue the cross.

1          MR. MAGEE:  Thank you, Your Honor.

2     BY MR. MAGEE:

3     Q    Dr. DeRamus, you observed that there was no capital in LLC

4     until UK Finco contributed cash capital in early 2008, correct?

5     A    Correct.  Until March of 2008.

6     Q    And it's your opinion expressed in your report, is it not,

7     that until the cash is contributed as capital, the assignment

8     could not be treated as having occurred?

9     A    No.  The question I've looked at in my report is not, you

10    know, whether or not you treat it as being -- the assignment as

11    having occurred but whether there was any modicum of risk

12    transfer?  So I just want to be clear that my question -- the

13    issue that I am looking at is at what point is there some

14    relief by LLC to Perrigo US of the 877,000 dollar assignment

15    price, and that's when the cash trades hands in March of 2008.

16    Q    And in your direct examination you testified regarding the

17    value that you calculated assuming that the March 2008 date was

18    the assignment date, correct?

19    A    I used the March 1, 2008 date as a valuation date?

20    Q    Yes.

21    A    To say that I can value it -- I can value the assignment

22    using three alternative dates?  One, which I do think is the

23    most appropriate valuation date to use is the March 1, 2008.

24    Q    And your valuation for that date is based upon the use of

25    actual sales rather than any ex ante information, isn't that

1       correct?

2       A    No, that's incorrect.  My primary opinion is based on

3       actual, but I do use a -- and there is some forecasts even

4       embedded in those actuals for the 2013 and forward time period,

5       but I also have an opinion that derives the 174 million dollar

6       number of the assignment value if you were to use March 1, 2008

7       as the valuation date, and if you were to use a forecast, the

8       most reasonable forecast I have at that date, the Epple

9       forecast from December of 2007 with the --

10      Q    With the actuals?

11      A    I'm sorry?

12      Q    With actuals?

13      A    No.  Those are all forecast numbers.

14      Q    Okay.

15      A    So it's, just to be clear -- I'm sorry, but it's the Epple

16      forecast for 2008 to 2009 prepared in December of 2007 plus the

17      Schutt forecast for FY 2010 and forward since Mr. Epple did not

18      provide an explicit forecast for those out years.

19      Q    If you assume, hypothetically, that the assignment of the

20      Dexcel contract to LLC is recognized, doesn't LLC own an

21      intangible asset of value?

22      A    LLC does own an intangible asset, namely, literally the

23      assignment agreement itself.  But there -- as I said, there are

24      embedded in the assignment -- or as an economist evaluating

25      that I need to look at the assignment in the sale and

1    distribution as a given as a totality as interrelated

2    transactions.

3    Q    Doesn't possession of the Dexcel contract, if you assume

4    hypothetically that the assignment is effective, give LLC an

5    asset, an intangible asset of value, the contract, the Dexcel

6    contract?

7    A    Yes.  The assignment of the contract to LLC provided LLC of

8    something of value, which in terms of the -- the contract

9    itself was a value.  I think that's ultimately what I'm asked

10   to provide an opinion on is what is the right payment for that

11   asset given the rights that transferred with those.

12   Q    That's not the question I'm asking you, but you have stated

13   that the contract has value.  Thank you.

14          You understand that UK Finco ultimately provided LLC

15   with the capital in March but you discount its financial

16   capacity to back up LLC's obligations as of November 29, 2006,

17   correct?

18   A    I wouldn't say I discount it.  I looked at it.  As an

19   economist trying to price the transaction, I look at the

20   related parties at issue with the specific transaction, namely,

21   LLC on the one hand and Perrigo US on the other, or LLC plus

22   PITLP without looking further above, but I did evaluate whether

23   UK Finco had the ability to finance the transaction at arm's

24   length even though it didn't have the contractual obligation

25   under the terms of the contract with PITLP or the terms of its

1    membership agreement with PITLP, and I concluded that it did

2    not if everything had been done at arm's length.

3    Q    And that included revaluing the desloratadine and the

4    coated nicotine gum assignments, did it not?

5    A    Well --

6    Q    Just yes or no, please.  Did it not?

7    A    It did not depend entirely on that.  Even my lower bound of

8    the value using the forecasts, the $125 million, is far in

9    excess of UK Finco's financing capability, particularly if you

10   take out the non-arm's-length transfer of the coated nicotine

11   gum business, but even with that in there, it didn't have $125

12   million or $175 million or $474 million of financial capacity

13   independent of what Perrigo US could provide.

14   Q    And when you did your report, were you aware that in

15   successive audit cycles the IRS did not disturb the

16   desloratadine or the nicotine gum assignments?

17   A    Yes, I did.  Yes, I was aware of that, but I still

18   concluded it was relevant to my analysis.

19   Q    Let's turn to page 81 of Exhibit 5392, your report, please.

20   And I'm looking at the heading in the middle of the page for

21   V1B.  At arm's length, LLC would sell omeprazole to Perrigo US

22   at the price it pays to Dexcel.  And here you are assuming that

23   LLC has the Dexcel contract, correct?

24   A    Correct.  I assume that there is an assignment that has

25   been -- that has occurred.  That Dexcel has -- I'm sorry, that

1    LLC has the -- whatever rights and obligations under the

2    agreement and that Perrigo US is obligated to perform whatever

3    it has under the sale and distribution agreement.

4    Q    All right.  But if we look at paragraph 187, you conclude

5    that due to LLC's inability to, quote, perform any function or

6    take any significant financial risks or contribute a valuable

7    intangible asset, that it would have, quote, no income and its

8    revenues would be equal to its costs of purchasing the product

9    from Dexcel.  That carries over into 190.  That was your

10   conclusion in your report, correct?

11   A    Correct.  But just to be clear, when I say, or contribute a

12   valuable intangible asset, what I meant was other than kind of

13   the four corners of the assignment agreement itself.

14   Q    So we are going to get to that.  Taking the assignment of

15   the Dexcel contract as a given here, you conclude that at arm's

16   length LLC would effectively receive zero on the omeprazole

17   profits, correct, in fiscal years '09 through '12?

18   A    Correct.  Taking the actual 877,000 dollar assignment price

19   as given, that that -- given the relative functions and assets

20   and risks of LLC versus Perrigo US, the result for LLC would be

21   zero.

22   Q    So if we look again at paragraph 187 where you state that

23   LLC uses no intangible asset (other than the assigned Dexcel

24   contract rights) means that your analysis excludes any effect

25   for the Dexcel contract here, correct?

1  A    Well, as I said before, that's why -- that's --

2         MR. WEAVER:  Objection.  He interrupted Dr. DeRamus's

3  answer.

4         THE COURT:  Well, the answer wasn't apparently

5  responsive so I can understand why it was --

6         MR. MAGEE:  Once again, yeah.

7  BY MR. MAGEE:

8  Q    I'm sorry.  I apologize if I interrupted you, but please

9  answer my question.

10 A    I'm sorry.  Could you repeat that?

11 Q    When you say other than the Dexcel contract, you are not

12 recognizing any value contributed by the LLC because of its

13 ownership of the Dexcel contract, correct, in this analysis in

14 paragraph 187?

15 A    Not entirely correct.  I'm saying, again, you have to

16 consider the two contracts as fundamentally interrelated, and

17 so I take as given the pricing, this $877,832 that was paid for

18 the contract, so that is baked into that analysis, and then I'm

19 trying to figure out what is the compensation that is due to

20 Dexcel -- I'm sorry, to LLC with that assignment price as

21 given.

22 Q    With all due respect, Dr. DeRamus, this paragraph doesn't

23 say anything about the 877 or anything else or about the supply

24 or the sales and distribution agreement.  This analysis says

25 that you are looking at what LLC is contributing in the

1    transaction, and it has to contribute functions or it has to

2    contribute assets, but you are ignoring the Dexcel contract as

3    an asset for purposes of this analysis, isn't that correct?

4    A    No, that's not correct.

5    Q    That's not correct.  All right.  Doesn't LLC's ownership of

6    the Dexcel contract, if you consider hypothetically that it

7    does own it, mean that Dr. Reddy's launch of a magnesium

8    product -- that until Dr. Reddy's launches a magnesium product

9    in 2010, LLC controlled the only rights to the source of an FDA

10   approved OTC omeprazole product that could be -- that could

11   compete with Prilosec OTC, correct?

12   A    Yes.  Well, I would say Perrigo US owned those rights, and

13   if the assignment assigns those rights, then LLC owns those

14   rights.

15   Q    I'm sorry, Dr. DeRamus, you need to listen to me.  I said,

16   assuming hypothetically that LLC owns the contract, that was

17   the assumption embedded in my question, means that until

18   Dr. Reddy's launch of a magnesium product in 2010, LLC

19   controlled the only rights to the source of an FDA approved OTC

20   omeprazole product that could compete with Prilosec OTC?

21   Making that assumption, isn't that correct?

22   A    Yes, that's correct.

23   Q    And isn't that more than just a, quote, passive financial

24   investor, end quote, that you characterized LLC in your direct?

25   A    No, I disagree with that.  I think ultimately it is acting

1    as a passive financial because LLC has no ability to implement

2    the terms of the Dexcel contract.  All it has -- it has the

3    four corners of the assignment contract, but it is not like

4    Dr. Reddy's.  It is not like Leiner.  It is not like Perrigo

5    US.  It has no ability to commercialize a product, so I think

6    the appropriate way to evaluate that is -- if you are looking

7    at that investment is to look at -- from LLC's perspective is

8    looking at LLC simply as a passive financial investor.

9    Q    I see.  Did you hear Mr. Papa's testimony that they are a

10   large wholesaler distributor with marketing and retail customer

11   experience like AmerisourceBergen, Cardinal Health had, and

12   similar companies, that could provide distribution of an

13   omeprazole product?  Did you hear that testimony?  That's the

14   question.

15   A    Yes, I did hear that testimony.

16   Q    Okay.  You are not challenging the fact witnesses here, are

17   you?

18   A    I am not challenging any fact witness, but I have to,

19   again, make economic inferences based on the sum total of the

20   information that I have reviewed, and that statement is very --

21   cuts across what I heard or is counter to what I heard from

22   Dexcel itself or what I saw that Dexcel stated when it said it

23   evaluated other alternatives including the very companies that

24   Mr. Papa noted and concluded that they were not suitable

25   partners for it in the OTC market.  So either -- whether it was

1    the broader marketing capability -- I believe ultimately it was

2    the broader marketing capability and OTC experience that

3    Perrigo US uniquely brought to Dexcel.

4    Q    Yes.  It was the fact that they liked Perrigo best, but

5    Dexcel never -- you never saw anything that Dexcel concluded

6    that none of these other companies could possibly distribute an

7    omeprazole product, did you?

8    A    The question --

9    Q    Did you?  Yes or no, please.

10   A    I did not see anything that said physically

11   AmerisourceBergen, Cardinal Health couldn't distribute.  I saw

12   the response that Dexcel provided that indicated to me that

13   these companies could not effectively market the product in the

14   way that Perrigo US and, therefore, it was not a -- they were

15   not an economically viable alternative to Dexcel at the time it

16   was seeking a partner for this business.

17   Q    Did you ever compute the return on operating expenses

18   earned by LPC under the sales and distribution agreement?  Did

19   you ever compute what actually happened in terms of the return

20   on operating expenses?

21   A    In terms of the markup over expenses?

22   Q    Return on expenses, yeah.  I don't mean the margin that

23   they granted.  I mean what did they earn as a return on their

24   operating expenses?  Did you ever make that computation?

25   A    I don't believe I did, no.

1    Q    If I represented to you that the return was between 63 and

2    104 percent, what would your reaction be?

3    A    My reaction would be that's probably consistent with my

4    understanding of the sales and marketing expenses which are a

5    relatively low percentage of sales and the SG&A expenses.

6    Q    Right.  And those levels of returns on operating expenses

7    are not routine within the meaning of 482, are they?

8    A    I think it's the wrong measure.  I think --

9    Q    I'm sorry, but that's not what I asked you, please.

10   A    Well, it is, because you said within -- is it -- when I

11   have to provide my opinion as to what is a routine return, a

12   routine return for a distributor is typically a kind of a

13   return on sales.  Well, like Dr. Frisch did and like E&Y

14   reported, but you might an RRA but not necessarily a return on

15   expenses.  I guess you could, but not one that I have looked at

16   in analyzing a distributor contract.

17   Q    But a return -- if you are using that methodology, a return

18   on operating costs, the range that I just described to you is

19   far above routine return, isn't it?

20   A    Well, I am having trouble reconciling two different data

21   points.

22   Q    All right.  Let's move on then.  All right.  You agreed

23   with Dr. Frisch that the DCF method is an appropriate method to

24   value intangible property like the Dexcel contract, correct?

25   A    I do -- as a general matter I did conclude in this instance

1    it's not the most reliable method, but yes.

2    Q    We understand that you have other opinions about the

3    approach, but you agree that it's an appropriate valuation

4    method for intangible property or contracts that constitute

5    intangible property, do you not?

6    A    That's correct, if the information is sufficiently

7    reliable.

8    Q    And you agree with Dr. Frisch, do you not, that in

9    calculating the value for the assignment you must specify the

10   profits retained by LPC for its distribution function as well?

11   You are taking them into account together, the Dexcel contract

12   value and the distribution compensation?

13   A    Correct.  That if you are doing it in the second method,

14   you need to not just value the Dexcel contract as a whole but

15   the portion that LPC is retaining through the sales and

16   distribution agreement.

17   Q    All right.  I'd like to talk about the projections.

18   Apparently you disagree with Dr. Frisch that ordinarily the

19   Perrigo cash flow projections would be probability weighted

20   before -- for unique risks that affect the prospects of

21   achieving the cash flows before the cash flows are discounted

22   to net present value, because you testified on direct on Friday

23   the primary way in which a risk is incorporated in a NPV type

24   calculation is through the discount rate.  Standard way

25   financial analysts account for possibility that the cash flows

1    may not occur is through a discount rate that captures the

2    risks of those flows.  Do you recall that testimony?

3    A    I do recall that testimony, yes.

4    Q    And that contradicts Dr. Frisch's testimony that you

5    discount -- that you probability weight the cash flows first

6    before discounting them to net present value?

7    A    Well --

8    Q    Doesn't it?

9    A    I'm sorry.  It's not a yes or no question because there is

10   an assumption.  I think I talked about the fact that sometimes,

11   or maybe not, the fact that an analyst preparing that cash flow

12   statement, there is kind of a certain expectation about what

13   those cash flows are.  So the forecast itself should be an

14   expected value, so they are effectively embedded probably in

15   some kind of, you know, implicit or explicit probabilities

16   associated with that.  Sometimes I have observed with --

17   particularly in pharmaceutical companies in innovator drug

18   development there will be an explicit factor that you would

19   then adjust that forecast by the probability of technical

20   success, but here, given the product and the stage of its

21   development, I believe that that would have been close to a

22   hundred percent.

23   Q    Do you recall Mr. Schutt testifying that these projections

24   done by the pharmaceutical business development group were not

25   risk weighted?  Do you recall that testimony?

1   A    I do recall that.  It is a little bit contrary to some of

2   the things I had seen in the underlying forecasts, but I do

3   recall him saying that.

4   Q    All right.  And your testimony on Friday was that the

5   primary way in which a risk is incorporated in a NPV type

6   calculation is through the discount rate?

7   A    That's correct.

8   Q    Okay.  Let's -- can we pass out Exhibit 1678, please?

9   Dr. DeRamus, this is an excerpt from the Principles of

10  Corporate Finance by Brealey, Myers, and Allen.  It's marked as

11  Exhibit 1678.  You cited this ninth edition text in your

12  report, did you not?

13  A    Yes, I did.

14  Q    And it's the most widely used textbook in graduate finance,

15  isn't it?

16  A    I believe so.  I would agree with that.

17  Q    The excerpt that I have selected for you is 10.3, if we

18  turn to page 246 of the exhibit.  Setting discount rates when

19  you don't have a beta.  It opens with a discussion about betas

20  and risk and a rough guide to risk and averaging risk and so

21  forth, but I want to focus on the middle, the bottom half sort

22  of.  What if the proposed investment is not close enough to

23  business as usual to justify using a company cost to capital?

24  These cases clearly call for judgment.  For managers making

25  that kind of judgment we offered three pieces of advice.  One,

1    avoid fudge factors.  Don't give into the temptation to add

2    fudge factors to the discount rate to offset things that could

3    go wrong with the proposed investment.  Adjust the cash flow

4    forecasts first.  That's consistent with Dr. Frisch's

5    testimony, isn't it?

6    A    I don't know if it's consistent with his testimony.  It's

7    consistent with my understanding and my testimony, I believe.

8    Q    This says that you don't raise the discount rate to take

9    account of risk but you probability weight the cash flows

10   first.  That's contrary to your testimony on Friday.

11   A    Well, I think you misapprehend the section.  It says

12   setting discount rates when you don't have a beta.  Here,

13   Perrigo is a publicly trade company.  There is a beta.  Its

14   cost of capital appropriately includes the relatively risk --

15   the relative riskiness of its cash flows.  So I think this

16   whole section applies to when you are dealing with private

17   companies.

18        And in terms of avoiding fudge factors, I would not --

19   you want to get the cash flow forecasts right from the get-go,

20   which is why I think those forecasts should have been updated

21   with information that was known and knowable.  So I completely

22   agree with the statement that says adjust cash flow forecasts

23   first.  And I completely agree, if you have a bad forecast, you

24   wouldn't then try and say, okay, I can just somehow increase

25   the discount rate and somehow that will take care of all the

1  problems with my reliable forecasts.  So I agree with the
2  statement.
3  Q   If you are working with forecasts that are not probability
4  weighted then you are not taking into account the adjustments
5  that they talk about here, correct?
6          Let's move over to 247.
7          MR. WEAVER:  Objection.  He asked a question.  He
8  didn't give Dr. DeRamus --
9          MR. MAGEE:  My apologies, Mr. Weaver.
10          MR. WEAVER:  Well, can he answer the question, Your
11  Honor?
12          MR. MAGEE:  Sure.
13          THE COURT:  You did put the question so we can take
14  the answer.  Do you remember it?
15          THE WITNESS:  Yes, I do.  So I think I remember the
16  question.  So the -- when people talk about an expected value
17  forecast, as an economist or as a financial analyst you
18  typically think of those by the very nature of the term
19  expected value, that it encompasses some form of probability
20  weighting.  You see that, for example, in Mr. Schutt's work in
21  August where he has the high case, the medium case, the low
22  case, the business case.  So the derivation of that baseline
23  forecast has embedded in it -- if you pick the right one has
24  embedded within it certain assumptions about the probability
25  weighting that the analyst has in coming up with that forecast.

1    On the spreadsheets that Mr. Schutt provided and that

2    are in all the forecasts there is a little tab at the top that

3    talks about the relative risk associated with a particular

4    product, and that always says low for omeprazole.  So -- but,

5    again, this whole section is about discount rates when you

6    don't have a beta, which is not the case here.

7    BY MR. MAGEE:

8    Q    Yeah.  Okay.  Let's go to 247, because they further

9    elaborate the avoiding fudge factors and discount rates with an

10   example.  It starts out by saying, we have defined risk from

11   the investor viewpoint as a standard deviation of portfolio --

12   let me start again.  We have defined risk from the investor's

13   viewpoint as the standard deviation of portfolio return or the

14   beta of a common stock or other security, but in every day

15   usage risk simply equals bad outcomes.  People think of the

16   risks of a project as a list of things that can go wrong.  For

17   example, if you look at the second bullet it says, a

18   pharmaceutical manufacturer worries about the risk that a new

19   drug that cures baldness may not be approved by the FDA.  And

20   then below the bullets it continues.  Managers often add fudge

21   factors to discount rates to offset worries such as these.

22   This sort of adjustment makes us nervous.

23   First, the bad outcomes we cited appear to reflect

24   unique, that is, diversifiable risks that would not affect the

25   expected return demanded by investors.  Second, the need for a

1    discount rate that -- discount rate adjustment usually arises

2    because managers fail to give bad outcomes their due weight in

3    cash flow forecasts.  Managers then try to offset that mistake

4    by adding a fudge factor to the discount rate.

5            And then if we go over to page 248 we see them

6    applying their example with a zero -- with a 10 percent

7    probability of no approval of the drug and they demonstrate how

8    that would affect the present value calculation, because rather

9    than raising the discount rate, you probability adjust the cash

10   flow.  Can you see that happening here?

11   A    I see that, and that's exactly consistent with the scenario

12   I described, because in the paragraph above that it talks about

13   if there is technological uncertainty that introduces a 10

14   percent chance of a zero cash flow then would you drop that by

15   10 percent, which is what I have seen pharmaceutical companies

16   do with this probability of technical success.  It is that PTS

17   that is often used to then apply it to a given forecast, which

18   is not present here, which is really that unbiased forecast

19   above, which is here in the block on the top of page 248.  So

20   it says, the possible cash flow of 1.2, 1.0 and .8, and the

21   unbiased forecast is 1.0.

22   Q    But you heard Mr. Schutt's testimony that the

23   pharmaceutical business development people in the models that

24   they used for projections and that Dr. Frisch used for his

25   valuation did not have probability weighting for the cash

flows.  You saw that, did you not?

A    I did see that.

Q    Okay.  You mentioned the low risk verbiage on the projections in the headings -- I think in the headings on the projections?

A    That's correct.

Q    First, the market and risk, low, you mentioned that.  And you assumed that that referred to the projections themselves, correct?

A    I assume that that actually was referring to omeprazole itself.

Q    Yeah.

A    The business, as a business prospect, that omeprazole was a low risk business.

Q    And, therefore, there are no probability weightings in the projections contained in those exhibits, correct?

A    Well, again, when I say there is no probability weightings, I would not expect there to be something like a PTS, a probability of technical success, like you would see in an innovator pharmaceutical company, or in the example provided in the Brealey and Myers text that you just provided to me, I would have expected the forecast to provide effectively the expected value, which is more of an implicit way of weighting those cash flows by a probability of occurrence.

Q    But you don't know, in fact, do you, that the low risk

1    reference in the projections related to the omeprazole business

2    or to the cash flows in the projections?  You don't know that

3    for a fact, do you?

4    A    No.  Because they apply the same low risk for probably

5    various different iterations.  My assumption is it's primarily

6    applied to the overall opportunity as opposed to any given

7    projection.

8    Q    And it could have referred to the threat of competition or

9    low risk of recovery of investment or other types of risks,

10   could it not?

11   A    In theory it could, but there are things I can learn by

12   comparing that risk factor relative to other products, so, for

13   example, on desloratadine, if it's a medium risk, which I took

14   to refer to the fact that desloratadine had not yet gone to

15   OTC, there had not been an OTC switch by the national brand

16   whereas there had been already long since for omeprazole.

17   Q    In fact, don't these projections that Dr. Frisch used

18   themselves demonstrate to you that the risks or contingencies

19   affecting the omeprazole product could substantially reduce the

20   projection cash flows and their ultimate value in an NPV

21   calculation?  Isn't it true that the projections themselves

22   demonstrate that?

23   A    I am not quite sure what you mean by that.  I'm sorry.  The

24   projections are simply the projections that the analyst

25   provided.

1    Q    But let's explore that.  You agree that the June 2006 and

2    January 2007 projections that Dr. Frisch used showed NPV,

3    five-year NPV of approximately 31 million for the first to

4    market scenario, correct?

5    A    I recall something generally in that order of magnitude.

6    Again, keep in mind the NPV is not a -- is a post-tax number

7    not a pre-tax number, and so it is not a measure of the value,

8    but there was no change -- I would agree with you that there

9    was no change in that forecast dated June 2006 and the one

10   dated January 2007.

11   Q    My question simply is do you recall that the net present

12   value five-year calculation was approximately 31 million?  That

13   was my question.  Do you recall that?

14   A    As I sit here today I think that's generally consistent

15   with my recollection.  I just can't recall the exact number off

16   the top of my head.

17   Q    And do you agree that those projections dropped the NPV

18   projections -- that the NPV for the projections dropped to 11.6

19   million when just the risk of being tied to market was taken

20   into account?

21   A    I agree that there was a significant reduction in the cash

22   flows in those projections under the tied to market scenario,

23   yes.

24   Q    So the first to market didn't have any probability

25   weighting for tied to market, those projections?  I mean, the

1    first to market projections didn't have any probability

2    weighting for risk of being tied to market, did they?

3    A    As a scenario analysis it did not have any explicit

4    weighting.  The question is whether the analyst in preparing

5    that had some kind of risk adjustment, because the -- if you

6    recall, the first year, the 2009 projections -- the first year

7    in that first to market scenario is FY 2009.  It's not adjusted

8    for -- risk adjusted for the potential that it might have had a

9    launch date, and FY 2008 has actually occurred, so there is

10   only so much I can tell in terms of the assumptions that the

11   analyst had when they were preparing that particular forecast.

12   Q    But you can tell with a certainty, can you not, that the

13   tied -- when the tied to market NPV drops from 31 million to

14   11.5 million, that there has been a risk adjustment or

15   reduction in the cash flows used to compute the NPV, isn't that

16   correct?

17   A    I would agree insofar as it shows that the analyst has

18   different parameter assumptions under the tied to market, and

19   that those parameter assumptions result in lower profits, and

20   that results in a lowering of the cash flows.  And, again, I

21   hesitate to rely on that NPV number because it's not a relevant

22   number, but it does reduce those cash flows.

23   Q    So you would agree, hypothetically assuming that other

24   contingencies affecting the cash flows needed to be taken into

25   account through probability weighting, that it is possible

1    there would be a further reduction in the net present value

2    significantly below 11.5 million, correct?

3    A    I'm sorry, you said if there was a need to incorporate

4    probabilities?

5    Q    Assuming other contingencies could affect the cash flows,

6    risk weighting the cash flows for those contingencies could

7    dramatically reduce the net present value below 11.5 million,

8    correct?

9    A    It assumes what specific contingencies those are?  I'm

10   sorry, it is a it depends kind of answer, because those

11   forecasts embed certain expectations and, frankly, the past

12   experience that Perrigo US has had in launching products, and

13   there are certain information that we know.  As of even

14   November 2006 we know that there has not been an application

15   yet or a paragraph IV litigation by -- by Dr. Reddy's, so we

16   know that given the timeline of the litigation, the expectation

17   is that U.S. will be the first to market as of the time that

18   you are doing the analysis, so that's why I said it depends on

19   the specific contingency that you are talking about.

20   Q    I just asked you to assume that there are other

21   contingencies that could affect the cash flows if they were

22   risk weighted in the cash flow projections.  And if that

23   occurred, there could be a NPV substantially below 11.5

24   million, isn't that correct?

25   A    It would only be the case if there were a contingency that

1    the analyst had not even been aware of.  That was not reflected

2    in any historical experience.  That was -- and that they had

3    somehow not factored in that contingency in some way.  Where

4    the probability was sufficiently high, they would have been

5    remotely relevant to those cash flows, again, with the caveat

6    that the NPV that you are talking about is not a relevant data

7    point for me.  What's relevant to me are the cash flows

8    embedded in those forecasts.

9    Q    Which, again, were not risk weighted.  So let's assume that

10   the probability of FDA approval were questioned like the

11   example in Brealey and Myers.  The fact -- the potential --

12   even a small potential that the FDA might not approve the

13   omeprazole drug could dramatically affect the net present value

14   calculation, could it not?

15   A    Again, I think the reference in Brealey and Myers is to a

16   situation when you don't have the cost of capital and, B, that

17   specific reference is to technological risks, i.e., has the

18   molecule been developed?  And that's the scenario that I've

19   seen with these explicit probability of technical success

20   adjustment factors, which are not present here.  So I don't

21   think that it would have been appropriate to have a further --

22   you know, some kind of percentage point and then applied to

23   those cash flows because I think those cash flows -- that

24   forecast of cash flows was, in some broad sense, an expected

25   value as economists think of this.  Those cash flows could have

1    been higher.  Those cash flows could have been lower, but those

2    are kind of an expected value of those cash flows.

3    Q    You criticized Dr. Frisch's use of the 9.27 percent of

4    sales for his SG&A expense in his calculations because you

5    believe a buyer would use marginal sales expenses in

6    calculating a purchase price and because Dr. Frisch used an ex

7    post number in Mr. Broadhurst's work.  Is that an accurate

8    statement of your reservations about the use of the 9.27?

9    A    The first part of your statement I would say yes.  The

10   second part is where I said -- I believe in my report I said

11   that his use of the 9.27 percent is the -- an area of

12   methodological inconsistencies, as he says, oh, I,

13   Dr. Frisch -- I'm paraphrasing.  I need to use the information

14   available at the time except for this one important data point

15   called SG&A.  So that's where I considered it to be a

16   methodological inconsistency if he is staying true to his

17   asserted method.

18   Q    Right.  But you believe that a marginal sales expense is

19   more appropriate in this valuation than a fully loaded expense

20   like Dr. Frisch used, correct?

21   A    Correct.  Other than -- particularly when talking about

22   fully loaded in the sense of additional corporate overhead, and

23   even that five percent, that five percent includes some

24   overhead because the marginal rate is something more like one

25   percent and something as reflected in the Epple December 2007

1     forecast.

2     Q    Let's look at Exhibit 1089, please.  Will you pass that

3     out?  This is an IDR response in the audit, and the date of the

4     IDR is November 20, 2012, and it's referring to the need for

5     some additional information about the intercompany transactions

6     relating to omeprazole calculated by E&Y in early 2009 on the

7     front page.  You see that?

8     A    Yes.

9     Q    So this is an inquiry about that presentation of data from

10    March of 2009.  If we turn the page, the requests are all

11    repeated, and then there are some answers.  And the first

12    request was in the P&L, section No. 2, the assumed SG&A expense

13    for selling omeprazole appears to be 15 percent of sales.

14    Please verify if this is correct.  And the response below is,

15    yes, that is correct.

16           Did counsel show you these -- this document in --

17    before you prepared your report?

18    A    I'm sorry, can you give me a second to just quickly look at

19    this?

20    Q    Sure.  I am focused on question No. 1 and response No. 1.

21    A    I'm sorry, I just don't recall one way or the other.  I was

22    focused primarily on the forecasts and how that number changed

23    in the forecasts, and I did look at the actual experience

24    particularly based on Mr. Broadhurst's analysis.  I just don't

25    recall this specific IDR.

Q    You only looked at actual experience related to the sales
and profits but not to actual experience on costs like this,
correct?

A    I am not sure what you mean.  I mean, I did refer to
doctor -- I'm sorry, Mr. Broadhurst's analysis.  I saw his
calculation, and I assume that there was some allocations that
were done on that, but, again, I don't recall specifically.
The analysis done by Mr. Epple in December of 2007 was a
reasonable estimate of the incremental SG&A based on the sum
total of information I received.

Q    It's fair to say, is it not, that in your report and your
testimony here in reviewing the projection models prepared by
the Perrigo's pharmaceutical business development group before
the ones before Mr. Schutt's July 2018 analysis, have limited
reliability in a valuation exercise because they were prepared
for business planning purposes and not for an actual
transaction?

A    Yes, I agree with that statement.

Q    Yeah.  Did you hear Mr. Schutt's testimony that these
projections were reliable and that the business development
group used the best available information in its modeling?  Did
you hear the testimony, yes or no?

A    I did hear his testimony, something to that effect, but I
don't recall the exact words that he used at this point.

Q    Did you hear Mr. Schutt's testimony that the projections

1    from the business development group were also used in

2    negotiating third-party term sheets and in real transactions?

3    You recall hearing that testimony?

4    A    I'm sorry.  Give me a moment.  I don't recall that

5    specifically.  No.  I'm sorry.

6    Q    And you have seen and heard here in trial that the results

7    of these projections by the business development group were

8    periodically presented to the board of directors?  You recall

9    that?

10   A    I do recall that testimony.  I also recall the

11   discrepancies from some of the numbers that I saw in the board

12   presentations with the numbers that were being prepared in

13   these projections.

14   Q    The May 1, 2007, board pipeline display for omeprazole had

15   a hundred million dollars, which is pretty close to the 113

16   million that Dr. Frisch was using from the projections,

17   correct?

18   A    That's consistent with my recollection.  It is also a kind

19   of a data point for me that says there is a disconnect between

20   the information that is coming out at the time and the

21   information that's available about Prilosec OTC sales and those

22   numbers.  By that time in May of 2007 those -- the sales

23   numbers were just, you know, way higher and they are still

24   relying on -- well, even if they are relying on one of those

25   projections, it's a projection that's at least a year

1    and-a-half old by then and yet they are also quoting a number

2    that's not in that projection.

3    Q    I'd appreciate if you answer my questions directly, please.

4    Many of your alternative valuations in your appendix E utilize

5    data that result in sales figures -- first year sales figures

6    significantly above the 113 million in the projections that

7    Dr. Frisch used all the way up to 240 million from Mr. Schutt's

8    July 18 model, correct?

9    A    That's correct.

10   Q    Did you hear Mr. Schutt testify that when he made his own

11   assessment in July 2007 of the number of store brand units of

12   the omeprazole drug to be sold in the first year, his number

13   was 25.8 million units and that it turned out to be almost

14   precisely the same store brand volume of units shown in the

15   models Dr. Frisch relied upon which had 25.6?  Do you recall

16   that?

17   A    I recall -- well --

18   Q    Yes or no?

19   A    That's a two-part question so that's where I'm trying to

20   reconcile.  The first part of the question, I do recall him

21   saying that his projections of the units were spot on with the

22   actual units.  The part where I think there is some

23   inconsistency is somehow that that is consistent with the units

24   in Dr. Frisch's analysis.  Those -- because any time you are

25   talking about units you need to convert them to a 14-count

1    equivalent, so the actual number of units that Perrigo US

2    actually sold were far higher than the actual number of units

3    that were in that June 2006 forecast once you adjust for the

4    14-count units.

5    Q    In fact, Mr. Schutt's testimony was -- his computation of

6    25.8 million units was consistent with the prior projections

7    that he used, 25.6 million.  Do you recall that?  Just yes or

8    no.

9    A    I don't recall that.  I'm sorry.

10   Q    And you saw that his first July 18, 2007 model, the one

11   that was communicated slightly after midnight on the 17th, had

12   sales of 147 million before he added pipe fill and RX sales

13   units to his second model on July 18, that increased sales from

14   147 to 240 million.  You recall that?

15   A    I do recall his testimony on that point, yes.

16   Q    And do you recall hearing Mr. Schutt testify that he was

17   championing the RX idea as a potential new strategy?

18   A    I did hear his testimony on that.  It was -- as I said

19   earlier, that was -- there were some indications in those

20   earlier forecasts that led me to conclude that there were at

21   least some attempts to include RX in prior forecasts as well.

22   Q    That was your inference from some of the data that you

23   looked at?  I think it said that explicitly, didn't it?

24   A    It did say it explicitly.  It said RX in the heading of the

25   data of -- the adjustment that was made to the IRI data.  So I

1  don't know what that -- the magnitude of the adjustment was

2  because it was rolled into this X factor adjustment for the

3  club sales.

4  Q    You testified, I believe, that you are familiar with the

5  Dexcel contract; that you read the Dexcel contract?

6  A    Yes, I did.

7  Q    I think that's Exhibit 263, if I am not mistaken.  Did you

8  notice that the contract only gave Perrigo exclusive

9  distribution rights for store brand OTC which would not include

10  RX OTC?  Did you read that?  Just yes or no, did you need that?

11  A    It was my understanding that it was for store brand OTC,

12  but it's also my expectation that this is -- that the RX to OTC

13  switch is embedded in that it is an OTC sale.

14  Q    Did you hear Mr. Schutt's testimony that pipe fill was a

15  one-time inventory calculation that was not intended to reflect

16  consumer demand purchases?  Did you hear that testimony, yes or

17  no?

18  A    I did to the first part.  The second part, that's the part

19  I would hesitate about, consumer demand, because ultimately all

20  sales are derived from consumers, but yes, I heard that it was

21  a one-time adjustment he made to the model.

22  Q    Inventory.  It's a one-time inventory pipe fill, filling

23  the hose?

24  A    That's correct.  That was my recollection of his -- or that

25  is my recollection of his testimony.

Q    So if we ignore the sales attributable to RX and pipe fill,
hypothetically, and focus on consumer demand sales for the
store brand product, most of the updated information from
Mr. Schutt's July 18, 2007 projections that you use in your
alternative valuation are adjustments to pricing and
profitability determinations that he made at the time in July
2007, isn't that correct?

A    Not entirely.  His adjustments to the -- he updated the
underlying IRI data, and I think we observed a major increase
in the Prilosec OTC sales, but he did reduce the market share,
the projected market share below -- for omeprazole below
Perrigo's historical experience, so that's when I mentioned it
that there were some adjustments he made to lower the
projections and some he made that increased the projections.
But I would agree that the -- that the biggest changes in his
forecast are related to pipe fill on the volumes, the ORx just
for 2009, since he didn't include those in 2010 and forward,
and then particularly on the pricing assumptions, that those
did move -- the pricing assumptions are moving the needle by
quite a bit.

Q    Can you point us to any place in your report where you
explain why you as an expert believe that the assumptions
contained in Mr. Schutt's July 2018 projections were known or
knowable in November 2006, more than eight months earlier?
Anything in your report, that's what I'm asking you first,

1    okay?

2    A    Yes.  I think I have an entire section in there where I

3    have -- that's why I do it two different ways.  I have

4    projections where I did -- where I use Mr. Schutt's forecast

5    explicitly, and then I have another one, a different set of

6    computations that used just the elements of Mr. Schutt's

7    calculations that were known and knowable.  My -- I don't

8    update the, this big important parameter, the Prilosec OTC

9    sales available from IRI.  Those I still rely even on the

10   February 2006 data.  The only ones I adjust are the pricing,

11   the market share.  Actually, I even -- I'm sorry.  I adjust the

12   pricing assumptions that Mr. Schutt used.  I used his market

13   share assumptions.  Even those market share numbers are lower.

14   So he is bringing to the table a broader set of analytical, you

15   know, techniques and framework and data in order to get a more

16   reliable projection.  So all those methodological changes and

17   those assumptions, those are the ones that I am including in

18   the June 2006 forecast to adjust those numbers to then get to

19   the number that I concluded was a known or knowable type

20   valuation.

21   Q    Yeah.  I am afraid you didn't hear my question.  I asked

22   you if there is any place in your report, and let me add, aside

23   from your calculations, that explains why you believe that

24   those elements were known or knowable in November 2006, eight

25   months before they were adopted by Mr. Schutt in his work?

1    A    I do in several places, and if you'll give me a moment to

2    review my report, I'll identify those for you.

3    Q    Okay.

4    A    So in particular I point you to paragraph 237 of my report

5    on page 103, and then in my Exhibit -- one of the E exhibits I

6    kind of walk through the specific ones.  This is E-3.  I don't

7    have the PDF number, but it's paragraph 288 that walks through

8    each of those adjustments for the next several pages.

9    Q    Well, let's look at paragraph 237.  I have also estimated

10   the value of the Dexcel contract using Perrigo's asserted

11   November 29, 2006 assignment date.  This is also the day that

12   Perrigo formed LLC.  At that time Perrigo US could have

13   implemented the modeling assumptions that Mr. Schutt

14   implemented in June/July 2007 as the information on which his

15   assumptions were based was known or knowable at the time.

16           I don't see any explanation in this paragraph as to

17   why that information was known or knowable at that time.  Can

18   you point to another place in your report where it's explained?

19   A    Yes.  You'll notice there is a footnote 338.  338 refers to

20   appendix E-3, and then E-3 walks through those changes.

21   Q    It walks through the values but it doesn't walk through an

22   explanation of why, correct?

23   A    I believe it does.  Well, I provided as much information as

24   I thought was needed for someone to understand what I did and

25   why I did it.  So I talked about Mr. Schutt's e-mail

1  correspondence in paragraph 289, so I provided what I thought

2  was a fairly detailed description, then, of what I did.

3  Q    And in your report or in your testimony you have criticized

4  Mr. Schutt's work and also Mr. Epple's projections later in the

5  year in December 2007, correct?

6  A    Well, I wouldn't say I criticized Mr. Epple.  The question

7  is really one of trying to identify a reasonable data point,

8  and by then Mr. Epple had actually corrected what I thought was

9  either an incorrect or maybe an overly conservative assumption

10 of Mr. Schutt's forecast, namely, the cost of goods sold

11 number.  He had updated the SG&A number to one percent and

12 something.  So my concern about Mr. Epple's numbers is simply

13 that they were only 2009 -- for 2008 and 2009, fiscal years

14 2008 and 2009, and they weren't available for the out years.

15 Actually, Mr. Epple's forecasts were pretty spot on for the FY

16 2008 and FY 2009 time period with their actual experience.

17 Q    Let's look at your Exhibit 5441, if we may?  Let me first

18 note in the second line that you consistently refer to the

19 June/July 2007 forecast, but the forecast, in fact, is July 18,

20 2007, isn't that correct?

21 A    That is correct.  But the IRI data that it's relying on is

22 from June so that's why I considered a June/July forecast, and

23 I can't recall when Mr. Schutt described his beginning to work

24 on it, but it was produced on July 18, 2007.  That's what I

25 recall.

1    Q    If we look at row one, the June 2006 forecast, that's the

2    13 million.  That's the forecast that Dr. Frisch used, isn't

3    it?

4    A    That's correct.

5    Q    I'm looking at 2009 fiscal year, and Mr. Schutt's forecast

6    is 240 after adding pipe fill and RX, correct?

7    A    And after lowering the market share projections, but yes.

8    And with all the other -- with his additional pricing

9    assumptions, too.

10   Q    And after concluding that the number of store brand units

11   was identical to what had been used in the prior forecast?

12   A    Well, that's the part where I don't recall Mr. Schutt

13   describing that, and that's inconsistent with -- well, again, I

14   was focused primarily on comparing actuals to the June 2006

15   forecast.  I just don't recall how Mr. Schutt's, again,

16   14-count weighted numbers would have compared to the June 2006

17   14-count numbers.

18   Q    And when we look at the December '07 it's 280,780?

19   A    That's correct.

20   Q    280 million, 281 million, approximately?

21   A    Correct.

22   Q    And you thought overall that even those projections were

23   low?

24   A    I thought the FY 2010 and forward numbers were low because

25   they simply were not updated.  So, for example, I could have

1    applied a factor of proportionality to, you know, Mr. Epple's

2    numbers, compare it to the June/July forecast, and applied

3    those to Mr. Schutt's numbers, but instead I pulled those down.

4    That's why the numbers for FY 2010 and forward are the same in

5    both the second and the third row because I think those numbers

6    are too low.

7    Q    In your direct examination you didn't talk about the

8    management's projections at the time of the approval in

9    December or later in February with the earnings call that was

10   given on February 5th.  You didn't discuss those, correct?

11   A    I did review those.  Again, this is a management -- the

12   Epple forecast is a management forecast, but it is not the same

13   as the amounts that Mr. Papa told the financial analysts on the

14   earnings call.

15   Q    Let's look at that.  Exhibit 416, please.  December 10,

16   2007, announcing the final FDA approval of the product.

17   Perrigo's announcing that.  And in the last sentence of the

18   first paragraph they refer to a full year annual sales to be a

19   range of 150 to 200 million.  That's what management was

20   willing to tell the market.

21   A    That is correct.  That is what they were willing to say in

22   an earning -- in either a press release or an earnings call.

23   Q    And if we go to Exhibit 5215, the transcript of a February

24   5, 2008, earnings call, likewise it says -- I am looking for

25   the language on the sales.  Sorry, I don't have that exhibit.

1    I can't read the screen.  Do you have it?  Again, they are

2    repeating, I would expect omeprazole to add 150 million to 200

3    million in annual sales after its launch in the next six to

4    seven weeks.  That's consistent with their announcement in

5    December, and that's what they were willing to tell the market

6    immediately before launch, correct?

7    A    I'm sorry, I think the document speaks for itself.

8    Correct.  That's what they were willing to tell the financial

9    analysts, and that's consistent with my recollection of what

10   they did tell the financial analysts.

11            MR. MAGEE:  Thank you, Dr. DeRamus.

12            THE COURT:  Any redirect?

13            MR. WEAVER:  Yes.

14            THE COURT:  All right.  Go to government redirect, and

15   the government has about an hour and 25 left and Perrigo about

16   a hour 40.

17            MR. WEAVER:  I'm sorry?

18            THE COURT:  An hour 25.  Okay.  I am giving you

19   your --

20            MR. WEAVER:  I appreciate that, Your Honor.  I am

21   hoping not to use it all.

22            THE COURT:  The equivalent of the two-minute warning

23   here.

24            MR. WEAVER:  Thank you, Your Honor.

25                    REDIRECT EXAMINATION

BY MR. WEAVER:

Q    So, Dr. DeRamus, I want to cover a few topics that were raised by Mr. Magee on the cross.  The first thing is, just so that we don't have to come back and fix the record in any way, early on Mr. Magee complained that there weren't dates associated with some of the litigation background that you included in your report.  Do you recall that?

MR. MAGEE:  Objection, Your Honor.  I didn't complain. I asked why there weren't any dates.

MR. WEAVER:  I'll rephrase.

BY MR. WEAVER:

Q    Mr. Magee noted that, do you recall that?

A    I do recall that.

Q    And I think you responded that you were recalling a separate schedule was provided to Perrigo, and maybe you did -- maybe we did, maybe we didn't.  I don't recall.  So is it possible that there was no additional schedule?  I don't know standing here.

A    I'm sorry, say that one more time.

Q    Is it possible that the only schedule of litigation experience was at the back of your report that was provided to Perrigo?

A    Well, no.  I recall providing dates.  I just don't know who did what with those dates.  It had the dates of my -- the dates that I filed reports.

1    Q    Okay.  But you don't know a hundred percent for sure

2    whether that got passed on to Perrigo?  I just don't recall.

3    A    I don't.  I don't recall.

4    Q    Okay.

5    A    I don't know.

6    Q    Just so we don't have to come back and clean up a record on

7    a minor point.

8         Now, Mr. Magee talked with you a little bit about

9    SG&A, and he pulled up an exhibit that we can't pull up on

10   screen unless -- well, we can't pull it up on screen because it

11   was, I guess -- maybe we can.  Exhibit 1089.  Exhibit 1089.

12        MR. MAGEE:  Do you want it pulled up for him?

13   BY MR. WEAVER:

14   Q    First page of 1089.  I think our operator has it.  Go to

15   the second page, please, and blow up the first part of that

16   request.

17        Now, what Mr. Magee didn't cover with you when he

18   asked you about this document was the following questions

19   related to Exhibit I of the analysis of a certain intercompany

20   transactions relating to omeprazole transfer pricing study

21   prepared by Ernst & Young dated 13 March of 2009.  This exhibit

22   contains Perrigo's initial product projections for omeprazole.

23   Do you see that?

24   A    I do see that.  Thank you.

25   Q    So what is being asked about is what E&Y was utilizing in

1    its report, correct?

2    A    That's my understanding of this, yes.

3    Q    And if we drop down to the bottom of the page, I think

4    there is some reference to 15 percent, correct?

5    A    That's correct.

6    Q    All right.  So let's first go to Exhibit 5210.  Exhibit

7    5210.  And I think this exhibit was utilized with a witness

8    some time during the course of this trial.  And if we drop

9    down, it's an e-mail chain, and you may recall it, Dr. DeRamus.

10   If we keep dropping down there was a Q&A essentially between

11   E&Y and Perrigo, and let's go to the second page.  Here is the

12   part I want to look at.  Questions on the financial model.

13   These are E&Y questions with responses.  And what I'm looking

14   for is the SG&A one.  Keep scrolling down.  Hopefully -- here

15   we go, No. 6.  Please provide a breakdown of SG&A.  Why was

16   SG&A assumed to be five percent of net sales or in the case of

17   the target scenario 1.3 percent given that Perrigo's

18   consolidated SG&A average is approximately 13 to 15 percent,

19   Andre?  And then the answer, the 1.3 percent is a calculated

20   factor being used currently on all new products.  The five

21   percent comes from the original sales department projections on

22   whether to pursue this product.  Obviously the consolidated

23   average SG&A is not a good comparison to individual products

24   because of the heavy amount recorded at corporate level.

25              Now, let's turn to an exhibit that hasn't come up in

1    trial yet but it's admitted, I believe.  Let's go to Exhibit

2    5021.  Exhibit 5021.  Well, first, do you recall reviewing

3    that?

4    A    Very much so, yes.

5    Q    Let's go to Exhibit 5021.  Here is another IDR response

6    from Perrigo, and it's transfer pricing study Exhibit I.  Do

7    you see that?

8    A    I do.

9    Q    And now if we can scroll down because I am not exactly sure

10   where it is?  Let's keep going until we find the SG&A line, and

11   I can't read this very well on screen, but there it is.  We are

12   blowing it up now.  And so you can see that notwithstanding the

13   information -- so do you see what the SG&A expense utilized by

14   E&Y was?

15   A    Yes, I do.

16   Q    It was 15 percent, wasn't it?

17   A    According to this schedule, yes.

18   Q    And so -- and this was information provided by Perrigo to

19   the IRS, so surely Perrigo knew that the E&Y studies were using

20   15 percent notwithstanding the Q&A that we just saw, isn't that

21   correct?

22   A    That would be my inference based on these documents, yes.

23   Q    Okay.  Dr. DeRamus, let's just briefly talk about that

24   Brealey and Myers exhibit.  We don't have it but we don't need

25   to put it on screen.  And there was reference to things like

1    beta, so let's just talk for a second about that.

2            There is something known as the capital asset pricing

3    model, is that correct?

4    A    That's correct.

5    Q    All right.  And is the idea behind the capital asset

6    pricing model that you build up to find out some sort of cost

7    of capital or return?  You start with the risk free rate,

8    right?

9    A    That's correct.

10   Q    And then you build up from there, don't you?

11   A    You do.

12   Q    And part of that building up process would get you to a

13   rate that included risk, correct?

14   A    That's correct.

15   Q    And part of that build up is something called the beta,

16   isn't it?

17   A    That's correct.

18   Q    Mr. Magee asked you a lot of questions about ex post and ex

19   ante in connection with the transfer pricing regs.  Do you

20   recall that?

21   A    I do recall those questions.

22   Q    And I am not asking for you to give legal opinions on those

23   transfer pricing regs, but since Mr. Magee broached the

24   subject, the -4 reg, the -4, 1.482-4, that's the regulation

25   that has to do with intangible property, correct?

1    A    That's correct.

2    Q    And -4(f)(2) and (f)(6) apply the commensurate with income

3    standard, is that generally your understanding?

4    A    That's my understanding, yes.

5    Q    And there are a couple of examples in those regulations.

6    One is called the nose split example where the IRS applies the

7    operation by making up a pretend company called nose split, do

8    you recall that?

9    A    I do.

10   Q    And do you recall there is another example in those

11   regulations where the IRS makes up a hypothetical company

12   called the Whopper Chopper, do you recall that?

13   A    I do very much.

14   Q    Or maybe that Whopper Chopper is the product in that

15   example?

16   A    Yes, it is the product.

17   Q    And do you recall in those examples in those regulations

18   that they are using actual profit experiences to come up with

19   the calculations?

20   A    Yes.  That is consistent with my recollection of those

21   regulations.

22   Q    All right.  And, finally, if we could pull up your

23   deposition, because Mr. Magee failed to read through all the

24   way to finish a quote early on in your examination.  If I could

25   refer you to page 95 of your deposition?  Let's pull that up on

1    screen, and then I am going to go to page 95, but I'm having

2    trouble finding.  Maybe I ought to turn it over the right way

3    here myself.  Okay.  So go to page 95 at the bottom.  Let's

4    start with line 17 on page 95.  Page 95, line 17.  There we go.

5    And there is a sequence of questions here.  It starts with,

6    question -- I think Mr. Magee explored this with you --

7    wouldn't the ordinary practice to -- wouldn't the ordinary

8    practice be to reprice a transaction rather than ignore it?

9    And then that's the start of the exchange.  Do you see that?

10   A    Yes, I do.

11   Q    Now, there is a long answer that Mr. Magee read some of

12   beginning at the top of -- bottom of page 95 going on and page

13   96.  I just want to focus on the last sentence in your answer.

14   If we could go down to line 16 through 18, which Mr. Magee did

15   not read into the record, and I'll just read that now.  Page

16   96, lines 16 through 18 you said, here it's very different

17   because LLC has no functions, assets, or in my conclusion no

18   risks.  Did I read that correctly?

19   A    Yes, you did.

20            MR. WEAVER:  I have no further questions.

21            THE COURT:  All right.  Thank you.  Any recross?

22            MR. MAGEE:  I have no recross, Your Honor, but I do

23   need to move into evidence Exhibit 1678 under 803(18).  It's a

24   learned treatise excerpt of Brealey and Myers Financial.

25            THE COURT:  Well, I mean, you used it for a form of

1    impeachment, I think, so it wasn't on the final pretrial order

2    and -- at least I didn't see it.

3            MR. WEAVER:  I would object, Your Honor.

4            THE COURT:  Yeah.  I don't think it comes into

5    evidence, but obviously it was used and questioned, and it's

6    perfectly fine for that purpose, but it's not substantive

7    evidence that I'll accept.  It's just part of the impeachment.

8            MR. MAGEE:  Well, it went beyond impeach, because it

9    was --

10           THE COURT:  That's my ruling.  You can appeal me so --

11           MR. MAGEE:  I accept your ruling, Your Honor.  Thank

12   you.

13           MR. WEAVER:  Your Honor, at this point what we have

14   left are two readings.  I would guess they will take less than

15   15 or 20 minutes.  If you want us to do it now, we can do it,

16   or if you want to take a break.

17           THE COURT:  Let's get through it.  That will be the

18   end of your case, then?

19           MR. WEAVER:  Yes.

20           THE COURT:  And we can get to any rebuttal from

21   Perrigo.  Let's go ahead.

22           MR. WEAVER:  Okay.  So the first, Your Honor --

23           THE COURT:  Please, yes.

24           (Witness excused, 12:02 p.m.)

25   ************************************************************

1

INDEX

2

Defendant's Witnesses:                          Page

3

DAVID DERAMUS

4

Direct Examination(Cont.) by Mr. Weaver        3
5        Cross Examination by Mr. Magee                35
Redirect Examination by Mr. Weaver           113

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE


I, Paul G. Brandell, CSR-4552, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of an excerpt from the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.



                        /s/ Paul G. Brandell
                        Paul G. Brandell, CSR-4552, RPR, CRR
                        U.S. District Court Reporter
                        399 Federal Building
                            Grand Rapids, Michigan  49503